## UNITED STATES BANKRUPTCY COURT

## EASTERN DISTRICT OF LOUISIANA

## NEW ORLEANS

\* \* \* \* \* \* \* \* \* \* \* \*

IN THE MATTER OF:            \*      NO. 07-11862

RON WILSON AND LARHONDA WILSON,  \*      SECTION "A"

       DEBTORS.            \*      CHAPTER 13

\* \* \* \* \* \* \* \* \* \* \* \*

       Transcript of the proceedings taken in the above captioned matter on **Thursday, August 21, 2008,** the Honorable Elizabeth W. Magner, United States Bankruptcy Judge, presiding.

AUDIO OPERATOR (AM):  Gaynell Donelon

AUDIO OPERATOR (PM):  Kevin Foe

TRANSCRIPTIONIST:  Sherryl Robinson
          3704 Chadwood Drive
          Harvey, Louisiana 70058
          (504) 348-3704

Proceedings recorded by electronic sound recording, transcript produced by transcription service.

**APPEARANCES:**

Harrington & Myers
By:  Kirk Myers, Esquire
2901 North Causeway Boulevard, Suite 303
Metairie, Louisiana 70002

    Representing the Debtors


The Boles Law Firm
By:  D. Clay Wirtz, Esquire
1818 Avenue of America
Monroe, Louisiana 71201

    Representing Option One Mortgage Corporation


Winstead P.C.
By:  Michael P. Cash, Esquire
1100 JP Morgan Chase Tower
600 Travis Street
Houston, Texas 77002

    Representing Dory Goebel and Fidelity


Office of the U.S. Trustee
By:  Sean Haynes, Esquire
By:  Carolyn S. Cole, Esquire
Texaco Center
400 Poydras Street, Suite 2110
New Orleans, Louisiana 70130

    Representing U.S. Trustee

I N D E X

**Dory Goebel:**

Direct Examination by Mr. Cash . . . . . . . . . . . . . . 37

Cross-Examination by Mr. Myers . . . . . . . . . . . . . . 58

Cross-Examination by Mr. Haynes. . . . . . . . . . . . . . 87

Redirect Examination by Mr. Cash . . . . . . . . . . . .111


**Arthur Simmons:**

Direct Examination by Mr. Wirtz . . . . . . . . . . . . . 119

Cross-Examination by Mr. Myers. . . . . . . . . . . . . . 179

Cross-Examination by Mr. Haynes . . . . . . . . . . . . . 203

Cross-Examination by Mr. Cash . . . . . . . . . . . . . . 242

Redirect Examination by Mr. Wirtz . . . . . . . . . . . . 260

| **EXHIBITS** | **MARKED** | **RECEIVED** |
| --- | --- | --- |
| No. 1  Screen Shot (BNKH) | 91 | 91 |
| No. 2  Corporate Resolution | 91 | 91 |
| No. 3  Arthur Simmons' File | 210 | 210 |

P R O C E E D I N G S

(Thursday, August 21, 2008)

(Call to Order of the Court)

THE COURT:  Good morning.

(All Counsel respond, "Good morning, Your Honor.")

THE COURT:  Please be seated.

THE CLERK:  Continuing this 21st day of August, 2008, Case Number 07-11862, Ron and LaRhonda Wilson.

THE COURT:  Appearances, please.

MR. MYERS:  Kirk Myers for the Debtors.

MR. WIRTZ:  Your Honor, Clay Wirtz individually and on behalf of Option One.  I have Mr. Arthur Simmons representing Option One.

THE COURT:  Thank you.

MR. CASH:  Your Honor, Mike Cash for Dory Goebel and for Fidelity.

THE COURT:  Thank you.

MR. HAYNES:  Your Honor, I'm Sean Haynes for the United States Trustee, and my colleague Carolyn Cole.

THE COURT:  All right.  The first order up is I have a Motion to Continue, thank you, and an opposition.  Let's take that one.

MR. HAYNES:  Your Honor, for the United States Trustee, I'm Sean Haynes.  Your Honor, there were actually two motions that were filed because I know that Your Honor's

1  Section A procedures require that Motions for Continuance be

2  filed at least eight days in advance of the hearing, and so, if

3  I may just address the Motion for Relief from the Section A

4  procedures?

5          THE COURT:  All right.

6          MR. HAYNES:  Your Honor, as we were preparing for the

7  hearing, you know, obviously the Court had entered its order

8  that said that today we were going to have a scheduling

9  conference with respect to the motion that the United States

10 Trustee had filed.  And of course, we referenced, you know,

11 very explicitly in that motion that we filed on June 30th that

12 we would like to go forward with some discovery in this case.

13         As we were preparing, and of course then after the

14 order was entered on that motion, the Court entered the Orders

15 to Show Cause for Ms. Goebel to be here, for Fidelity to be

16 here, and for Option One to have a representative here.  And

17 again, as we have stated in the motion, the concern was, is

18 that the United States Trustee wanted to have the opportunity

19 to go forward with the discovery.  And that to the extent that

20 we were going to get into significant evidentiary issues today,

21 or substantively deep into the case, the concern was that our

22 discovery might be mooted.

23         So, we wanted to be clear with Your Honor and, you

24 know, in consulting with the United States Trustee, we just

25 deemed it that we wanted to bring to the Court's attention as

1    we were preparing, you know, that this was an important issue

2    to the U.S. Trustee to be able to go forward with the discovery

3    if we could.

4              THE COURT:  All right.  Let me ask you this,

5    Mr. Haynes.  What I have before me is an Order to Show Cause,

6    my Order to Show Cause.

7              MR. HAYNES:  Yes, Your Honor.

8              THE COURT:  As I appreciate the status of the case,

9    and correct me if I'm wrong, the Motion for Relief was denied,

10   is that correct?

11             MR. HAYNES:  Yes, that's correct, Your Honor.

12             THE COURT:  Okay.  So, all that's up is my Order to

13   Show Cause.  So, what the U.S. Trustee is asking is for the

14   right to conduct discovery into the patterns or practices of

15   Option One in relation to the Order to Show Cause?

16             Put this in context for me, please.

17             MR. HAYNES:  Well Your Honor, I know that the Court

18   ruled on June 26th that the account was deemed to be current.

19             THE COURT:  Right.

20             MR. HAYNES:  Well, I have said yes to Your Honor's

21   question as to that the motion has been denied.  That would

22   seem to be the natural effect of the Court's ruling, so I don't

23   mean to --

24             THE COURT:  I think, if I'm not mistaken, I actually

25   ruled that the motion was denied.

1          MR. HAYNES:  Okay, all right.

2          THE COURT:  So, I think there is no motion pending at

3    this time.  I've got Mr. Cash nodding there isn't, and I've got

4    Mr. Arthur nodding there isn't, so I'm going to take it from

5    their pretense since they filed the motion, that they believe

6    their motion has been denied, and so there is no Motion for

7    Relief pending.

8          MR. HAYNES:  Okay.

9          THE COURT:  Only the Order to Show Cause.

10         MR. HAYNES:  Okay.

11         MR. MYERS:  Your Honor, if I can weigh in on this.  I

12   don't think you actually -- I think that's certainly the intent

13   of what you did.

14         THE COURT:  Right.

15         MR. MYERS:  That's certainly how I understood it, but

16   I don't think those words were actually used, because you

17   continued the motion.  You continued the motion with your

18   order.  So, from a strict scrutiny --

19         THE COURT:  You might want to check that.  I thought

20   we had checked yesterday.

21         THE CLERK:  The note on the record says denied.

22         THE COURT:  The note on the record says that the

23   motion is denied.  We don't have the order in the record,

24   evidently.

25         MR. MYERS:  But I certainly agree that that was your

1    intent.

2            THE COURT:  Okay.  All right, let's go.

3            MR. HAYNES:  All right.  Your Honor, the concern that

4    I took, that the United States Trustee took from the June 26th

5    hearing was, is inaccuracy in the affidavit which supported the

6    motion.

7            THE COURT:  Clearly, clearly.

8            MR. HAYNES:  That, Your Honor, gets to the -- is the

9    central concern of the United States Trustee.  And Your Honor,

10   you know, and implicitly, as I understand the phrasing of the

11   Orders to Show Cause, Your Honor wanted representatives of

12   Fidelity and Option to come in and explain the amounts due on

13   the mortgage loan of the Debtors.

14           THE COURT:  Right.

15           MR. HAYNES:  Implicit in that, I see Your Honor, is

16   if we know the correct amount that's due on those mortgage

17   loans, then why wasn't that correct amount stated --

18           THE COURT:  Correct.

19           MR. HAYNES:  -- in the affidavit and motion?

20           THE COURT:  Correct.

21           MR. HAYNES:  And I think Your Honor, our contention

22   is, is that there are a lot of predicate facts.  You know, it

23   would be nice if we could walk in here and someone could say,

24   "Well, this is," you know if we go A, B, C, "this is what

25   happened with this case."  But I think there are a lot of

1  predicate facts that go into explaining why there was not

2  accurate information in the affidavit and in the motion.  And

3  that's the discovery that we want to get into, Your Honor.

4          THE COURT:  I understand your position.  I guess what

5  I'm struggling with is that when I had the initial hearing on

6  this matter, I could not get the information that I wanted to

7  be able to determine how this happened.  How is it that the

8  affidavit was not correct?  How is it that this error occurred?

9  That's why I continued and asked that representatives from

10  Fidelity, and now I have the representative from Option One, be

11  here because I assumed that they would bring the people who

12  actually could answer those questions and determine whether or

13  not -- well, just the circumstances under which the affidavit

14  is -- I'll stop there.

15          The thing I'm struggling with right now, Mr. Haynes,

16  is what -- why their explanation.  I mean, the hearing today is

17  to find out what that explanation is.  To the extent that I

18  deem it insufficient, or to the extent that the U.S. Trustee's

19  Office deems it insufficient, or believes that there is

20  additional information that should be discovered, that may be

21  the grounds to ask that the matter be left open and continued.

22  I think I want to hear from these representatives today and see

23  what they are offering to the Court in response to the Order to

24  Show Cause, and then from there, determine whether I believe

25  that explanation to be sufficient.

1          That will go to their personal knowledge.  And the

2     extent to which they can offer the explanation of what

3     happened, and then I'll make the determination on whether I

4     want more information supplied.

5          MR. HAYNES:  I understand, Your Honor.  And

6     Your Honor, in terms of the involvement of the United States

7     Trustee today, the concern then if we go into the evidence is,

8     you know, we are going to be in a status that we have not

9     previously obtained discovery, you know, depositions, documents

10    from these witnesses, so it's going to be difficult to satisfy

11    ourselves that the testimony of these witnesses has been tested

12    against what we learned in discovery.

13         So, to the extent we may, we would like to reserve

14    the right to further cross-examine witnesses or put on our own

15    proof if the Court deems that that would be appropriate.

16         THE COURT:  Okay.  And this is the other issue that I

17    have.  It's that typically an Order to Show Cause is between

18    the party and the Court.

19         MR. HAYNES:  Yes, Your Honor.

20         THE COURT:  It's not your typical adversary

21    proceeding.  And I know that, for example, Judge Brown has

22    conducted his own Orders to Show Cause and got into extensive

23    discovery with the U.S. Trustee's Office leading the way.  I

24    have read all of the pleadings and I welcome your involvement,

25    but I do have some reservations about my institution of a

1 particular matter, and then it sort of being taken over by

2 the U.S. Trustee's Office.

3        And when I say "taken over," I don't mean that in a

4 pejorative way or a derogatory way.  But what I would prefer to

5 see, if there are, you believe, more significant problems with

6 this particular lender or in this particular case, is a request

7 for an examination under the Bankruptcy Rules, even pre-

8 adversary, and then an adversary proceeding filed by the U.S.

9 Trustee's Office, because I think that would be the proper

10 procedural vehicle to bring whatever issues you're concerned

11 about to a head.

12        It may be that you need a 2004 examination, a request

13 for a 2004 examination and then if you glean from that

14 examination, sufficient facts which would warrant bringing, you

15 know, something to the attention of the Court, then you file an

16 adversary and we would take it up in the traditional method.

17        MR. HAYNES:  All right Your Honor, if I may say that,

18 because this is an issue of importance to my client as to, in

19 this district before Your Honor, Your Honor's preference.  And

20 what I hear Your Honor saying is that a proceeding under Rule

21 2004, an examination under Rule 2004 might be an appropriate

22 way that the U.S. Trustee would file a motion with Your Honor

23 stating the predicate for wanting to examine a particular party

24 or a particular entity or person, and that if that motion is

25 granted, then we go forward with the discovery and then we make

1   our own analysis if we decide to file an adversary proceeding

2   or some other appropriate filing.  That would be the ideal way

3   for Your Honor, as I understand.

4           THE COURT:  Because I have some hesitancy with the

5   Court really conducting what amounts to an adversary proceeding

6   on its own.  I mean, I do file Orders to Show Cause when I

7   believe that there is an unexplained problem with a pleading

8   like a 9011 issue, which is where I am today.  I've got a

9   pleading filed in the Court that is incorrect and I want to get

10  to the bottom of that.

11          But a third party entering in on my Order to Show

12  Cause, I'm a little unclear about.

13          MR. HAYNES:  Yes, Your Honor.  And obviously, the

14  United States Trustee, the desire is to assist the Court.

15          THE COURT:  I understand.

16          MR. HAYNES:  And being a means of obtaining the

17  information.

18          THE COURT:  I'm not -- believe me, I welcome all of

19  the assistance.  I've got plenty enough to do on my own.

20          MR. HAYNES:  Yes, Your Honor.

21          THE COURT:  So, this is not to say that I'm upset

22  that you're here or I think it's inappropriate that you're

23  concerned or that you're involved.  I welcome any review and

24  anything that you can do.  I am just trying to get my hands

25  around this particular procedural issue.

1          MR. HAYNES:  Yes, Your Honor.

2          THE COURT:  That's fair enough.  All right.

3          MR. HAYNES:  Thank you, Your Honor.

4          THE COURT:  All right.  Let's hear from Option One

5     and Fidelity.

6          MR. WIRTZ:  Your Honor, Clay Wirtz on behalf of

7     Option One.  I agree with everything that Your Honor stated as

8     far as our understanding of the scope of these proceedings and

9     what was going to be your focus, and that is mainly, you know,

10    how we got to this place with the pleadings.  And so, we are

11    here to answer the Court's questions as best we can, to help

12    you to get to the bottom of that.  So, we agree with everything

13    that Your Honor has stated.

14         THE COURT:  Okay.  Why don't you get whoever you

15    believe, Mr. Wirtz, is the appropriate party to take the stand

16    and explain how the affidavit was signed and the numbers were

17    calculated?

18         MR. WIRTZ:  Okay.  If I may, Your Honor, may I confer

19    with the attorney Mike Cash?

20         THE COURT:  Yes.

21        (Pause.)

22         MR. CASH:  Your Honor, Mike Cash for Dory Goebel and

23    Fidelity.  First, I would like to thank the Court for allowing

24    me to appear here.

25         THE COURT:  Thank you for coming.

1          MR. CASH:  We have filed what I can only deem as an

2     unusual pleading to be involved.  If I could give the Court a

3     little background, so they understand who all the players are.

4          THE COURT:  All right.

5          MR. CASH:  Fidelity does work for Option One, and

6     basically Fidelity's role is almost as a conduit and storage of

7     information and data.  Option One will send their information

8     to Fidelity, and then attorneys such as Clay can access that

9     information.

10         THE COURT:  Let's get the formal names.  What is

11    Fidelity's formal name?

12         MR. CASH:  At this point it's Lender Processing

13    Services, Inc. as of July 1st, Your Honor.

14         THE COURT:  Okay, Lender Processing.

15         MR. CASH:  It was a --

16         THE COURT:  And what was former name?

17         MR. CASH:  Fidelity, in this instance it was Fidelity

18    National Information Services.

19         THE COURT:  All right.  All right?

20         MR. CASH:  What would happen, Your Honor, is that

21    basically Fidelity became -- if you think if it almost as a

22    library, various clients could put their information in that

23    library.  The attorneys would go to the library, check out the

24    information, and that's how things would happen.  One of the

25    services that we provided, and no longer do, but one that we

1  did is executing affidavits such as the one in this case.

2          THE COURT:  Okay.

3          MR. CASH:  Ms. Goebel is an employee of Fidelity.

4  The various clients in this case, including Option One, would

5  sign a corporate resolution, and I have a copy of a corporate

6  resolution, that would give her limited authority as a vice

7  president for particular purposes.  And in this case one of the

8  purposes was executing the affidavit.

9          THE COURT:  All right.

10          MR. CASH:  I think what we are going to see here is

11  that, and when Ms. Goebel would execute the affidavit she would

12  have access to the same information as someone at Option One.

13  She would go into their system, look at what has been posted,

14  what hasn't been posted.  And I think what happened here was

15  just a series of miscommunications and we'll put on the

16  testimony.

17          But so that the Court knows where we are going, I

18  have the screen shot, which I will give to the Court, which

19  will show what Ms. Goebel saw.

20          THE COURT:  Let me ask you a question.

21          MR. CASH:  Yes, Your Honor.

22          THE COURT:  In terms of the information, did Option

23  One receive and process all payments on the account and enter

24  charges, or did Fidelity do that?

25          MR. CASH:  Option One does that.

1          THE COURT:  Okay.

2          MR. CASH:  Fidelity does not do that.

3          THE COURT:  So when, in the simplest form, when a

4    check is received as a payment on account, it goes to Option

5    One?

6          MR. CASH:  Yes, Your Honor.

7          THE COURT:  Option One processes that payment.

8    Option One enters onto its computer system the entry of the

9    payment, and then that is picked up by Fidelity?

10         MR. CASH:  Yes, Your Honor.

11         THE COURT:  Is that the way it works?

12         MR. CASH:  Basically, the --

13         THE COURT:  So, is there an interface between the

14   Fidelity computer system and the Option computer system?

15         MR. CASH:  It's basically Option One posts it -- in

16   the system they use, it's basically part of and plugs into the

17   Fidelity system, so it would be on Option One's books and

18   records and we will have access to that through our screen

19   shots, as well.

20         THE COURT:  Okay.

21         MR. CASH:  And so, yes, there is an interface.

22         THE COURT:  Is there a separate computer system that

23   Option One maintains and then it just interfaces with Fidelity,

24   or does Option One use Fidelity's system as its own?

25         MR. CASH:  Both.

1          THE COURT:  Both, okay.  Explain it to me.

2          MR. CASH:  It doesn't use it as their own.  They have

3    their own system, but then information is posted on the --

4          THE COURT:  On the Fidelity system.

5          MR. CASH:  -- on the Fidelity system.

6          THE COURT:  So, they are actually posting onto your

7    system?

8          MR. CASH:  Yes, I believe that's correct.

9          THE COURT:  Okay.

10          MR. CASH:  More or less.

11          THE COURT:  Well, the witness is going to end up

12    giving me that, because she's like it's a little more complex

13    than that, is what I think I'm hearing.

14          MS. GOEBEL:  Yes.

15          THE COURT:  All right.

16          MR. CASH:  I think that in simplest terms, that

17    that's basically what happens, Your Honor.  It's a very

18    proprietary and obviously, high tech system, but that is, in

19    short, it basically, the information that is in Option One's

20    system is accessible through Fidelity's system to the Fidelity

21    employees who are assigned to the Option One account.

22          THE COURT:  All right.  Who codes, when an expense is

23    entered onto the system, Option One says an inspection fee or a

24    late charge has been incurred?  Does Option One code that

25    expense onto the Fidelity system, or is it just entered and the

1   Fidelity system codes it?

2           MR. CASH:  I do not know the answer to that question,

3   Your Honor.

4           THE COURT:  Okay.  And the other question that I had

5   for you was:  Who audits or ensures that the system is correct,

6   for accuracy?

7           MR. CASH:  I think Option One has to make sure that

8   their postings are correct.

9           THE COURT:  All right.

10          MR. CASH:  And what we really have access to is that

11  system.  And I think that the simple explanation here,

12  Your Honor, and I think it's one that's clearly human error

13  that can happen, is there was a payment sent.  There was an

14  error made where that payment was sent, because this was in

15  bankruptcy and there had been a default that it was already

16  past due, that that payment was sent to the Boles Firm, rather

17  than being posted.  And that was basically, I think, someone in

18  Mr. Wirtz's office had instructed Option One, "Send us the

19  checks and we will send them back," or "we will take care of

20  that."

21          THE COURT:  Okay.  And Mr. Wirtz is hired by Option

22  One?

23          MR. CASH:  Yes.

24          MR. WIRTZ:  Yes.

25          THE COURT:  Okay.  You have no contractual

1  relationship with Mr. Wirtz?

2          MR. CASH:  We do have a contractual relationship.

3          THE COURT:  Okay.

4          MR. CASH:  And let me explain how that works,

5  Your Honor.

6          THE COURT:  All right.

7          MR. CASH:  Basically, what we have is we have clients

8  like Option One who will sign up with us, and they are our

9  clients.

10          THE COURT:  Okay.

11          MR. CASH:  They want to utilize our system because it

12  basically cuts out a lot of work for them.  They don't have to

13  process a lot of things that Fidelity will basically do that in

14  their stead.

15          THE COURT:  Like?

16          MR. CASH:  For example, organizing the documents,

17  having a place where the attorneys can access it quickly,

18  rather than having 20 phone calls to people who are -- there is

19  a laptop, a desktop where you can go to and you can access all

20  of the information if you are the attorney.

21          THE COURT:  So, the mortgage, the note, the

22  recordation information?

23          MR. CASH:  Payment information, processing, all of

24  that.

25          THE COURT:  Abstract information, closing documents?

1          MR. CASH:  I believe that --

2          THE COURT:  Are they all put in a database?

3          MR. CASH:  -- all of the things that they need, the

4     attorneys can get through our system.

5          THE COURT:  And when you say "need," need for

6     collection?

7          MR. CASH:  Need for collection, need for negotiation

8     with the Debtor, need for foreclosure, need for bankruptcy

9     proceedings.  Basically, in fact at one point --

10          THE COURT:  But essentially, it's a collection

11     process?

12          MR. CASH:  Correct, like I say, a library.

13          THE COURT:  So, it might be a rework or a

14     negotiation, but it's all in the context of a default and a

15     collection process?

16          MR. CASH:  Correct, Your Honor.

17          THE COURT:  Okay.

18          MR. CASH:  So, if you think of it as rather than

19     having to drive all over town to try to find a book, you can go

20     to this one spot.  So, that's from the lender's side, that's

21     what we have.

22          Then, from the attorney's side, attorneys sign up on

23     a network with us to be able to utilize our system and are

24     charged to use our system.  We don't choose the attorneys.

25     Basically, what will happen is Option One may say, "Here's the

1  attorneys we use."  But for them to efficiently -- for this

2  to work for us, Option One, for them to efficiently access our

3  information, they are going to have to sign up with Fidelity,

4  because that's where we are going to put our information.

5          THE COURT:  All right.

6          MR. CASH:  So, we have a separate --

7          THE COURT:  Well, let me get this straight.  There

8  are lawyers that sign up to join a network?

9          MR. CASH:  Correct.

10          THE COURT:  That gives them access to your system?

11          MR. CASH:  Correct.

12          THE COURT:  Now that, I assume the Boles Firm is a

13  member of the network?

14          MR. CASH:  Correct.

15          THE COURT:  Suppose Option One says, "I don't want

16  to use the Boles Firm, I want to use Jones Walker in New

17  Orleans," and Jones Walker is not a member of your network.

18  Can Jones Walker get access to Option's information on your

19  network?

20          MR. CASH:  No.

21          THE COURT:  Okay.  Why?

22          MR. CASH:  Because our network is a product and they

23  would have to -- if you think of it as you have to buy a

24  membership to our library to check out the books.  Now, they

25  could still represent --

1          THE COURT:  But I thought Option One had already

2   paid for you to have that information stored?

3          MR. CASH:  There is no charge to Option One.

4          THE COURT:  Okay.  So all of the information that

5   Option One puts on your network is free?

6          MR. CASH:  Yes.

7          THE COURT:  Okay.

8          MR. CASH:  It is a service to them.  The attorneys

9   are charged.

10          THE COURT:  All right.  So, there is no contract or,

11   well I assume there is a contract between you and Option One?

12          MR. CASH:  There is, Your Honor.

13          THE COURT:  But there is no fee?

14          MR. CASH:  That is correct.

15          THE COURT:  So, Option One enters all the information

16   onto your system, free of charge.  It's stored there.  For

17   anyone other than Option One, I assume, to get access to it,

18   they have to pay a fee?

19          MR. CASH:  Correct, Your Honor.

20          THE COURT:  All right.  What is the fee?

21          MR. CASH:  It varies.  It depends on if you think of

22   Westlaw.  Westlaw charges, there's hourly or transactional.

23   What we do is basically charge a flat fee and we tie it, and

24   there's actually a menu, and we tie it directly to a service.

25   For example, we have been able through our experience to know

1  you're going to access our system for a certain amount of

2  information if you do a proof of claim.

3          THE COURT:  All right.

4          MR. CASH:  So, for a proof of claim, they're $65, I

5  believe.

6          THE COURT:  Okay.  So, it's by task?

7          MR. CASH:  It's by task.

8          THE COURT:  Okay.

9          MR. MYERS:  Your Honor, if we could back up just so

10 that while we're on the record, could we get the names of the

11 Louisiana attorneys, because I don't think it's very many?

12         THE COURT:  Okay.  How many members are there from

13 Louisiana?

14         MR. CASH:  I don't know.  I don't know who the

15 Louisiana attorneys are, Your Honor.  That's not information

16 that I --

17         THE COURT:  Okay, all right.

18         MR. CASH:  I was focused on this issue.

19         THE COURT:  All right.  So, what happens is the

20 members sign up and they pay some initial membership fee, is

21 that correct?

22         MR. CASH:  No, they do not.

23         THE COURT:  No?  So, it's just by task?

24         MR. CASH:  They do basically, it's just by task.

25         THE COURT:  So, if it's a one file representation,

1   then it's one file and they don't have to buy a membership

2   that costs more?

3           MR. CASH:  Correct.

4           THE COURT:  Okay.  So, they're charged by the task.

5   A proof of claim might be a certain charge, $65?

6           MR. CASH:  Correct.

7           THE COURT:  Let's just say that.  And then, I assume

8   filing a Motion for Relief from the Automatic Stay is a

9   different charge?

10          MR. CASH:  There are various charges and there are a

11  number of things that there is no charge for.

12          THE COURT:  Okay.

13          MR. CASH:  Simply because our experience is that our

14  system really isn't something that assists in that.  For

15  example, a hearing like today, there's no charge for that

16  because that's not something that's in the system that uses the

17  data that it basically would charge a fee for that.

18          THE COURT:  All right.  So, the lawyer pays by the

19  task?

20          MR. CASH:  Correct.

21          THE COURT:  With you.  The lawyer though works for

22  Option One?

23          MR. CASH:  Correct.

24          THE COURT:  He's the attorney for Option One?

25          MR. CASH:  Right.

1              THE COURT:  Okay.

2              MR. CASH:  We do not have an attorney/client

3     relationship.

4              THE COURT:  All right.  Tell me about the affidavits,

5     how do they work into this?

6              MR. CASH:  Well, as of this time that this was

7     signed.

8              THE COURT:  Well, as of the time that this was, this

9     motion.

10             MR. CASH:  Right, as of the time at issue here.  One

11    of the things that we would do, Your Honor, is after there was

12    appropriate signing authority and a corporate resolution that

13    would give someone at Fidelity signing authority then we would

14    execute the affidavit.  The affidavits were prepared by the law

15    firm.  We would review the screen shots, which is basically the

16    system, to see what was posted, what wasn't posted, what the

17    amounts were that were due and owing, and then we would, our

18    employee would execute the affidavit based upon that

19    information.

20             THE COURT:  Now, is there a charge for that service?

21             MR. CASH:  I don't believe there was a separate

22    charge for that service, no, Your Honor.

23             MR. MYERS:  And Your Honor, it was mentioned that

24    there was a corporate resolution available.  Could I look at

25    that while we're talking?

1          THE COURT:  All right.

2          MR. MYERS:  And is that the corporate resolution in

3  this case.

4          MR. CASH:  Yes, sir.

5          MR. MYERS:  Thank you.

6          MR. WIRTZ:  Is there another copy?

7          MR. CASH:  I'll get you one.  You can only do so many

8  things at one time.

9          MR. WIRTZ:  Thank you.

10          THE COURT:  Okay.  Why is it, I'm curious, why did it

11  develop that your firm would -- your firm, your client.

12          MR. CASH:  I understand.

13          THE COURT:  Would sign these affidavits if Fidelity

14  is merely storing information?  Why wouldn't Option One sign

15  the affidavit?

16          MR. CASH:  You know, a number of clients sign their

17  own, Your Honor.  Sometimes they would want us to, simply

18  because we have people like Ms. Goebel who handle the accounts

19  on a daily basis, who review the material, who have access to

20  the material, and it was simply one less thing that the client

21  had to do, that we would do.

22          THE COURT:  Okay, all right.  All right, so let's

23  talk about this particular case and the affidavit that was --

24  well, let me back up.

25          MR. CASH:  All right.

1          THE COURT:  You were about to say that there was a

2   different company that the network of attorneys belonged to?

3   Did you say that?  Were you starting with that?

4          MR. CASH:  No.

5          THE COURT:  No.  So, this is all under Fidelity

6   National Information Services, now Lender Processing Services,

7   Inc.?

8          MR. CASH:  Correct.

9          THE COURT:  All right.

10          MR. CASH:  And what you had asked, Your Honor, is

11  let's say if they want to use someone else, and other than

12  someone who is in the Fidelity network.  Certainly, Option One

13  is free to use any attorney they want, and their attorney does

14  not have to be part of our network.  It's just to have the

15  convenience of basically going to the library and having one

16  stop shopping, which is what makes this system easier for both

17  the attorney and the client.

18          And the attorneys will also bill through our system.

19  They'll send invoices.  There are ways for the attorney to

20  communicate directly with the client through the system in

21  terms of notes and information, and it has been discovered by

22  the attorneys and the client to be a faster flow than kind of

23  the old style, "I'm trying to call John and I can't get John on

24  the phone and he's out on vacation."  This basically gives them

25  everything in one place.  But if they wanted to use a different

1    firm that firm could do it the way it has always been done.

2              THE COURT:  Well, but all it gives them is the

3    information that has been placed on the system by Option One,

4    correct?

5              MR. CASH:  Right.  But let's say that the attorney

6    has a question about something.

7              THE COURT:  All right.

8              MR. CASH:  They can type in the system the question,

9    and rather than it being lost in a sea of e-mails, it basically

10   will go through the Fidelity system.  Someone on the Option One

11   side will get that, and there is actually a communication

12   process through the system, which we have found --

13             THE COURT:  Explain that to me.

14             MR. CASH:  -- is more efficient.

15             THE COURT:  Explain that to me.

16             MR. CASH:  Let's say that I'm your lawyer, you're the

17   lender, and I have a question about a payment that isn't

18   posted.  I will send -- I will basically sit at my desk, I will

19   type in the system, "note."

20             And it will say:  Question about payment on, you

21   know, 12/1/05.

22             That will basically go to your end.  When you log

23   onto the system, you will look at it and you will respond to

24   that note.  And if it's something that's urgent you can flag it

25   and raise it to a higher level where I would see that as soon

1   as I pull up my system as the attorney. One of the things

2   that is monitored and one of the things that I think Fidelity

3   assists in, is the timeliness of responses. So, there is an

4   incentive to timely respond if you are in the Fidelity network

5   of attorneys.

6          THE COURT: Okay.

7          MR. CASH: And we keep track of that for the clients.

8          THE COURT: Let's talk about that. It raised two

9   thoughts in my mind. The first one was a client doesn't pay

10   the note on time, post-confirmation.

11          MR. CASH: Okay.

12          THE COURT: No payment received.

13          MR. CASH: All right.

14          THE COURT: Option One has nothing to post, to log in

15   for that month. We'll get into what Option One will do in that

16   situation, but does Fidelity National -- does its computer

17   system have an automatic what I will call triggering or flag

18   event that sends out a message that the loan is in default, or

19   to the lawyer, or that a payment has not been received?

20          MR. CASH: It is the client's decision, because there

21   are -- some clients may not want to trigger a default or do

22   anything about a default until it's 60 days past due. Others

23   may want it to be 90 days past due.

24          THE COURT: Okay, but that's my question.

25          MR. CASH: So, the client controls that.

1          THE COURT:  Does Option One say to Fidelity at the

2     beginning of the relationship, "When a loan is 60 days past

3     due, I want a triggering notice of default"?

4          MR. CASH:  I am not sure if that type of trigger is

5     in the system, Your Honor, where it would basically let them

6     know a payment hasn't been received.  But I do not believe that

7     there are automatic triggers of that nature.

8          THE COURT:  Okay.  What is the -- how does the lawyer

9     -- if all of the communication is going through the system from

10    Fidelity down to the Boles Firm and up to Option One, how does

11    Option One tell the lawyer that it wants a Motion for Relief

12    filed?

13         MR. CASH:  There are a number of ways, Your Honor.

14    And if I said all of the communication goes through the system,

15    that's not accurate.  Certainly, telephonic communication still

16    happens.  Communication outside the system still happens.

17    Verification outside the system still happens.  But if Option

18    One wants to file a Motion for Relief, all they have to do is

19    basically communicate Motion for Relief, which will go from

20    Option One to the lawyer.

21         THE COURT:  Is that how it happened in this

22    particular relationship?

23         MR. CASH:  I believe that it was, yes, Your Honor.

24         THE COURT:  So, each individual file, there's an

25    individual order from Option One to Counsel, and there's no

1  automatic?

2          MR. CASH:  I believe --

3          THE COURT:  Okay.

4          MR. CASH:  Yes, I believe that that's correct,

5  Your Honor.

6          THE COURT:  Okay.

7          MR. MYERS:  I'm sorry, Your Honor.  On the

8  communication thing can, for example on this case, can Clay

9  Wirtz pick up the phone and call Option One directly and say,

10  "I have a question"?

11          MR. CASH:  Sure, absolutely.  I mean, there's no

12  prohibition against it.

13          MR. MYERS:  Okay.

14          MR. CASH:  I mean he's the attorney, and he's the

15  client.

16          THE COURT:  Where does national counsel fit in?

17          MR. CASH:  Where does what?

18          THE COURT:  Where does national counsel fit in?  Does

19  Option One have national counsel?

20          MR. CASH:  I don't know if Option One has national

21  counsel that oversees.

22          THE COURT:  Okay.

23          MR. CASH:  That's not something that we would be

24  involved in.

25          THE COURT:  All right.

1          MR. CASH:  But certainly, if Mr. Wirtz has any

2     question whatsoever he is free to, and I assume, does

3     communicate with his client.

4          THE COURT:  Okay.

5          MR. CASH:  And that's --

6          THE COURT:  Now, let's talk about the time of the

7     services.  You mentioned that Fidelity monitors the timeliness

8     of the requests and how fast the parties respond.  Now, you've

9     just said it in a general term, but I assume that you are

10    monitoring the timeliness of the response of the attorneys and

11    not of the lenders?

12         MR. CASH:  Correct.

13         THE COURT:  So, if the attorney types in a note to

14    the lender that says, you know, "Client's claiming payment on

15    December 1 in the amount of $750, not posted on the screens.

16    Please advise."  You're not monitoring how long it takes the

17    lender to respond to that?

18         MR. CASH:  No, Your Honor.

19         THE COURT:  It's the other way around, if the lender

20    says, "File a Motion for Relief," you're monitoring how long it

21    takes the lawyer to file the Motion for Relief?

22         MR. CASH:  Right.  What we monitor is how responsive

23    they are to the client's request.  Now, we certainly --

24         THE COURT:  Which translates into how quickly they do

25    the requested task?

1          MR. CASH:  Correct.

2          THE COURT:  All right.

3          MR. CASH:  Now, what we can't monitor --

4          THE COURT:  Okay.  Let's talk about that.  How is

5   that -- what are the parameters?  How is that done?

6          MR. CASH:  It depends upon the client.  Different

7   clients will have different time tables that they want things

8   done by.

9          THE COURT:  Let's talk about this client.

10         MR. CASH:  I do not know Option One's specific

11  parameters.

12         THE COURT:  Okay.  All right, now tell me about what

13  you would report.  That, let's assume that Option One says that

14  it wants a Motion for Relief filed within 24 hours of the

15  request.

16         MR. CASH:  I don't think anybody has that short of a

17  time table.  But if that was the time table --

18         THE COURT:  Okay.

19         MR. CASH:  Let's say that that was the time table.

20         THE COURT:  Give me a normal one.  Give me a normal

21  one.

22         MR. CASH:  Let's say that it's from the time Option

23  One requests a Motion for Relief.  Their, let's say

24  hypothetically, that their time table is we would like that

25  filed within seven days of that request.

1          THE COURT:  All right.

2          MR. CASH:  We monitor --

3          THE COURT:  A week.

4          MR. CASH:  We monitor whether or not that is done.

5          THE COURT:  All right.

6          MR. CASH:  Is it done timely, or is it not done

7     timely?

8          THE COURT:  And you give -- do you give Option One a

9     report on that?

10          MR. CASH:  Yes.

11          THE COURT:  Okay.  So, how often is the report

12     delivered?

13          MR. CASH:  I believe, if I'm not mistaken, that there

14     are monthly reports that the clients can review on all of the

15     lawyers across the country --

16          THE COURT:  Okay.

17          MR. CASH:  -- who do work for that particular client.

18          THE COURT:  So, if the Boles Firm is handling Option

19     One's foreclosure and bankruptcy work in Louisiana, once a

20     month a report on their responsiveness, as you call, would be

21     delivered to Option One?

22          MR. CASH:  Yes, Your Honor.

23          THE COURT:  And it would set forth, I assume, however

24     many requests there were for a Motion for Relief, and does it

25     say the percentage that were within the parameters?  Is it

1    seven days?  Or does it say the percentage that were outside,

2    or does it go file by file?

3           MR. CASH:  I don't know that it's in that detail as

4    much as an overall timeliness on requests from the client.

5           THE COURT:  Okay, on the affidavit, because that's

6    part of a Motion for Relief, or even on the calculation of the

7    amounts on the proof of claim.  Wait, let me back up.

8           Proof of claims; the lawyers prepare the proofs of

9    claim, or Fidelity prepares the proof of claim, or Option One

10   prepares the proof of claim?

11          MR. CASH:  I know Fidelity does not prepare the

12   proofs of claim.  I would assume that the law firm does,

13   although I can't speak to that because I don't know that.

14          THE COURT:  Who signs the proofs of claim?

15          MR. CASH:  I think that either -- I think proofs of

16   claim are signed by the client.

17          THE COURT:  Okay.

18          MR. CASH:  I know we do not.

19          THE COURT:  Okay.  Are there also time requirements

20   on proofs of claim?

21          MR. CASH:  I think it varies by client.  I think some

22   clients may have.

23          THE COURT:  But that's one of the tasks that's

24   monitored?

25          MR. CASH:  Certainly, I believe that that is

1  correct.

2        MR. SIMMONS:  Correction.  The lawyer --

3        THE COURT:  I will let you testify.

4        MR. SIMMONS:  Okay, okay.

5        THE COURT:  I'm hearing from the lawyer right now.

6        MR. SIMMONS:  Okay.

7        THE COURT:  I'm just getting the background.

8        MR. SIMMONS:  Okay.

9        THE COURT:  So that we can maybe make the testimony

10 go faster.

11        MR. SIMMONS:  Okay.

12        THE COURT:  All right.  So, the preparation, you

13 think that those are monitored?

14        MR. CASH:  But I'm not sure of that, Your Honor.

15        THE COURT:  Okay.  Do you know any other tasks that

16 are monitored?

17        MR. CASH:  No, I do not.

18        THE COURT:  All right.  Does Fidelity do any internal

19 audits to ensure the accuracy of its system?

20        MR. CASH:  Oh, I'm sure we do.  Yes, Your Honor.

21        THE COURT:  Okay.  And what are those?

22        MR. CASH:  That's not something that I have looked

23 into because it wasn't something that I thought would be an

24 issue here today.

25        THE COURT:  Okay.  All right, let's hear some

1    testimony then.

2              MR. CASH:  Okay.

3              THE COURT:  All right.

4              MR. CASH:  Dory, why don't we start with you?

5              THE WITNESS:  Okay.

6              MR. CASH:  Your Honor, where would you like the

7    witness?  Right here (indicating)?

8              THE COURT:  Yes.

9              THE CLERK:  Please raise your right hand.

10                  *   *   *   *   *

11                  **DORY GOEBEL, WITNESS, SWORN**

12                  *   *   *   *   *

13                     DIRECT EXAMINATION

14   BY MR. CASH:

15   Q.   Dory, will you please state your name for the record?

16   A.   My name is Dory Goebel.

17   Q.   All right.  And how are you employed?

18   A.   I am employed by Lender Processing Services.

19   Q.   And what is your position with LPS?

20   A.   I am an assistant vice president in the Bankruptcy Support

21   Department.

22   Q.   Okay.  As one of your duties in the past, and I understand

23   that that may have changed, but in the past, was one of your

24   duties to sign affidavits in support of Motions for Relief from

25   Stay?

1   A.   Yes.

2   Q.   Okay.  And in this particular case you signed one, is that

3   correct?

4   A.   That is correct.

5   Q.   Okay.

6        MR. CASH:  Your Honor, I have pre-marked these

7   exhibits that I would use, but I will call them by the exhibit

8   numbers that they have been marked, if the Court agrees.

9        THE COURT:  That's fine.

10  BY MR. CASH:

11  Q.   I'm going to hand you a copy of the affidavit, Ms. Goebel,

12  that you executed in this case.

13  A.   (Witness examines document.)

14  Q.   Do you recognize that?

15  A.   Yes.

16  Q.   All right.  And I understand you may not have a specific

17  recollection of this specific affidavit?

18  A.   I recognize that it's an affidavit of debt, not

19  necessarily this specific affidavit.

20  Q.   All right.  And would you tell the Court the process you

21  go through when you execute such an affidavit?

22  A.   To execute such an affidavit, once I receive the

23  affidavit, I will review the information that is in the

24  affidavit with Option One's system.  So, I will validate the

25  information based on their system and the information that is

1  there.

2  Q.   All right.  And tell me how that works.  Do you go, from

3  your desk can you log into and look at the Option One system,

4  or would you explain that to the Court?

5  A.   Yes.  From my desk, once I receive the affidavit I will --

6  there is a loan number, or there's client service loan numbers.

7  I will go into Option One's system where they keep their

8  business records and I can sign in right from my desktop, so I

9  have a log in that I will log in to there and look at this

10 client's loan number and look at this specific loan.

11            THE COURT:  When you say you log into Option One's

12 system, are you talking about Option One's independent computer

13 system, or the information that Option One has placed on the

14 Fidelity National database?

15            THE WITNESS:  This is Option One's system where they

16 keep all of their business records.  I can go into their system

17 of records.

18            THE COURT:  All right.  So, is your testimony that as

19 far as you know there is no independent computer system for

20 Option One?

21            THE WITNESS:  It is Option One's independent computer

22 system.  We have access to that system that we are able to sign

23 in to.

24            THE COURT:  All right.  But you heard your Counsel --

25            THE WITNESS:  Uh-huh. (affirmative response)

1          THE COURT:  -- describe that there is an actual

2    Fidelity National Information Services database?

3          THE WITNESS:  Yes.

4          THE COURT:  You're not looking at that?

5          THE WITNESS:  We also look into there.  There's two

6    systems.  There's Option One's system with the business

7    records, and then there's the Fidelity National system that we

8    can sign in to where the communication happens between the law

9    firms and Option One.

10         THE COURT:  All right.  So, what you're describing is

11   that the Fidelity system is simply for communication purposes,

12   but that the Option One's database system is their entire

13   mainframe computer system?

14         THE WITNESS:  Correct.

15         THE COURT:  So, you can get into any account at

16   Option One and in their entire mainframe computer system?

17         THE WITNESS:  Yes.

18         THE COURT:  Okay, everything?

19         THE WITNESS:  We have -- Option One gives us specific

20   access, based on what services we provide for them.  So, they

21   have security levels and they authorize us certain security, so

22   we've got certain loans and certain information.

23         THE COURT:  All right.  So, what you're describing is

24   that Fidelity National Information Services does not maintain

25   its own database, that it's using the client's database?

1          THE WITNESS:  We have our own database in

2     connection that directly works in connection with Option One's

3     database.

4          THE COURT:  And what does it do?

5          THE WITNESS:  It houses --

6          THE COURT:  You said it only goes --

7          THE WITNESS:  It houses information, it houses, like

8     Counsel explained it, it houses documents and information, kind

9     of a storage library for the attorneys and the clients.

10         THE COURT:  I thought it housed the account

11    information?

12         THE WITNESS:  It has account information directly in

13    relation to the default.  The cash posting and applications are

14    done within Option One's mainframe system, so we also access

15    that at the time the affidavit is executed.

16         THE COURT:  All right.  Tell me the difference

17    between the two, what Fidelity maintains and what Option One

18    maintains?

19         THE WITNESS:  Fidelity maintains, basically, the

20    library or the information that Option One supplies --

21         THE COURT:  What information?

22         THE WITNESS:  -- to them.

23         THE COURT:  What information?

24         THE WITNESS:  The information in relation to the

25    default.  You will be able to --

1          THE COURT:  Like?

2          THE WITNESS:  The note, the mortgage, their specific

3    tracking as to what is going on in the specific case.  If there

4    is an action or a task that has been sent to an attorney, we

5    will track that.

6          THE COURT:  A what, an action or a test?  What does

7    that mean?

8          THE WITNESS:  A task.

9          THE COURT:  What does that mean?

10          THE WITNESS:  So if, like this Motion for Relief,

11    we'll track that within the Fidelity system.

12          MR. CASH:  I think it was task, T-A-S-K, Your Honor.

13          THE COURT:  All right.

14          THE WITNESS:  Task.

15          THE COURT:  But it does not have the account

16    information on it?

17          THE WITNESS:  It has --

18          THE COURT:  And when I say "account information," I'm

19    talking about the monetary account information.

20          THE WITNESS:  It has screen shots of the monetary

21    account information from Option One's mainframe system.

22          THE COURT:  What does that mean?  What is a screen

23    shot?

24          THE WITNESS:  It goes and takes information from

25    Option One's mainframe system.

1          THE COURT:  Okay.

2          THE WITNESS:  It kind of snaps a picture of it and

3     houses it within the library.

4          THE COURT:  What pictures does it take?

5          THE WITNESS:  Such as what Counsel just provided.  It

6     will take a snapshot of the accounting and the payment

7     information for the account.

8          THE COURT:  All right.  What your Counsel has handed

9     to me is what looks like to be a picture of the computer

10    screen.

11         THE WITNESS:  Uh-huh. (affirmative response)

12         THE COURT:  Or a computer program picture.

13         THE WITNESS:  Yes.

14         THE COURT:  And it starts out on July the 11th and it

15    says that there is a post-petition distribution from suspense.

16         Do you have a copy that you can show the witness?

17         MR. CASH:  I do, Your Honor.

18         THE COURT:  And that you can provide to Counsel,

19    Mr. Cash?

20         MR. CASH:  I do, Your Honor.

21       (Pause.)

22         THE COURT:  Okay.  Do you see that first line where

23    it says, "7/11/08, post-petition distribution from suspense"?

24         THE WITNESS:  Uh-huh. (affirmative response)

25         THE COURT:  All right.  What does that tell you when

1  you see that?

2          THE WITNESS:  That tells me that it looks like they

3  are -- that there were some monetary funds within suspense that

4  they are now posting out.

5          THE COURT:  Okay.

6          THE WITNESS:  And onto the account.

7          THE COURT:  And applying to the account?

8          THE WITNESS:  Yes.

9          THE COURT:  Where on this, does the screen tell you

10 what the total balance in suspense is?

11         THE WITNESS:  The total -- this specific screen does

12 not.  There are other screens within the system that will tell

13 you the total suspense.  This will give you a step by step

14 accounting of how they're applying the items out, and once

15 there is another screen that will tell you the total that's

16 currently in there.

17         THE COURT:  How do you know by looking at this

18 particular account if that particular application is correct?

19         THE WITNESS:  We do -- we look at the information and

20 we go by Option One.  Option One has their own internal audit

21 and they do the posting of the applications.  We do not

22 validate the application of what Option One does.

23         THE COURT:  All right.  So, when you sign an

24 affidavit that says that the Debtor has not made payments for

25 the months of November 1st, 2007 in this case, through and

1    including February 1st, 2008, you were simply looking at

2    these computer screens, and saying that you don't see payments

3    posted?

4                THE WITNESS:  Correct.

5                THE COURT:  Okay.  What if there is money in

6    suspense?

7                THE WITNESS:  If there is money in suspense, we

8    would, depending on the amount of the money in suspense, we

9    would go back to Option One and ask them their opinion.

10               THE COURT:  What do you mean "their opinion"?

11               THE WITNESS:  We would, through the communication of

12   Fidelity's system, we would alert Option One that there are

13   funds in suspense.  And then, they would advise us as to what

14   they're doing with those funds or how to -- they would advise

15   Counsel as to how to continue with the motion.

16               THE COURT:  All right.  So, Counsel sends you the

17   affidavit, correct, so Counsel prepares the affidavit?

18               THE WITNESS:  Counsel prepares the affidavit,

19   correct.

20               THE COURT:  And sends it to you for execution?

21               THE WITNESS:  Uh-huh. (affirmative response)

22               THE COURT:  In this particular case, how fast was

23   Counsel required to file the Motion for Relief to meet the

24   timeliness requirements of Option One?

25               THE WITNESS:  I believe it is seven days.

1            THE COURT:  Seven days?

2            THE WITNESS:  Yes.

3            THE COURT:  Do you know when you received this

4    affidavit?

5            THE WITNESS:  I believe this particular affidavit, I

6    do not recall.  I believe it was within February when I

7    executed this particular one.

8            THE COURT:  Within what?

9            THE WITNESS:  I believe it was in February.

10           THE COURT:  Well, I would assume it's in February,

11   because it goes through February 1st.

12           THE WITNESS:  Right.

13           THE COURT:  And it's dated February 28th.

14           THE WITNESS:  Right.

15           THE COURT:  But do you know on what day you received

16   it?

17           THE WITNESS:  I would have received it on February

18   28th when I executed the affidavit.

19           THE COURT:  Okay.  And typically, you execute them

20   the same day you receive them?

21           THE WITNESS:  Typically, yes.

22           THE COURT:  Okay.  Did this account show that there

23   was a suspense balance?

24           THE WITNESS:  At the time, I mean I do not recall.  I

25   can see from my signature that I signed this on February 28th.

1  I do not recall on February 28th if there was a suspense

2  balance, or not.

3          THE COURT:  You don't recall, but you don't know if

4  there was?

5          THE WITNESS:  I would say that there was not, being

6  that it was executed and there is no communication to Option

7  One that there was a suspense balance at that time.

8          THE COURT:  How do you know that there is no

9  communication to Option One that there is no suspense balance?

10          THE WITNESS:  When going into Fidelity's system we

11  would have a communication and a stamped date of us going to

12  Option One.

13          THE COURT:  All right.  So you have reviewed the

14  file, and looking at this page that has been handed to me, or

15  the affidavit --

16          THE WITNESS:  Uh-huh. (affirmative response)

17          THE COURT:  -- there is no evidence of communication,

18  there wouldn't be, typically?

19          THE WITNESS:  Uh-huh. (affirmative response)

20          THE COURT:  But you have reviewed the file before you

21  testified today and you saw no communication between your firm

22  and Option One?

23          THE WITNESS:  Correct.

24          THE COURT:  So, that leads you to believe that there

25  was no suspense balance?

1              THE WITNESS:  Correct.

2              THE COURT:  So, if there was a suspense balance, you

3    either missed it, or you didn't communicate it to Option One?

4              THE WITNESS:  Correct.

5              THE COURT:  Okay.

6              MR. MYERS:  Judge, how many screens are we looking

7    at?

8              THE COURT:  Right now, I've just got one.

9              MR. MYERS:  No, to get to this affidavit process?

10             THE COURT:  Well, I haven't asked that question.

11             All right, let's talk about -- you have already

12   testified that you don't verify that the amounts that are set

13   forth on the screens are accurate, you just take the

14   information as you see it on the screen, that Option One is the

15   one that is directing the payments?

16             THE WITNESS:  Correct.

17             THE COURT:  And dealing with what is going on?

18             THE WITNESS:  Correct.

19             THE COURT:  Let's suppose there is a suspense

20   balance.  You see something small.

21             THE WITNESS:  Uh-huh. (affirmative response)

22             THE COURT:  Now, in this case we've got the

23   allegation is four months that haven't been paid, but let's

24   suppose, just for purposes of this hypothetical that that was

25   $1,000 in payments, $250 a month.

 1              THE WITNESS:  Uh-huh. (affirmative response)

 2              THE COURT:  When you see a small suspense balance of

 3    $50 sitting there, all right, your testimony is that you would

 4    then notify Option One that there is a $50 suspense balance,

 5    what do they want you to do with that?

 6              THE WITNESS:  Correct.

 7              THE COURT:  Okay.  Does Option One have general

 8    parameters of what you're supposed to do, or is it case by

 9    case?

10              THE WITNESS:  It's case by case.

11              THE COURT:  Okay.

12              THE WITNESS:  That we go to them on.

13              THE COURT:  Okay.  How long does it take them

14    typically to respond?

15              THE WITNESS:  Typically, with each client we see that

16    they have their own internal oscillations of 24 to 48 hours.

17              THE COURT:  Okay.  And you found that they typically

18    honor that, that they get back to you within 24 to 48 hours?

19              THE WITNESS:  Yes, Option One has a really good

20    response time.

21              THE COURT:  Okay.

22              THE WITNESS:  Yes.

23              THE COURT:  If you can, tell me what, generally,

24    their views are with regard to suspense accounts, based on your

25    experience?

1        THE WITNESS:  As I said, they would -- obviously,

2   we only go to them and alert them that we've seen it on their

3   system.  I am not familiar with their policies and how they

4   treat the suspense.

5        THE COURT:  Okay.  So, you've never had a situation

6   where a suspense account existed and they directed you to file

7   the affidavit and ignore the suspense balance?

8        THE WITNESS:  No, they'll review it and then they'll

9   direct us back to how we should handle -- how we should go

10  ahead, execute it, or if they will work with the attorney's

11  office to prepare a new affidavit.

12       THE COURT:  Okay.  What I'm asking, what is your

13  general -- what are the general parameters?  Do they typically

14  tell you to go ahead and file the affidavit, or have you found

15  in your experience that they say, "Stop and let me talk to the

16  lawyer"?

17       THE WITNESS:  In most experiences they say, "Stop and

18  let me discuss it with the lawyer --"

19       THE COURT:  Okay.

20       THE WITNESS:  "-- before we continue."

21       THE COURT:  And do you generally receive an amended

22  affidavit?

23       THE WITNESS:  Yes.  Once they say stop, we will

24  disregard this affidavit and wait for a new affidavit from the

25  attorney's office.

1          THE COURT:  Okay.  All right, do you typically deal

2  with local counsel, or do you deal with national counsel in the

3  case of Option One?

4          THE WITNESS:  We would deal with their local counsel.

5          THE COURT:  Okay.  Does Option One employ national

6  counsel?

7          THE WITNESS:  Not to my knowledge.

8          THE COURT:  So, Boles would be the firm you would

9  have direct communication with?

10          THE WITNESS:  Yes.

11          THE COURT:  Do you deal with them by phone, or is it

12  typically through the system?

13          THE WITNESS:  Both.

14          THE COURT:  "Both."  So, they can contact you

15  directly?

16          THE WITNESS:  Yes.

17          THE COURT:  Are you assigned to a particular account,

18  or are you in a bank of vice presidents that handle any

19  requests?

20          THE WITNESS:  I am in a bank that we handle any

21  requests.

22          THE COURT:  Okay.  You're not individually assigned

23  to either Option One's files or the particular files of Option

24  One?

25          THE WITNESS:  No.

1          THE COURT:  Okay.  Let's talk about when a default

2   occurs.  When there has been a default of a particular loan,

3   what is the process, if you know, that the computer system and

4   Option utilizes to notify counsel that the default has occurred

5   and they want a Motion for Relief filed?

6          THE WITNESS:  From my knowledge, what will occur is

7   Option One will obviously request the motion on the individual

8   files.  There is a certain trigger set up within their system.

9          THE COURT:  Okay.

10          THE WITNESS:  That they trigger on each individual

11   file, which then sends the communication to Fidelity's system

12   to alert the attorney.

13          THE COURT:  All right.  And then it goes through the

14   Fidelity system to the attorney?

15          THE WITNESS:  Yes.

16          THE COURT:  When you say "their system," their

17   computer system that Option One, you believe, has a monitoring

18   event that when, I guess, certain monetary issues or, for

19   example, if 60 days of past due monthly payments occur it will

20   flag the account?

21          THE WITNESS:  I'm not specific on how they flag the

22   account.  There is a specific flag within their system that

23   they trigger to send the account to local counsel.

24          THE COURT:  All right.  So then, it goes through the

25   communications system to Fidelity and then it goes to local

1  counsel.  At that point, your system kicks in on it and it

2  monitors the, as I think Mr. Cash described it, the timeliness

3  of counsel's response, correct?

4            THE WITNESS:  Correct.

5            THE COURT:  So, the benefit to sending that request

6  through your system is that it will then trigger within your

7  system, an automatic time clock that sets off based on the

8  parameters that Option One has requested?

9            THE WITNESS:  Correct.

10           THE COURT:  Okay.  Do you have a requirement that

11 Counsel supply you with an affidavit so many days before the

12 motion is due?  I guess what I'm saying is if Option One has

13 seven day window.

14           THE WITNESS:  Uh-huh. (affirmative response)

15           THE COURT:  And we're just using that as an example.

16 Let me ask you:  Do you know what Option One's window is for

17 Motions for Relief?

18           THE WITNESS:  I believe it is seven days, but I'm not

19 specific.

20           THE COURT:  Okay.  Let's assume it's seven days.

21           THE WITNESS:  Okay.

22           THE COURT:  If they have a seven day window, but they

23 need an affidavit in order to file the motion.

24           THE WITNESS:  Uh-huh. (affirmative response)

25           THE COURT:  Does Fidelity require that counsel submit

1  the affidavit three days before the time runs, or are you

2  receiving affidavits the day they need to be filed?  How does

3  that work?

4           THE WITNESS:  We give counsel, depending on the

5  client's time lines and the signature of an affidavit, we give

6  them an expected time line of when we can return an affidavit.

7           THE COURT:  All right.

8           THE WITNESS:  But we do not require them to send it

9  to us within a specific time.

10          THE COURT:  Okay.  So, tell me what that means, the

11 time line when you can return?  Meaning within 24 hours of

12 receipt?

13          THE WITNESS:  We will give them a time line that is

14 usually within 48 to 72 hours of receipt, that an affidavit

15 would be returned to them.

16          THE COURT:  Okay.  So, if they need to file within

17 seven days they would have to get that affidavit to you by the

18 third or the fourth day?

19          THE WITNESS:  Correct.

20          THE COURT:  Is that right?

21          THE WITNESS:  Yes.

22          THE COURT:  Okay.  Tell me about proofs of claim.

23 Who prepares those?

24          THE WITNESS:  Local counsel will prepare the proof of

25 claim.

1          THE COURT:  Okay.  And do they also execute the

2   proofs of claim?

3          THE WITNESS:  I am not --

4          THE COURT:  You don't execute them?

5          THE WITNESS:  I do not execute them, and I do not

6   know who specifically executes them.

7          THE COURT:  Do you prepare any other documents for

8   counsel to use in connection with collection?

9          THE WITNESS:  No.

10          THE COURT:  Just the affidavits?

11          THE WITNESS:  (Witness nods head affirmatively.)

12          THE COURT:  Yes?

13          THE WITNESS:  Yes.

14          THE COURT:  Okay.  And do you execute any documents

15   other than affidavits?

16          THE WITNESS:  Yes.

17          THE COURT:  What documents do you execute?

18          THE WITNESS:  We would execute a substitution of

19   Trustee typically within a foreclosure action.

20          THE COURT:  Okay.  And that's to notify -- that's to

21   evidence the transfer of the note?

22          THE WITNESS:  The transfer of the note would be like

23   an assignment of mortgage transferring that.  The substitution

24   of Trustee would just be assigning the certain attorney to the

25   account.

1          THE COURT:  Okay.

2          THE WITNESS:  It usually happens more in foreclosure

3    situations.

4          THE COURT:  Okay.

5          MR. MYERS:  I'm sorry, Your Honor.  When we're

6    talking about "you," we're talking about Ms. Goebel herself, as

7    opposed to the global Fidelity here?

8          THE COURT:  I'm talking about her executing on behalf

9    of Goebel, as the representative of the lender.

10          MR. MYERS:  So, the actual substitutions that you're

11    personally doing?

12          THE WITNESS:  We have authorization to do, and I am

13    through the corporate resolution, authorized to execute those,

14    yes.

15          MR. MYERS:  Thank you.

16          THE COURT:  Okay.  I'm sorry Mr. Cash, I interrupted

17    your line.

18          MR. CASH:  That's all right, Your Honor, I figure

19    that these were questions that you wanted answered, and I might

20    not have gotten to them, so it's better to have you ask them.

21          THE COURT:  All right.  Go ahead.  You can pick up

22    your questioning and I'll jump in again if I need to.

23          MR. CASH:  All right.

24    BY MR. CASH:

25    Q.   Dory, in this specific case when you went to Option One's

1  screen shots and you looked at what was there and relying on

2  their business records.

3  A.   Uh-huh. (affirmative response)

4  Q.   Was the information in the affidavit, did it match the

5  information on Option One's system?

6  A.   Yes.

7  Q.   All right.  And based upon that, you executed the

8  affidavit?

9  A.   Correct.

10 Q.   All right.

11          MR. CASH:  That's all I have, Your Honor.

12          THE COURT:  All right.  Mr. Cash?

13          MR. CASH:  Yes, Your Honor.

14          THE COURT:  I am going to allow the U.S. Trustee's

15 Office to ask questions at this time, and also Mr. Myers.  And

16 then if that brings up anything else, I'll ask questions and

17 I'll give you an opportunity to clarify.

18          MR. CASH:  That's fine.  Your Honor, my only request

19 would be we have appeared here and Ms. Goebel has appeared here

20 to testify about this affidavit.

21          THE COURT:  I understand.

22          MR. CASH:  And this case.

23          THE COURT:  I understand.

24          MR. CASH:  And I would not welcome a fishing trip, a

25 fishing expedition into --

1          THE COURT:  Well, I'm just trying to understand how

2     the system works.

3          MR. CASH:  I understand.  But as to, I know the U.S.

4     Trustee wants to learn a lot more about the Fidelity system,

5     but I don't think that they have the vehicle or the justiciable

6     controversy here to do so.

7          THE COURT:  Well, I'll let you object when you think

8     it's appropriate.

9          MR. CASH:  Thank you.

10          THE COURT:  Okay.

11          MR. MYERS:  I just have a few questions, I'll be

12     happy to go first, Your Honor.

13          THE COURT:  Okay.

14          MR. MYERS:  I'm Kirk Myers for the Debtor and for the

15     record.

16                         *    *    *    *    *

17                         CROSS-EXAMINATION

18     BY MR. MYERS:

19     Q.   Ms. Goebel, you have indicated and I have asked a question

20     and you may have answered it and I just lost clarity, but you

21     look at a variety of screen shots when you are preparing an

22     affidavit, how many screens do you look at, approximately, to

23     prepare your affidavit?

24          MR. CASH:  Your Honor, I just have to object.

25          MR. MYERS:  In this case.

1          MR. CASH:  Well, not in that.  The reference is

2    made to her preparing an affidavit and I think it needs to be

3    clear.

4          THE COURT:  All right.

5          MR. CASH:  We don't prepare --

6          THE COURT:  How about verifying the affidavit?

7          MR. CASH:  We don't prepare any documents.  She

8    simply executes the affidavit.

9          THE COURT:  All right.

10          MR. CASH:  She does not prepare.

11          THE COURT:  She testified she executes the documents

12    prepared by Counsel, so let's talk about verification.

13          MR. MYERS:  I stand corrected.

14    BY MR. MYERS:

15    Q.   While you verify this affidavit prepared by counsel, how

16    many screen shots?

17    A.   It would really vary, depending on --

18    Q.   On this case?

19    A.   On this particular case, I cannot say for certain how many

20    screen shots were reviewed.  We would go through all of the

21    records within Option One's system, and depending on how long

22    that payment history was, would depend on how many pages there

23    were.

24          THE COURT:  What do you mean by "depending on how

25    long the payment history was"?

1          THE WITNESS:  Well, as you can see in this one

2    screen shot, it starts at 11/20 of '07 and goes to 7/11 of '08.

3    If this case -- if there was further information prior to 11/20

4    of '07, it would be on another page within their system, so we

5    would review all of the pages within their system.

6          THE COURT:  All right.  So, if the information in the

7    system started on July 11th, 01, is that when you would start

8    at '01 and work forward?

9          THE WITNESS:  We would have access to those screen

10   shots to review those.

11         THE COURT:  That's not what I asked.  You would look

12   at each screen from '01, forward?

13         THE WITNESS:  We would look at the specific summary

14   screens that provide the current due dates and the current

15   amounts --

16         THE COURT:  Okay.

17         THE WITNESS:  -- that are delinquent on the account.

18         THE COURT:  Stop.

19         MR. MYERS:  And Your Honor, if I could correct, I

20   just -- and I'm not trying to expand it.  I would like to get

21   off the "we" and I would like to get it directly, because I'm

22   just -- I want to know what she does.  And everyone can ask

23   different questions, of course.

24         THE COURT:  I understand.

25         MR. MYERS:  But my focus is on just this one case.

1          THE COURT:  Okay.  Ms. Goebel, let's start with

2  this particular case.

3          THE WITNESS:  Uh-huh. (affirmative response)

4          THE COURT:  Do you know how old the transactional

5  history was by Option One in this case?

6          THE WITNESS:  I do not recall.

7          THE COURT:  Okay.  So, you don't know if it was six

8  months or six years?

9          THE WITNESS:  No.

10         THE COURT:  All right.  Do you know what you did in

11 this particular case to review the amounts that were placed in

12 the affidavit?

13         THE WITNESS:  Yes.  I would go into their system and

14 I would review the BNKA which supplies the post-petition due

15 date.  I would review the --

16         THE COURT:  Wait, wait, wait.

17         THE WITNESS:  Okay.

18         THE COURT:  Slow, because I'm going to have to

19 understand this.

20         THE WITNESS:  Okay.

21         THE COURT:  BNKA?

22         THE WITNESS:  Uh-huh. (affirmative response)  It's

23 one of the --

24         THE COURT:  Which supplies the due date?

25         THE WITNESS:  Right.

1              THE COURT:  All right.  Tell me what that is.

2              THE WITNESS:  It's -- BNKA is a subset of their

3     bankruptcy screens within their master mainframe system and it

4     provides me the current post-petition due date.

5              THE COURT:  And when you say the current post-

6     petition due date.

7              THE WITNESS:  Uh-huh. (affirmative response)

8              THE COURT:  Tell me what that means?

9              THE WITNESS:  It means the post-petition due date at

10    the time that I'm in the system.

11             THE COURT:  All right.

12             THE WITNESS:  What is the post-petition due date?

13             THE COURT:  If you went into the system today?

14             THE WITNESS:  Yes.

15             THE COURT:  And you looked at BNKA screen.

16             THE WITNESS:  Yes.

17             THE COURT:  It would tell you that this Debtor is due

18    for -- I looked at it, what month are we in, August?

19             THE WITNESS:  August.

20             THE COURT:  Is due for September 1?

21             THE WITNESS:  Correct.

22             THE COURT:  Of 2008, if they were current?

23             THE WITNESS:  If they were current, yes.

24             THE COURT:  Okay.  If they were not current, it might

25    say that they were due for June 1, 2008, if for example they

1  were three months behind?

2         THE WITNESS:  Correct.

3         THE COURT:  So, it would just have a date?

4         THE WITNESS:  It would have a date and the payment

5  amount.

6         THE COURT:  Okay.  Meaning the monthly payment amount

7  or the total amount due?

8         THE WITNESS:  The monthly payment amount.

9         THE COURT:  Okay.  So, the monthly installment amount

10  would be posted by the due date.  If they were three months

11  past due, it would still just be the monthly amount?

12         THE WITNESS:  Correct.

13         THE COURT:  So, it wouldn't be three months worth of

14  payments?

15         THE WITNESS:  There would be another screen that you

16  could review --

17         THE COURT:  Okay.

18         THE WITNESS:  -- for that breakdown.

19         THE COURT:  So let's say you're asked to sign this

20  affidavit, you first go to that screen.

21         THE WITNESS:  Uh-huh. (affirmative response)

22         THE COURT:  And it says, "Due for June 1," because

23  we're in August, "due for June 1."

24         THE WITNESS:  Correct.

25         THE COURT:  Now, what do you do?

1          THE WITNESS:  We would next review a screen, it's

2    called PCH2.  It provides the payment change amount.  So, if

3    this is an ARM loan or there's payment changes.

4          THE COURT:  Okay.

5          THE WITNESS:  We would review that.  Typically, what

6    they --

7          THE COURT:  Can you tell me what that says?

8          THE WITNESS:  That provides each month that the

9    payment amount is set to change if, in the situation, it is an

10   ARM loan.  So, we would review that to ensure that the payments

11   listed within the affidavit are accurate.

12         THE COURT:  All right.  So, for example, if you have

13   three months past due and the note might have changed, reset if

14   you will in July, in my example.

15         THE WITNESS:  Uh-huh. (affirmative response)

16         THE COURT:  You look to make sure that the

17   installments that are outstanding or that are alleged to be

18   outstanding are accurate, and since the June installment is the

19   right number, the July would be a different number because it

20   reset, and then August would be a different number, so you're

21   just verifying the actual installment numbers?

22         THE WITNESS:  Yes.

23         THE COURT:  Okay.

24         MR. CASH:  Your Honor, if I may.  I'm just, in

25   reviewing the Court's Order about what the Show Cause was for

1    today, it specifically does cite to appear and explain the

2    amounts due on the mortgage loan for this Debtor.

3            THE COURT:  That's why I'm asking how this happened,

4    because we have payments that were not in the system and I want

5    to understand how the system works and what she does to verify

6    the amounts.

7            MR. CASH:  And I think what happened in this case,

8    Your Honor, and if I can explain to the Court that may short

9    circuit some of this, is there was a payment that was sent,

10   that was sent back to the Boles law firm and it was never

11   posted, which has nothing to do with our system or with how our

12   system works.

13           THE COURT:  It may not, but I want to know -- I'm

14   looking for what the checks are on the system, and that's going

15   to include what you do and what Option One does, because Option

16   One is going to testify next as to what they do.

17           MR. CASH:  All right.

18           THE COURT:  All right.

19           MR. CASH:  If I may, Your Honor, just for the record

20   to keep my record, certainly, we would object to going into the

21   generalities of our system beyond this specific transaction,

22   because we -- I don't believe that that is what the notice of

23   what we were brought here for the Show Cause would include.

24           THE COURT:  Okay.

25           MR. CASH:  So, I mean I understand the Court is going

1   to do as it wishes, but I --

2                THE COURT:  Overruled.

3                MR. CASH:  All right.

4                THE COURT:  All right Ms. Goebel, let's go.  You

5   would check the screen that says to check the amounts.  What is

6   the next screen you would check?

7                THE WITNESS:  There is a screen within Option One's

8   system that provides the total amount due on the loan, so the

9   principle balance, interest, so we would go in and verify those

10  monetary numbers to the numbers within the affidavit supplied.

11               THE COURT:  Okay.  And those are just totals,

12  correct?

13               THE WITNESS:  Yes.

14               THE COURT:  So, it's not -- that's not breaking it

15  out.  When it says principle balance, you're talking about just

16  the total outstanding balance on the loan?

17               THE WITNESS:  The total outstanding principle

18  balance, the total outstanding interest, so if they were to pay

19  off the loan at this time, what is the total outstanding

20  indebtedness on the loan.

21               MR. MYERS:  And I'm sorry, Your Honor.  I guess

22  either I have an objection or I want to clarify something here.

23  BY MR. MYERS:

24  Q.  Ms. Goebel, is there anyone helping you do this affidavit?

25  Is it just you?

1  A.   It's just me.

2  Q.   You keep answering all the questions "we" and I don't want

3  to have a problem with the record later on where if we find

4  that one of these things that you're saying that you need to do

5  to verify the affidavit isn't done and you come back and say,

6  "But I said we and not I."

7           MR. MYERS:  And I'm not trying to be technical,

8  Your Honor, but I'm just trying to preserve a record here to

9  create a change.

10           THE WITNESS:  I would --

11           THE COURT:  The royal "we."

12           So, what you're saying is "we" as in your company?

13           THE WITNESS:  We as in the company would do this.  As

14  the signer, this is the procedure that I would follow when

15  executing the affidavit.

16           THE COURT:  Okay.

17           MR. MYERS:  And in this case, which is what I'm

18  limiting my questions to.

19           MR. CASH:  Right.

20           MR. MYERS:  This is what you did?

21           THE WITNESS:  This is what I would have done.

22           MR. MYERS:  That's where I'm going to.

23           THE COURT:  All right.  So, in this particular

24  affidavit you have -- I'm trying to -- I just had it in my

25  hands, okay.  There is under Paragraph 5 -- do you have a copy

1 of the affidavit in front of you?

2 　　　　　THE WITNESS:  Yes, I do.

3 　　　　　THE COURT:  Okay.  It sets out the total amounts due

4 as of March 7th, and this is the information that would come

5 off of that screen?

6 　　　　　THE WITNESS:  Yes.

7 　　　　　THE COURT:  Okay.  So, it's just --

8 　　　　　MR. MYERS:  Can we have the screen name for this last

9 one that we're on?

10 　　　　　THE WITNESS:  This is the PAY 4 screen.

11 　　　　　MR. MYERS:  Thank you.

12 　　　　　THE COURT:  Okay.  And again, this is just -- this is

13 summarizing what Option One has already put into the system,

14 correct?

15 　　　　　THE WITNESS:  Correct.

16 　　　　　THE COURT:  Okay.  And they're just -- so if Option

17 One identifies something as a foreclosure fee or a cost, it

18 goes into that category and it shows up on the system, you

19 don't have anything to do with how the particular items are

20 derived?

21 　　　　　THE WITNESS:  No.

22 　　　　　THE COURT:  Okay.  Okay, so then you look, and you

23 look at the total amount due and now you're verifying it to

24 make sure that those particular amounts are correct?

25 　　　　　THE WITNESS:  Yes.

1        THE COURT:  In the affidavit?

2        THE WITNESS:  Within the affidavit.

3        THE COURT:  As Counsel has set forth?

4        THE WITNESS:  Yes.

5        THE COURT:  Okay.  Then, what is the next thing you

6   do?

7        THE WITNESS:  Once all of those are validated and the

8   information that Counsel has set forth within the affidavit are

9   correct, then I would sign the affidavit.

10        THE COURT:  All right.  So, what you're looking for

11   then are three pieces of information.  The last is the date

12   that the loan is due?

13        THE WITNESS:  Uh-huh. (affirmative response)

14        THE COURT:  And that's shown on one screen?

15        THE WITNESS:  Yes.

16        THE COURT:  The payment amounts that are set forth,

17   and in particular if it's a change loan, if it's an ARM?

18        THE WITNESS:  ARM, yes.

19        THE COURT:  To make sure that the installment amounts

20   are correct?

21        THE WITNESS:  Correct.

22        THE COURT:  And then, the total amount due which is

23   in Paragraph 5, that those three screens match what is in this

24   affidavit?

25        THE WITNESS:  Correct.

1           THE COURT:  Okay.  You also testified that if you

2    see a suspense account, you would at least notify Option One

3    that a suspense account exists, correct?

4           THE WITNESS:  Correct.

5           THE COURT:  Okay.  And you would --

6           MR. MYERS:  Which screen is showing the suspense

7    account?  I'm sorry.

8           THE WITNESS:  Your Pay 4 screen will provide the --

9           MR. MYERS:  Thank you.

10          THE WITNESS:  -- amount within the suspense.

11          THE COURT:  Because it will show up as an item,

12   either a positive or a negative suspense?

13          THE WITNESS:  Yes.

14          THE COURT:  Okay.  So, at that point when you get to

15   this very last screen, if you see a suspense, you send the

16   communication to Option One saying, "I'm seeing $50 in

17   suspense," or, "I'm seeing $5,000 in suspense, what do you want

18   to do?"

19          THE WITNESS:  Correct.

20          THE COURT:  Okay.  Do you send them the affidavit

21   when you send them the note?

22          THE WITNESS:  The affidavit is stored within the

23   Fidelity system.

24          THE COURT:  So, they can see it?

25          THE WITNESS:  So, they can see it.

1            THE COURT:  Okay.

2            THE WITNESS:  And they would have access to it.

3            THE COURT:  So then, they will be able to understand

4    when they get your e-mail or your communication that this is

5    what you're talking about?  You're being asked to sign this

6    affidavit and this is a number that's showing up?

7            THE WITNESS:  Correct.

8            THE COURT:  All right, if the numbers do not match,

9    Ms. Goebel, for some reason.

10           THE WITNESS:  Uh-huh. (affirmative response)

11           THE COURT:  Suppose there's a typographical error,

12   something as simple as that, do you send it back to counsel and

13   say, "Fix this"?

14           THE WITNESS:  Correct.

15           THE COURT:  Okay.  So counsel has to fix it, you

16   don't edit the affidavit?

17           THE WITNESS:  No, I do not edit the affidavit.

18   Counsel would be responsible for that.

19           THE COURT:  All right.  So, you just sign what they

20   send you, as long as you verify that in your experience, you

21   know that these are correct?  If you find an error you tell

22   them to, "Fix this," and then they fix it and send it back to

23   you?

24           THE WITNESS:  Correct.

25           THE COURT:  Okay.

1          MR. MYERS:  Is there a report card number for them

2    to get back to you when you tell them to repair an error?  Is

3    that a timed event that you track?

4          THE WITNESS:  No.

5          THE COURT:  Okay, so it's not -- when they have to do

6    a new affidavit, there's not any monitoring?

7          THE WITNESS:  There is a communication and a step

8    within the system that tells them that, you know, we have

9    reviewed the affidavit and there may be corrections that they

10   need to review.  But once -- and then there is a communication

11   or a step for them to send it back to us through this system,

12   but there is no time --

13         THE COURT:  Monitoring.

14         THE WITNESS:  -- standard.

15         MR. MYERS:  Do we have the report --

16         THE COURT:  But they are still going to fall within

17   the 48 to 72 hours of receipt rule, correct, so when the new

18   affidavit comes out you would still have the same 48 to 72

19   hours to execute the new affidavit, is that right?

20         THE WITNESS:  Correct.

21         THE COURT:  Okay.

22         MR. MYERS:  Do we have the report card in this

23   case?

24         THE COURT:  Okay.  He's asking is this particular

25   file being time monitored for responsiveness of counsel?

1        THE WITNESS:  All files that are within the

2  Fidelity system are monitored.

3        THE COURT:  Okay.  All files, and certainly all files

4  that are Option One files, correct?

5        THE WITNESS:  Yes.

6        THE COURT:  Okay.  Okay, Mr. Cash?

7        MR. CASH:  I was through, Your Honor.

8        MR. MYERS:  Your Honor, I'm almost done.

9  BY MR. MYERS:

10  Q.   And so, and you testified or I wrote it down wrong, but

11  the first screen that you look at is BNKA, as in apple?

12  A.   Yes.

13  Q.   And then, so what is the BNKH, as in Harry?

14  A.   That's the --

15        MR. CASH:  Your Honor, if I may -- if I may, before

16  we go into our screens, this is a highly proprietary system and

17  this is a public record.

18        THE COURT:  Okay.

19        MR. CASH:  There are confidential --

20        THE COURT:  Okay, but you have introduced this

21  particular screen.

22        MR. MYERS:  I would --

23        MR. CASH:  I understand I've introduced that screen,

24  Your Honor.  But to go into what is the BNKA?  What is the

25  BNKH?  And it seems like we are getting far afield from this

1  specific case.

2          THE COURT:  No, I'm trying to figure out who makes

3  decisions on the affidavit and where the information is

4  gleaned.

5          MR. CASH:  Absolutely, Your Honor.

6          THE COURT:  Your client testified as to what she

7  looks at.  You introduced into evidence the BNKH screen.  I

8  think it's a fair question to say:  Why was this offered as

9  one of the items that is in the system, and what is its

10  relevance?

11         MR. CASH:  And with all due respect --

12         THE COURT:  Because what I have right now is

13  testimony that she didn't look at the BNKH system.

14         MR. CASH:  With all due respect, Your Honor, I did

15  not introduce that into evidence.  I showed it to the Court as

16  an illustration, so the Court could see in this.

17         THE COURT:  Okay, a point, but you have opened the

18  door.

19         Go forward, Mr. Myers.

20         MR. MYERS:  Thank you, Your Honor.

21         And while I'm on the record, they have indicated that

22  the proprietary system is only available to those attorneys

23  that subscribe to their system, so it's not like the whole

24  world can come and look at this BNKH.  I think it's very

25  limited.

1   BY MR. MYERS:

2   Q.    But so, there is also a BNKH screen?

3   A.    Correct.

4   Q.    And did you look at the BNKH screen in this case?

5   A.    No.

6   Q.    And why would you not look at the BNKH screen which is

7   purported to be the bankruptcy history?

8   A.    This is the history and the detail of Option One's posting

9   of the funds.  As I reported, we -- part of executing the

10  affidavit is just verifying the information within the

11  affidavit and we do not verify Option One's posting

12  transactions.

13          THE COURT:  And that's what this would be?

14          THE WITNESS:  That's what this would be.

15          THE COURT:  This is the actual posting?

16          THE WITNESS:  Correct.

17          THE COURT:  And this goes back as far as the system

18  -- as Option One places on your system, correct?

19          THE WITNESS:  Correct.

20          THE COURT:  So, the loan could actually be older,

21  couldn't it, than what is on the system because Option One may

22  have taken it over at some point during its life, is that

23  true?

24          THE WITNESS:  Yes, that is true.

25          THE COURT:  So, you wouldn't necessarily have the

1   entire history on the system of the loan?

2          THE WITNESS:  Not within this system.

3          THE COURT:  Right, okay.

4   BY MR. MYERS:

5   Q.   And then which screen, if you're not looking at the BNKH,

6   which screen gives you your post-petition payments from the

7   Debtors?

8   A.   What I validate is the post-petition due date and that is

9   on the BNKA screen.

10  Q.   I'm sorry.  But my question is:  How do verify what

11  payments due date, as we have litigated extensively, it is a

12  very fudgy thing.  Payment history gives you exact

13  information.

14         MR. MYERS:  Well, let me rephrase it and I strike

15  that.

16  BY MR. MYERS:

17  Q.   Are you looking at a payment history of the Debtor before

18  you prepare an affidavit?

19         MR. CASH:  Again --

20         THE COURT:  She doesn't prepare.

21         THE WITNESS:  I don't --

22         MR. MYERS:  I'm so sorry.

23  BY MR. MYERS:

24  Q.   Before you do --

25         MR. MYERS:  I'll strike that.

1  BY MR. MYERS:

2  Q.   Ms. Goebel, do you look at a payment history from a Debtor

3  and prepare that to the affidavit that has been presented to

4  you?

5  A.   No.  My role in executing the affidavit is to validate the

6  information within the affidavit.

7  Q.   In the affidavit in the case in question, you indicated in

8  Paragraph -- the affidavit indicates in Paragraph 6 that the

9  Debtor is delinquent from November 1st, 2007 through and

10 including February 1st of 2008.  How did you verify that

11 information was correct or not correct?

12 A.   As I stated, I reviewed BNKA, which provides me with the

13 post-petition due date.

14 Q.   Okay.  The problem that I have with the due date is the

15 due date has nothing to do with the post-petition payments.

16      MR. CASH:  Object to the speech, Your Honor, and it's

17 not a question.

18      THE COURT:  You're going to have to ask that in the

19 form of a question.

20      MR. MYERS:  That's perfectly fine, Your Honor.

21 BY MR. MYERS:

22 Q.   How do you determine the payment history from a due date?

23 A.   After I reviewed BNKA, I reviewed the PCH2, which is the

24 payment change screen, which tells you the exact payment amount

25 that would be due.

1  Q.   All right.  Which screen would show you that they made a

2  payment on April 2nd of 2008 in the amount of $1,546.84?

3  A.   The BNKH.

4  Q.   And you've just testified that you don't look at the BNKH

5  when you sign the affidavit and verify its contents?

6  A.   No, because the contents do not correlate with the

7  information within the affidavit.

8  Q.   So, when you're signing these affidavits presented to you

9  by Counsel, you're not verifying post-petition payments, you're

10  simply verifying due dates?

11  A.   I'm simply verifying the information within the affidavit.

12  I'm not validating Option One's payment processing.

13  Q.   But how --

14        THE COURT:  Ms. Goebel, let me ask you a question.

15        THE WITNESS:  Uh-huh. (affirmative response)

16        THE COURT:  Let's assume that a loan is 90 days past

17  due, back to my example of June, July and August have been

18  missed, and now you're getting this affidavit to file.

19        THE WITNESS:  Uh-huh. (affirmative response)

20        THE COURT:  And let's assume that unbeknownst to you,

21  a check has been delivered to Option One for those three months

22  of payment and it literally has crossed in the mail.  It has

23  arrived at their offices.  Counsel has already been contacted

24  to file the Motion for Relief.  You've gotten the affidavit to

25  basically execute and Stay the loan.  So, you look at the

1  computer screen and you see three months past due, because

2  you see the next contractual date was June 1, fine.

3              THE WITNESS:  Uh-huh. (affirmative response)

4              THE COURT:  Now, you're clear on that.  Is there a

5  means by which Option One keeps you, your company, advised on a

6  daily basis of the receipt of funds so that you have real time

7  access to money that might be arriving at their offices?

8              THE WITNESS:  No, we do not --

9              THE COURT:  Okay.

10             THE WITNESS:  -- work with Option One on their

11 postings.

12             THE COURT:  Okay.  So, you really only see it as they

13 post?

14             THE WITNESS:  Correct.

15             THE COURT:  So, if they sit on the check for five

16 days or they put it somewhere, you won't know that?

17             THE WITNESS:  Correct.

18             THE COURT:  And they don't have a system to notify

19 you, "Stop, we've gotten a payment"?

20             THE WITNESS:  They can use Fidelity's information

21 system --

22             THE COURT:  Right.

23             THE WITNESS:  -- to notify us of that, but there

24 isn't a screen in which I can go into and validate.

25             THE COURT:  Okay, that's what I wanted to know.

1          THE WITNESS:  Okay.

2          MR. CASH:  And let me follow up on that just for a

3     second, Dory.

4          THE WITNESS:  Uh-huh. (affirmative response)

5          MR. CASH:  If they were to get a payment and use the

6     information service and send a note that says, "Stop, we just

7     got paid today," would that get to you and stop the process of

8     the affidavit?

9          THE WITNESS:  Yes.

10          MR. CASH:  Okay.

11          THE COURT:  Right.  But there is no automatic system

12     on that, you would have to look.  I guess what I'm asking is

13     the timing can be critical, obviously.  If you sign the

14     affidavit on a Wednesday, and let me ask you this question, let

15     me ask it a different way:

16          If you sign the affidavit on Wednesday and you return

17     it to Counsel, on Friday the account gets posted with three

18     payments.  Now, is there anything that alerts you that on this

19     account that's in mortgage foreclosure now there has been three

20     months payments posted, or there has been a payment posted, so

21     that you will alert counsel that now that affidavit isn't any

22     good?

23          THE WITNESS:  Procedurally, there is a procedure with

24     in which Option One would notify counsel and Fidelity through

25     our system.

1          THE COURT:  Okay.

2          THE WITNESS:  To say, "Stop this action."

3          THE COURT:  Okay.

4          THE WITNESS:  And the attorney would get an immediate

5    notice.

6          THE COURT:  Okay.  So, what happens is the -- and

7    again, I'm just trying to get what you know, because you are

8    the Fidelity representative.

9          THE WITNESS:  Uh-huh. (affirmative response)

10         THE COURT:  Is that if a payment comes in, in the

11   interim or at some different time after you have looked at the

12   screen, you don't necessarily know that because you're not

13   going back and checking the screen every day to see if the

14   situation has changed, that is Option One's responsibility to

15   notify its counsel that the situation has changed?

16         THE WITNESS:  Correct.

17         THE COURT:  Okay.

18   BY MR. MYERS:

19   Q.   But then the question that I have, and you have just

20   testified that you would stop the foreclosure, I believe -- is

21   that your testimony that you would stop it?  Do you have the

22   ability to stop the lift-stay in this particular case?

23   A.   No, Option One would through Fidelity's system notify

24   their attorney to lift the stay, and to stop the action.

25   Q.   And so, you can't stop it, Fidelity can't stop the action?

1  A.   Fidelity does not stop the action, it's Option One.

2  Q.   You just make a recommendation to stop the action?

3  A.   We do not make any recommendations.  Option One would

4  communicate through our system to the attorney to stop the

5  action.

6  Q.   And how -- do you take any steps to verify whether the

7  attorney gets that message?

8  A.   It would just be a message that the attorney would get

9  through our system.

10  Q.   My question was:  Does Fidelity take any steps to

11  determine whether or not the attorney retrieves that message?

12  A.   (No response.)

13  Q.   Do you have a system that notifies you when the attorney

14  logs on to read his e-mail, for example?  And I don't exactly

15  know how you're conveying that message to him, but is there any

16  indicator that shows the message read?

17  A.   There would be -- Option One would task the attorney to

18  respond back to them saying that they have stopped their

19  action, but it's Fidelity, it's through our system, not an

20  action that Fidelity would monitor.

21  Q.   And in this case did Option One make any requests for the

22  attorney to stop?

23  A.   Not that I'm aware of.

24  Q.   Okay.  Having gone through these screens and then

25  verifying that we're going to sign it in this specific case,

1  how long does that take you?

2         MR. CASH:  If you know.

3         THE WITNESS:  Well, reviewing the file and the

4  information, it really just -- I mean probably five to ten

5  minutes to go in and validate the information and validate the

6  screens.

7  BY MR. MYERS:

8  Q.   And how many affidavits do you sign in a day, Ms. Goebel?

9  A.   Typically, less than 30.

10  Q.   Who prepared the affidavit in this case?

11  A.   The attorney's office would have prepared the affidavit.

12  Q.   Specifically?

13  A.   The Boles Law Firm would have prepared this affidavit.

14  Q.   Do you know who in that law firm prepared the affidavit?

15  A.   No.

16  Q.   Does your screen indicate to you when you received the

17  affidavit, who has prepared it other than the Boles Law Office?

18  A.   No.

19         THE COURT:  I mean, does it come from -- I think the

20  question really is, is it:  Do you know the individual that's

21  sending it to you?

22         THE WITNESS:  There would be the name of the

23  individual who put it within Fidelity's system and notified us

24  that there is an affidavit to be executed.

25         THE COURT:  Okay.  But you don't -- that individual

1    may not have prepared it, they might have just put it into

2    the system?

3              THE WITNESS:  I am not familiar with Boles Law Firm's

4    procedures.

5              THE COURT:  Okay, okay.  That's fine.

6    BY MR. MYERS:

7    Q.   And you work in which office?

8    A.   I work in the Mendota Heights, Minnesota office.

9    Q.   And the notary, Paris Jackson, they're in the same office?

10   A.   Yes, she's in the same office.

11   Q.   How many employees is Fidelity utilizing to prepare

12   affidavits?

13             MR. CASH:  Objection, Your Honor.  I don't see how

14   that's relevant to this particular affidavit when this

15   particular person did this particular affidavit.

16             MR. MYERS:  Well, I'm just trying to verify that she

17   only does 30, and I'm coming back around, the only continuity

18   that it appears that I'm going to have is the notary.

19             THE COURT:  All right.  Let me ask this question:

20   How many affidavits, if you know, does the notary end up

21   signing per day?

22             THE WITNESS:  I do not have knowledge of how many she

23   would notarize.

24             THE COURT:  How many individuals in your office sign

25   affidavits?

1          THE WITNESS:  It would depend on the signing

2    authority provided.

3          THE COURT:  Well, you said you signed less than 30 a

4    day?

5          THE WITNESS:  Correct.

6          THE COURT:  Is that typical?

7          THE WITNESS:  Yes, that is typical.

8          THE COURT:  Okay, and of other people, as well?

9          THE WITNESS:  Of other people, yes.

10         THE COURT:  And how many people sign affidavits in

11   your office?

12         THE WITNESS:  There's probably more than ten.

13         THE COURT:  More than ten?

14         THE WITNESS:  Uh-huh. (affirmative response)

15         THE COURT:  More than fifteen?

16         THE WITNESS:  Potentially.

17         THE COURT:  Okay.

18         THE WITNESS:  And there's at least ten or more that

19   have the ability to execute documents.

20         THE COURT:  All right.  And you said there's one

21   notary, or two in your office?

22         THE WITNESS:  There are probably more than ten

23   notaries within our office.

24         THE COURT:  Okay, okay.  That all notarize the

25   affidavits?

1          THE WITNESS:  Yes.

2          THE COURT:  Okay.

3          MR. MYERS:  That's all that I have at this time,

4    Your Honor.

5          THE COURT:  Do you keep copies of the affidavits that

6    are executed by you, Ms. Goebel, or is it just on the system

7    that those are placed?

8          THE WITNESS:  It would just be on the system that

9    it's placed.

10         THE COURT:  Okay.

11         Mr. Haynes, do you have any questions?

12         MR. HAYNES:  I do, Your Honor.  I again will, if the

13   Court would like or permit me to ask questions, and I

14   understand the Court is making that offer, but I would also

15   like to reserve the opportunity if the Court would permit, to

16   have further examination, whether cross-examination or --

17         THE COURT:  Well, I'll give you the opportunity to

18   argue for further, and I assume in the form of a deposition, is

19   that what, or in discovery?

20         MR. HAYNES:  Right.

21         THE COURT:  Okay.

22         MR. HAYNES:  Right, Your Honor.

23         THE COURT:  All right.

24         MR. HAYNES:  And then later if we needed an

25   evidentiary hearing.

1          THE COURT:  All right.

2          MR. CASH:  And just to keep the record clean,

3    Your Honor, we certainly would object to the U.S. Trustee's

4    participation at this point, in a matter that is the Court's

5    Show Cause on a very narrow issue, and in fact, my

6    understanding an issue which has already been resolved with the

7    Debtor as to this one particular affidavit.  I would question

8    the U.S. Trustee's standing in this matter and for the record

9    would want to preserve that objection for review at the

10   Circuit.

11         THE COURT:  All right.  Overruled.

12         MR. CASH:  All right.

13         MR. HAYNES:  Your Honor, would you prefer me to ask

14   questions from here, or from the lectern?

15         THE COURT:  Whatever your preference.

16         MR. HAYNES:  All right.  I would probably prefer

17   that.

18         THE COURT:  All right.

19                    *    *    *    *    *

20                    CROSS-EXAMINATION

21   BY MR. HAYNES:

22   Q.   Ms. Goebel, I have seen this screen, I have been looking

23   at it, that was handed up to you.  Now, as I understand your

24   testimony, I mean from a moment ago, you would not have looked

25   at the BNKH screen when you prepared the affidavit in the

 1  Wilson case?

 2          THE COURT:  When you verified the affidavit.

 3          MR. HAYNES:  Right.  Yes, Your Honor.

 4  BY MR. HAYNES:

 5  Q.  And when you executed the affidavit, in the course of

 6  executing and verifying the affidavit, you would not have

 7  looked at the BNKH screen, is that correct?

 8  A.  That is correct.

 9  Q.  And this BNKH screen itself in the upper right-hand corner

10  shows a print date, is that what it is, of 7/14/08, or what is

11  the reference to July 14th, 2008?

12  A.  That would have been the print date.

13  Q.  Okay.  So, and this is something that your office would

14  not have created, is that correct?

15  A.  That is correct.

16  Q.  That this is a document that Option would have created?

17  A.  This is a screen print of a specific screen within Option

18  One's system.

19  Q.  But again, this is not part of the Fidelity system, not a

20  document that would have been generated by the Fidelity system?

21  A.  It would be a document that is stored within Fidelity's

22  system.

23  Q.  But in terms of who input the content that is in this

24  screen that would have been input by Option, is that correct?

25  A.  Correct.

1  Q.   Do you know if the information that is contained in this

2  screen dated July 14th, 2008 is exactly consistent with the

3  information that would have been in the screen on February

4  28th, 2008?

5  A.   I cannot verify that.

6  Q.   In essence --

7          MR. CASH:   I'm going to have to object to the

8  question.  I think it's misleading, because I think there are a

9  number of entries there that are post February.

10         THE COURT:   I think that's what he's getting at.

11         MR. CASH:   So, I don't see how they could have been

12 the same.

13         THE COURT:   I think he's asking -- I think that's

14 exactly what he's getting at, Mr. Cash that he wants to know if

15 the witness can make that correlation.

16 BY MR. HAYNES:

17 Q.   And to get to Mr. Cash's and the Court's concern and to be

18 clear, what we're saying is:  If we omitted the information

19 after February 28th, 2008 that's here on this July 14th, 2008

20 screen shot, if we look at only the data for dates before, on

21 or before February 28th, 2008, do you know if this screen shot

22 shows identically what would have been on the February 28th,

23 2008 screen shot?

24 A.   If you omitted any entries after February 28th, this

25 screen would be the same.

1  Q.   You're absolutely certain of that?

2  A.   It's a real time system not post by date, the entries that

3  occur.

4  Q.   The entries cannot be modified whatsoever?

5  A.   Option One maintains the system.  I'm not sure if they

6  could modify those.  I would only be able to validate what I

7  would see within the screen.

8  Q.   All right.  What I'm not understanding and what I'm trying

9  to clarify with you, Ms. Goebel, is what is the point of this

10  screen shot?  I don't understand in terms of explaining to the

11  Court, if you didn't look at it, if you're not certain if it

12  contains the information that would have been there on February

13  28th, what relevance does this have to the proceeding today?

14         MR. CASH:  Your Honor, I think I would be better

15  speaking to the relevance since I'm the lawyer.  The relevance

16  is I think that that screen shot shows that what she swore to,

17  her affidavit, corresponds with what was posted, and that she's

18  being accused of signing a false affidavit when postings that

19  didn't occur until after she signed the affidavit.  That's the

20  relevance of the screen shot.

21         THE COURT:  But she didn't look at it.  Okay, but I

22  don't know --

23         MR. CASH:  But whether she looked at it or not,

24  Your Honor, the reality of what is there, I think, corresponds

25  with what she signed.  So, that was the relevance of the

1    affidavit.

2              THE COURT:  Okay.

3              MR. CASH:  Of that document.

4              THE COURT:  Okay, I guess.

5              MR. HAYNES:  Your Honor, while we're at it, if we

6    can, I would move this screen shot into evidence and I would

7    move the corporate resolution into evidence.  I believe those

8    are the only two matters that were --

9              THE COURT:  Any objections?

10             Admitted.

11   BY MR. HAYNES:

12   Q.   The Court asked, Ms. Goebel, about amounts that might be

13   in a suspense account?

14   A.   Yes.

15   Q.   And there was some discussion that there is the ability to

16   communicate with Option about amounts in the suspense account.

17   You can do that through Fidelity's system, is that correct?

18   A.   That is correct.

19   Q.   All right.  And I want to go back through the -- I guess

20   that what I'm trying to do is to distinguish between the

21   potential to be able to look at suspense amounts and what

22   happened in this case.  Now, when you were outlining your steps

23   for the Court, I think you said there were four or five steps

24   and I'm trying to clarify that.  Is it the case that in every

25   affidavit that you're verifying --

1      Well, let's go back.  And let's deal with this specific

2  case.

3  A.   Okay.

4  Q.   Do you recall whether you looked at a screen shot that

5  would show suspense amounts for the Wilson case?

6  A.   Yes.  The suspense amount would be shown in the Pay 4

7  screen.

8  Q.   Okay.  Well okay, let's break that down.  You could access

9  a suspense amount screen for the Wilson account, correct?

10 A.   Yes.

11 Q.   All right.  Do you have a specific recollection of looking

12 at that screen for this account, when you were verifying that

13 affidavit?

14 A.   Yes, when I verify affidavits, I would verify the Pay 4

15 screen which would show your suspense amount.

16 Q.   That's your practice, correct?

17 A.   Correct.

18 Q.   But do you have a specific recollection of looking at that

19 screen with regard to this affidavit?

20 A.   Not with regard to this affidavit, no.

21 Q.   Okay.  Now again, I understand that you can look at that,

22 potentially.  Are you saying that that's your practice every

23 time that you prepare an affidavit, or I mean verify an

24 affidavit for Option, that you always look at the amount in the

25 suspense account?

1    A.    Yes.

2    Q.    Okay.  Now, let's say -- and again, because you don't have

3    a specific recollection for this account, I'm trying to

4    understand the process.  What if there was one dollar in that

5    suspense account, what would happen in the process at that

6    point?

7    A.    We would notify Option One.

8    Q.    All right.

9    A.    And ask them -- and let them review the file.

10   Q.    Typically, what is the typical response that you get from

11   Option if you notify them that there is one dollar, or some

12   amount in suspense?

13   A.    It would be a case by case basis.

14         MR. CASH:  Objection.  Well, and I was going to say

15   objection, Your Honor, it's not relevant to this case.

16         MR. HAYNES:  Your Honor, I think it's relevant to

17   know the practice, because there's --

18         THE COURT:  I'll allow it.  I'll allow it.

19   BY MR. HAYNES:

20   Q.    So Ms. Goebel, you say it would vary from case to case?

21   A.    Correct.

22   Q.    What would be the options for -- or, what would be the

23   types of responses that Option would normally make when you

24   notify them about amounts in suspense?

25         MR. CASH:  Again, Your Honor, just for the record I'm

1    going to have to object.  There has been no evidence that

2    there were amounts in suspense.  There has been no evidence

3    that it's relevant to this lawsuit.

4              THE COURT:  It is relevant from this perspective,

5    Mr. Cash and that's why I'm allowing it.  There were payments

6    that were received by Option One.  They weren't evidently

7    posted to the account.  They were held by Option One.  Now, why

8    they didn't show up on the suspense account is something that

9    I'm going to get into with Option One, but I want to understand

10   what Fidelity does to check, so that I verify that in fact it

11   wasn't on the system when this affidavit was signed, fair

12   enough?

13             MR. CASH:  Fair enough, Your Honor.

14             THE COURT:  Okay.

15   BY MR. HAYNES:

16   Q.   Ms. Goebel, then I'm going to go back to my question, and

17   my question is:  When you said, "Well, Option's response can

18   vary from case to case," what I'm asking you are what are the

19   types of responses that Option can send back to Fidelity?

20   A.   Well, depending on their review of the case, they will

21   advise us what actions to take or they will go to counsel and

22   advise them to re-execute an affidavit.

23   Q.   Okay.  And going back, I think the Court asked this

24   question but I'm going to make sure I understand the answer.

25   You reviewed the communication in the Wilson account that

1  Fidelity had with Option before you testified today, is that

2  correct?

3  A.   I reviewed the account and I -- yes.

4  Q.   Ma'am?

5  A.   I reviewed this particular, specific account, yes.

6  Q.   Did you review the screens that would have reflected

7  communications between Fidelity and Option regarding the Wilson

8  account?

9  A.   Yes.

10  Q.   All right.  And you did not see in that data concerning

11  communications, that Fidelity had notified Option about any

12  amounts in the suspense account, is that correct?

13  A.   That is correct.

14  Q.   And per your normal practice would that indicate to you

15  that you had checked the amount in suspense and found that it

16  was zero?

17  A.   Yes.

18  Q.   You would always notify Option even if there was one

19  dollar in a suspense account, is that correct?

20  A.   That is correct.

21  Q.   Again, to clarify the steps:  You look at a screen that

22  shows the date loan due, is that correct?

23  A.   The post-petition due date, that is correct.

24  Q.   And what is that screen called?

25  A.   BNKA.

1  Q.   BNKA?

2  A.   Yes.

3  Q.   And another thing you do is look at the payment amounts,

4  is that correct?

5  A.   The monthly payment amount, yes.

6  Q.   And you're trying to verify the specific to the penny

7  amount that the Debtors are supposed to pay each month?

8  A.   Correct, and verify the information of what their monthly

9  payment amount would be.

10 Q.   You mentioned something about payment changes, or let's go

11 back to my prior question:  When you said you look at the

12 payment's amount, the payment amounts that would be due, what

13 screen is that called?

14 A.   PCH2.

15 Q.   All right.  Then you talked about changes in the monthly

16 payment amount, what screen is that called?

17 A.   That's the PCH2 screen.

18        MR. CASH:  Objection.  Your Honor, at this point I

19 have to object.  Our screen, what we call our screens is not

20 relevant to this case and it's certainly proprietary to us,

21 what our internal names of our internal documents are.

22        THE COURT:  I don't think that that's of such a

23 proprietary nature that knowing the name of a screen is going

24 to matter in this case.

25        MR. CASH:  And I would --

1        THE COURT:  I think for clarity purposes, it will

2   say where the information is obtained.  It's necessary for

3   clarification of the record.  Overruled.

4   BY MR. HAYNES:

5   Q.   And then Ms. Goebel, you said that you would look at the

6   total amount due.  What screen does that come from?

7   A.   Pay 4.

8   Q.   I'm sorry, pay?

9   A.   P-A-Y, 4.

10  Q.   F-O-R?

11  A.   The number four.

12  Q.   Four?

13  A.   Yes.

14  Q.   You mentioned, as well, the potential that Option could

15  notify you about payments that come in on an account, and I'm

16  going to start with the Wilson account.  Do you have any

17  specific recollection that Option notified Fidelity that

18  payments had come in after February 28th, 2008?

19  A.   I believe I had stated that Option One had the ability to

20  notify their attorney through Fidelity's system.  There are

21  notes within Fidelity's system that Option One was working with

22  the Boles Law Firm.

23       THE COURT:  Meaning that they had notified the Boles

24  Law Firm that they had received payments?

25       THE WITNESS:  Correct.

1          THE COURT:  All right.  You said there were

2   notations in the Fidelity system.  Let me just make sure we've

3   got this straight, that Option One had notified the Boles Law

4   Firm that payments had been received?

5          THE WITNESS:  Correct.

6          THE COURT:  And you saw those?

7          THE WITNESS:  Yes, and the information --

8          THE COURT:  When you reviewed for today?

9          THE WITNESS:  Yes.

10          THE COURT:  Okay.  When you were verifying the

11   affidavit, you don't review correspondence, correct?

12          THE WITNESS:  Correct.

13          THE COURT:  Okay.  So, you don't look at the

14   correspondence screens either, from Option One to Boles, or

15   from Option One to Fidelity?

16          THE WITNESS:  We would review communication to

17   Fidelity.

18          THE COURT:  All right.

19          THE WITNESS:  But the communication between Option

20   One and the Boles Law Firm, we would not review.

21          THE COURT:  All right.  So, an additional screen then

22   that you would look at when you were verifying the affidavit

23   would be a quick check of the correspondence between Fidelity

24   and Option One?

25          THE WITNESS:  Right.

1              THE COURT:  Okay.

2              THE WITNESS:  Correct.

3              THE COURT:  So, that would be one more step you would

4      perform before you signed the affidavit?

5              THE WITNESS:  We would look within our system to see

6      the communication, yes.

7              THE COURT:  Okay.  I'm just trying to get -- but you

8      don't have -- but the step isn't taken out.  Now, when you

9      looked at this particular case, preparing for today, you saw

10     correspondence between Option One and Boles regarding your

11     receipt of additional payments.  Does that correspondence date

12     to before you signed your affidavit?

13             THE WITNESS:  It would appear that there was

14     communication before the execution of the affidavit and after

15     the execution of the affidavit.

16             THE COURT:  Okay.  So it was during this entire time

17     frame?

18             THE WITNESS:  Correct.

19             THE COURT:  The payments were being received.  Do you

20     remember how many?

21             THE WITNESS:  I do not recall.

22             THE COURT:  Okay.  Did you see any correspondence

23     that directed the Boles Law Firm to stop its action to Lift the

24     Motion to Stay, early?

25             THE WITNESS:  No.

1          THE COURT:  Okay.

2    BY MR. HAYNES:

3    Q.  Ms. Goebel, you indicated that before coming to testify

4    today that you did look at the communications that were

5    available there in the Fidelity screen.  And I want to ask you,

6    I know you indicated -- well, let me ask you to do this:

7    Clarify whether Fidelity ever, in preparing its affidavits,

8    looks at the communication between Option and the law firm?

9          MR. CASH:  Objection, Your Honor.  Fidelity doesn't

10   prepare affidavits.

11         THE COURT:  All right.  For purposes of this record

12   if anybody says that we are going to have on the record it's

13   straight that we have gotten it established that they don't

14   prepare the affidavits, they just verify the amounts and the

15   allegations in the affidavits, based on the information that

16   they are testifying that they checked.

17         MR. HAYNES:  I apologize Your Honor, I don't mean

18   to --

19         THE COURT:  Okay, let's go.

20         MR. HAYNES:  All right.

21   BY MR. HAYNES:

22   Q.  When Fidelity -- in the process of verifying affidavits

23   for Option, does Fidelity look at the communication going on

24   between Option and its law firm?

25   A.  No.

1  Q.   And why is that?

2  A.   With regard to the procedure for executing the affidavit,

3  we validate the information within the affidavit.

4  Q.   But wouldn't that communication between Option and its

5  attorney be a source of information that would indicate that

6  the amounts due screen or the date due screen might be

7  inaccurate?

8  A.   No.  The attorney prepares and requests the execution of

9  the affidavit.  They are familiar with the information going on

10 with the case and they have direct access to talk with Option

11 One.  We would leave it in the hands of the attorney to handle

12 the case.

13 Q.   But at the time that Option is preparing -- I mean, excuse

14 me, that Fidelity is verifying an affidavit, it could access

15 those communications going on through Fidelity's system?

16 A.   Yes.

17 Q.   I believe you testified, Ms. Goebel, that you are an

18 assistant vice president in bankruptcy support?

19 A.   For Lender Processing Services, yes.

20 Q.   And is that a different title than you had with Fidelity?

21 A.   No.

22 Q.   It's the exact same title?

23 A.   Yes.

24 Q.   And how long have you had that position of assistant vice

25 president in bankruptcy support?

1    A.    I have held that position since September of 2007.

2    Q.    Are you an employee of Option One Mortgage Corporation?

3    A.    No.

4    Q.    What are your job duties with -- or when you were working

5    with Fidelity, what were they?

6              MR. CASH:  Again, Your Honor, objection.  Beyond

7    this, her job duty of verifying and executing this affidavit,

8    her other job duties just are not relevant in this issue and

9    this is not a deposition.

10             THE COURT:  Well --

11             MR. MYERS:  Your Honor, if I could add on that before

12   you rule.  It is relevant to this because it goes to time.  And

13   if her job duties exceed the ability she has to do time, I

14   think it could shorten how much time she spends on an

15   affidavit.

16             THE COURT:  I was going to say I think it's relevant

17   to the extent of her experience and her knowledge of the

18   systems and her ability to verify the affidavits and execute

19   them.  So, I'll allow it.

20             THE WITNESS:  As an assistant vice president, my job

21   duties are to oversee and manage the Bankruptcy Support

22   Department, which includes assisting and monitoring information

23   between the client systems and Fidelity's system.

24   BY MR. HAYNES:

25   Q.    You mentioned that you oversee the Bankruptcy Support

1  Department.  How many employees are there in the Bankruptcy

2  Support Department?

3  A.   Within the Department I have 70 employees that I oversee.

4  Q.   And the 70 employees all report up to you, is that

5  correct?

6  A.   No, I have four managers who would report directly to me.

7  Q.   But and then, do the other employees report to those

8  managers?

9  A.   Through a chain of management, yes.

10 Q.   Ultimately, you have the management over those 70

11 employees, correct?

12 A.   Correct.

13 Q.   Now, in terms of the affidavit verification process, how

14 does your office physically obtain a copy of the affidavit?

15 A.   The Boles Law Firm would provide us the affidavit through

16 our information system.

17 Q.   Is it, just so I'm a technology novice, is it technically

18 a PDF document that you can just print?

19 A.   Yes.

20 Q.   All right.  Now, as you say, I believe you said you have a

21 copy of the affidavit in front of you?

22 A.   Correct.

23 Q.   And if you could turn to the second page, Paragraph 6?

24 A.   Yes.

25 Q.   The last sentence on that paragraph says, "The Debtors are

1  delinquent on post-petition arrearages for the months of

2  November 1, 2007 through and including February 1, 2008,

3  through date on the direct monthly mortgage payments of

4  $1,546.84."

5      Now, I didn't understand what was being said with that

6  phrase immediately after February 1, 2008, "through date on the

7  direct monthly mortgage payments."  What does that mean,

8  through date on?

9  A.   It means that the Debtor is delinquent November 1st, 2007,

10  December and January and February in the amount of $1,546.84.

11  Q.   Well, I understand the sentence up to February 1, 2008,

12  but I don't understand that next phrase, "through date on the

13  direct monthly mortgage payments of $1,546.84."  What is that

14  trying to convey?

15  A.   I did not prepare the affidavit.  I verified the

16  information within in.

17  Q.   So your office, again, consistent with what you have said,

18  this sentence was already in the affidavit when you signed it,

19  correct?

20  A.   Correct.

21  Q.   Did that sentence make sense to you?

22  A.   What I validated was the Debtor was post-petition

23  delinquent starting on November 1st, 2007 and their monthly

24  payment amount was $1,546.84.

25  Q.   But you don't know the meaning of "through date on the

1   direct monthly," that part?

2   A.    I did not prepare the affidavit.

3   Q.    Now, in this affidavit, Ms. Goebel, I see -- my count is

4   eight blank spaces if we start at the first page of the

5   affidavit?

6   A.    Okay.

7   Q.    And in each of those blanks there appears to be different

8   types of information, a different way of printing that

9   information, different fonts, if you will.  So, let's take the

10  first three.  The first one has your name, Dory Goebel, there

11  (indicating), and that's the first blank.

12       The next blank in paragraph one has "assistant secretary,"

13  and do you see how those have separate fonts?

14  A.    Yes.

15  Q.    All right.  So, when the affidavit was at your office, was

16  someone inserting "Dory Goebel" in that blank?

17  A.    Yes.

18  Q.    And how is that inserted?

19  A.    With a stamp.

20  Q.    So, that part of this affidavit is prepared by your

21  office, the filling in of that blank?

22  A.    We would fill in the name and our title.  As I stated

23  there are over ten to fifteen authorized signers within our

24  office, dependent -- we all have a number of affidavits we are

25  responsible for executing.  When these come to our office they

1   separate them out and put our name within the affidavit.

2   Q.   Then in the blank space "assistant secretary," how would

3   that have come to be put in that blank?  Would your office have

4   done that, as well?

5   A.   Yes.

6   Q.   Is that with a stamp, as well?

7   A.   Correct.

8   Q.   Then, on the second page in paragraph four, there is a

9   blank there and someone has written in handwriting "Dory

10  Goebel."  Would that have been done in your office, as well?

11  A.   (Witness examines document.)  Yes.

12  Q.   Yes?

13  A.   Yes.

14  Q.   Then of course, we see on the last page of the

15  affidavit --

16          THE COURT:  Wait, stop.

17          Whose handwriting is that, if you recognize it?

18          THE WITNESS:  I could not validate whose handwriting

19  that is.  We have our document execution team that would fill

20  this out.

21          THE COURT:  Okay.  So, you have a document execution

22  team?  You mentioned earlier that when the affidavits come in

23  they get sorted because there are maybe ten or fifteen people

24  who can sign them?

25          THE WITNESS:  Correct.

1          THE COURT:  The document execution team sorts the

2    affidavits?

3          THE WITNESS:  Sorts them and brings them to the

4    signers, yes.

5          THE COURT:  Okay.  And they are the people that are

6    putting these stamps on that say your name and the assistant

7    secretary?

8          THE WITNESS:  Correct.

9          THE COURT:  And maybe they missed this block, and so

10   they filled it in by hand?

11         THE WITNESS:  Correct.

12         THE COURT:  Okay.  Okay, but you're the person who

13   actually verifies the information, correct?

14         THE WITNESS:  Yes.

15         THE COURT:  Okay.  So, you're the one who physically

16   looks at the screens?

17         THE WITNESS:  Correct.

18         THE COURT:  Okay.  And they bring you a stack?

19         THE WITNESS:  They bring me a stack of documents

20   then.

21         THE COURT:  And they say, "Here is your homework for

22   today"?

23         THE WITNESS:  Here's my list of documents for today,

24   yes.

25         THE COURT:  Okay.  And then you start going through

1   them and checking the screens?

2           THE WITNESS:  Correct.

3           THE COURT:  Okay.

4           THE WITNESS:  Yes.

5   BY MR. HAYNES:

6   Q.   And then the witnesses who signed, as well, work in your

7   office, correct?

8   A.   Correct.

9   Q.   They're among the 70 employees that you manage?

10  A.   They are among the document execution team, yes.

11  Q.   They are among those 70 people that --

12  A.   I do not manage the document execution team.  So, they are

13  among our office, correct, and they are a part of the document

14  execution team that gets the affidavits ready for us, and

15  validates that we sign the affidavit and then puts it back into

16  the system to send to Boles Law Firm.

17  Q.   So, these two witnesses don't report up to the managers

18  that ultimately report up to you, is that correct?

19  A.   Correct.

20  Q.   Now, in terms of the actual signing of this affidavit, do

21  you have a specific recollection of Paris Jackson and these

22  other, and these two witnesses being at a certain location when

23  this was signed?

24  A.   Yes, Seretha Hobson (phonetic) and the other witness bring

25  the documents to us and pick the documents up.  Paris Jackson

1  is the one who typically stamps my name to my documents for

2  me and notarizes the documents that I execute.

3  Q.    And again, I want to be specific to this affidavit in the

4  Wilson account.  Do you have a specific recollection of signing

5  this affidavit?

6  A.    No.

7  Q.    All right.  So, going with your phrasing of the typical

8  process, does that typically occur that you would be sitting in

9  your office and these three people would come in, the two

10  witnesses and a notary would come in and sign it, or would you

11  all go to a separate location, or how does that process work?

12  A.    Once I validate the information at my desk I would execute

13  the document.  And after I have executed and signed it, Paris

14  Jackson would then take the document back to her desk and

15  notarize it.

16  Q.    All right.

17  A.    After she has seen me execute it.

18  Q.    Right.  And would those witnesses be in the same room with

19  you, in your office while you were signing it?

20  A.    They would be in the building, yes.

21       THE COURT:  That's not the question.  Are they in

22  your office?

23       THE WITNESS:  I have a cube on the floor.  They would

24  be near me and around my cube, yes.

25       THE COURT:  Are they in your cube, watching you sign?

1      THE WITNESS:  No.

2      THE COURT:  Okay.

3  BY MR. HAYNES:

4  Q.   Ms. Goebel, I want to now ask you about the phrasing of

5  the affidavit back on paragraph six, Page 2.

6  A.   (Witness examines document.)

7  Q.   Do you see where it says that the Debtors are delinquent

8  on post-petition arrearages for the months of November 1, 2007

9  through and including February 1, 2008?

10 A.   Yes.

11 Q.   Do you know if that identical phrasing is contained in the

12 Motion to Lift Stay?

13 A.   No, that would be something the attorney would prepare.

14 Q.   You wouldn't control if it's phrased that way or if

15 different months are stated as being past due in the motion, is

16 that correct?

17 A.   Correct.

18 Q.   After your office executes the affidavit and sends it to

19 the attorney, is it the typical process that you would notify

20 the law firm about any additional information with regard to

21 payments on a borrower's account?

22 A.   We would not notify them about payments on a borrower's

23 account.  That would be Option One.

24 Q.   And again, with regard to the Wilson account, from your

25 review of what you looked at before you came today, there was

1  no -- was there -- I'll ask it this way:  Was there any

2  communication from Fidelity to the Boles Law Firm about any

3  additional payments that came in?

4  A.   No, that is not a responsibility of Fidelity.  We would

5  not know of additional payments, Option One would.

6  Q.   You're saying it's not Fidelity's responsibility, but you

7  signed this as Option One's assistant secretary, correct?

8  A.   Based on the corporate resolution, yes, that is correct.

9            MR. HAYNES:  Your Honor, for now that's what I --

10  those are my questions.

11            THE COURT:  Any other questions, Mr. Cash?

12            MR. CASH:  Just briefly.

13                      *   *   *   *   *

14                    REDIRECT EXAMINATION

15  BY MR. CASH:

16  Q.   Dory, I think that we may need to clarify Fidelity's role

17  a little bit.

18  A.   Okay.

19  Q.   When you sign an affidavit, you do it as an officer of

20  Option One, based on a corporate resolution, not as an officer

21  of Fidelity, is that correct?

22  A.   Correct.

23  Q.   And debtors don't make payments to Fidelity, correct?

24  A.   Correct.

25  Q.   They make them to Option One?

1  A.    Correct.

2  Q.    And I think there was a question asked, and I don't

3  remember who asked it, but it was:  And if Option One got a

4  payment and they notified you, then would you notify the lawyer

5  to stop?  Fidelity isn't a go between, are they?

6  A.    No.

7  Q.    Option One uses our system, like the Verizon network, the

8  guy with those friends in the helicopter, they use our network

9  to communicate directly with their lawyer, is that correct?

10  A.    Correct.

11  Q.    All right.  I want to go to a little different issue, just

12  for a minute, because I think that we need to make a record of

13  it.  You were instructed to be here in this court one time

14  before, is that correct?

15  A.    Correct.

16  Q.    And on that date, where were you, with me?

17  A.    I was at another hearing in Ohio.

18  Q.    Okay.  And on that date there were actually two hearings

19  that we were ordered to be at, in Ohio, is that correct?

20  A.    That is correct.

21  Q.    And we were ordered to be at those before we were ordered

22  to be at these?

23  A.    Yes.

24  Q.    Okay.

25              MR. CASH:  Your Honor, one of the things that I'm

1  going to move for, is she was sanctioned for not appearing

2  at a hearing and she really was in a Hobson's choice of having

3  to decide whether to go --

4       THE COURT:  But she didn't notify the Court that she

5  was in a Hobson's choice.

6       MR. CASH:  Actually, Your Honor --

7       THE COURT:  All it took would be a -- was a call.

8       MR. CASH:  A continuance, a Motion for Continuance on

9  that basis was filed by the Boles Law Firm.  It's my

10 understanding that she could not appear because she was in

11 another hearing.

12      THE COURT:  I don't think that's true.  We continued

13 it once for that reason, but then on the second hearing she

14 didn't show up.

15      MR. CASH:  Well, and then if that wasn't filed then I

16 apologize, Your Honor.  I was under the impression that it had

17 been.

18      THE COURT:  You can check the record, but it was not

19 raised to me.

20      MR. MYERS:  Your Honor, an untimely filed response

21 was filed, and I opposed it.

22      THE COURT:  Okay.  Well, if it was untimely, the

23 chances are the Court didn't see it.

24      MR. CASH:  Okay.  I guess I would just request that

25 the Court may reconsider the sanction, given that she had --

1    she couldn't have been in both places at once.

2           THE COURT:  No, she certainly can't unless she can

3    bi-locate.  But the issue really is did she notify the Court of

4    that fact, and I'll take and I'll look at the record.

5           MR. CASH:  Thank you, Your Honor.

6           MR. MYERS:  It was, Your Honor.  And while we're on

7    that point, the problem that I have with it, and in fact my

8    response is characterized:  Response to Motion to Continue

9    filed less than 48 hours before the hearing.  And I went

10   through it line by line.  The problem that I have with this is

11   that Option asked to continue that other hearing in the other

12   court, and they moved it into a conflict situation, and they

13   had ample time to change this up.

14          THE COURT:  All right.  I'll take a look at it.

15          MR. MYERS:  My response --

16          THE COURT:  My concern is, well, it's several.  The

17   Orders to Show Cause generally gives a 30 day, certainly a 20

18   to 30 day notice, and they would have known that there was

19   another, if your representation is correct, that the other

20   court hearing was scheduled before this one, you would have had

21   30 to 20 days to file it, and 48 hours before would not have

22   been timely to notify the Court.

23          I suspect I did not know that there was another

24   hearing, because I typically don't sanction people, but I do

25   require that the Court be notified well in advance so that we

1  all don't waste our time.

2          MR. CASH:  I agree, Your Honor.  And I don't think

3  that we knew.  And I understand Dory's dual capacity here as an

4  officer of Option One.  I don't think Fidelity was aware of the

5  hearing until very shortly before, and I don't think that

6  counsel for Option One was aware of the conflict until, as the

7  result, until very shortly before.  But I was just more

8  speaking to her in her individual capacity.

9          THE COURT:  Well, I understand that, but I have her

10  side.  I don't guess who people are.

11          MR. CASH:  I understand.

12          THE COURT:  I see a signature on an affidavit, I see

13  a signature on a proof of claim, that's who I order to come in.

14  They sign as representatives of the particular creditor.  I'm

15  not going to get into the communications that occur between the

16  various parties.  I'll take a look at it, Mr. Cash.

17          MR. CASH:  Thank you, Your Honor.

18          THE COURT:  I'm not saying I'll remove it.

19          MR. CASH:  I understand.

20          THE COURT:  You may step down.

21          THE WITNESS:  Thank you.

22      (Witness is excused)

23          THE COURT:  I have another hearing scheduled at

24  11:00.  I think I'm going to need to hear from Option One.  I

25  assume that Mr. Arthur, you are the representative of Option

1  One?

2          MR. SIMMONS:  Yes.

3          THE COURT:  Correct?

4          MR. SIMMONS:  Uh-huh. (affirmative response)

5          THE COURT:  You're not counsel, you're actually a

6  representative?

7          MR. SIMMONS:  Representative of the company.

8          THE COURT:  Okay.  So, I think at this point we will

9  probably need to recess until after lunch, and take this back

10  up at probably, let's say 2:00.

11          MR. MYERS:  And Your Honor --

12          THE COURT:  Because the next hearing is going to take

13  an hour.

14          MR. MYERS:  Do you want me at that hearing at 2:00,

15  too?

16          THE COURT:  It's your call, Mr. Myers.

17          MR. MYERS:  All right.

18          THE COURT:  Yes.

19          MR. MYERS:  All right.

20          THE COURT:  Okay.

21          MR. WIRTZ:  Your Honor, will there be anything else

22  on the docket at that time, or will we be called at 2:00?

23          THE COURT:  You will be called at 2:00.  There's

24  nothing else on the docket.  We had a trial but it was

25  continued.

1          MR. WIRTZ:  All right.

2          THE COURT:  Okay.  Thank you very much.

3          MR. CASH:  Your Honor, just for scheduling purposes,

4   I'm happy to go as long as we need to go.  There are not a ton

5   of flights from New Orleans to Memphis each day.

6          THE COURT:  What is your last flight?

7          MR. CASH:  My recollection, Your Honor, is it's at

8   4:25, which is the one that I'm on.  So, I am happy if the

9   Court wants me to stay over or catch a flight in the morning, I

10  can easily make those arrangements.

11         THE COURT:  I think you can probably be out of here

12  by 3:30, that's an hour and a half.  It's one witness.

13  Presumably that's all it's going to take.

14         MR. WIRTZ:  Your Honor, Mr. Simmons is flying out at

15  1:00 as scheduled today to Jacksonville, so.

16         THE COURT:  No, Mr. Simmons isn't.

17         MR. WIRTZ:  Well, right.  He's just scheduled to, but

18  we'll be here at 2:00.

19         THE COURT:  Okay.

20         MR. CASH:  Thank you, Your Honor.

21         MR. MYERS:  Thank you, Your Honor.

22      **(Recess from 11:10 a.m. to 2:30 p.m.)**

23         THE CLERK:  Please be seated.

24         This is a continuation of the hearing on August 21st,

25  2008, Number 07-11862, Ron and LaRhonda Wilson.

1       THE COURT:  Okay.  First a housekeeping matter.

2   We need the corporate resolution for the record.

3       MR. CASH:  I was under the impression that it had

4   already been handed up, Your Honor, and I brought it to lunch

5   and it's in the car and I will bring it back to the Court at a

6   break.

7       THE COURT:  Okay.  But please do not leave without

8   giving it to us.

9       MR. CASH:  All right.

10      THE COURT:  That's your responsibility, okay?

11      MR. CASH:  I will make sure of that.

12      THE COURT:  Okay.  That was Mr. Cash on the record.

13      MR. CASH:  Yes, it was, that was me.

14      THE COURT:  Okay.  Where did we leave off?  I guess

15  it's now Mr. Arthur's turn?

16      MR. WIRTZ:  That would be fine, Your Honor.

17      THE COURT:  Is that correct, Mr. Wirtz?

18      MR. WIRTZ:  That will be fine.

19      THE COURT:  Okay.  Mr. Arthur?

20      MR. WIRTZ:  Your Honor, Clay Wirtz representing

21  Option One Mortgage Company.  This is Mr. Arthur Simmons

22  representing Option One.

23      THE COURT:  Oh, I'm sorry, it's Mr. Arthur Simmons.

24      MR. SIMMONS:  Yes, ma'am.

25      THE COURT:  I thought Arthur was your last name.

1      MR. SIMMONS:  No, it's Simmons.

2      THE COURT:  Come up to the witness stand, please.

3                    *    *    *    *    *

4              **ARTHUR SIMMONS, WITNESS, SWORN**

5                    *    *    *    *    *

6                    DIRECT EXAMINATION

7  BY MR. WIRTZ:

8  Q.   Mr. Simmons --

9      THE COURT:  Mr. Wirtz, I need you to stand by the

10 mike, please, because we won't pick you up if you don't.

11     MR. WIRTZ:  Okay, sure.  I'm sorry.

12 BY MR. WIRTZ:

13 Q.   Would you please state your name for the record?

14 A.   Arthur Simmons.

15 Q.   And what company do you work for?

16 A.   American Home Mortgage, formerly Option One Mortgage.

17 Q.   Okay.  And what title do you hold?

18 A.   Legal Action Specialist III.

19 Q.   Okay.  With regard to this Wilson loan that is the subject

20 of these proceedings, could you give us a current status of

21 that loan?

22 A.   Okay.  She's currently due for August of '08 with

23 $1,495.59 in suspense.

24     THE COURT:  Okay.  Can you give me the number again,

25 please, Mr. Simmons?

1          THE WITNESS:  It's $1,495.59 in suspense.

2          THE COURT:  Okay.

3          MR. WIRTZ:  Okay Your Honor, at this time Mr. Simmons

4   would be happy to answer any questions that the Court has.

5          THE COURT:  Okay.  Mr. Simmons, why is the $1,495.59

6   in suspense?

7          THE WITNESS:  When the borrower paid every month they

8   included late charges, and the late charges --

9          THE COURT:  Meaning Option One included late charges?

10         THE WITNESS:  No, meaning the borrower included late

11  charges --

12         THE COURT:  All right.

13         THE WITNESS:  -- as a part of their payment.

14         THE COURT:  All right.

15         THE WITNESS:  And the loan, being in bankruptcy it's

16  not assessed late charges.

17         THE COURT:  All right.

18         THE WITNESS:  So, we basically --

19         THE COURT:  All right.  So, that has been building

20  up?

21         THE WITNESS:  Yes, it has been building up and we

22  just basically removed that money to suspense.

23         THE COURT:  Okay.  So, the $1,495.59 is what you

24  believe to be the accrual of late charges on the loan?

25         THE WITNESS:  Exactly.

1          THE COURT:  Okay.  Then, let's talk about the

2    history of the loan from the perspective of the affidavit.  Are

3    you familiar with the affidavit that was filed?

4          THE WITNESS:  Yes, I am.

5          THE COURT:  Okay.  And you were in the courtroom when

6    you heard the testimony, correct?

7          THE WITNESS:  Right.

8          THE COURT:  And the representations of Mr. Cash's

9    counsel for Fidelity?

10          THE WITNESS:  Right.

11          THE COURT:  All right.  So, I want to go through some

12    of what they represented to the Court and I want to get your

13    testimony as the representative of Option One on the procedures

14    and the way that this particular matter was handled.

15          THE WITNESS:  Okay.

16          THE COURT:  Okay?

17          THE WITNESS:  Okay.

18          THE COURT:  All right.  I believe Ms. Goebel

19    testified that Fidelity is simply a, for want of a better term,

20    a library of sorts, that they house documents and records and

21    accounting information for the benefit of their client lenders,

22    and that lawyers become members or participate by paying a fee

23    to them, and get access, I'm sure with the lender's permission,

24    but access to their database in an effort to assist the lender

25    with whatever actions are needed to collect the loan, is that a

1  fair summary of what you heard?

2           THE WITNESS:  That's correct.

3           THE COURT:  Okay.  So, do you agree with the

4  testimony that Option One is simply a warehousing facility and

5  not -- and performs no other real functions for Option One?

6           THE WITNESS:  That's correct.

7           THE COURT:  Okay.  When Option One signed its

8  contract with Fidelity --

9           MR. WIRTZ:  Excuse me, Your Honor.  And just for the

10  record to be straight, I think you said that Option One is a

11  warehouse.

12           THE COURT:  Excuse me.

13           MR. WIRTZ:  And I know you meant Fidelity.

14           THE COURT:  Fidelity is a warehousing for Option One.

15           THE WITNESS:  I understand, yes.

16           THE COURT:  I'm sorry.

17           THE WITNESS:  Right, yes.

18           THE COURT:  You have to correct me when you hear

19  that.

20           THE WITNESS:  Okay.

21           THE COURT:  All right.  When Option One retained

22  Fidelity for this purpose, for handling this function, which

23  I'll just call the library of your information, are you

24  familiar with that particular arrangement, that contract?

25           THE WITNESS:  No, I'm not.  I'm not familiar with the

1    contract between Fidelity and Option One.

2             THE COURT:  Okay.

3             THE WITNESS:  Not the specifics.

4             THE COURT:  Okay.  Do you know if Fidelity is paid a

5    fee?

6             THE WITNESS:  I have no idea how that works.

7             THE COURT:  Okay.  So, you don't have that kind of

8    information?

9             THE WITNESS:  I don't have that kind of information,

10   no.

11            THE COURT:  What is your position with Option One,

12   and you said now it's called -- what's the name?

13            THE WITNESS:  A Legal Action Specialist III.

14            THE COURT:  Okay.

15            THE WITNESS:  And basically, I'm responsible for

16   monitoring loans, handling the escrow piece, just various

17   bankruptcy functions.

18            THE COURT:  Okay.  So, when a debtor or a borrower

19   for Option One goes into bankruptcy, is the loan transferred to

20   your department to be monitored?

21            THE WITNESS:  Actually, not.  It's loaded onto the

22   system by Fidelity.

23            THE COURT:  Okay.

24            THE WITNESS:  They have systems in place and they

25   would have to speak to that.  I don't know the specifics of

1   that, but once a loan goes into bankruptcy it's loaded onto,

2   on the system and we start processing the loan.

3           THE COURT:  Okay.  And is that a bankruptcy work

4   station?

5           THE WITNESS:  Yes, it's called a bankruptcy work

6   station.

7           THE COURT:  Okay.

8           THE WITNESS:  Exactly.

9           THE COURT:  So, when one of the borrowers from Option

10  One -- and I'm going to use Option One.

11          THE WITNESS:  Okay.

12          THE COURT:  Because that's who was the holder at this

13  point in time.

14          THE WITNESS:  Okay.

15          THE COURT:  When one of Option One's borrowers files

16  for bankruptcy, first of all, how does Option One know that

17  they've filed for bankruptcy?

18          THE WITNESS:  Actually, again, that is communicated

19  to Fidelity, and I don't know the specifics of their process

20  and a bankruptcy work station is open and at that point we

21  start actually processing the loan.

22          THE COURT:  All right.  So, when the bankruptcy work

23  station is open that's the first your department receives

24  knowledge that one of the borrowers has filed?

25          THE WITNESS:  Exactly.

1          THE COURT:  Okay.  And you receive some sort of

2     tickler or notification of that from the Fidelity system?

3          THE WITNESS:  That's right.

4          THE COURT:  What is the first thing that you do when

5     you get that notice?

6          THE WITNESS:  Basically, just review the loan.  If in

7     fact any action needs to be taken on the loan, then we move

8     forward with that.

9          THE COURT:  Okay.  What type of action would have to

10    be taken?

11         THE WITNESS:  For instance if the loan was

12    delinquent.  I mean, and of course, and I don't want to get too

13    much into that because we have a report that's in place that

14    actually handles delinquent loans, you know, loans that are

15    delinquent 45 to 60 days.  But basically, we really do -- to be

16    honest we really do nothing at that point.  I mean, the

17    bankruptcy work station is open.  In terms of the proof of

18    claim, we don't actually take any action to do that.  All of

19    that, I -- and again, we're speaking for Fidelity, I think that

20    they actually handle the actual.

21         THE COURT:  All right.  So, from your perspective and

22    you handled, and you supervised this particular loan, correct?

23         THE WITNESS:  I beg your pardon?

24         THE COURT:  You supervised this particular loan,

25    correct?

1          THE WITNESS:  When you say supervised --

2          THE COURT:  The Wilson.  The Wilson, and this was in

3    your department?

4          THE WITNESS:  Yes.

5          THE COURT:  This loan was part of the portfolio that

6    you were managing?

7          THE WITNESS:  Yes.

8          THE COURT:  Correct?

9          THE WITNESS:  This loan was, right, exactly.

10         THE COURT:  All right.  So, when the Wilson's filed

11   bankruptcy, they were behind, they were delinquent?

12         THE WITNESS:  Exactly.

13         THE COURT:  All right.  I mean that's pretty evident

14   from the proof of claim?

15         THE WITNESS:  Yes.  Yes, they were contractually

16   delinquent, yes.

17         THE COURT:  Correct?

18         THE WITNESS:  Right.

19         THE COURT:  Right.  There were past due payments.

20         THE WITNESS:  Exactly.

21         THE COURT:  When this case was filed?

22         THE WITNESS:  Right.

23         THE COURT:  You received a notification from the

24   Fidelity system through the bankruptcy work station that they

25   had filed bankruptcy?

1          THE WITNESS:  Exactly.

2          THE COURT:  Your testimony is you look at the loan,

3    you see that it's delinquent?  And let's just pick something

4    out.  We've been using 90 days past due.

5          THE WITNESS:  Okay.

6          THE COURT:  It's 90 days past due, what happens?  As

7    far as you know?

8          THE WITNESS:  Uh-huh. (affirmative response)  What

9    happens, and what our prior procedure was, is if in fact a loan

10   is anywhere from 45 to 60 days delinquent, a report is kicked

11   out.  And if in fact that loan is in my work station, then I

12   would hold the loan to be referred for a Motion for Relief.

13         THE COURT:  Okay.  Now, do you actually send -- does

14   your computer send that notification to your counsel to file

15   the Motion for Relief?

16         THE WITNESS:  Actually, that information is sent to

17   the process management.  Actually, it's sent through Fidelity,

18   if I'm not mistaken, because we actually go in and code the

19   loan.  I can't remember about the code, but we have a 25, and

20   it's picked up, I think, from a report from Fidelity and they

21   actually take action to open up a process for our attorney.

22         THE COURT:  All right.  So, when the loan goes --

23   now, we're talking post-petition.  The loan goes past due post-

24   petition?

25         THE WITNESS:  Right.

1          THE COURT:  It's kicked out on a report to you?

2          THE WITNESS:  That's right.

3          THE COURT:  Through the computer.  So, the computer

4   sees that there have been no payments docked for two months?

5          THE WITNESS:  Right.

6          THE COURT:  And 45 days, 60 days, whatever the

7   parameter is.

8          THE WITNESS:  Uh-huh. (affirmative response)

9          THE COURT:  You agree, you see that and you go, "All

10  right, this is" -- and then you take and you put a code on that

11  file.

12         THE WITNESS:  Uh-huh. (affirmative response)

13         THE COURT:  And it probably automatically codes the

14  Fidelity system --

15         THE WITNESS:  Right.

16         THE COURT:  -- to send a task request to counsel?

17         THE WITNESS:  That's correct.

18         THE COURT:  Do you ever talk to counsel?

19         THE WITNESS:  Yes.

20         THE COURT:  Okay.  When would you talk to counsel?

21         THE WITNESS:  I would talk to counsel if, in fact,

22  I'm not getting clarity in my interactions with Fidelity, and

23  that's not usually the case.

24         THE COURT:  Okay.

25         THE WITNESS:  But you know, we are allowed to

1   communicate with counsel, if need be.

2            THE COURT:  All right.  When you tell me you're not

3   getting clarity with your communications with Fidelity, why

4   would you be talking to Fidelity?  What would be a reason that

5   you would contact them?

6            THE WITNESS:  Because Fidelity might request some

7   information.

8            THE COURT:  Okay.

9            THE WITNESS:  Through the process management system

10  there might be something that they don't understand and they

11  might intercom me to request the information or request any

12  additional information of me.

13           THE COURT:  Okay.  Did you hear the testimony that

14  if, for example, if the Debtor says that they made a payment.

15           THE WITNESS:  Uh-huh. (affirmative response)

16           THE COURT:  But the payment is not showing up on the

17  system, and that the lawyer would, Mr. Wirtz might type in or

18  send a message that the Debtor's claiming that they paid, you

19  know, in this case $1,546 in December.

20           THE WITNESS:  Uh-huh. (affirmative response)

21           THE COURT:  And not showing up on the system, you

22  know, can you verify it.  The testimony from Fidelity was that

23  they don't even look at that, that that goes straight to you.

24  Is that true?

25           THE WITNESS:  Well --

1          THE COURT:  You're under oath.

2          THE WITNESS:  I think that would go through Fidelity

3     and then Fidelity would communicate that information to us.

4          THE COURT:  All right.  So, if Fidelity would take a

5     look at the software --

6          THE WITNESS:  Correction, correction.  I stand

7     corrected.  Actually, the attorney could intercom me.  He's

8     connected to the system, as well, so he could actually intercom

9     me directly.

10         THE COURT:  Okay.  But how does that usually work?

11         THE WITNESS:  It usually -- it usually flows through

12    Fidelity, and then Fidelity to us.

13         THE COURT:  So, only if Fidelity can't figure it out

14    do they contact you?

15         THE WITNESS:  For the most part.

16         THE COURT:  Okay.

17         THE WITNESS:  Unless they're requesting information,

18    specifically.

19         THE COURT:  So, the first line of a response from

20    counsel is through Fidelity.  If Fidelity can't figure out how

21    the information or the question of counsel, then Fidelity comes

22    to you?

23         THE WITNESS:  Yes.

24         THE COURT:  All right.  If in this particular case,

25    there was more than one payment that was not accounted for in

1   the system.

2              THE WITNESS:  Uh-huh. (affirmative response)

3              THE COURT:  There was a November, December, January

4   and February payments that weren't on the system, that had been

5   sent to Option One, but weren't on the system, and then there

6   were payments received after that, in March and April.  How did

7   that happen?

8              THE WITNESS:  Could you clarify that?  I'm just a

9   little unclear on your question.

10             THE COURT:  Well, there's evidence in the record.

11             THE WITNESS:  Uh-huh. (affirmative response)

12             THE COURT:  And I have already accepted this into

13  evidence, so you know, I'll tell you that the Debtor sent by

14  certified mail.

15             THE WITNESS:  Okay.

16             THE COURT:  And by money order, payments to Option

17  One and Wells Fargo or the different, you know, the different

18  entities that were forwarding --

19             THE WITNESS:  Uh-huh. (affirmative response)

20             THE COURT:  -- and have confirmed that it was picked

21  up by Wells Fargo.

22             THE WITNESS:  Uh-huh. (affirmative response)

23             THE COURT:  For example, on November 30th of '07.

24             THE WITNESS:  Uh-huh. (affirmative response)

25             THE COURT:  A $1,546.84 was sent to Option One, and

1    it was picked up by Option One on November 30th, '07.

2              THE WITNESS:  Right.

3              THE COURT:  Okay.  On 12/27/07, $1,546.84 was sent

4    and it was picked up by Option One on 1/2/08.

5              On 1/26/08, $1,000 and $546.54 were sent to Option

6    One.  It was picked up on 1/31/08.

7              Late charges were forwarded to Option One in the

8    amount of $312 and also picked up by Option One.

9              In 2 of '08, $1,546.84 was sent to Option One.  It

10   was picked up on 3/3/08.

11             On 3 of '08, $1,546.84 was sent to Option One and

12   picked up on 3/31/08.

13             THE WITNESS:  Okay, all right.  In terms of -- and

14   are you asking about a specific payment, or are you asking

15   about --

16             THE COURT:  I'm asking about why these payments

17   weren't reflected on the system.

18             THE WITNESS:  Okay.  And I'm speaking specifically

19   about the January payment, because the October payment and the

20   November payment actually were reflected on the system.

21             THE COURT:  Okay.  Why then did the computer software

22   that was introduced into evidence, I think it was Exhibit 1,

23   reflect that they were, that the Debtor was contractually due

24   for October 1st, '07.

25             THE WITNESS:  Uh-huh. (affirmative response)

1          THE COURT:  As of 12/3/07, when there had been two

2    payments that had been received?

3          THE WITNESS:  Okay.  That was due to a clerical error

4    in set up.  It was an error.

5          THE COURT:  What clerical error?

6          THE WITNESS:  The bankruptcy was actually filed in

7    September.

8          THE COURT:  Okay.

9          THE WITNESS:  And the bankruptcy work station was

10   actually opened in November.  By that time the October payment

11   had come in, and when the work station was open, due to a

12   clerical error, and we have procedures in place that handle

13   late set ups, we did not roll the post-petition due date, then

14   that's what triggered the report, triggered the loan on the

15   report.

16         THE COURT:  So, the payments were going to pre-

17   petition defaults?

18         THE WITNESS:  Yes.  Well, actually they were going to

19   post -- yes.  Well, actually it was going to post.  It should

20   have been going to post.

21         THE COURT:  No, they would be going to pre, and

22   that's why you were showing them due for October 1.

23         THE WITNESS:  They could have very well -- yeah, well

24   I guess they were going to pre, but it actually should have

25   been going to post, because the payment came in post.

1          THE COURT:  Right.  Okay, but then what happens --

2     okay.  So, they are two months behind, as of December they owe

3     for October 1, so now by January, February -- well, certainly

4     December, January and February, they should be at least -- you

5     should be reflecting that they are only post-petition due like

6     two months.  But you still have them going all the way back to

7     November when you filed this affidavit in late February?

8          THE WITNESS:  Yes.  And you know, again, and I'm

9     going to -- again, when the payment came in after -- I mean

10    prior to the bankruptcy work station set up, and because of

11    that, the loan reported delinquent.  The post-petition due date

12    still showed them due for I think November.  And then we got

13    another payment in November.

14         THE COURT:  Right.

15         THE WITNESS:  And then, by that time, I think -- let

16    me just see.  On 12/20 we referred the loan out for a Motion

17    for Relief, and that was after we actually got that check in

18    January.

19         THE COURT:  No, 12/20, you had only received the

20    November payment.  You received another payment on December --

21    well, it was mailed on December the 27th, it was picked up on

22    1/2.

23         THE WITNESS:  Actually, in October we had received a

24    payment.

25         THE COURT:  Right, that's on here.

1          THE WITNESS:  Okay.  And the October payment, it

2    was applied to the October payment.  And then we received

3    another payment in November.

4          THE COURT:  In November, right.

5          THE WITNESS:  Right.  And then another payment came

6    in, in December, and that's the payment that posted the first

7    part of January.

8          THE COURT:  Correct.

9          THE WITNESS:  Okay.  Now, with that payment, that

10   payment came in after the loan had been referred out for a

11   Motion for Relief.

12         THE COURT:  Okay.

13         THE WITNESS:  Our policy is that if in fact an action

14   has been taken on the loan, that we open an issue, because we

15   did get the payment, we open an issue with Fidelity to contact

16   our attorney to tell us what to do with the payment, whether to

17   post the payment or to --

18         THE COURT:  Okay.  So, when you say your policy is an

19   open issue, tell me what you mean by that?

20         THE WITNESS:  We open an issue in process management,

21   which is the system.

22         THE COURT:  All right.  And you get a payment on

23   January the 2nd for $1,546?

24         THE WITNESS:  Right.  Uh-huh. (affirmative response)

25         THE COURT:  Let's talk about physically, what do you

1  do with that payment?

2          THE WITNESS:  The payment came in.  We immediately

3  went to the system, opened an issue that was communicated to

4  Fidelity.

5          THE COURT:  Meaning you send like an e-mail to

6  Fidelity?

7          THE WITNESS:  Basically, an e-mail.

8          THE COURT:  All right.

9          THE WITNESS:  Okay, an e-mail of sorts, but I'm just

10  saying that it's an open issue.  We send an e-mail to Fidelity.

11  Fidelity in turn contacts our attorney, and our attorney makes

12  a decision on whether we should post a payment, or not post a

13  payment.

14          THE COURT:  All right.  And then communicates that

15  back through Fidelity?

16          THE WITNESS:  And communicates that back through

17  Fidelity.

18          THE COURT:  Okay.  So, in this case, this particular

19  case, your testimony is that you received the payment on

20  January the 2nd?

21          THE WITNESS:  Uh-huh. (affirmative response)

22          THE COURT:  You don't deposit it, you just physically

23  hold that money order, or check, or whatever it is?

24          THE WITNESS:  Right.

25          THE COURT:  And you send a request.

1          THE WITNESS:  Right.

2          THE COURT:  Or an e-mail to Fidelity saying that we

3  need you to contact counsel and tell us what to do with this?

4          THE WITNESS:  Exactly.

5          THE COURT:  Fidelity sends that to counsel, then

6  counsel replied, and in this case what did counsel reply?

7          THE WITNESS:  Indicated that we needed to send the

8  payment to his office.

9          THE COURT:  Okay.  So, you sent it to him?

10          THE WITNESS:  Right.

11          THE COURT:  All right.  Then in late January, January

12  31st to be exact, there were actually three checks, $1,000,

13  $1,546 and $312?

14          THE WITNESS:  The same process.

15          THE COURT:  Okay.  And so, those then payments go to

16  counsel?

17          THE WITNESS:  Exactly.

18          THE COURT:  All right.  And then on 2/8, this is

19  after the motion has been filed.  And maybe I should stop at

20  this point.  When the affidavit is prepared, by counsel?

21          THE WITNESS:  Uh-huh. (affirmative response)

22          THE COURT:  Is that correct?

23          THE WITNESS:  That's right.

24          THE COURT:  Do you see that affidavit?

25          THE WITNESS:  Currently, we do.  We didn't at that

1    point.

2              THE COURT:  Okay.  So, at this point when this

3    particular case --

4              THE WITNESS:  In this particular case, no, we did not

5    see the affidavit.

6              THE COURT:  So, that affidavit would go to Fidelity

7    and you would not review it?

8              THE WITNESS:  Exactly.

9              THE COURT:  All right.  Fidelity has already

10   testified that they would check the numbers based on the

11   system.

12             THE WITNESS:  Right.

13             THE COURT:  And you were aware of that?

14             THE WITNESS:  Yes.

15             THE COURT:  All right.  Now, you are also aware that

16   these payments that you have been forwarding to counsel aren't

17   getting posted on the system, correct?

18             THE WITNESS:  Yes.

19             THE COURT:  Because you're the only person who can do

20   that?

21             THE WITNESS:  Yes, exactly.

22             THE COURT:  All right.  So, you sent the payments

23   there but you haven't -- the record doesn't reflect that those

24   payments are in the possession of Option One?

25             THE WITNESS:  When you say the record doesn't --

1          THE COURT:  Meaning your records.  Your accounting

2     records do not reflect that you have payments that are in your

3     possession?

4          THE WITNESS:  Actually, it does.  We have what we

5     call the cash log system.

6          THE COURT:  Okay.

7          THE WITNESS:  So, we actually do know that the

8     payments are in our possession.  And actually, in that cash log

9     system we actually notate what happens with the payments, so we

10    are tracking the payments.

11         THE COURT:  Okay.  How would anyone know that?  Is

12    that cash log system available to Fidelity?

13         THE WITNESS:  No, it's not available to any of our

14    vendors.

15         THE COURT:  Okay.  So, this is an internal thing?

16         THE WITNESS:  This is an internal deal, right.

17         THE COURT:  Okay.  So, this isn't -- Mr. Wirtz

18    wouldn't have access?

19         THE WITNESS:  No, he doesn't.

20         THE COURT:  And neither would Fidelity?

21         THE WITNESS:  Right.

22         THE COURT:  This is your internal?

23         THE WITNESS:  Internal, exactly.

24         THE COURT:  Okay, accounting system.  That's so you

25    don't lose them.

1          THE WITNESS:  That's right.

2          THE COURT:  Or that you know Mr. Wirtz doesn't go to

3   the casino with them?

4          THE WITNESS:  That's right.

5          THE COURT:  You know that you gave them to him?

6          THE WITNESS:  Yes.

7          THE COURT:  All right.  Then, in February a payment

8   of $1,546.84 is received and by you on March 3rd?  Now, this is

9   after the motion has been filed, I believe, or right on the

10  cusp of when it's filed.

11         THE WITNESS:  Uh-huh. (affirmative response)

12         THE COURT:  What did you do with that payment?

13         THE WITNESS:  What is the date on that payment?

14         THE COURT:  March 3.

15         THE WITNESS:  All right.

16     (Pause.)

17         THE WITNESS:  Do you have a check number on that?

18         THE COURT:  Maybe.

19         MR. MYERS:  It's a postal cashier's check, the last

20  few digits are 85392735.

21     (Pause.)

22         THE WITNESS:  Well, I want to say that that payment

23  went back to the attorney, because the first payment that we

24  actually posted was in April.

25         THE COURT:  All right.  There was another one that

1   was in March that was picked up by you on March 31st, '08

2   for 1548, that's probably the payment --

3            THE WITNESS:  That's that payment.

4            THE COURT:  -- that was posted?

5            THE WITNESS:  Yes.

6            THE COURT:  All right.  Were you in direct

7   communication with Mr. Wirtz between the time the loan was

8   referred for a Motion for Relief and let's just say February of

9   2008, when the affidavit was signed?

10           THE WITNESS:  No, not myself, no.

11           THE COURT:  All right.  You have never talked to

12  him --

13           THE WITNESS:  No, I never.

14           THE COURT:  -- directly?

15           THE WITNESS:  No, never directly.

16           THE COURT:  All right.  The communications that you

17  had regarding these payments that were coming in, that you were

18  forwarding, were they addressed to Fidelity?

19           THE WITNESS:  Every time we got the payments we

20  actually, again, e-mailed Fidelity and asked them to contact

21  the attorney to make a decision on what to do with the

22  payments.  We didn't just send them.  We never make that

23  assumption.

24           THE COURT:  All right.

25           THE WITNESS:  That's just not our policy.

1          THE COURT:  All right.  So, as far as you know,

2  Fidelity was communicating with Counsel, and then when you got

3  the directions to send the payments to the attorney, where did

4  those come from?

5          THE WITNESS:  That came from Fidelity.

6          THE COURT:  Okay, so Fidelity actually was the party

7  communicating with you.

8          THE WITNESS:  Right, communicating back and forth.

9          THE COURT:  Saying, "Send these to your counsel"?

10          THE WITNESS:  Exactly.

11          THE COURT:  Who was your contact at Fidelity?  Who

12  was giving you these instructions?

13     (Pause.)

14          THE WITNESS:  I'm going to have to kind of go through

15  the notes here.  I mean I have a big folder so it's going to

16  take a little while.  (Witness examines documents.)

17          I think there were multiple people communicating back

18  and forth, because I'm seeing Johnny, I'm seeing Shelonda

19  Brinson (phonetic).

20          THE COURT:  Give me the first name?

21          THE WITNESS:  Johnny Timm.

22          THE COURT:  T-I-M-M?

23          THE WITNESS:  Right.

24          THE COURT:  Okay.

25          THE WITNESS:  Shelonda Brinson.

1          THE COURT:  Okay.

2          THE WITNESS:  Those are the two names that I'm

3   seeing, mostly.

4          THE COURT:  Okay.  Did you ever have any direct

5   contact with Ms. Goebel?

6          THE WITNESS:  With who?

7          THE COURT:  Ms. Goebel?

8          THE WITNESS:  No.

9          THE COURT:  Okay.  What positions are Johnny Timm and

10  Shelonda Brinson?

11         THE WITNESS:  I have no idea.

12         THE COURT:  You don't know?

13         THE WITNESS:  No, I don't know.

14         THE COURT:  And you have never talked with them

15  directly?

16         THE WITNESS:  I have talked to them via the e-mail

17  system, the intercom system.

18         THE COURT:  Okay.

19         THE WITNESS:  But I don't know their titles.

20         THE COURT:  Are those the two individuals that you

21  normally communicate with?

22         THE WITNESS:  It varies, just depending on what

23  process I am, you know, with what process.  I mean if it's POC,

24  then it's a different person.  And if it's --

25         THE COURT:  All right.

1          THE WITNESS:  And these are kind of broken out by

2   process, if I'm not mistaken.

3          THE COURT:  All right.  So, these are the individuals

4   that deal with Motions for Relief?

5          THE WITNESS:  No, I can't testify to that.  I don't

6   know specifically what their role is.

7          THE COURT:  Okay.  But when you're dealing with

8   Motions for Relief you most often deal with them?

9          THE WITNESS:  Not consistently.

10          THE COURT:  Okay.

11          THE WITNESS:  No.

12          THE COURT:  There are other individuals, as well?

13          THE WITNESS:  There are other individuals, as well,

14   yes.

15          THE COURT:  Okay.  And then, there are different

16   individuals for proofs of claim?

17          THE WITNESS:  That's right.

18          THE COURT:  And are there different individuals for

19   confirmation of plans?

20          THE WITNESS:  Most definitely.

21          THE COURT:  Or review of plans?

22          THE WITNESS:  Yes.

23          THE COURT:  Okay.  So, it's sort of task-oriented?

24          THE WITNESS:  It's task-oriented, right.

25          THE COURT:  And how many different groups are there?

1          THE WITNESS:  I have no idea.

2          THE COURT:  All right.

3          THE WITNESS:  You know, again, that's Fidelity's

4     structure and I just don't know the specifics of that, to

5     testify on it.

6          THE COURT:  Are you the only person that they deal

7     with?

8          THE WITNESS:  No.

9          THE COURT:  Okay.  Tell me about that.  How are the

10    loans managed from your department?

11         THE WITNESS:  Well, we actually are broken out by

12    loan -- not necessarily loan numbers, but a special code in the

13    loan number.

14         THE COURT:  All right.

15         THE WITNESS:  And just based on what that code is,

16    and they have the list, they actually interact with that

17    project manager or legal action specialist.

18         THE COURT:  Tell me how the loans are broken down.

19    What do the codes mean?

20         THE WITNESS:  The codes mean nothing specifically,

21    outside of the fact that this person has these loans, these

22    loans are in their portfolio, and this person has these loans

23    in their portfolio.

24         THE COURT:  Okay.

25         THE WITNESS:  So, it's just --

1          THE COURT:  So, you get assigned a certain set of

2    loans.

3          THE WITNESS:  The certain codes, right, you know.

4          THE COURT:  And then, they know that you're the point

5    person --

6          THE WITNESS:  Exactly.

7          THE COURT:  -- for that particular file?

8          THE WITNESS:  Exactly.

9          THE COURT:  Okay.  So on this file, the Wilson file,

10   you would have been the party that they were dealing with?

11         THE WITNESS:  Most definitely.

12         THE COURT:  They weren't dealing with ten other

13   people?

14         THE WITNESS:  Right, right.

15         THE COURT:  All right.  So, you would deal with this

16   file whether it was the filing of the proof of claim, whether

17   it was the confirmation of the plan, whether it was the filing

18   of the Motion for Relief.  Anything that had to do with this

19   particular file, you would be handling that?

20         THE WITNESS:  Exactly.

21         THE COURT:  Okay.  Once it obviously went into the

22   bankruptcy work station?

23         THE WITNESS:  Right.

24         THE COURT:  So I assume someone else handled it

25   before either it went into default or into bankruptcy?

1              THE WITNESS:  Yeah, most definitely.  It probably

2    was in foreclosure.  I'm not so sure on that.

3              THE COURT:  Okay.

4              THE WITNESS:  But yes.

5              THE COURT:  And you don't do foreclosures?

6              THE WITNESS:  I don't do foreclosure at all.

7              THE COURT:  You just do bankruptcy?

8              THE WITNESS:  Just bankruptcy.

9              THE COURT:  Lucky you.

10             THE WITNESS:  Yes.

11             THE COURT:  All right.  When the motion was filed did

12   you get a copy of the Motion for Relief?

13             THE WITNESS:  Yes, we actually get that.  That's

14   uploaded actually into process management.

15             THE COURT:  Okay.  And I assume the system will tell

16   you that a Motion for Relief has actually been filed?

17             THE WITNESS:  Most definitely.

18             THE COURT:  Do you review it before it is filed?

19             THE WITNESS:  No, we don't review it prior to it

20   being filed.

21             THE COURT:  Okay.  After it's filed, do you review

22   it?

23             THE WITNESS:  Yes, we will look at it after that,

24   yes.

25             THE COURT:  All right.  Tell me what you look at

1 | after it's filed?

2 | THE WITNESS:  We basically just generally read the

3 | motion.  It's sent out from Fidelity with the intercom and it

4 | indicates that the Motion for Relief has been filed.  And of

5 | course, we would see that note and we would basically just go

6 | in and review just the entire motion.

7 | THE COURT:  Now, if you see something in the motion

8 | that you think is incorrect, I mean do you check the numbers,

9 | do you check the allegations?

10 | THE WITNESS:  No, we don't.  We don't get that

11 | detailed with it.

12 | THE COURT:  So, you don't verify the amounts that are

13 | being claimed?

14 | THE WITNESS:  No, we don't verify it.  We don't do

15 | any verifications.

16 | THE COURT:  So, what are you looking for when you

17 | read it?

18 | THE WITNESS:  Well, just basically just to -- it's

19 | basically just for information purposes only.

20 | THE COURT:  Okay.

21 | THE WITNESS:  You know, we open a process, we just --

22 | THE COURT:  Now, in this particular case there was a

23 | response, an objection to the Motion for Relief.

24 | THE WITNESS:  Right.

25 | THE COURT:  When did you learn there was an

1    objection?

2            THE WITNESS:  Are you asking a specific date?

3            THE COURT:  Just, do you -- well, let's start with

4    how did you find out that there had been an objection?

5            THE WITNESS:  That information would be communicated

6    through process management.  Fidelity would communicate that

7    information to us.

8            THE COURT:  Okay.  So, just the way the motion has

9    been filed, you'd get a notification that an objection has been

10   filed?

11           THE WITNESS:  A communication that an objection has

12   occurred, right.

13           THE COURT:  Okay.  Do you know how Fidelity knows

14   that an objection has been filed?

15           THE WITNESS:  No, and I can't speak to that.

16           THE COURT:  Okay.

17           THE WITNESS:  I really don't.

18           THE COURT:  All right.  When you saw that there was

19   an objection, did you speak with Counsel?

20           THE WITNESS:  Our process is, is to communicate any

21   information back to Fidelity.

22           THE COURT:  To Fidelity?

23           THE WITNESS:  Yes.

24           THE COURT:  All right.  So, the objection is filed.

25   You get a notification that it has been filed.  What do you do

1    at that point?  Do you read the objection?

2              THE WITNESS:  Not necessarily.

3              THE COURT:  Did you read it in this case?

4              THE WITNESS:  No, we didn't.  No, I didn't.

5              THE COURT:  Okay.  So, do you just wait until

6    somebody asks you for something?

7              THE WITNESS:  Basically.

8              THE COURT:  All right.  So, the objection has been

9    filed and you know it has been filed, you don't read it, you

10   just wait for somebody to contact you?

11             THE WITNESS:  Right.

12             THE COURT:  You don't contact your lawyer and you

13   don't contact Fidelity?

14             THE WITNESS:  No.  If, in fact, they need additional

15   information from us, then they would, Fidelity would intercom

16   us and we would provide the information.

17             THE COURT:  Okay.  So, when you say they, you mean

18   Fidelity?

19             THE WITNESS:  Fidelity, right.

20             THE COURT:  All right.  So, at this point you expect

21   Fidelity to manage this objection or the interface between

22   Counsel and Fidelity?

23             THE WITNESS:  Yes.

24             THE COURT:  Okay.  So, you don't talk to Counsel or

25   give them directions on the objection or discuss any of the

1   grounds for the objection with Counsel?

2          THE WITNESS:  Only if there is not, again, clarity.

3          THE COURT:  What do you mean if there is not clarity?

4          THE WITNESS:  If, in fact, Fidelity has asked me for

5   information and me, myself, I am not understanding what

6   Fidelity is asking for.

7          THE COURT:  Okay.

8          THE WITNESS:  At that point, I would pick up the

9   phone and call Counsel just for clarity.

10          THE COURT:  Okay.  So, if Fidelity says to you:  We

11   may be missing three payments.

12          THE WITNESS:  Uh huh. (affirmative response)

13          THE COURT:  And they send that and you don't

14   understand which payments or what months or what days.

15          THE WITNESS:  Exactly.

16          THE COURT:  Then you might call Counsel or you might

17   call Fidelity?

18          THE WITNESS:  That's right.

19          THE COURT:  Either one?

20          THE WITNESS:  Either one.

21          THE COURT:  And say, "Which ones are you hunting

22   for"?

23          THE WITNESS:  Which one, exactly.

24          THE COURT:  "What am I looking for"?

25          THE WITNESS:  Exactly.

1          THE COURT:  Okay.  In this particular case did

2    Mr. Wirtz contact you directly, or did the query about the

3    missing payments come through Fidelity?

4          THE WITNESS:  The query about the missing payments

5    came from Fidelity.

6          THE COURT:  Okay.  Did you understand when they made

7    that inquiry what the issue was?  I mean, did you recognize

8    that it was probably the payment that --

9          THE WITNESS:  Yes, I mean, yes, I definitely knew

10   that the payments had been forwarded.  I mean, we definitely

11   were able to verify that.

12         THE COURT:  All right.  So, when the query comes did

13   you send the response back to Fidelity?

14         THE WITNESS:  I guess I'm a little confused on which

15   specific query are you talking about?

16         THE COURT:  Well, the objection gets filed.

17         THE WITNESS:  Uh huh. (affirmative response)

18         THE COURT:  And the objection says, "We don't think

19   we're in default.  We have made payments all along."

20         THE WITNESS:  Okay.

21         THE COURT:  "And here is our accounting for what we

22   have done," meaning the Debtor.

23         THE WITNESS:  Uh huh. (affirmative response)

24         THE COURT:  What the Debtor has paid.  At that point,

25   I assume, and you know, I should move on with this, but

1  Mr. Wirtz said, you know, what does -- well, maybe I should

2  say at that point what was the query from Fidelity to you?

3              THE WITNESS:  Okay, all right.  And I'm looking at

4  notes and just reviewing the file.  I see where there is

5  documentation that Fidelity attempted to contact the attorney,

6  our attorney, to follow, you know, to let them know and to

7  alert them that the Counsel, the borrower's attorney, is

8  questioning, you know, the payments and questioning the

9  accuracy of the payments.

10             THE COURT:  Okay.  And so --

11             MR. MYERS:  Your Honor, could we get the date of that

12  query?

13             THE COURT:  What is the date of the query?

14             THE WITNESS:  It's 2/14.

15             MR. MYERS:  Thank you.

16             THE COURT:  All right.  So you've gotten a query from

17  Fidelity saying that borrower's counsel is questioning payments

18  that aren't reflected on the account?

19             THE WITNESS:  Okay.  I didn't get the query, the

20  inquiry.

21             THE COURT:  Okay.

22             THE WITNESS:  I didn't get any query.

23             THE COURT:  Fidelity gets the query?

24             THE WITNESS:  Fidelity got it, they must have gotten

25  it.  I don't know.  Let me see, who did it come from?  Because

1   we didn't get the inquiry, the inquiry was – I'm looking at

2   a note where it was actually --

3           THE COURT:  Okay, tell me.  Let's start with that one

4   so we don't get confused, the 2/14 one.

5           THE WITNESS:  Okay.  (Witness examines documents.)

6           We received information from the Debtor indicating

7   that payments hadn't been posted to the account, and they --

8           THE COURT:  Okay.  And you received the information

9   from?

10          THE WITNESS:  And I'm not clear on who received the

11  information.  I'm just looking at the fact that Fidelity

12  responded by contacting our attorney.

13          THE COURT:  Go ahead, I'm sorry, I didn't hear you.

14  You received -- on 2/14 you received information that the

15  Debtor's attorney was questioning the accounting?

16          THE WITNESS:  Right, exactly.

17          THE COURT:  That there were payments that weren't

18  posted?

19          THE WITNESS:  Right.

20          THE COURT:  And you don't know who told you that?

21          THE WITNESS:  Right, right.

22          THE COURT:  You just know that you learned that they

23  were questioning them?

24          THE WITNESS:  That's right.

25          THE COURT:  Okay.  And what did you do?

1          THE WITNESS:  Actually, I did not even know

2     specifically about that.  Fidelity made -- okay, yes.  Fidelity

3     contacted me and I, in turn -- I think they contacted both me

4     and the Debtor's attorney on this deal.

5          THE COURT:  And what was your response?

6          THE WITNESS:  Let me see.  (Witness examines

7     documents.)  It appears I was contacted -- looking at the

8     notes, I just want to look at the way the notes were, it

9     appears I was contacted, I contacted Fidelity and then Fidelity

10    contacted our attorney.

11         THE COURT:  Okay.  So, you were contacted about the

12    missing payments.  Did you understand when you received the

13    notification that Debtor's Counsel was inquiring as to where

14    these payments were, that they were referring to the payments

15    you had received and forwarded to Counsel?

16         THE WITNESS:  Yes, I did understand that.

17         THE COURT:  Okay.  So, you weren't confused about

18    that?

19         THE WITNESS:  No, I wasn't confused about that.

20         THE COURT:  So, what was your response?

21         THE WITNESS:  My response was, as I said, I contacted

22    Fidelity and Fidelity was to contact the attorney.

23         THE COURT:  And you told them to say that those are

24    the payments that -- what did you tell Fidelity?

25         THE WITNESS:  I just basically indicated that the

1  Debtor was questioning the, you know, missing payments and

2  to contact the, you know, our attorney, because I know that the

3  payments had been sent back to the attorney.

4          THE COURT:  Did you tell Fidelity that they were with

5  the attorney?

6          THE WITNESS:  I didn't get into the specifics of

7  that.

8          THE COURT:  Do you know if Fidelity contacted

9  Mr. Wirtz?

10         THE WITNESS:  Yes, I do see that.

11         THE COURT:  They did?

12         THE WITNESS:  Yes, they did.

13         THE COURT:  Okay.  And what happened after that

14  communication by you to Fidelity?  Do you know how it was

15  resolved?

16         THE WITNESS:  No, I don't know how it was resolved at

17  that point.

18         THE COURT:  Were you asked to make any decisions

19  regarding the loan, like bringing it current, waiving fees,

20  negotiating any settlement?

21         THE WITNESS:  No, none of that information came

22  about.

23         THE COURT:  Okay.

24         THE WITNESS:  I mean, just in --

25         THE COURT:  How is it that -- who negotiates on what

1    will happen with the loan?

2              THE WITNESS:  We, Option One negotiates actually on

3    what would happen.

4              THE COURT:  All right.

5              THE WITNESS:  Fidelity is contacted, we actually make

6    the decision.

7              THE COURT:  Okay.  So, if a borrower makes an offer

8    on a disputed amount.

9              THE WITNESS:  Uh huh.  (affirmative response)

10             THE COURT:  Then that is communicated, I assume, from

11   Mr. Wirtz to Fidelity?

12             THE WITNESS:  Communicates that to me.

13             THE COURT:  And Fidelity communicates that to you?

14             THE WITNESS:  It's communicated back to Fidelity and

15   Fidelity --

16             THE COURT:  And then you go back down the train?

17             THE WITNESS:  Right, exactly.

18             THE COURT:  Okay.  To the best of your knowledge were

19   any negotiations conducted between the borrower and yourself

20   regarding the settlement of this particular dispute?

21             THE WITNESS:  No, no.

22             THE COURT:  Does Mr. Wirtz have any authority

23   independent of you to settle the amounts in dispute?

24             THE WITNESS:  No, he doesn't.

25             THE COURT:  So, he has no settlement authority?

1           THE WITNESS:  No.

2           THE COURT:  Does Fidelity have any settlement

3   authority?

4           THE WITNESS:  No, they don't.

5           THE COURT:  Okay.  I would like to -- you heard

6   Fidelity testify that they do not employ Mr. Wirtz?

7           THE WITNESS:  Okay.

8           THE COURT:  That he is Counsel for Option One and

9   they have no legal relationship with him, whatsoever, other

10  than he would be a member on their system and pay on a fee

11  basis for access to the system?

12          THE WITNESS:  Uh huh.  (affirmative response)

13          THE COURT:  Do you have a contractual relationship

14  with Mr. Wirtz?

15          THE WITNESS:  Yes.

16          THE COURT:  Okay.  And is that in the form of a

17  written contract?

18          THE WITNESS:  I don't know the specifics of it.

19          THE COURT:  Okay.  And what is the nature of his

20  representation of Option One?

21          THE WITNESS:  He's an attorney.

22          THE COURT:  Okay.  Does he handle all of Option One's

23  matters in Louisiana?

24          THE WITNESS:  No, he doesn't.

25          THE COURT:  Okay.

1          THE WITNESS:  And we have various attorneys in

2    Louisiana.

3          THE COURT:  And who do you have that handles your

4    work in Louisiana?

5          THE WITNESS:  I just, to be honest, I only know of

6    Mr. Wirtz.  But I know that --

7          THE COURT:  The Boles Firm?

8          THE WITNESS:  The Boles Law Firm.

9          THE COURT:  But you believe there are other firms?

10         THE WITNESS:  I know that there are at least one

11   more.

12         THE COURT:  But you don't know their names?

13         THE WITNESS:  No, but I don't know their name right

14   off the top of my head.

15         THE COURT:  Do you know what city they are located

16   in?

17         THE WITNESS:  I have no idea.

18         THE COURT:  Okay.

19         THE WITNESS:  Uh-huh. (affirmative response)

20         THE COURT:  Does the Boles Firm handle just

21   bankruptcy matters for you?

22         THE WITNESS:  I think they handle foreclosure as

23   well.

24         THE COURT:  Okay.  Have you worked with Mr. Wirtz

25   before?

1              THE WITNESS:  No, not prior to this case.

2              THE COURT:  Okay.  Have you discussed this file with

3      any members of Mr. Wirtz's firm?

4              THE WITNESS:  No.

5              THE COURT:  No.  So, you don't deal with paralegals

6      or other individuals in his firm?  Or you have not dealt with

7      them?

8              THE WITNESS:  No, not on this file.

9              THE COURT:  Not on this file?

10             THE WITNESS:  Right.

11             THE COURT:  Okay.  How is Mr. Wirtz paid?

12             THE WITNESS:  I don't know the specifics of that.

13             THE COURT:  Okay.

14             THE WITNESS:  I mean, he was --

15             THE COURT:  Do you know if Option One pays him?

16             THE WITNESS:  Again, I just don't know the

17     contractual relationship.

18             THE COURT:  So, you wouldn't be responsible for

19     placing those charges on this account?

20             THE WITNESS:  No.

21             THE COURT:  How are those charges posted to the

22     account?

23             THE WITNESS:  I do not -- I'll be honest, I don't

24     know the specifics of it.  I know we do have an invoice system

25     in place, but I just don't know the specifics of that, because

1  I don't get involved with that piece of the --

2           THE COURT:  Is that a vendor system?

3           THE WITNESS:  Yes, it's a vendor system.

4           THE COURT:  The vendors upload their invoices onto

5  the Fidelity system, is that correct?

6           THE WITNESS:  I don't know the specifics of it, but I

7  think it's something like that.

8           THE COURT:  Okay.  And then it goes to your Payables

9  Department?

10          THE WITNESS:  And then it goes to our Payables

11 Department and we actually go through and we have someone in

12 the department, and again, that's outside of my realm that

13 actually goes through and approves the amount and approves the

14 attorney fees.

15          THE COURT:  Okay.  Do you know -- do you ever review

16 those statements?

17          THE WITNESS:  I don't, myself.

18          THE COURT:  You don't?

19          THE WITNESS:  No.

20          THE COURT:  So, it's the Payables Department that

21 reviews it?

22          THE WITNESS:  Exactly.

23          THE COURT:  Do you pay for legal fees based on a task

24 that has been requested?

25          THE WITNESS:  Most definitely.  We have a --

1          THE COURT:  So, these aren't hourly bills?

2          THE WITNESS:  No, no.  We have a fee structure that

3    is in place.

4          THE COURT:  Okay.  And that fee structure specifies

5    how much you will pay for filing a Motion for Relief, for

6    example?

7          THE WITNESS:  Exactly, per process.

8          THE COURT:  Okay.

9          THE WITNESS:  Uh huh.  (affirmative response)

10         THE COURT:  Okay.

11         THE WITNESS:  You know, different processes.

12         THE COURT:  Is the fee, is there ever a deviation

13   from the fee structure if --

14         THE WITNESS:  If there is, then Fidelity would

15   contact us and ask for -- inquire about additional fees, you

16   know.  If in fact it is going -- if it exceeds what is already

17   in place, they will e-mail us or intercom us and ask if, in

18   fact, they are able to, you know, that -- you know, informing

19   us that there is going to be additional fees assessed for the

20   whatever process it is, and we would yea or nay that.

21         THE COURT:  All right.  So, let's get this straight.

22   You have some contractual agreement with the Boles Law Firm to

23   represent you?

24         THE WITNESS:  Right.

25         THE COURT:  You believe it's based on a task, so they

1   get paid so much for different tasks?

2          THE WITNESS:  That's right.

3          THE COURT:  If they believe that a file is going to

4   require more work or deviate from the norm --

5          THE WITNESS:  Uh huh.  (affirmative response)

6          THE COURT:  -- substantially deviate from the norm,

7   let's say?

8          THE WITNESS:  Right.

9          THE COURT:  Then they would contact Fidelity and give

10  them an estimate or explain to them why, and then Fidelity

11  would contact you?

12         THE WITNESS:  That's correct.

13         THE COURT:  Okay.  The Boles Firm wouldn't call you

14  directly?

15         THE WITNESS:  No, they wouldn't.

16         THE COURT:  Okay.  Why wouldn't they just call you

17  directly?

18         THE WITNESS:  I don't know.

19         THE COURT:  Okay.

20         THE WITNESS:  I don't know.

21         THE COURT:  So, after Fidelity contacts you and says

22  the Boles Firm is requesting that they be paid hourly, let's

23  just, do you pay hourly?

24         THE WITNESS:  No, we don't pay hourly.  They might --

25         THE COURT:  You mean they don't pay hourly?

1          THE WITNESS:  No.  They might -- an example, they

2    might say that this task is going to require an additional

3    three hours at a cost of --

4          THE COURT:  A thousand dollars more?

5          THE WITNESS:  -- a thousand dollars.  Do you approve

6    of the fees?

7          THE COURT:  Okay.

8          THE WITNESS:  You know, and --

9          THE COURT:  What if you say "no"?  What do they do?

10         THE WITNESS:  They don't do it.

11         THE COURT:  They don't do the work?

12         THE WITNESS:  They don't do the work.

13         THE COURT:  All right.  So, if on this particular

14   matter, where we have a Motion for Relief, we have had multiple

15   hearings, there is an Order to Show Cause.

16         THE WITNESS:  Uh huh.  (affirmative response)

17         THE COURT:  Does this particular matter stay under

18   your standard fee arrangement, or do you --

19         THE WITNESS:  I'm pretty sure it exceeds the fee

20   arrangement.

21         THE COURT:  I would think.

22         THE WITNESS:  Yes.

23         THE COURT:  So, the question is:  Do you pay them by

24   the hour at that point, or do you just say, "Well, send us your

25   bill and we'll pay it," or what do you do?

1          THE WITNESS:  Outside of that standard basic

2    structure, I don't know how -- what the breakout is in terms of

3    anything that exceeds that.

4          THE COURT:  Okay.  And would you be the person who

5    would approve it?

6          THE WITNESS:  Actually, that would go over my head.

7    That would go to my actual director.  She would actually make

8    that decision.

9          THE COURT:  Okay, because you have authority to

10   approve up to a certain amount?

11         THE WITNESS:  No, just up to the fee structure --

12         THE COURT:  All right.

13         THE WITNESS:  -- that's already in place, nothing

14   more.

15         THE COURT:  So, your director approves anything above

16   that?

17         THE WITNESS:  Anything above that.

18         THE COURT:  Okay.  Who pays for the costs of

19   accessing the system, the Fidelity system?  They testified that

20   there is a fee charged every time an attorney gets a task and

21   uses the system.

22         THE WITNESS:  I don't know.

23         THE COURT:  I think they said $65 for a proof of

24   claim.

25         THE WITNESS:  I am just not familiar with the

1    contractual arrangement under the fees on the system.

2              THE COURT:  Okay.  You heard Mr. Cash and also

3    Ms. Goebel discuss the reports on compliance that are kept on

4    Counsel, that they -- how quickly they actually execute the

5    tasks that are assigned to them?

6              THE WITNESS:  Uh huh.  (affirmative response)

7              THE COURT:  Are you in charge of reviewing those?

8              THE WITNESS:  No.

9              THE COURT:  Okay.  Who receives those reports?

10             THE WITNESS:  My director.

11             THE COURT:  Okay.

12             THE WITNESS:  Uh huh.  (affirmative response)

13             THE COURT:  So, your director would be the party that

14   would review --

15             THE WITNESS:  Right.

16             THE COURT:  -- those report cards, if you will?

17             THE WITNESS:  Exactly.

18             THE COURT:  And determine if Counsel was complying?

19             THE WITNESS:  Yes.

20             THE COURT:  In a timely manner?

21             THE WITNESS:  Exactly.

22             THE COURT:  Are you aware -- I should say are any of

23   those time frames routinely waived?

24             THE WITNESS:  No.

25             THE COURT:  No?

1          THE WITNESS:  No.

2          THE COURT:  If they need to be waived, if a case

3     becomes more involved, is the same process employed, Counsel

4     communicates with Fidelity and then Fidelity to Option One?

5          THE WITNESS:  Actually, if in fact -- we don't

6     actually go in and waive any processes in terms of time frames

7     from our end.  You know, if that's going to happen it would

8     happen with our vendor.  We don't actually go in and waive the

9     time.  We don't extend any one just from our end in terms

10    about, you know, on the system, anyway.

11         THE COURT:  Okay.  So, it would happen with your

12    vendor, meaning Fidelity?

13         THE WITNESS:  Right.

14         THE COURT:  Okay.  On the, let's talk about proofs of

15    claim.  When a proof of claim is filed, who prepares the proof

16    of claim?

17         THE WITNESS:  Our attorney.

18         THE COURT:  Who signs it?

19         THE WITNESS:  Our attorney.

20         THE COURT:  Okay.  So, you don't see the proof of

21    claim at all?

22         THE WITNESS:  No, we don't see the proof of claim, at

23    all.

24         THE COURT:  That's all within his responsibility?

25         THE WITNESS:  Exactly.

1          THE COURT:  If he has a question about the proof

2    of claim, who does he contact?

3          THE WITNESS:  He would go through Fidelity, and

4    Fidelity would contact us.

5          THE COURT:  Okay.  Reviewing a plan, who reviews the

6    plans?

7          THE WITNESS:  I want to say, and I'm not sure, but I

8    want to say Fidelity is responsible for reviewing the plans.

9          THE COURT:  Okay.  To see if the amounts set forth in

10   the plan are that which is on the proof of claim?

11         THE WITNESS:  That's right.

12         THE COURT:  In fact on the proof of claim?

13         THE WITNESS:  That's right.

14         THE COURT:  If Fidelity -- I guess if the plan is

15   unacceptable, what is your understanding?

16         THE WITNESS:  What they would do is they would

17   contact us via e-mail and then we would make the decision.

18         THE COURT:  And when you say "make the decision,"

19   make the decision whether to object?

20         THE WITNESS:  To object, right.

21         THE COURT:  If you object, what happens?

22         THE WITNESS:  We just basically indicate to them that

23   they need to object to the plan.

24         THE COURT:  Okay.

25         THE WITNESS:  And then they would go back to the

1   attorney on that.

2           THE COURT:  And then they communicate with Counsel?

3           THE WITNESS:  Right.

4           THE COURT:  There was some discussion about a

5   suspense balance.

6           THE WITNESS:  Okay.

7           THE COURT:  In this case there was no suspense

8   balance, but there were several checks that were held and were

9   not deposited.

10          THE WITNESS:  Uh huh.  (affirmative response)

11          THE COURT:  Did it concern you that those payments

12  had not been deposited?

13          THE WITNESS:  It didn't concern me as long as it was

14  clear that the loan was delinquent.  Again, we don't get

15  involved with that.  Our general rule, our general policy

16  across the board is if, in fact, we have started a Motion for

17  Relief action, we consult our attorney with checks that are

18  coming in, after that process is started.

19          THE COURT:  So then, your policy is you consult with

20  your attorney on a case by case basis on what to do with the

21  payments, so there's no overall policy by Option One as to what

22  to do with those payments?

23          THE WITNESS:  No, with the exception of consulting

24  with the attorney.

25          THE COURT:  Okay.  So whatever, Counsel in Minnesota

1  might tell you to do one thing and Counsel in Louisiana,

2  something else?

3          THE WITNESS:  And that's what we do.

4          THE COURT:  Okay.

5          THE WITNESS:  We just follow strictly our attorney's

6  advice.

7          THE COURT:  You also heard Ms. Goebel testify that

8  Fidelity assumes the responsibility of executing the affidavits

9  that accompany the Motions for Relief from the Automatic Stay?

10         THE WITNESS:  Right.

11         THE COURT:  Do you ever sign affidavits?

12         THE WITNESS:  At that point, no.

13         THE COURT:  Okay.  Do you do it now?

14         THE WITNESS:  We do it now.

15         THE COURT:  Okay.  When you get an affidavit, what do

16 you do to verify the affidavit is correct?

17         THE WITNESS:  Basically, I would go in and review the

18 pay history, to see if in fact any payments have come in.

19         THE COURT:  Okay.

20         THE WITNESS:  And to make sure that what is on the

21 system is actually matching the affidavit.

22         THE COURT:  Okay.  When you say you review the

23 history, do you review the BNKH history?

24         THE WITNESS:  I would -- no, I probably would go into

25 SAR-1 hist or DLQH.

1          THE COURT:  Okay.  Tell me what those are.

2          THE WITNESS:  Well, basically they are just histories

3  of the loan.

4          THE COURT:  Summaries?

5          THE WITNESS:  Summaries.  Well, no, no.  Actually, it

6  shows all of the payments, so every payment that has actually

7  hit the loan, that's actually looked at.

8          THE COURT:  All right.  So, it's a similar report to

9  what is coming on the BNKH?

10          THE WITNESS:  It is, but it isn't.  That report is a

11  bankruptcy work station report.  The other report that I'm

12  looking at is a report that is tied to cashiering, and so on

13  and so forth.

14          THE COURT:  Okay.

15          THE WITNESS:  I mean I look at that one.

16          THE COURT:  So, it's what I recall the regular loan

17  account?

18          THE WITNESS:  Exactly, the regular loan history.

19          THE COURT:  And by looking at -- how does that report

20  differ from this one?  Meaning, I'm referring to the BNKH.

21  What is the primary difference between the two reports?

22          THE WITNESS:  Basically, that report will show you

23  if, in fact, anything is posted pre-petition, any foreclosure

24  costs that are being paid.  It gets more specific in terms of

25  how things were posted, whereas, the other reports just

1  basically show monies coming in.

2           THE COURT:  Okay.  So the loan account report just

3  shows the money that's coming in from the borrower?

4           THE WITNESS:  Exactly.

5           THE COURT:  So, you would check that account because

6  you're concerned about whether or not the borrower is past due?

7           THE WITNESS:  That's right.

8           THE COURT:  So, you're just looking to see payments

9  posted?

10          THE WITNESS:  Payments posted, right, exactly.

11          THE COURT:  So, it's a more concise report?

12          THE WITNESS:  Right.

13          THE COURT:  Because this one has got both expenses

14 going in, money going out, and the borrower's payments coming

15 in.

16          THE WITNESS:  Right.  If in fact I wanted to be

17 knowing exactly where monies were posted and where monies were

18 replied to, then I would go to the BNKH report.

19          THE COURT:  Okay.

20          THE WITNESS:  But if in fact I just want to verify

21 that payments have actually come in, I would use the SAR-1

22 hist.

23          THE COURT:  All right.  So, if you checked the cash

24 report, and I'll just call it the cash report.

25          THE WITNESS:  Okay.

1           THE COURT:  And you see that there are three

2  payments missing.

3           THE WITNESS:  Uh huh.  (affirmative response)

4           THE COURT:  And that they are contractually due for

5  October, let's just say in this case, October.  Do you go back

6  to the bankruptcy report to make sure that the system -- that

7  those three payments are pre or post-petition?

8           THE WITNESS:  Yes, most definitely.

9           THE COURT:  Okay.

10          THE WITNESS:  Most definitely.

11          THE COURT:  So, you look for the petition date to

12  see?

13          THE WITNESS:  Exactly.

14          THE COURT:  All right, because at this point you're

15  looking really for post-petition defaults?

16          THE WITNESS:  Most definitely.

17          THE COURT:  Okay.  If money has not been posted, it

18  has been sent to your Counsel, how do you know that?

19          THE WITNESS:  Actually, if in fact I have been

20  alerted that money has come in, or if in fact I review the loan

21  for notes and I'm mostly relying on notes, and I see that "X"

22  amount of check came in, then what I would do is I would go to

23  the cash log to see if in fact those monies came in.  And in

24  that log it would show me instructions on what we did with that

25  money.

1          THE COURT:  Okay.  Would you treat that as a

2    payment made?

3          THE WITNESS:  No.

4          THE COURT:  Okay.  What would you do with it?

5          THE WITNESS:  I would not treat it as a payment made.

6    I would basically just, you know, if in fact it's at our

7    attorneys, I know factually that, you know, our policy is, is

8    that, you know, we have been instructed to send it to them.

9          THE COURT:  All right.  But the reason why I'm asking

10   is in this particular case the motion and the affidavit allege

11   that there have been no payments received from November 1st,

12   forward.

13         THE WITNESS:  Uh huh.  (affirmative response)

14         THE COURT:  And in fact, there were payments

15   received?

16         THE WITNESS:  Most definitely.

17         THE COURT:  Okay.  So my question is:  What would you

18   do if the motion said that or the affidavit said that, and you

19   knew that payments had been received?  How would you handle

20   that?

21         THE WITNESS:  If in fact I knew, well, that's a tough

22   question.  You know, in terms of just -- and I'm just trying to

23   put my mind around it, wrap my mind around me getting that

24   information back.  Because I don't think the information was

25   communicated to me.  I mean, I knew that the payments were

1   going out.

2              THE COURT:  Okay.

3              THE WITNESS:  I knew that the payments were being

4   sent to our attorney.  But I think through clerical error we

5   just, you know, we failed to -- and I don't sign the

6   affidavits, I wasn't signing the affidavits then.  But we just

7   did not -- the payments that were being sent to the attorney

8   were not accounted for.  I mean, that's just clear and it's

9   just a clerical error on our part.

10             MR. MYERS:  I'm sorry, Judge.  I think I would like

11  to put an objection for the record on this.  I don't think he

12  answered your question.  I think you were giving a hypothetical

13  and he delicately and wonderfully dodged it, but I think if

14  you're still submitting that question, and if you don't, I

15  will, I would like to know what happens in your hypothetical,

16  where you specifically have knowledge that the payments are

17  not?

18             THE COURT:  How would you handle that in the pleading

19  in the affidavit?

20             THE WITNESS:  What we would do, or what we should

21  have done, is we should have contacted the attorney and we

22  should have done more research to see that there was, you know,

23  because we knew that those payments were there.  We should have

24  contacted the attorney and actually did a reconciliation to see

25  exactly where the loan was at that point.

1          THE COURT:  All right.  And now, let me ask you

2    another question.  At this point, you know, what we have

3    established is that when the loan goes into default the system

4    sort of takes over and notifies you that the loan has gone past

5    due and then you notate it and the Motion for Relief goes out.

6          THE WITNESS:  Uh huh.  (affirmative response)

7          THE COURT:  I think you said that that occurred, that

8    you got that notification in December, is that right?

9          THE WITNESS:  Yes, we actually got the notification

10   in November.

11         THE COURT:  In November?

12         THE WITNESS:  Right.

13         THE COURT:  And you sent, and you identified the

14   account for a Motion for Relief in December or November?

15         THE WITNESS:  In December.

16         THE COURT:  In December, okay.  When the next payment

17   comes, because you have already, you know, you've gotten a

18   couple before this.

19         THE WITNESS:  Uh huh.  (affirmative response)

20         THE COURT:  But when the next payment comes, and you

21   send it to your lawyer because you communicated what do I do

22   with this, and Fidelity sends it back to you and says, "Send it

23   to the lawyer."  At that point don't you realize that payments

24   are coming from the Debtor and you got another two or three

25   before the motion was filed, or close on the --

1          THE WITNESS:  Yes, but at that point, at the point

2     that we referred that out, we were strictly, and we hadn't

3     reviewed the account, you know, again, a clerical error.  We

4     hadn't actually looked into it, and we hadn't looked deep

5     enough into the account to see that the October payment had

6     been posted.  Okay, we were simply just looking at the post-

7     petition due date and we referred the loan out.

8          And that situation existed until the other Motion for

9     Relief was actually filed, and at that point, when the second

10    Motion for Relief was filed, that payment was accounted for.

11         THE COURT:  But why did you settle the first Motion

12    for Relief if you thought that they were two months behind?

13         THE WITNESS:  Excuse me?

14         THE COURT:  If you thought that the Debtor was two

15    months behind on the first Motion for Relief, why did you pull

16    that one down?

17         THE WITNESS:  We only thought that the Debtor was

18    delinquent one month.

19         THE COURT:  Okay, when you pulled that down?

20         THE WITNESS:  When we pulled that down, right.

21         THE COURT:  Okay.  And so, when you filed the second

22    one you felt the Debtor was two months behind?

23         MR. MYERS:  I'm sorry, Your Honor.  For the record,

24    just having it in front of me, you're using the words to pull

25    it down?

1          THE COURT:  Meaning to withdraw it.

2          MR. MYERS:  You denied it, Judge.

3          THE COURT:  Well, I denied the second one.  The first

4  one I denied --

5          MR. MYERS:  Judge, you denied the first one.

6          THE COURT:  -- the first one because it was only --

7          MR. MYERS:  There was no affidavit.

8          THE WITNESS:  Right.

9          THE COURT:  Right.  But I'm asking when the first one

10  was denied, was the second one in response to the first denied?

11  I mean you always thought it was in default and you were just

12  trying to clean up what you hadn't done on the first one?

13          THE WITNESS:  We just always thought that the loan

14  was in default.  Again, we were not accounting for the payments

15  that we had actually sent.  At that point when we actually

16  filed the second Motion for Relief, we had accounted for the

17  October payment.  You know, we had accounted for the October

18  payment, we had accounted for the November payment, we had

19  accounted for the December -- we actually hadn't counted for

20  the December payment, because that was the period -- that was

21  the beginning of the payments actually being sent back to our

22  Counsel.

23          THE COURT:  All right.

24      (Pause.)

25          THE COURT:  Okay, Mr. Myers and Mr. Haynes, I'll let

 1  you question the witness.

 2          MR. CASH:  And Your Honor, I'm going to have some

 3  questions as well, if that's all right.

 4          THE COURT:  Okay.  That's fine.

 5          MR. MYERS:  And Kirk Myers for the record.  And I

 6  guess that's kind of, sort of where I'm at Judge, and you hit

 7  it right there, right there at the end.  We are dealing with

 8  two motions.

 9          THE COURT:  Yes, sir.

10                  *    *    *    *    *

11                  CROSS-EXAMINATION

12  BY MR. MYERS:

13  Q.   You testified earlier that February 14th of '08 was the

14  query about the missing payments which came from Fidelity.

15  A.   Uh huh.  (affirmative response)

16  Q.   Is that your first query about missing payments?

17  A.   I think so.

18  Q.   It was, and the Judge asked you about it and I just wanted

19  to make sure that the record --

20  A.   Yes, that is.

21  Q.   -- reflected it was the first.

22  A.   Yes.

23  Q.   And so, as Debtor's Counsel I'm a tad bit confused.  Your

24  first motion which was denied by the Court, the Debtor

25  responded to.  That first motion was filed on January 7th.  The

1    response by Debtor was filed and the Court denied that on

2    February 8th.  Why are you not getting information until

3    February 14th?

4        (Pause.)

5    A.   I don't know.  I can't answer that.  I don't know.

6    Q.   Okay.  You testified that Fidelity, I believe, will refer

7    to you a Debtor's -- what the Court referred to as an

8    objection, what the record reflects as the response, as the

9    same thing.  How?  Do they send you a PDF document of that?

10   How are you getting that, physically?

11   A.   The objection, the actual document?

12   Q.   The Debtor's response in the form of an objection to the

13   request that --

14   A.   We're getting that through process management and all of

15   the documents are loaded into process management.

16        THE COURT:  You mean Counsel loaded in?  Does Counsel

17   load that document in?

18        THE WITNESS:  Yes.

19   BY MR. MYERS:

20   Q.   And so, what happened in this case when you, based on your

21   testimony, you've got Debtor's response that Debtor is current,

22   what did you guys do to verify that response?

23   A.   We in turn, actually, Fidelity in turn actually contacted

24   our attorney.

25        MR. CASH:  Your Honor, at this point I'm going to

1   have to object.  He is constantly talking about what

2   Fidelity has done.  He is speculating about what Fidelity has

3   done and he has no personal knowledge.  And when I take the

4   client on cross, or the witness on cross, I think I'm going to

5   be able to show that it's very different than what he's

6   pointing out.  So, I've got to object to him opining about what

7   Fidelity has done and who Fidelity has contacted and what steps

8   Fidelity has made.

9          THE COURT:  I think this is based on his review.  I'm

10  assuming that this is based on his knowledge and his review of

11  the record.  He has reviewed the entire file and testified as

12  to correspondence back and forth.  If you disagree, you can do

13  that on cross, but at this point I'm going to let him testify.

14         MR. CASH:  Well, may I take him on voir dire at

15  least, Your Honor, to -- voir dire, I'm sorry, I've crossed the

16  Sabine.  May I take him on voir dire to test at least if he has

17  that knowledge?

18         THE COURT:  How about objection as to the foundation?

19         MR. CASH:  All right, objection, Your Honor, no

20  foundation.

21         THE COURT:  Okay.  Mr. Myers, why don't you establish

22  a foundation?

23         MR. MYERS:  Okay.

24  BY MR. MYERS:

25  Q.   How long have you been doing your position that you're

1    doing?  I think you've testified, and correct me if I'm

2    wrong, a legal specialist?

3    A.    A legal action specialist, yes.

4    Q.    So, are you --

5    A.    Actually, I have been doing it since October of last year.

6    Q.    How many accounts do you manage in that position?

7    A.    About three to four hundred.

8    Q.    In that position, on a day-to-day basis, you've indicated

9    that you deal strictly with bankruptcy related issues?

10   A.    That's correct.

11          MR. MYERS:  And I think I'm going to expand voir dire

12   and we'll just have a little chat about Fidelity while we're

13   here, Judge.

14   BY MR. MYERS:

15   Q.    And in that process, can you have day-to-day dealings then

16   with Fidelity?

17   A.    Yes.

18          MR. CASH:  Your Honor --

19   BY MR. MYERS:

20   Q.    Now, if --

21          MR. CASH:  Your Honor, the visiting about Fidelity,

22   that's exactly my objection.  This is a very narrow hearing for

23   a very narrow purpose.

24          THE COURT:  We are going to hear the -- I'm still on

25   voir dire, so let him -- what he is asking is does he have day-

1   to-day communications with Fidelity.  That's not an

2   objectionable question.

3           MR. MYERS:  And for the record I'm going to reflect,

4   you just opened up the whole door when you wanted me to voir

5   dire my witness.

6           MR. CASH:  No, I asked if I might take the witness on

7   voir dire, to show his lack of knowledge about what Fidelity

8   does, Your Honor, and that's why I asked to.

9           THE COURT:  He's not an expert so voir dire isn't the

10  appropriate thing.  It's lack of foundation.  So, you objected

11  to lack of foundation, I'm going to let Mr. Myers try to

12  establish the foundation.

13  BY MR. MYERS:

14  Q.   You have given testimony and specifically on this Wilson

15  case, did you have any contact directly with the Boles Law

16  Firm?

17  A.   No.

18  Q.   How did you make any contacts with any questions you had

19  on this file?

20  A.   Via the process management system.

21  Q.   And the process management system goes through whose

22  system?

23  A.   It goes through -- from us to Fidelity.

24  Q.   It's kind of like an e-mail?

25  A.   Right.

1   Q.   And it's from your bankruptcy work station or your

2   computer through what system, to the best of your knowledge?

3   A.   Right, exactly.

4   Q.   Where is it going, when you type that into your computer,

5   who is getting the response on the other end?

6            MR. CASH:  Objection, Your Honor, lack of personal

7   knowledge as to who is receiving this.

8            THE COURT:  Mr. Cash, he is the one that's making the

9   request.  He has already testified that he's managing this

10  account and he's dealing with Fidelity.

11           Overruled.  Sit down.

12           MR. CASH:  Your Honor -- Your Honor --

13           THE COURT:  Overruled.  Sit down.

14  BY MR. MYERS:

15  Q.   And this --

16           MR. CASH:  Your Honor, I don't want to upset the

17  Court but I have to make my record.

18           THE COURT:  You can make your record.  Overruled.

19  But then I ask that you please sit down at that point and not

20  argue with the Court.

21  BY MR. MYERS:

22  Q.   Previously, you've testified that a Johnny Timm and I

23  believe it was a Shelonda Brinson?

24  A.   Uh huh.  (affirmative response)

25  Q.   Were receiving your e-mails, or what I'm referring to as

1   e-mails, your communications to this system?

2   A.   Right.

3   Q.   Is that correct?

4   A.   Yes.

5   Q.   And what is your personal appreciation of who these

6   employees work for?

7   A.   Are you asking me who they work for?

8   Q.   Yes.

9   A.   Fidelity.

10  Q.   Do they work for Option One?

11  A.   They worked on -- I assumed that they were both --

12       MR. MYERS:  I'm sorry, let me rephrase it.

13  BY MR. MYERS:

14  Q.   Are they housed in your building?

15  A.   No, they are not housed in our building, right.

16  Q.   Are they direct employees?

17  A.   No.

18  Q.   I understand they may have some corporate resolution

19  approval.

20  A.   Right.

21  Q.   But, to the best of your knowledge, personally, are they

22  employees of Option One directly?

23  A.   No, they are not.

24  Q.   And again, personally, to the best of your knowledge, who

25  are they employees of?

1  A.    To the best of my knowledge, Fidelity.

2  Q.    Why does Option One use Fidelity if you can pick up the

3  phone at any time and call your attorney?

4  A.    I'm just not privy to why they got it.

5  Q.    You indicated that you don't know the specifics of the

6  contract, but you know that there is a contractual relationship

7  between Option One and Boles, is that correct?

8  A.    Yes.

9  Q.    How do you know there is a contractual relationship?

10  A.    Well, and again, since I've never seen the contract, but

11  just for the simple fact that they are employed by us, I just

12  assume that there is a contract in place.

13  Q.    You indicated earlier that when Boles in this particular

14  situation requests a fee or wants a larger fee, do they send

15  that directly to you?

16  A.    Boles doesn't send that to us.

17  Q.    How do they get it?

18  A.    Again, all of that information is communicated through

19  process management.

20  Q.    And that's, again, who controls process management?

21  A.    I don't know.

22  Q.    Were you getting the information from process management?

23  A.    I'm getting the information from process management and I

24  don't know who --

25  Q.    Is that through Fidelity?

1    A.    That's through the Fidelity system.

2    Q.    Approximately, how many times do you think you have

3    accessed the Fidelity system in your employment with Option

4    One?

5    A.    I couldn't even begin to guess at that.

6    Q.    Give me a ballpark guess.

7    A.    I mean, I access the Fidelity system every day.

8    Q.    How many times a day?

9    A.    I can't even guess at that.  I would just be reaching to

10   even guess at that, but definitely multiple times a day, a lot.

11   Q.    Hundreds of times a day?

12   A.    I just couldn't guess.  I don't know.

13   Q.    Lots?

14   A.    Lots.

15          MR. MYERS:  Your Honor, I think I have more than

16   enough foundation at this point.

17          THE COURT:  Well no, I'm --

18          Mr. Simmons, let's see, when you look at the Fidelity

19   system on this file.

20          THE WITNESS:  Uh huh.  (affirmative response)

21          THE COURT:  Wilson, only this file.

22          THE WITNESS:  Uh huh.  (affirmative response)

23          THE COURT:  Can you see all communications, and when

24   I say all communications, I mean communications between Option

25   One and Fidelity and Fidelity and the Boles Firm?

1                THE WITNESS:  Yes.

2                THE COURT:  And the Boles Firm back to Fidelity?

3                THE WITNESS:  Yes.

4                THE COURT:  And Fidelity back to you?

5                THE WITNESS:  Yes, I can.

6                THE COURT:  So, that's all a part of the same

7    database?

8                THE WITNESS:  Most definitely.

9                THE COURT:  So, when you testify that you direct

10   Fidelity to tell Boles something, you can actually see if

11   Fidelity does that?

12               THE WITNESS:  Yeah, I can see that.

13               THE COURT:  Okay.  And you have reviewed those

14   correspondences in connection with your testimony?

15               THE WITNESS:  I reviewed it, yes.

16               THE COURT:  Okay.  The foundation has been laid.

17               MR. MYERS:  Thank you, Your Honor.

18   BY MR. MYERS:

19   Q.   With regards to this first motion that was denied, in your

20   communication, February 14th is after the February 8th denial of

21   that motion.  Is there any reason that you know of that

22   Fidelity didn't communicate to you that the Debtor had defenses

23   to that first motion?

24               MR. CASH:  Objection, Your Honor.  It assumes facts

25   not in evidence.

1          THE COURT:  What is the question?

2          MR. MYERS:  If there's any reason why Fidelity didn't

3   communicate to him, any information about this first motion?

4          THE COURT:  Well --

5          MR. MYERS:  I can rephrase.

6          THE COURT:  Rephrase.

7   BY MR. MYERS:

8   Q.   You testified on February 14th that the first time you

9   heard about Debtor's defense was from Fidelity through this

10  network, correct?

11  A.   Right.

12  Q.   Did Clay Wirtz or any representative of the Boles Firm

13  send any correspondence earlier than February 14th regarding

14  the hearing that was denied on February 8th?

15         MR. CASH:  Objection, Your Honor.  And if I can tell

16  the Court what my objection is, please?

17         THE COURT:  Yes.

18         MR. CASH:  They're not treating these communications.

19  This is a secure server.  When Mr. Wirtz types something in, it

20  is for him to read.  That is communication directly between

21  them.  We are just the server.  We are --

22         THE COURT:  You are making an argument at this point.

23         MR. CASH:  And what I'm trying to explain is,

24  Your Honor, when you say did you learn it from Fidelity or

25  Fidelity told you.

1           THE COURT:  That will be your job to clarify --

2           MR. CASH:  It's the system.

3           THE COURT:  -- on when you question, Mr. Cash.

4    You're really making an argument at this point.

5           MR. MYERS:  And for the record, I certainly

6    understand why those arguments are being made, I just don't buy

7    into it.  I don't -- I think it's argumentative.

8           THE COURT:  Now, you're arguing.

9           MR. CASH:  I object to this, Your Honor.

10          THE COURT:  Wait, wait.  You're both arguing.

11   Questions and answers.

12          MR. MYERS:  I'm trying, Judge.

13   BY MR. MYERS:

14   Q.   You indicated -- you gave testimony that you had some

15   approval of fees within a statutory guideline.  I think you

16   referred to it as a fee structure?

17   A.   Uh-huh. (affirmative response)

18   Q.   How much is the fee for a Motion to Lift?

19   A.   $650.

20          THE COURT:  How much?

21          THE WITNESS:  Six-fifty.

22          THE COURT:  Six-fifty.  Does that include the filing

23   fee?

24          THE WITNESS:  Yes.

25          THE COURT:  So, it's $500?

1              THE WITNESS:  Right.

2    BY MR. MYERS:

3    Q.   Who pays that money to, in this situation, the Boles Law

4    Firm?

5    A.   I have no idea.  I'm just -- I'll be honest, I'm just

6    totally out of that whole picture.  I don't get involved with

7    the payments and the fee, you know, with the exception of

8    approving fees that are actually there and structured, you

9    know, I just don't know who actually makes that payment.

10   Q.   Did you receive Debtor's response to the first motion

11   filed on February the 4th?

12   A.   Yes, I did.  Yes, I did.

13   Q.   What did you do after you received that first response?

14             THE COURT:  Well, let's start with when did you

15   receive it?

16        (Pause.)

17             THE WITNESS:  I received the intercom on the 14th.  I

18   responded back on the 14th indicating that the message had been

19   read, and requested a ledger.

20   BY MR. MYERS:

21   Q.   Was that ledger provided to you?

22             THE COURT:  You requested a ledger from?

23             THE WITNESS:  From Fidelity.

24             THE COURT:  From Fidelity, and did you -- okay, when

25   you say you requested a ledger, do you mean that Fidelity was

1    to produce something, or were they to get it from someone

2    else?

3              THE WITNESS:  They were to produce the ledger.

4              THE COURT:  Okay.  Tell me what the ledger is?

5              THE WITNESS:  Basically, it's basically the

6    accounting history, you know, basically going through and

7    actually looking at the payments and seeing actually what --

8              THE COURT:  So, they basically manually create this?

9              THE WITNESS:  They don't actually -- yeah, it's a

10   manual ledger.  I mean, it's a manual ledger.  I mean it's not

11   system generated, but it's a manual ledger through the

12   reviewing of the account.

13             THE COURT:  Okay.  So, instead of looking at screens

14   like this, this BNKH that are part -- it's actually a

15   spreadsheet type of ledger?

16             THE WITNESS:  It's like a spreadsheet kind of deal,

17   right.

18             THE COURT:  And they prepare that?

19             THE WITNESS:  And they prepare that, right.

20             THE COURT:  I take it, from this information?

21             THE WITNESS:  Exactly, from the information that's on

22   the system.

23             THE COURT:  Okay.  So, on the 14th you asked them for

24   a ledger?

25             THE WITNESS:  Right.

1  BY MR. MYERS:

2  Q.   Did they provide it, and if so --

3  A.   Yes, they did actually provide the ledger.  I understand

4  that the ledger was actually provided.

5          THE COURT:  When did they provide it?

6      (Pause.)

7          THE WITNESS:  I cannot find specifically, but I know

8  it was provided.  But I just can't find the note indicating the

9  specific time.

10  BY MR. MYERS:

11  Q.   And you don't have the ledger with you?

12  A.   Yes.

13          THE COURT:  You do have the ledger with you?

14          THE WITNESS:  Yes.

15          THE COURT:  And it doesn't have a date on it?

16          THE WITNESS:  Let me see here.  I don't know

17  specifically when it was provided, but it was actually filed

18  with the affidavit.

19          THE COURT:  Filed with the affidavit?

20          THE WITNESS:  Yes.

21          THE COURT:  Meaning in the court record?

22          THE WITNESS:  Yes.

23          MR. MYERS:  Is this a little three entry --

24          THE WITNESS:  Yes.

25          MR. MYERS:  -- thing?

1          THE WITNESS:  Right.

2          MR. MYERS:  All right, yes.  I've seen that.

3    BY MR. MYERS:

4    Q.   So, it doesn't reflect the October 21st payment or the

5    November 30th payment, is that correct?

6    A.   Actually, it does.  (Witness examines document.)

7    Actually, it does.

8          THE COURT:  This has an October --

9          THE WITNESS:  October --

10         THE COURT:  -- 22nd payment.

11         THE WITNESS:  Right, October the 22nd and December

12   the 3rd.

13         THE COURT:  The third.

14         THE WITNESS:  As well as the April.

15         THE COURT:  It doesn't have the January payment.

16         THE WITNESS:  It doesn't have the January payment,

17   and that's the payment --

18         THE COURT:  Or the February.

19         THE WITNESS:  Right.  Those are the payments that

20   were sent back.

21         THE COURT:  Send to Mr. Wirtz?

22         THE WITNESS:  Wirtz, right, yes.

23   BY MR. MYERS:

24   Q.   You indicated that you, with regard to specifically the

25   October and November payments, that you -- I believe you

1   testified that you physically forwarded a check to

2   Mr. Wirtz's account to process them, is that correct?

3   A.   Right.

4   Q.   Those two payments were made Western Union.  How did that

5   Western Union payment get converted into a check form?  Did you

6   post it into account?

7   A.   No, we didn't.  We never posted it.  I mean, once we get

8   instructions, we just basically send whatever is there.  I

9   don't know --

10  Q.   Yes, but you can't send -- you can't like forward my money

11  order or a personal check.

12  A.   Uh-huh. (affirmative response)

13  Q.   You have to cut a check.  Western Union is electronic,

14  correct?

15  A.   No, no.  Which check are you talking about?

16  Q.   The October 20th and the November 30th checks --

17  A.   The October --

18  Q.   -- that you received --

19  A.   The October and the November, we actually posted that to

20  the account.  It was not until we got the December payment,

21  that we actually started forwarding the monies back to our

22  attorney.

23          THE COURT:  Okay, but they weren't posted to the

24  account --

25          THE WITNESS:  Correct.

1          THE COURT:  -- at the time this went to a Motion

2   for Relief, correct?

3          THE WITNESS:  Actually, they were.  It was due to a

4   clerical error.  They were -- no, the accounting has been

5   cleaned.  They were actually posting it.  I have an accounting

6   history.  They were actually posted to the account when they

7   came in.  We didn't hold any of the Western Unions.

8          THE COURT:  Okay.  So, why didn't they show up when

9   you looked at the account history?

10         THE WITNESS:  They -- again, it was due to the fact,

11  due to the late bankruptcy set up.  When we actually did the

12  set up, we didn't go back and --

13         THE COURT:  You posted them to pre-petition --

14         THE WITNESS:  Pre-petition.

15         THE COURT:  -- instead of post-petition?

16         THE WITNESS:  Right, exactly.

17         THE COURT:  Okay.

18  BY MR. MYERS:

19  Q.   Would you be able to find those payments if you had looked

20  at a payment history on the account?

21  A.   Which payments are we talking about?

22  Q.   The October and November payments, the Western Union

23  payments that are --

24  A.   Yes, most definitely.

25  Q.   -- misapplied?

1  A.   Yes.

2  Q.   You indicated that there has been a change and you

3  currently do affidavits yourself?

4  A.   That's correct.

5  Q.   Is there any reason why you simply don't look for the due

6  date on your paperwork as the basis for filing your affidavit?

7  You indicated that you looked at a proprietary screen on your

8  cash log system.  Why not just look at the due date?

9  A.   Actually, we don't look at the cash log.  The only time we

10 look at the cash log is when there is a question about a

11 payment that has been sent, allegedly been sent to us, and it's

12 not showing as being posted.

13 Q.   So, what do you look at when you prepare your affidavit?

14 A.   We basically look at the history, the payment history

15 screen.  And you know, we do initially -- I mean, we do both.

16 We look at the post-petition due date and we see what is due

17 post-petition.  But just for purposes of dotting our I's and

18 crossing our T's, we actually look at all of the payments that

19 have come in, as well.

20 Q.   So, you're taking another step --

21 A.   Taking another step.

22 Q.   -- besides simply looking at the due date?

23 A.   We're just looking at the payments, right.

24 Q.   And what is the screen called, or what are you looking at

25 to look at the payment processing?

1   A.    SAR-1 hist or DLQH.

2   Q.    Does Fidelity have access to that screen?

3   A.    I'm not sure.

4   Q.    The BNKH screen shot, is that from your system?

5   A.    Yes, it is.

6   Q.    And that will only reflect a bankruptcy history?

7   A.    That's correct.

8          THE COURT:  So, it has no pre-petition data on it?

9          THE WITNESS:  Actually, it does.  It does have pre-

10  petition as well.

11  BY MR. MYERS:

12  Q.    Let me show you --

13         MR. MYERS:  Judge, what has this been marked as?

14  What is the exhibit number?

15         THE COURT:  Exhibit 1.

16  BY MR. MYERS:

17  Q.    Let me show you Exhibit 1 that's in the record.

18  A.    (Witness examines document.)

19  Q.    So, would it be your belief, having looked at that, that

20  there's more pages than just that one screen shot?

21  A.    There's definitely more pages.  I have proof to that

22  effect.

23  Q.    All right.

24  A.    I have a complete history.

25  Q.    And that, your complete history is also referred to as a

1   BNKH history?

2   A.   No.  No, it's not the SAR-1 history.

3   Q.   I understand.  But would BNKH have more history than --

4   A.   No, BNKH would have history at the point that the Debtor

5   filed bankruptcy.

6   Q.   Okay.

7   A.   And then that information would go over into the

8   bankruptcy work station.

9   Q.   Okay.  I just -- that's what I was thinking.  All right.

10  A.   Uh-huh. (affirmative response)

11  Q.   Did Option One make a second request to file a Motion for

12  Relief after the first Motion for Relief was denied on February

13  8th?

14  A.   (Witness examines documents.)  There are no notes

15  indicating that.

16  Q.   Did Mr. Boles or a representative of his office ever

17  personally contact you by telephone?

18  A.   No.

19  Q.   At any point, up until the last motion was denied?

20  A.   No.

21  Q.   If I remember correctly, this case was continued multiple

22  times.  I'm trying to determine a payment history on this.  Did

23  you receive notes through the Fidelity system --

24  A.   No.

25  Q.   -- inquiring as to the status of payments?

1    A.    We received notes through process management.

2    Q.    That's the Fidelity system?

3    A.    (No response.)

4              THE COURT:  Yes or no?

5              THE WITNESS:  Huh?

6              THE COURT:  The notes came through the Fidelity

7    system?

8              THE WITNESS:  Through process management, yes.

9              THE COURT:  Process management is part of the

10   Fidelity system?

11             THE WITNESS:  Yes.

12             THE COURT:  Yes?

13             THE WITNESS:  Yeah.

14             THE COURT:  Okay.

15             MR. MYERS:  Thank you.  Okay, it's just -- we need it

16   for cross, so I'm just trying to keep the record clear.

17   BY MR. MYERS:

18   Q.    You indicated that when we were talking about counsel,

19   that you're allowed to contact counsel if you want.  How many

20   times do you contact counsel, in a given week?

21   A.    There is really no number that I can put on that.  I mean,

22   if in fact something is again, not clear, then I'll pick up the

23   phone and contact them.

24   Q.    How many Motions to Lift do you personally handle in a

25   given week?

1   A.   Well, I guess about 20, 25.

2          THE COURT:  Twenty or 25?

3          THE WITNESS:  Twenty-five, yes.  Yes.

4   BY MR. MYERS:

5   Q.   And then, say for example this week, have you contacted an

6   attorney with questions?

7   A.   No, I haven't contacted an attorney.

8   Q.   How about last week?

9   A.   No.

10  Q.   In the last month?

11  A.   Maybe once or twice.

12  Q.   But it's a fairly unusual --

13  A.   It's a fairly unusual.  Most of the information is pretty

14  accurate.  They request information, or the information was

15  requested.  We send the information back, and then it's a done

16  deal.

17  Q.   How often does counsel call you?

18  A.   Not that often.  Most of their communication is through

19  the process management system.

20  Q.   All right.  But it's your testimony that they can call you

21  if they want?

22  A.   Yes, they have the option to pick up the phone, but most

23  of them would rather not do that.  They would rather go, you

24  know.  The initial step is to go through process management.

25          THE COURT:  Do you discourage them from contacting

1    you?

2           THE WITNESS:  We don't discourage them, but the, you

3    know, you know, the initial is to go through process

4    management.

5    BY MR. MYERS:

6    Q.   Do you know why?

7    A.   No, I have no idea.  Again, I'm not clear.

8    Q.   Is has been, you heard testimony early today, it has been

9    presented that Fidelity is like a library?

10   A.   Uh-huh. (affirmative response)

11   Q.   Why --

12          MR. MYERS:  I'll strike that, Your Honor.

13          THE COURT:  All right.

14   BY MR. MYERS:

15   Q.   In this -- and I'm sorry, and I may have asked this.  Did

16   you give testimony that you don't know who cut the check for

17   the Boles Law Firm in this case?

18   A.   That's correct.

19   Q.   Do you know if there has been any request for additional

20   money in this case?

21   A.   I'm not aware of any.

22   Q.   If there had been a request for additional money, would

23   that come through the network since you've not received any

24   phone calls from the Boles Law Firm?

25   A.   Yeah, that would come through, yes.

1  Q.   Could the Boles Law Firm have been calling any other

2  party in your office, other than yourself on this file?

3  A.   Outside of my manager and director, no.

4  Q.   Are you personally aware of any contact that they had with

5  your manager, directly?

6  A.   Not at all, not since this situation.

7            MR. MYERS:  I'll stop there, Judge.

8            THE COURT:  Mr. Haynes.

9            MR. HAYNES:  All right.  Your Honor again, I would

10  renew my request if I may reserve further examination.

11           THE COURT:  All right.  I'll rule on that after we

12  get through here.

13           MR. HAYNES:  Yes, Your Honor.

14                    *   *   *   *   *

15                    CROSS-EXAMINATION

16  BY MR. HAYNES:

17  Q.   Mr. Simmons, you had begun your testimony describing your

18  job title, and I'm trying to make sure I understand as a

19  practical matter what that means.  My impression is, is that

20  you're a line worker, that you're, you know, directly

21  responsible for the Wilson file during the phase when it's in

22  bankruptcy; would that be a correct description?

23  A.   That's correct.

24  Q.   And then you mentioned a moment ago that you have a

25  manager and a director that you report to, and who are they?

1   A.   The manager, actually the team leader is Alicia Fisher

2   and the director is Christine Johnson.

3   Q.   And are you all, all in the same office?

4   A.   That's correct.

5   Q.   And where is that?

6   A.   That's at 4600 Touchton, in Jacksonville, Florida.

7           THE COURT:  Are you glad to be away from the storm?

8           THE WITNESS:  Yes, I am.

9   BY MR. HAYNES:

10  Q.   Now Mr. Simmons, do you know what authority Option gave to

11  Fidelity with regard to the Wilson bankruptcy case?

12  A.   No, I don't.

13  Q.   We were discussing the screen shot.

14          THE COURT:  Exhibit 1?

15          MR. HAYNES:  Exhibit 1.

16  BY MR. HAYNES:

17  Q.   And Mr. Simmons, do you have a copy of that in front of

18  you?

19  A.   No, I don't.

20  Q.   All right.

21          MR. HAYNES:  Your Honor, if I may approach

22  Mr. Simmons?

23          THE COURT:  Yes, you may.

24  BY MR. HAYNES:

25  Q.   Mr. Simmons, do you see the line dated December 20, 2007

1  and then the Code 25, referred for MFR?

2  A.    Yes, I do.

3  Q.    All right.  And that's what you were referring to earlier,

4  that that's the direction to get a Motion for Relief filed, is

5  that correct?

6  A.    That's correct.

7  Q.    Okay.  Mr. Simmons, do you know who entered that in this

8  BNKH screen?

9  A.    Are you asking about who actually referred it out?

10  Q.    Well, let's take that question up.

11  A.    Okay.

12  Q.    Who referred it?  Who was the person -- was it a person at

13  Option?

14  A.    It was a person at Option that actually did the referring.

15  Q.    Okay.  Who physically in essence made the referral?

16  A.    You're asking for a specific name?

17  Q.    Yes, sir.

18  A.    Laura Kelly.

19  Q.    What is her title?

20  A.    She's a Fidelity employee on site.

21       THE COURT:  You have people on site?

22       THE WITNESS:  One.  Yes, one.

23       THE COURT:  One?

24       THE WITNESS:  Uh-huh. (affirmative response)

25       THE COURT:  And what is the purpose of her being on

1    site?

2            THE WITNESS:  Again, I don't, you know, I don't

3    understand all of that.

4    BY MR. HAYNES:

5    Q.   Now, did you and Ms. Kelly discuss that decision to refer

6    the Wilson account for a Motion for Relief?

7    A.   At that particular time what we did is we ran the report.

8    She was responsible for actually going in and referring our

9    Motions for Relief and she just had that report and basically

10   reviewed the loans, and referred them out.

11           THE COURT:  Wait, back up.  I thought you testified

12   earlier that you reviewed the report and you made the code to

13   refer the --

14           THE WITNESS:  I currently do that.  But at that point

15   she was doing that.

16           THE COURT:  All right.

17   BY MR. HAYNES:

18   Q.   As of today, is Ms. Kelly still on site?

19   A.   Yes, she is.

20   Q.   Is she the only Fidelity employee that's on site as of

21   today?

22   A.   I think we brought another employee in.  I know we brought

23   another employee on site for Fidelity.

24   Q.   Did that employee have anything to do with the Wilson's?

25   A.   No, she's a new employee.  She has been there less than a

1   month.

2           THE COURT:  So, I'll take that as a no?

3           THE WITNESS:  Yes.

4           THE COURT:  That she has nothing --

5           THE WITNESS:  That's a no, right.

6           THE COURT:  Okay.

7       (Pause.)

8           THE COURT:  Okay.  Just so that I make sure I've got

9   this straight, Mr. Simmons.  Ms. Kelly, at the time this loan

10  was referred to for a Motion for Relief, Ms. Kelly was the

11  person who reviewed the reports that the computer generated and

12  said were in default.

13          THE WITNESS:  Exactly.

14          THE COURT:  Post-petition default?

15          THE WITNESS:  Right.

16          THE COURT:  She reviewed the account, she made the

17  decision to go ahead and refer out for a Motion for Relief?

18          THE WITNESS:  Exactly.

19          THE COURT:  Did you receive any notification from her

20  that that had happened?

21          THE WITNESS:  No.

22          THE COURT:  No?

23          THE WITNESS:  No.  Basically just gave --

24          THE COURT:  You didn't like flagged or e-mailed or

25  anything like that?

1          THE WITNESS:  No, no, nothing like that.  No, she

2    was just basically given the report.

3          THE COURT:  All right.  So, I'll be clear because of

4    all of the questions that I asked you previously; when you

5    testified earlier that you would receive the objections, you

6    would receive the Motion for Relief and look at it, was

7    Ms. Kelly doing all of this at this point?

8          THE WITNESS:  No, she was just simply doing the

9    Motion for Relief at that point.

10         THE COURT:  Okay.

11         THE WITNESS:  Right.

12         THE COURT:  So, that was just her piece?

13         THE WITNESS:  That was just her piece, right.

14         MR. HAYNES:  Your Honor, I may forget this if I don't

15   ask this now.

16         THE COURT:  Go ahead.

17         MR. HAYNES:  If I may move into evidence Mr. Simmons'

18   file?

19         THE COURT:  Well you know it's interesting because I

20   don't think anybody has seen it.  And I'll be honest with you,

21   I am very curious about what is in that file myself.  So, I

22   think what I'm going to do, Mr. Haynes, and I'll just announce

23   this right now, is that this hearing is going to be continued

24   over.  I'm going to ask the U.S. Trustee's Office to conduct on

25   the Court's behalf, some specific discovery in this matter,

1   which will include the production of the entire file from

2   Option One in this case, as well as the Fidelity files.

3           In particular, I'm looking for the correspondence

4   through e-mails and other communications between Option One and

5   Fidelity, and Fidelity and the Wirtz firm.

6           I'm not going to get into privileged communications.

7   You can assert the privilege, Mr. Wirtz.  But I am trying to

8   determine who knew what, when, because that is the crux of this

9   particular inquiry as to why this affidavit was executed and

10  was incorrect.  And the only way it seems I'm going to be able

11  to get to that, because I have two witnesses, one saying they

12  didn't know anything about it, it wasn't their responsibility,

13  that's the Fidelity witness.

14          And the Option One saying, "No, it was Fidelity's

15  responsibility."  And then, of course, I have the attorney on

16  the other side, which is I'll deal with it on a completely

17  different basis.

18          But I think what I'll do is I'll let you do the

19  production, and then that way everyone can see all of the

20  documents and deal with it at that time.

21          MR. HAYNES:  Yes, Your Honor.  And I thank you for

22  that, and Your Honor, in that, I would assume that as part of

23  that, that would include Mr. Simmons' file that he's looking at

24  today.  But if I --

25          THE COURT:  Yes.

1                MR. HAYNES:  I understand you're granting my

2      motion to move it into evidence?

3                THE COURT:  Yes.

4                MR. HAYNES:  All right, thank you, Your Honor.

5                MR. CASH:  I'm sorry --

6                THE COURT:  I'm delaying the motion to put it into

7      evidence.

8                MR. HAYNES:  Oh.

9                THE COURT:  I'm ordering the production.  I'm going

10     to continue this hearing.

11               MR. HAYNES:  Yes, Your Honor.

12               THE COURT:  So that there may be further evidence

13     taken or testimony given by everyone.  Everyone's rights are

14     preserved, okay?

15               MR. CASH:  Your Honor, just -- when you say the

16     entire Fidelity file, all right.

17               THE COURT:  I know that is a very inarticulate

18     direction, Mr. Cash, and I apologize for that.  And if I was a

19     lawyer, I'm sure that you could argue that it's just vague and

20     not specific, and that's what you're telling me.  I don't know

21     what that file is.  I'm not an attorney in this case.  I'm

22     going to rely on the U.S. Trustee's Office to direct production

23     to both Fidelity and to Option One, to get whatever

24     documentation, electronic or paper, that exists in their files

25     on this case.  I'm not going to try to limit it or describe it.

1    Right now, it's just going to be the entire record.

2                MR. CASH:  And I just --

3                THE COURT:  And preserving, obviously, any

4    privileges.

5                MR. CASH:  And I assume once that's directed, we

6    would have the opportunity --

7                THE COURT:  Yes.

8                MR. CASH:  -- to either seek a protective order?

9                THE COURT:  Yes.

10               MR. CASH:  To object to the breadth.

11               THE COURT:  Absolutely, absolutely.  And then, I'll

12   just tell you right now, if you're worried about proprietary

13   information, just draft a protective order and I'll be happy to

14   sign it and so that it will be locked and sealed from anyone

15   else discovering it, okay?

16               MR. CASH:  All right.

17               THE COURT:  You don't even have to come here, just

18   agree to it and send it to me.

19               MR. CASH:  Okay.

20   BY MR. HAYNES:

21   Q.   Mr. Simmons now, let's return back to the discussion of

22   the Motion for Relief.  What I think I heard you say, and I

23   want to confirm, is that you didn't make the decision that the

24   Motion for Relief was to be filed?

25   A.   Right.

1    Q.   And your manager didn't make that decision, and your

2    director didn't make that decision, is that correct?

3    A.   That's correct.

4    Q.   The decision was made by Laura Kelly?

5    A.   That's correct.

6    Q.   Do you know --

7              THE COURT:  Excuse me.

8              MR. HAYNES:  Yes, Your Honor.

9              THE COURT:  Did she have certain parameters or

10   instructions from you as to when a Motion for Relief should be

11   filed?

12             THE WITNESS:  Yes, we have procedures in place so she

13   knows exactly when to make, you know, we have procedures in

14   place in terms of --

15             THE COURT:  These are written?

16             THE WITNESS:  These are written procedures, exactly.

17             THE COURT:  Okay.  So, you gave her written

18   procedures?

19             THE WITNESS:  Yes, she has written procedures and

20   terms.

21             THE COURT:  That she -- that you expect her to

22   follow?

23             THE WITNESS:  Exactly.

24             THE COURT:  Okay.  I think we are going to need the

25   written procedures.

1           MR. MYERS:  And for the record, she's not an

2    attorney, right?

3           THE WITNESS:  No, she's not.

4           THE COURT:  All right.  You may proceed.

5           MR. HAYNES:  All right.

6    BY MR. HAYNES:

7    Q.   Mr. Simmons, do you recall specifically with regard to the

8    Wilson account, how long it was between the time Ms. Kelly

9    directed the filing of the Motion for Relief and your personal

10   -- personally learning of that decision?  Would that be within

11   the same day?

12   A.   I don't know.  I mean I have no idea when I found out.

13   Q.   Okay.

14   A.   I mean, I just don't know.  I can't give you a specific

15   time.

16   Q.   Okay.

17          THE COURT:  Would you know once it was filed?

18          THE WITNESS:  Yeah, if in fact information was

19   requested on it.

20          THE COURT:  Well, not information requested.  I'm

21   just saying once the motion itself was filed, wasn't it your

22   testimony that you would then receive the notification that the

23   motion has actually been filed?

24          THE WITNESS:  Actually, no.  Just through my general

25   review of the file I would have run across that as being filed.

1   But there was nothing that would kick off to me that the

2   motion had actually been filed.  There is no trigger.

3           THE COURT:  Would it go to Ms. Kelly?

4           THE WITNESS:  I beg your pardon?

5           THE COURT:  Would it have gone to Ms. Kelly?

6           THE WITNESS:  No, I wouldn't have gone to Ms. Kelly.

7   Ms. Kelly had a long report of all, you know, the loans that

8   failed, delinquent within that 45 to 60 day period, and she

9   basically would go through and review the loans based on

10  procedures that are in place, and then refer the file out.

11          THE COURT:  All right.  I guess what I'm -- maybe I

12  was confused and that's why I'm going to ask the next question.

13  I thought your testimony was that if you reviewed the report.

14          THE WITNESS:  Uh-huh. (affirmative response)

15          THE COURT:  Checked the file and believed the motion

16  was appropriate, that you would send a notification through the

17  system that ultimately would get to counsel to file the Motion

18  for Relief?

19          THE WITNESS:  Uh-huh. (affirmative response)

20          THE COURT:  Once he filed the Motion for Relief, that

21  would be uploaded into the system and you would receive

22  something that would tell you that it had been filed?

23          THE WITNESS:  Yeah.  That's what I would currently

24  do, but I would have --

25          THE COURT:  Oh, but back then?

1          THE WITNESS:  But back then, she was actually

2    doing the referring.

3          THE COURT:  All right.  So, how did you check to make

4    sure that the motion was filed?  How did Option One know that

5    its direction had been honored?  She tells Counsel for

6    Fidelity, whatever.

7          THE WITNESS:  Uh-huh. (affirmative response)

8          THE COURT:  Well, somehow it gets to she starts the

9    ball that Counsel is to file a Motion for Relief.  At that time

10   how did Option One know that the motion was filed?

11         THE WITNESS:  I mean there's no follow up.  There was

12   no follow up to it, after it was filed.

13         THE COURT:  There was no follow up?

14         THE WITNESS:  There was no follow up after it was

15   filed.

16         THE COURT:  Okay.

17         THE WITNESS:  With the exception of if, in fact, we

18   got --

19         THE COURT:  A request for additional information was

20   received?

21         THE WITNESS:  Okay.

22         THE COURT:  Right?

23         THE WITNESS:  Right.

24         THE COURT:  That would be the only way you would --

25         THE WITNESS:  Exactly, additional information

 1  received, requested information.

 2           THE COURT:  All right.

 3  BY MR. HAYNES:

 4  Q.   Back then, Mr. Simmons, under that process, ordinarily how

 5  long would it be between the time that Ms. Kelly would make a

 6  decision for a Motion for Relief to be filed and that you might

 7  learn about it?  Would it be --

 8  A.   Again, I would not know about it unless the information

 9  was being requested based on her actions.

10  Q.   Okay.

11  A.   I would not just automatically know.  There is nothing

12  that -- there is no system in place that triggers me that the

13  motion had been filed.

14  Q.   All right.  We were looking, you and I were looking a

15  moment ago at this Exhibit 1, the screen, and it references

16  refer for Motion for Relief.  Now, do you recall Ms. Goebel's

17  testimony that this is a screen, the information contained in

18  this screen is on Option's own system?

19  A.   Right, yes.

20  Q.   Okay.  Would you agree with that?

21  A.   I agree with that.

22  Q.   All right.  And is the information contained in this

23  screen loaded by Option, or is it loaded by Ms. Kelly?

24  A.   When you say "loaded," I'm not sure what you mean.

25  Q.   Okay.  Well --

1          THE COURT:  Key punched in.

2          THE WITNESS:  What?

3          THE COURT:  Key punched in.

4          THE WITNESS:  Actually, it's just fed from our main

5    system and it's fed in.  I mean it's not loaded, it's not

6    inputted, it's just fed in.

7          MR. HAYNES:  All right.

8    BY MR. HAYNES:

9    Q.   Okay.  And we'll give a specific example to try and work

10   through this.  I assume someone, some human being typed in

11   "Referred for MFR."  So, let's start:  Did you type that in?

12   A.   No, I didn't.

13   Q.   Okay.  Do you know if that is something that Ms. Kelly

14   would have done?

15   A.   That entry would automatically come in through us going in

16   and coding the system and BNKS.  And we would code that system

17   25 and that information would automatically come in.  It would

18   not be typed in.

19   Q.   I see what you're saying.

20   A.   Yes.

21   Q.   Because the code 25 was typed in?

22   A.   The 25 actually generates it, right.

23   Q.   That's what caused that to be printed out?

24   A.   Exactly.

25   Q.   Now, do you know, and that 25 we know that it was there on

1  that Exhibit 1, correct?

2  A.   Most definitely.

3  Q.   Do you know who would have typed in 25?

4  A.   She would have.

5  Q.   Ms. Kelly would have?

6  A.   Ms. Kelly would have, when she actually --

7         THE COURT:  At this time, Ms. Kelly would have?

8         THE WITNESS:  At this time Ms. Kelly would have typed

9  it in there, because she was actually referring the loan out

10  for a Motion for Relief.

11  BY MR. HAYNES:

12  Q.   So, Fidelity had the ability to modify the information

13  that's in this screen?

14  A.   No, they didn't.  They don't --

15  Q.   They had the ability to input the information?

16  A.   There is no input from Fidelity on that screen.

17  Q.   Well, I thought you were saying that the 25 was input by

18  Ms. Kelly?

19  A.   She has the ability, and because I'm getting confused when

20  you're talking about the modification of the screen, because

21  she can't just pull up that screen and modify it.  But she can

22  go in, in our system, and she had the access to go into our

23  system and since she was reviewing the Motion for Relief, to go

24  in and code the system 25, and that in turn pulled that

25  referral into that screen.

1            THE COURT:  Okay.

2  BY MR. HAYNES:

3  Q.   So, she would have input the 25 in a different system?

4  A.   In a different screen.

5  Q.   And then, that information feeds into this system?

6  A.   And then, it would have been uploaded into that screen,

7  right.

8  Q.   I believe that you mentioned that you, yourself, are

9  assigned a code number for your work.  If I were to look at

10 screens and that type of thing, what is your code number?

11 A.   P-Z-A-S-V.

12           THE COURT:  One more time?

13           THE WITNESS:  P-Z-A-S-V.

14           THE COURT:  Thank you.

15 BY MR. HAYNES:

16 Q.   And if I can do it --

17           THE COURT:  It's not quite as good as James Bond 007,

18 right?

19           THE WITNESS:  Uh-huh. (affirmative response)

20 BY MR. HAYNES:

21 Q.   P as in Peter?

22 A.   Uh-huh. (affirmative response)

23 Q.   Z as in zebra?

24 A.   Uh-huh. (affirmative response)

25 Q.   A as in alpha, S as in snake, V as in Victor?

1  A.    Right.

2  Q.    Okay.  You were mentioning how that the motion would have

3  been available to be viewed in Option's system, is that

4  correct?

5  A.    In process management.

6  Q.    In process management?

7  A.    Uh-huh. (affirmative response)

8  Q.    Through process management?

9  A.    Right.

10 Q.    Do you know if the affidavit itself would have been part

11 of what was viewable?

12 A.    That's correct, it would have.

13 Q.    The Wilson motion and affidavit were viewable?

14 A.    Most definitely, they would have been viewable in process

15 management.

16 Q.    We were talking, I believe you were testifying about fees

17 from vendors and how that they might get uploaded into the

18 system.  Is that the new invoice system?

19 A.    That's correct.

20 Q.    And is that a Fidelity product?

21 A.    I have no idea.

22 Q.    Okay.  You testified about your request and you said the

23 14th, and I can't remember if that was -- I believe you said

24 February 14th?

25 A.    Uh-huh. (affirmative response)

1  Q.   When you made a request for a ledger?

2  A.   Right.

3  Q.   Now, I want to go through that.  I believe you're

4  referring to an attachment within the affidavit of Ms. Goebel

5  that's a spreadsheet.  Can you see what I am holding up?

6  A.   Yes, sir.

7  Q.   Does this look to be it?

8  A.   Yes, it is.

9  Q.   Okay.  And again, this was right after the last, the

10  signature page of Ms. Goebel's affidavit?

11  A.   Right.

12  Q.   The concept I'm trying to work through is it seems like

13  it's almost an echo effect that you asked for a ledger, for

14  Fidelity to prepare a ledger, correct?

15  A.   Correct.

16  Q.   But won't Fidelity prepare that ledger based on Option's

17  own information?

18  A.   That's correct.

19  Q.   Why wouldn't Option -- if you wanted a ledger, why

20  wouldn't you or one of your colleagues at Option prepare the

21  ledger yourself?

22  A.   Again, I don't understand the -- I mean, I'm just doing

23  what's directed.  I don't understand the rules behind preparing

24  a ledger.  And it has always been told to me that if, in fact,

25  you want a ledger prepared to go through process management and

1  request it.

2  Q.   Exactly.  The protocol is to ask Fidelity to prepare the

3  ledger?

4  A.   To go through process management, right.

5  Q.   But would you agree with me, based on your understanding

6  of the system, Fidelity is drawing the information to prepare

7  the ledger from Option's own information?

8  A.   That's correct.

9  Q.   A number of times today, Mr. Simmons, you have referred to

10  a clerical error.

11  A.   Uh-huh. (affirmative response)

12  Q.   And I don't know that I have quite understood precisely

13  what you mean by that sort of the who, what, when, where, why

14  of that.

15  A.   Okay.

16  Q.   So, let's break that down, if you don't mind.

17  A.   Okay.

18  Q.   When you say the clerical error, who is the clerk that

19  made the clerical error?

20  A.   When Laura reviewed the file she looked at the post-

21  petition due date, okay.

22  Q.   Okay.

23  A.   The post-petition due date was not accurate, because it

24  was not reflecting the October's payment.  And the reason that

25  it was not correct is because the loan was forwarded late.  A

1  payment came in prior to the bankruptcy work station being

2  set up, and that's what I mean when I say a clerical error.

3  Q.   And correct me if I'm wrong, because I don't want to

4  mischaracterize what you're saying, but I was thinking at the

5  beginning of your testimony today you were saying that there is

6  a protocol that when it is learned some time after the fact

7  that a bankruptcy has been filed, that there is a protocol

8  for --

9  A.   Yes, we do have procedures in place that if, in fact,

10 there is a late bankruptcy set up, that we actually, to go into

11 certain screens to see if any payments have come in prior to.

12 Q.   And that apparently didn't occur in this case?

13 A.   That did not occur in this case.  That's what I mean by

14 clerical error.

15 Q.   Whose responsibility -- and I mean whether we start off

16 with the entity or the specific person, who is responsible for

17 that late bankruptcy set up?

18 A.   When you say "responsible," anybody that's actually doing

19 the bankruptcy set up is responsible for it, if you're talking

20 in general.  Anybody that's doing a late bankruptcy set up

21 should follow the procedure.  And the procedure is, it's if in

22 fact there is a payment that has come in prior to the

23 bankruptcy, that they should actually account for that payment

24 and make an adjustment to BNKP.

25          THE COURT:  Who did the bankruptcy set up in this

1    case?

2             THE WITNESS:  Fidelity.

3             THE COURT:  So, your testimony is that Fidelity

4    should have gone into the system and looked for a payment?

5             THE WITNESS:  Yeah, they should have gone back and

6    looked for a payment to see if in fact something has come in --

7             THE COURT:  And then correct it?

8             THE WITNESS:  -- prior to the bankruptcy set up.

9             THE COURT:  And then corrected the accounting?

10            THE WITNESS:  And corrected the account.

11            THE COURT:  Okay.  They have the ability to correct

12   the account?

13            THE WITNESS:  They have the ability to go into the

14   BNKP screen and make the correction.

15            THE COURT:  Okay.

16   BY MR. HAYNES:

17   Q.   Do you know specifically if it was Ms. Kelly who was the

18   one that did the bankruptcy set up here in this case?

19   A.   No, she didn't do the bankruptcy set up.  She was only

20   handling Motions for Relief at that point.

21   Q.   Do you know the person with Fidelity who did the

22   bankruptcy set up?

23   A.   I have no idea who that is.

24   Q.   Would that have been done on site where you are, or off

25   site?

1   A.   It would have been off site.

2   Q.   Mr. Simmons, back in February of 2008, did you ever make

3   the decision that a Motion for Relief should be filed for

4   Option?

5   A.   No.

6   Q.   That was exclusively the responsibility of Fidelity?

7   A.   Yes.

8   Q.   Today, has that changed?  Do you ever make the decision

9   that a Motion for Relief should be filed?

10  A.   The procedure today is that we send Fidelity a report.  I

11  review the report, then the report is sent to Fidelity.  Any

12  loans that they are 45 to 60 days delinquent, they are to go in

13  and file for a Motion for Relief.

14  Q.   The minimum time for a delinquent loan to move forward to

15  a Motion for Relief is 45 days?

16  A.   Right, 45 days, right.

17  Q.   That's Option's policy?

18  A.   That's Option's policy.  We send that report out two times

19  a month.

20          THE COURT:  What was the due date on this loan?

21          THE WITNESS:  At what --

22          THE COURT:  This particular loan, Wilson, what was

23  the due date?

24          THE WITNESS:  At the date of filing.

25          THE COURT:  Yes, I suppose.

1              THE WITNESS:  Uh-huh. (affirmative response)

2              THE COURT:  It should be the same no matter what.

3              THE WITNESS:  Yes, October.

4              THE COURT:  I'm just saying now, what day of the

5    month?

6              THE WITNESS:  October.

7              THE COURT:  What day of the month is it due?

8              THE WITNESS:  October 1st.

9              THE COURT:  So, all of your loans are due on the

10   first?

11             THE WITNESS:  All of them, it's October the 1st,

12   right.

13             THE COURT:  All right.  So, when you say 45 days,

14   then the request would --

15             THE WITNESS:  Forty-five days.

16             THE COURT:  -- go out on November the 15th?

17             THE WITNESS:  Right, exactly.

18             THE COURT:  All right.

19        (Pause.)

20             THE COURT:  I have one more question, Mr. Haynes.

21             When you say 45 days, does that mean that the

22   borrower has missed two payments, or just one payment has been

23   outstanding for 45 days?

24             THE WITNESS:  One payment has been outstanding for 45

25   days.

1          THE COURT:  Okay.

2    BY MR. HAYNES:

3    Q.   Mr. Simmons, from what you have testified now, I

4    understand that neither you nor anyone at Option instructed

5    that the Motion for Relief should be filed, correct?

6    A.   Correct.

7    Q.   Fidelity made the instruction that the Motion for Relief

8    should be filed, Fidelity's employee?

9    A.   I'm not sure.  I'll be honest I'm not clear on that.  I'm

10   not seeing any notes.  I know that I did not instruct -- I

11   don't know who instructed.  I know that I did not instruct that

12   the Motion for Relief be filed.

13          THE COURT:  We're talking about the second one?

14          THE WITNESS:  That was the second one, yes.

15          THE COURT:  Okay.

16          THE WITNESS:  The initial one that I did --

17          THE COURT:  But the first one, we know.

18          THE WITNESS:  The initial one was not I, but Laura

19   did.

20          THE COURT:  Okay.

21          THE WITNESS:  And but the second one, I did not

22   instruct the filing of the Motion for Relief.

23          THE COURT:  Okay.

24   BY MR. HAYNES:

25   Q.   And that takes me to another issue with regard to Exhibit

1.

MR. HAYNES:  Again, Your Honor, if I might approach Mr. Simmons?

THE COURT:  Yes.

BY MR. HAYNES:

Q.   Mr. Simmons, when I looked at this Exhibit 1, I didn't see a second entry.  I saw the first entry, the 12-20-07 entry referred for MFR, but I didn't see on this screen, that as printed on July 14th and apparently the last June through the July 11th, 2008.

A.   Uh-huh. (affirmative response)

Q.   A second instruction or a notation that referred for MFR. Do you see one on there?

A.   No, I don't.

Q.   Okay.  Do you know why there wouldn't be a second one on there?

A.   Well, we didn't ever change the status of the loan.  The loan was never changed.  Obviously, the code never was flipped back to another status.

THE COURT:  So, even if the motion is denied, it doesn't go back?

THE WITNESS:  It should have.

THE COURT:  Okay.

THE WITNESS:  But it never flipped back.

THE COURT:  So, there would be another code entry

1  that should have been made --

2           THE WITNESS:  Yes.

3           THE COURT:  -- on the system, saying motion denied,

4  or what?

5           THE WITNESS:  Right.  I don't know if in fact we have

6  that code.

7           THE COURT:  But --

8           THE WITNESS:  But we do -- it would have flipped to

9  another code.  And it is code driven, and we would have gone

10 into the screen, changed the status of the loan, and that loan,

11 that status --

12          THE COURT:  And that's because once the situation --

13 the first motion has been resolved, one way or the other, you

14 want the computer to be able to pick it up again if it defaults

15 again, so you need to be able to take it off this status, is

16 that correct?

17          THE WITNESS:  Right, exactly.

18          THE COURT:  Okay.

19          THE WITNESS:  Yes, we want to be able to track the

20 different statuses of the loan.

21 BY MR. HAYNES:

22 Q.  Mr. Simmons, so my next question will be:  Who in the

23 ordinary course should be the person that would flip the loan

24 back to a status of not being in Motion for Relief?

25 A.  We would actually flip that back.

1  Q.   Option?

2  A.   Option One.

3  Q.   Okay.

4  A.   Fidelity would communicate to us the status, and we would

5  have actually gone in and changed the status code.

6            THE COURT:  You would do it yourself?

7            THE WITNESS:  Yes, we would do that ourselves.

8            THE COURT:  At this time would you have done it, or

9  Laura Kelly would have done it?

10           THE WITNESS:  I would have done it.

11           THE COURT:  Okay.

12 BY MR. HAYNES:

13 Q.   Was it communicated to you that the motion had been

14 denied, the first motion?

15 A.   It was communicated to me that the motion had been denied,

16 but it was also communicated that the motion was going to be

17 re-filed.

18 Q.   Did that influence your decision not to flip it back?

19 A.   Yes.

20     (Pause.)

21 Q.   You referred to a payment history, and the way you were

22 describing it, in my mind for lack of a better term, I might

23 want to call it the master loan history?

24 A.   Uh-huh. (affirmative response)

25 Q.   What I heard you saying is, is that there is a system that

1  records every payment that comes in, whether those payments

2  were made pre-petition or whether they were made post-petition,

3  is that correct?

4  A.    That's correct.

5  Q.    And did I understand that you look at that master loan

6  history in the current phase, you know, presently today in your

7  work that you would have done this week, to assess whether it

8  was appropriate, that it is appropriate to file a Motion for

9  Relief?

10  A.    Yes.  Yes, that's the screen that I look at.

11  Q.    Would it be correct to say that that's a highly automated

12  system?

13  A.    Most definitely.

14  Q.    Okay.  Is it the intent of Option to automate to the

15  extent possible, payment information so that a human being

16  doesn't have to get involved in that process?

17  A.    I don't understand what you're saying.

18  Q.    Well, let's compare it now to the bankruptcy system.  What

19  happens when an account goes into bankruptcy in terms of

20  accounting for payments?

21  A.    Basically, when the bankruptcy work station is set up, all

22  payments that are posted, post-petition, are actually shown on

23  that BNKH screen.

24  Q.    All right.  And that's a manually posted payment?

25  A.    That's manually posted payments, the payments that have

1    come in to our Cashiering Department that are actually

2    posted.

3    Q.   Are those payments posted by you, or someone else?

4    A.   They are posted by another department, the Cashiering

5    Department.

6    Q.   The cash --

7    A.   The Cashiering Department.

8    Q.   Cashiering Department?

9    A.   Yes.

10   Q.   And would it be true, Mr. Simmons, that that payment would

11   appear not only on the BNKH report, but it should also appear

12   on the master loan history?

13   A.   It would appear on a couple of screens, yes.  Yes, on the

14   master loan history.

15   Q.   Both places?

16   A.   Both places.

17   Q.   Okay.

18   A.   If, in fact, it came in after the bankruptcy work station

19   was set up.

20   Q.   It would appear on the BNKH?

21   A.   If, in fact, it came in after the bankruptcy work station

22   was set up.

23   Q.   But it's going to show on the master loan history?

24   A.   It's going to show on the master, irregardless.  But in

25   terms of it showing on BNKH, if in fact the payment came in

 1    prior to the bankruptcy work station showing up, it would be

 2    on BNKH.

 3    Q.    Unless someone went back in and did the --

 4    A.    Right, right.

 5    Q.    -- the late bankruptcy set up?

 6    A.    Exactly.

 7    Q.    Do you sometimes see errors with regard to the BNKH

 8    report?

 9    A.    Well, yeah, from time to time.

10    Q.    This one is in error, correct?

11    A.    That's correct.

12    Q.    Even though it's dated as of July 14th, 2008, it's still

13    not showing the October payment, is it?

14    A.    No, that one is not.  But the one that I currently have

15    is.

16    Q.    You have run -- this report has been modified since July

17    14th, 2008 to show the October payment?

18    A.    That's correct.

19    Q.    Mr. Simmons, do you see this block (indicating) that

20    appears on this Exhibit 1?

21    A.    Uh-huh. (affirmative response)

22    Q.    Yes?

23    A.    Yes, I do.

24    Q.    All right.  Does that normally appear on the computer

25    screen?

1  A.   No, it doesn't.

2  Q.   Is that a border maybe somebody created to highlight those

3  entries, those particular entries?

4  A.   Yes.

5  Q.   Mr. Simmons, what was the amount due on the mortgage loan

6  of the Wilson account on February 28th, 2008?

7  A.   February, when?

8  Q.   The 28th of 2008.

9  A.   Actually, the loan was current, if in fact we would have

10 accounted for all of the monies received.

11 Q.   You mean the monies in suspense?

12 A.   No, the monies that were forwarded to our attorney.

13 Q.   Would it have been current excluding any amounts that were

14 in suspense?

15 A.   No, not suspense because nothing went to suspense.  I'm

16 talking monies that would have actually been forwarded to our

17 attorney.

18 Q.   What about on March 10th, 2008?  What was the amount due

19 on the mortgage loan at that date?

20 A.   Again, the loan would have been current.  Now, the Debtor

21 has consistently paid late, but never past the 45 day rule.

22          THE COURT:  Current, but late?

23          THE WITNESS:  Late.

24          THE COURT:  Yes, that's what I said, current but

25 late?

1          THE WITNESS:  Yes, current but late, exactly.

2          THE COURT:  Okay.  Let me -- you've also testified, I

3  think Mr. Simmons, that you don't charge late fees once someone

4  is in bankruptcy?

5          THE WITNESS:  Uh-huh. (affirmative response)

6          THE COURT:  And so this $1,400 that has been building

7  up in this particular account.

8          THE WITNESS:  Uh-huh. (affirmative response)

9          THE COURT:  Am I to then understand that the Debtor,

10  this $312 that the Debtor paid in January of '08 for late

11  charges.

12          THE WITNESS:  Uh-huh. (affirmative response)

13          THE COURT:  For four months, that was for October,

14  November, December and January, that that was put into

15  suspense?

16          THE WITNESS:  That's correct.

17          THE COURT:  Okay.  Is there a reason why that wasn't

18  reported on the proof of claim?

19          THE WITNESS:  When was that paid?

20          THE COURT:  It was paid in January, and I was going

21  to see --

22          Can you tell me when the proof of claim was filed,

23  Mr. Myers?  Do you have the date?

24          MR. MYERS:  I'm sorry, Your Honor.  I can, but I

25  don't see it.

1          THE COURT:  Okay.  Just everybody has to hunt.

2     (Pause.)

3          MR. WIRTZ:  I think it was December 10th, '07.

4          THE COURT:  Okay.  And my question is the motion and

5    the affidavit that would have been in February.

6          THE WITNESS:  Uh-huh. (affirmative response)

7          THE COURT:  I think the testimony was that Fidelity

8    looks at the screen and the screen -- I think it was the -- let

9    me get the right one.  It was the Pay 4 screen, which shows the

10   different amounts that are due.  And it would have reflected

11   suspense, but in this case there was no suspense.

12         THE WITNESS:  Right.

13         THE COURT:  Because they hadn't actually been

14   deposited, they were being sent to Mr. Wirtz?

15         THE WITNESS:  Right.

16         THE COURT:  The payments were being sent to

17   Mr. Wirtz.

18         THE WITNESS:  Right.

19         THE COURT:  But once you finally got all of this

20   straight and you found the payments and you decided to apply

21   them, wouldn't you have corrected the proof of claim at that

22   point, to show that there is a suspense balance?

23         THE WITNESS:  Pending --

24         THE COURT:  Or I guess that would be the petition

25   date amount.

1            THE WITNESS:  That would be, right, exactly.

2            THE COURT:  Okay.  How does the Debtor know they have

3   a suspense balance?

4            THE WITNESS:  I'm not clear on that.

5            THE COURT:  Okay.  You don't know how they know?

6            THE WITNESS:  I don't know how they would be informed

7   of that.

8            THE COURT:  So, we don't know if the Wilson's know

9   they have $1,400 sitting at Option One?

10            THE WITNESS:  Right.

11            THE COURT:  Okay.

12            THE WITNESS:  I'm not clear on that.

13            MR. MYERS:  For the record, they don't, Your Honor.

14            THE COURT:  Okay.  Well, now they do.

15            MR. MYERS:  We had a chat yesterday.

16            THE COURT:  Okay.

17   BY MR. HAYNES:

18   Q.   Mr. Simmons, I believe I understood your testimony but I

19   just want to touch this before we move on, that no one at

20   Option would have reviewed Ms. Goebel's affidavit before it was

21   filed with the Motion to Lift Stay, right?

22   A.   No.

23   Q.   And in turn, no one -- neither you nor anyone else at

24   Option would have reviewed the Motion to Lift Stay that was

25   filed in the Wilson case --

1   A.    No.

2   Q.    -- before it was filed?

3   A.    No, we wouldn't have.

4   Q.    Okay.  You were mentioning that post-petition payments

5   would be reflected on the BNKH screen, correct?

6   A.    Uh-huh. (affirmative response)  That's correct.

7             MR. HAYNES:  And again, Your Honor, if I might

8   approach Mr. Simmons?

9             THE COURT:  Yes.

10  BY MR. HAYNES:

11  Q.    Mr. Simmons, do you see this entry that on December 3,

12  2007 showing $1,546.84, the code is one, a post-petition

13  payment?

14  A.    Yes.

15  Q.    All right.  And we talked about how that certain

16  information is drawn from another system and uploaded into the

17  BNKH system.  Who would have -- or what would be the source of

18  the information, the $1,546.84?

19  A.    When you say --

20  Q.    Would that be the Cashiering Department?

21  A.    When you say the source, you mean?

22  Q.    What would have been the original source that would

23  ultimately lead into that data being uploaded into this report?

24  A.    They would actually post it, yes, the Cashiering

25  Department would post it, make the posting.

1  Q.   Well, do they make it directly to this report or do

2  they make it to another report?

3  A.   To another system.

4  Q.   Okay.

5  A.   And I don't know the specifics of what they do, but to

6  another system, and it would upload to the bankruptcy work

7  station.

8       (Pause.)

9  Q.   You indicated that this BNKH report has been updated or

10 modified since the print date of July 14th, 2008?

11 A.   That's correct.

12 Q.   Would you have been involved in the process of updating

13 that information?

14 A.   Yes.

15 Q.   Do you make those modifications directly to this report,

16 or would you modify other reports which would feed into this?

17 A.   Actually, I modify directly to that report.

18 Q.   Mr. Simmons, from your testimony I'm getting an impression

19 of what your role is and I want to test that and make sure my

20 impression is correct.  You were trying to manage data that

21 relates to this Wilson account, is that correct?

22 A.   Correct.

23 Q.   You were not making decisions about what should happen

24 with regard to this account, correct?

25 A.   That's not true.  It just depends.  It's on a case by case

1   basis.

2   Q.    Okay.

3   A.    Uh-huh. (affirmative response)

4   Q.    Give me an example, if you would, where you would be

5   making a decision of something that should happen?

6   A.    If, in fact, Fidelity or one of their representatives

7   contacted our attorney, or our attorney contacted them and

8   indicated that these fees -- that we can't include these fees

9   in the proof of claim, then they would come back to me and then

10  I would have to research it to see exactly what the state law

11  is, and then tell them, you know, not to include those fees

12  into the fee.  You know, feed that information back to them to

13  have, and feed that information to the attorney so that that

14  information would be included in the POC.

15  Q.    So, there would be one category where you are on behalf of

16  Option, making a decision?

17  A.    Making a decision, right.

18          THE COURT:  Or, I think you testified that if a

19  Motion for Relief was filed and there was a negotiation with

20  the borrower.

21          THE WITNESS:  Right, we would be involved with it.

22          THE COURT:  As to a workout.

23          THE WITNESS:  Right, exactly.

24          THE COURT:  You would approve that, and the terms?

25          THE WITNESS:  Exactly, right.

1          THE COURT:  Okay.

2          THE WITNESS:  We would be involved in any

3   modifications they have, then Fidelity would make that

4   decision.

5          THE COURT:  And whether or not to object to a plan,

6   correct?

7          THE WITNESS:  Exactly.

8          THE COURT:  Okay.

9   BY MR. HAYNES:

10  Q.   There was reference in Ms. Goebel's affidavit,

11  Mr. Simmons, to BNK fees, costs of $1,000.  Do you know what

12  that means?

13  A.   BNK costs?  Was it bankruptcy fees and costs?

14  Q.   It says BNK fees/costs, $1,000.

15  A.   I don't have any idea what that cost is, if that's what

16  you're asking me.  No, I don't.

17  Q.   Mr. Simmons, do you know if there was an attorney fee

18  imposed on the Wilson's account with regard to the January

19  Motion to Lift Stay?

20  A.   I don't know for sure.

21  Q.   Do you know if there was one for the second Motion to Lift

22  Stay?

23  A.   I didn't review the fees and costs screen.

24  Q.   Okay.

25          (Pause.)

1           MR. HAYNES:  Your Honor, I did not see attached to

2    either the Motion for Relief or the proof of claim, the

3    assignment of the note to Option, and I don't want to impose on

4    Mr. Simmons to try and dig that out or make that request to

5    him, but I would like if I could ask Mr. Wirtz to provide a

6    copy later to us of the assignment.

7           MR. WIRTZ:  Sure.

8           MR. HAYNES:  And if I have overlooked it, I

9    apologize.

10          THE COURT:  All right.

11          MR. HAYNES:  Your Honor, those are the questions that

12   I have for now.

13          THE COURT:  Okay.  Mr. Cash?

14          MR. CASH:  Thank you, Your Honor.

15                   *    *    *    *    *

16                      CROSS-EXAMINATION

17   BY MR. CASH

18   Q.   Sir, have you heard the term Fidelity funded client

19   managed onsite employee?

20   A.   No, I haven't.

21   Q.   Okay.  In fact --

22          THE COURT:  Wait.  Say that one more time, Fidelity

23   funded?

24          MR. CASH:  Fidelity funded client managed onsite

25   employee.

1          THE COURT:  Thank you.

2     BY MR. CASH

3     Q.    In fact, Ms. Kelly, who is onsite at Option One, is

4     managed by Option One, isn't she?  She answers to the folks at

5     Option One?

6     A.    Again, I don't have any idea what her -- who manages her.

7     Q.    Well, she's in your department, isn't she?

8     A.    She's in my department but I don't supervise her.

9     Q.    And you can give -- you don't supervise her at all?

10    A.    I don't supervise her at all.

11    Q.    You don't give her instructions?

12    A.    I give her no instructions.

13    Q.    And in fact, don't you give her a report that says, "These

14    are the loan that are in default," and that's what she codes

15    in?

16    A.    No.

17    Q.    You don't do that?

18    A.    I don't do that.

19    Q.    No one at Option One does that?  She's just there in your

20    system on her own?

21    A.    I don't instruct her to take on any tasks.

22    Q.    Does anyone at Option One?

23    A.    Yes.

24    Q.    Okay.  So, Option One will bring her, and in fact, she

25    gets a set of reports that tell her, "Here are the loans in

1    default," and she codes those into the system.  Her task is

2    not to make decisions about what goes --

3              MR. WIRTZ:  Objection.  It assumes facts that are not

4    in evidence yet.

5              THE COURT:  Okay.

6              MR. CASH:  That's what, I'm not trying to --

7              THE COURT:  Mr. Cash, let's start with ask the

8    question who gives her the list, if he knows.

9              MR. CASH:  Okay.

10   BY MR. CASH

11   Q.   Do you know who gives her the list of loans that are to be

12   key punched in?

13   A.   No, I don't.

14   Q.   All right.  Do you know whether her role is limited?

15   Well, let me ask you this:  She doesn't have discretionary

16   authority at Option One, does she?

17   A.   Again, you are asking me about a supervisory role.  I have

18   nothing -- I do not interact with her in a supervisory role.

19             THE COURT:  Who supervises, who interacts with her?

20             THE WITNESS:  My manager, Christine Johnson, and

21   Alicia Fisher.

22             MR. CASH:  All right.

23             THE COURT:  So, those two individuals --

24             THE WITNESS:  Those are her major --

25             THE COURT:  -- are the people that she reports to?

1             THE WITNESS:  That she reports to.

2             THE COURT:  Or interacts with?

3             THE WITNESS:  Interacts with.

4             THE COURT:  Okay.

5             THE WITNESS:  That gives her tasks.

6             THE COURT:  Okay.  And they both work for?

7             THE WITNESS:  Option one.

8             THE COURT:  Option One?

9             THE WITNESS:  Right.

10             THE COURT:  Okay.

11             MR. CASH:  All right.

12    BY MR. CASH

13    Q.   And in fact, Option One has criteria as to when a loan is

14    in default and a Motion for Relief is supposed to be triggered,

15    correct?

16    A.   That's correct.

17    Q.   And those are Option One criteria?

18    A.   Most definitely.

19    Q.   Okay.  And they came up with those parameters, correct?

20    A.   Correct.

21    Q.   And she doesn't have, again, this is Ms. Kelly, she

22    doesn't have discretion to stray from those parameters on her

23    own?

24    A.   That's correct.

25    Q.   Okay, all right.  Now, we talked about and we used the

 1  term "e-mail" loosely.  I want to kind of tighten that down

 2  a little bit.

 3  A.    Okay.

 4  Q.    When you go on the process management system and you type

 5  an alert, something that you want your lawyer to know,

 6  Mr. Boles.

 7  A.    Uh-huh. (affirmative response)

 8  Q.    Are you under the impression that that goes to Fidelity,

 9  and then somebody at Fidelity reads that and then they type

10  something separate to Mr. Boles telling him what to do?

11  A.    No, I'm not under that impression.

12  Q.    Okay.

13  A.    I understand that if, in fact, I'm sending him something

14  directly, that I can put it in his name and send it directly to

15  him.  I understand that process.

16  Q.    Okay.  And it goes through the Fidelity system?

17  A.    It goes through the Fidelity system, correct.

18  Q.    So, as opposed to going to an e-mail server somewhere, it

19  basically -- the Fidelity is a closed secure system and you can

20  send directives and communications directly to Mr. Boles?

21  A.    Uh-huh. (affirmative response)

22  Q.    Correct?

23  A.    Yes, that's correct.

24  Q.    And he to you?

25  A.    That's correct.

1  Q.   Okay.

2       THE COURT:  So, when you testified that you told

3  Fidelity to contact your lawyer or to authorize your lawyer to

4  file a Motion for Relief?

5       THE WITNESS:  That was in response to something that

6  I had gotten from Fidelity.  If, in fact, Fidelity contacts me

7  first, I respond back to Fidelity.  I don't go directly through

8  Mr. Boles.

9       THE COURT:  Okay.  So, in this particular

10  circumstance, your testimony was that Fidelity had asked you

11  about the payments?

12       THE WITNESS:  Correct.

13       THE COURT:  So, you responded to Fidelity?

14       THE WITNESS:  I responded to Fidelity.

15       THE COURT:  That the lawyer, to talk to the lawyer,

16  but --

17       THE WITNESS:  Exactly.

18       THE COURT:  Okay.

19       MR. CASH:  Okay.

20  BY MR. CASH

21  Q.   And as far as what to do with those payments that went to

22  Mr. Boles' firm.

23  A.   Uh-huh. (affirmative response)

24  Q.   I think it sounded like he told Fidelity and then we told

25  you to send them to him.  In fact, didn't you just get a

1  directive through the system from Mr. Boles that you were to

2  -- or from the Boles Firm that you were to send the payments?

3  A.   Actually, I got that directive, that directive actually

4  came from a Fidelity employee.

5  Q.   Okay.  And had they checked with Mr. Boles about what was

6  supposed to be done with the payments?

7  A.   They had already checked with Mr. Boles about what to do

8  with the payments.

9  Q.   Okay.  Because you had indicated at some point that some

10  payments had come in and you didn't know what to do with them,

11  correct?

12  A.   That's correct.

13  Q.   And you didn't contact Mr. Boles directly, you contacted

14  Fidelity?

15  A.   That's correct.

16  Q.   Okay.

17  A.   Actually, yes, we did.  We contacted Fidelity.

18  Q.   All right.  And Fidelity asked Mr. Boles what is supposed

19  to happen?

20  A.   What we were to do with it.

21  Q.   He tells them and then they respond back to you, "Send

22  them to him"?

23  A.   Send them to him, that's correct.

24  Q.   All right.

25  A.   And that's what we did.

1    Q.   Okay.   One of the things that were talked about, in

2    this system there was a question as to if somebody wanted to

3    stray from a time limit or if there was another time limit.

4    A.   Uh-huh. (affirmative response)

5    Q.   In the system that, the Fidelity system that's set up,

6    there are holds that are built into that system where you can

7    basically put a hold in, and it stops the time from running,

8    isn't that correct?

9              THE COURT:  Hold, H-O-L-D?

10             MR. CASH:  H-O-L-D, yes, Your Honor.

11             THE WITNESS:  I'm not aware of that.

12   BY MR. CASH

13   Q.   Okay.  You don't know about that?

14   A.   I don't know about that.

15   Q.   Okay.  If the attorney wants additional fees, there is a

16   process, all he does is basically go to something on the

17   screen and asks for that and that gets sent to Option One,

18   doesn't it?

19   A.   That happens.  That's not consistent though, because we

20   have -- we get intercoms.

21   Q.   Intercoms?

22   A.   From Fidelity, asking and questioning about additional

23   attorney fees.

24   Q.   Okay.

25             MR. CASH:  So, and Your Honor, what would probably

1   help the Court and what we'll do --

2              THE COURT:  That's all right.

3              MR. CASH:  -- is the next time around, you know, we

4   can talk about some of the other issues.  I think it's going to

5   be some time.  But if he wants to stray from the agreed upon --

6   BY MR. CASH

7   Q.   You all set what the price is, right?

8   A.   Uh-huh. (affirmative response)

9   Q.   You say, "We'll pay the $650 for a proof of claim."

10  A.   Right.

11  Q.   "We'll pay whatever the numbers are."

12  A.   Right.

13  Q.   And I understand on some loans, that FANNIE MAE and

14  FREDDIE MAC may set some of the prices.

15  A.   Uh-huh. (affirmative response)

16  Q.   But if he wants to stray from that number, and he says to

17  Fidelity, "This is different than the number."  They come in to

18  you and they ask you?

19  A.   That's correct.

20  Q.   All right.  Fidelity has no discretion to say, "Sure"?

21  A.   No, they have no discretion in terms of fees and approving

22  fees.

23  Q.   Okay.  Now, I think at one point you said that there may

24  have been -- Fidelity may have actually talked to the Debtor's

25  lawyer?  I mean you have no knowledge of Fidelity ever

1    interacting with the Debtor's lawyers directly, do you?

2    A.    The Debtor's lawyer?

3    Q.    Yes.

4    A.    No.

5    Q.    Okay.

6    A.    I have no knowledge.

7              MR. MYERS:  And for the record, I will assure the

8    Court that he misspoke we were getting confused.

9              MR. CASH:  Okay.

10             MR. MYERS:  He didn't contact us.

11             MR. CASH:  Okay.

12             MR. MYERS:  Nor has Fidelity ever contacted us

13   directly.  They would come through -- nor would I talk to them

14   if they did.  I would say I'm not going to respond.

15             MR. CASH:  Okay.

16   BY MR. CASH:

17   Q.    I think one of the things that you were saying is that you

18   don't see proofs of claim, you don't see Motions for Relief.

19   In fact, in the system, aren't those documents actually

20   uploaded and all you have to do is click a button and you can

21   see any documents that Clay has put in the system, or Mr. Wirtz

22   has put in the system?

23   A.    That's correct.

24             MR. WIRTZ:  I'm going to object.  I think that

25   misstates what his testimony was.  I thought he said he could

1    see those documents.

2              MR. CASH:  I think that he --

3              THE COURT:  He said he can look at them.

4              THE WITNESS:  Right.

5              MR. CASH:  Oh, okay.

6    BY MR. CASH

7    Q.   But they were available for you to look at?

8    A.   They are available, right.

9    Q.   But you just didn't look at them?

10   A.   Right.

11   Q.   Okay, all right.  Then I misunderstood, and I'm sorry.

12        If there is an issue that comes up, you can create an

13   issue in the system and the lawyer can see it, you can red flag

14   it, you can prioritize it, and you can make it as urgent as you

15   need to?

16   A.   That's correct.

17   Q.   Is that correct?

18   A.   Yes.

19   Q.   Okay.

20             THE COURT:  What is an "issue," Mr. Cash?  Can you

21   give me an example?

22             MR. CASH:  We got some checks in, what should we do

23   with them?

24             THE COURT:  Okay.

25             MR. CASH:  It would probably be the best one for this

1    one.

2          THE COURT:  Okay.

3    BY MR. CASH

4    Q.   That's an issue that you would basically create in the

5    system, and then attorney can look at that, respond, do

6    whatever he needs to do, correct?

7    A.   That's correct.

8    Q.   And you can prioritize that if you want to?

9    A.   That's correct.

10   Q.   Okay.  And then, when the attorney drafts the affidavit,

11   that is available for you to review if you want to, is it not?

12   A.   Yes, it is.

13   Q.   Okay, and to confirm its accuracy?

14   A.   That's correct.

15   Q.   All right.  Now, in this case if Ms. Goebel is looking at

16   a screen and it doesn't show those payments that have gone to

17   Mr. Wirtz, I guess from -- technically, this is Option One's

18   records.  So, and if you're looking at Option One's record and

19   you have not credited those to the account, have you?

20   A.   That's correct.

21   Q.   All right.  So, when Dory Goebel is looking at that and

22   saying, "All right, what amounts have been credited?"  There is

23   no way for her to know that those -- what to do with those

24   amounts, are there?

25   A.   I agree.

1    Q.   Now, let me give a hypothetical here.  If Option One

2    had gotten, and I'm not saying that this happened.  So, but

3    let's say that they had gotten ten bounced checks from a

4    particular borrower, and they said, "We've got an agreement

5    with their lawyer.  We're not taking checks from them any more.

6    It has to be cashier's checks."

7         And you get checks, and you have an issue with Clay and

8    say, "Listen, we've got checks.  You know the situation with

9    the checks."

10        He says, "Send them to me."

11        If that had happened, if Ms. Goebel is to give credit for

12   those checks, that would be wrong, because those aren't posted

13   in your system, right?

14   A.   Correct.

15   Q.   She has no way to discern what decisions Option One makes

16   to post or not post, what to credit or not credit?

17   A.   Correct.

18   Q.   What she does is looks at the Option One system and

19   reflects what's there?

20             MR. WIRTZ:  I'm going to object, and unless

21   Mr. Simmons has personal knowledge of what Ms. Goebel does or

22   doesn't do, that he not answer.

23             MR. CASH:  That's fine.  I'll rephrase it,

24   Your Honor.

25             THE COURT:  All right.

 1  BY MR. CASH

 2  Q.   You heard her testify that what she does is she looks at

 3  Option One's system and books and records, is that correct?

 4  A.   That's correct.

 5  Q.   And Option One keeps those accounts?

 6  A.   That's correct.

 7  Q.   All right.  Option One decides what to post and when to

 8  post it, correct?

 9  A.   That's correct.

10  Q.   Okay.  Now, certainly Fidelity had no part in the decision

11  to not credit those checks that came in, and that were sent to

12  the law firm, right?

13  A.   I agree.

14       MR. WIRTZ:  I'm going to object on that one.  I think

15  we need to get to some point, and unless you can testify what

16  Fidelity had a part in or not, that's a pretty broad question.

17       MR. CASH:  Well Your Honor, I think that --

18       THE COURT:  I believe the question is who made the

19  decision whether to deposit or not deposit.

20       THE WITNESS:  Our attorney made that decision.

21       THE COURT:  Your attorney?

22       THE WITNESS:  Uh-huh. (affirmative response)

23       MR. CASH:  Okay.

24       THE COURT:  So, as far as you know, Fidelity didn't

25  have any input into that?

1          THE WITNESS:  No, they basically just -- we opened

2     an issue, went through Fidelity, you know, Fidelity contacted

3     our attorney, and then our attorney made that decision.

4          THE COURT:  All right.  So, in this case, this

5     particular case, your testimony is that you received the

6     checks, you opened an issue, meaning you sent something to

7     Fidelity?

8          THE WITNESS:  To Fidelity.

9          THE COURT:  Saying, "What do I do with this?"

10         THE WITNESS:  Exactly.

11         THE COURT:  They contacted --

12         THE WITNESS:  They contacted the attorney.

13         THE COURT:  -- your attorney.  The information that

14    you believe came back based on the file is that he said send

15    them to me, so Fidelity contacted you and said "Send them to

16    Mr. Wirtz"?

17         THE WITNESS:  Correct.

18         THE COURT:  Okay.

19         THE WITNESS:  Correct.

20         THE COURT:  But in this particular case --

21         THE WITNESS:  In this particular case.

22         THE COURT:  -- it actually went through Fidelity?

23         THE WITNESS:  That's right.

24         THE COURT:  So, Fidelity knew that your attorney was

25    holding checks?

1          THE WITNESS:  Exactly.

2          THE COURT:  Okay.

3          MR. CASH:  Okay.

4     BY MR. CASH

5     Q.   And as to whether or not those checks should be credited

6     or used or not used, that's a decision that ultimately Option

7     One makes.  I know you said that your attorney decided that,

8     but he advises you, ultimately, Option One has to decide, "Do I

9     use this check?  Do I post it or do I not?"

10    A.   We follow the instructions of our attorney.

11    Q.   Okay.  And based upon what your Counsel told you, you

12    chose not to?

13         MR. WIRTZ:  I'm going to raise an objection,

14    Your Honor.  I mean, this isn't on my cross.  I don't know if

15    that's true.

16         THE COURT:  Well, it's just his, what he believes has

17    happened.

18         MR. WIRTZ:  Okay, that's fine.

19         THE COURT:  That's how I'm going to take it.

20         THE WITNESS:  Uh-huh. (affirmative response)

21         MR. CASH:  All right.

22    BY MR. CASH

23    Q.   Well, if --

24         THE COURT:  I think the objection is lodged,

25    Mr. Cash, because so far we haven't gotten into the

1   conversations that Fidelity might have had with Mr. Wirtz.

2   And I think what they are preserving on objection is in the

3   event that there was some discussion between the two as to what

4   should happen.

5           MR. WIRTZ:  If I can redirect I'll clear it up in

6   redirect and we'll go with that.

7   BY MR. CASH:

8   Q.   Well, let me ask you this:  If you had decided, if

9   Mr. Wirtz said, "Send those checks to me."

10          And you said, "You know, I'm not going to do that.  We're

11  going to post them in the account."  That's your decision to

12  make or not make, correct?

13  A.   We would have followed the instructions of our attorney.

14  Q.   I understand that.  But if you had any --

15          THE COURT:  You could have overridden your attorney's

16  instructions?

17          THE WITNESS:  Yes, I could have overridden it if I

18  needed to, if I wanted to, yes.

19          MR. CASH:  Okay.

20          THE WITNESS:  We could have.

21          MR. CASH:  Okay.

22  BY MR. CASH

23  Q.   But Fidelity has no authority to override what the

24  attorney is telling you to do, do they?

25  A.   No, they don't.

1    Q.   They can't say, "Oh, you need to post these."  They

2    can't instruct you to post them in the account?

3              MR. WIRTZ:  Your Honor, I'm going to object.

4    Mr. Simmons has already testified that he doesn't know -- he

5    has never seen the contract.  He doesn't know what Option and

6    Fidelity have allowed each other to do.

7              THE COURT:  Okay.  I'll sustain that.  You can bring

8    that up later.

9              MR. CASH:  Well, let me ask it differently.

10   BY MR. CASH

11   Q.   In all of the bankruptcies that you have handled, has

12   there ever been a time when Fidelity has told you what you are

13   supposed to do with money and what you're supposed to post,

14   where they have basically overridden your decision?

15   A.   No, they have only communicated in a vehicle to

16   communicate the information that is --

17             THE COURT:  In other words, they have communicated

18   their opinion?

19             THE WITNESS:  Never their opinion, just communicated

20   information that they have received from our attorney.

21             THE COURT:  Okay.

22   BY MR. CASH

23   Q.   And that's exactly the point.  What they are basically is

24   a vehicle of communication, would that be fair?

25   A.   That's correct.

1   Q.   Okay.

2           MR. CASH:  I will reserve other questions,

3   Your Honor.  I'm sure I have some but I'm looking at the time,

4   so I'll reserve the rest.

5           THE COURT:  All right.

6           MR. WIRTZ:  Real, real quick, Your Honor, if I can

7   clarify this, because I don't think it's correct, but I can

8   clarify it real quick.

9           THE COURT:  All right.

10                  *   *   *   *   *

11                  REDIRECT EXAMINATION

12  BY MR. WIRTZ:

13  Q.   With regards to Fidelity in this last transaction that

14  we're talking about with these lost payments, Mr. Simmons, and

15  I want to just make sure you're going on the record under oath

16  and saying what the record is reflecting that you're saying.

17  You indicated that Option One forwarded a request through

18  Fidelity, to Boles, asking what to do about the checks?

19  A.   That's correct.

20  Q.   You have indicated that Boles, through Fidelity, sent back

21  a response to you, to Option One?

22  A.   That's right.

23  Q.   What personal knowledge do you have?  I don't know whether

24  this happened or not, but you are testifying under personal

25  knowledge that Fidelity didn't change that response from Boles

1   through their system coming back to you?

2          MR. CASH:  Objection, Your Honor.  On cross even,

3   there has to be a good faith basis for a question.

4          THE COURT:  All right.

5          MR. CASH:  And that is not a good faith basis for a

6   question, Your Honor.

7          THE COURT:  Okay.  Let me ask a question.  Let me ask

8   the question this way:

9          The file reflects correspondence between Counsel and

10  Fidelity, and Fidelity and Option One, correct?

11         THE WITNESS:  Yes.

12         THE COURT:  Does the file reflect that Mr. Wirtz

13  directed to Fidelity that the checks be delivered to him?

14         THE WITNESS:  Right, it does.  Yes.

15         THE COURT:  It does?

16         THE WITNESS:  Yes, it does.

17         THE COURT:  Okay.  And then does the file reflect

18  that Fidelity passed that direction on to you?

19         THE WITNESS:  Yes, it does.

20         THE COURT:  Okay.  And did you see any deviation

21  between --

22         THE WITNESS:  No deviations.

23         THE COURT:  -- the instructions from Mr. Wirtz to

24  Fidelity?

25         THE WITNESS:  No deviations.

1      THE COURT:  And what Fidelity told you?

2      THE WITNESS:  No.

3      THE COURT:  Okay.

4      THE WITNESS:  I studied it very carefully, no

5  deviations.

6      THE COURT:  Okay.

7  BY MR. WIRTZ:

8  Q.   You testified you could have sent an e-mail directly to

9  Mr. Wirtz, had you wanted to, bypassing the entire Fidelity

10 system, you have that capacity?

11 A.   We have that capacity, but it has been policy to go

12 through Fidelity.

13 Q.   In this situation, when we talk about file, you sent these

14 checks -- you sent an inquiry to Fidelity asking what to do

15 with these checks?

16 A.   Yes.

17 Q.   You sent that to Boles?

18 A.   We sent that directly to Fidelity.

19 Q.   And then, what's your personal appreciation of what

20 Fidelity did?

21 A.   Fidelity followed up and they contacted our attorney, and

22 our attorney responded, and Fidelity responded back to us.

23 Q.   And when your attorney responded, that's Boles, did he

24 respond -- did Fidelity just forward his response to you, or

25 did someone in Fidelity rewrite your attorney has said this?

1  A.   They basically rewrote another intercom.  They sent

2  another intercom out.

3  Q.   So, I'm back to my original question:  How do you know

4  what they told you in their intercom is exactly what your

5  attorney told them, personal knowledge of it?  How do you know

6  that that is accurate?

7  A.   I don't.

8  Q.   You've testified that that is exactly what your attorney

9  said.

10 A.   I don't, but --

11          MR. CASH:  Your Honor, asked and answered.  I think

12 you have already said that he read the --

13          THE COURT:  I've got it, Mr. Cash.

14          THE WITNESS:  Right.

15          THE COURT:  I've got it.

16          MR. CASH:  Okay.

17          MR. WIRTZ:  Okay.  That's just what I wanted to

18 clarify.

19 BY MR. WIRTZ:

20 Q.   And your answer again was what?

21 A.   I don't.

22          MR. WIRTZ:  Thank you.

23          THE COURT:  All right.  You can step down.

24          THE WITNESS:  Uh-huh. (affirmative response)

25          MR. CASH:  Your Honor, and may I follow up on that,

1  because I think that was misleading and I think it was

2  inappropriate.

3           THE COURT:  I've got it.  Don't worry, I understand

4  that what he said was he looked at the file and he sees that

5  the communications did not deviate, but I will take it that he

6  didn't have any personal conversations with anybody to confirm

7  that.  His information comes from reviewing the correspondence

8  in the file.

9           THE WITNESS:  Right.

10          THE COURT:  Okay.  You can step down, sir.

11          THE WITNESS:  Uh-huh. (affirmative response)

12       (Witness is excused)

13          THE COURT:  All right.  At this point the Court has

14  several questions as a result of the testimony that it has

15  received.  The first question that I have is the course and

16  scope of the employment of the Boles Law Firm.  I have concerns

17  regarding the fees and charges that are assessed for accessing

18  the system and how those are paid, or passed through to Option

19  One or to a debtor.  That's a little beyond the scope of what I

20  think has happened in this case, but I can't ignore it.

21          I don't quite understand the legal relationship

22  between the various parties, and so I'm going to ask the U.S.

23  Trustee to conduct discovery into that relationship and report

24  back to the Court whatever it believes is relevant and anybody

25  else will have an opportunity to address that, at the same

1  time.

2        The second issue that I see is the control I'll put

3  over the decision making, particularly with regard to filing

4  Motions for Relief from the Stay and determining whether or not

5  the loan is in default, and if in fact, you know, what amounts

6  are due and for what months.  I have heard conflicting

7  testimony from two different parties, the Fidelity

8  representative and the Option One representative, where each

9  essentially says that the other was supposed to review the loan

10 histories and ascertain that the loan was actually in default

11 and was ready for a Motion for Relief.

12        I would like to know essentially what the contracts

13 say between Option One and Fidelity, or the powers of attorney,

14 or the corporate resolutions, or you know, whatever authority

15 Fidelity is operating under.  And part of my concern is that

16 there is testimony that while Option One has the right to

17 contact directly Counsel, and Counsel contact Option One, in

18 fact, the policy is to go, quote-unquote, through Fidelity.

19 And that e-mails are frequently directed to Fidelity to make

20 certain inquiries or get certain advice from Counsel.  Fidelity

21 then passes its own inquiry on to Counsel and then feeds back.

22        I'll just say for the record that I don't understand

23 why that would be necessary if Fidelity had no ability to make

24 decisions in the middle of this chain.  Why go through them?

25 It's just adding an additional layer.  So, I want to know what

1  the purpose of that is, and what the understanding of the

2  parties is, as to why that exists.

3         I also have concerns about the time monitoring and

4  how that may have impacted this particular situation.  By that

5  I mean that given that there are certain parameters under which

6  Counsel is expected to operate to take legal actions, did that

7  have any impact on either Counsel or Fidelity's ability to

8  properly review the file and determine if in fact it was

9  appropriate.

10        There's conflicting evidence on whose responsibility

11  it was to set up the bankruptcy work station and maybe

12  conflicting is too strong of a word.  The last testimony from

13  Mr. Simmons was that Fidelity sets up the bankruptcy work

14  station and Fidelity should have gone into the system and

15  corrected the posting of a payment in October, to a post-

16  petition payment as opposed to a pre-petition payment.  There

17  is also conflicting testimony that Fidelity does not really

18  have the right to change the accounting, and that the

19  accounting is really a function of Option One, and that Option

20  One's accounting is just uploaded into this Fidelity library.

21  So, I'm not sure I can reconcile those two without further

22  evidence and testimony.  So, I want to know how that actually

23  works.

24        I need to know the parameters of the -- I wrote it

25  down, Mr. Cash, the Fidelity funded client managed employee,

1   and what that person's duties are, who supervises that

2   individual, and what discretion, if any, that the individual

3   has in making decisions.

4        In connection with the file, it appears that

5   Mr. Wirtz made the decision, based on the testimony, not to

6   deposit the amounts that had been received, and not to disclose

7   those amounts.  Mr. Wirtz's previous testimony in this Court

8   was to the effect that he was not aware until very late, around

9   the time that the affidavit was executed or maybe shortly

10   thereafter, that any payments were due.  That testimony

11   conflicts with the testimony I have heard today, so I am going

12   to ask the U.S. Trustee to determine who, in fact, held the

13   checks, by date, from the time that they were received until

14   the filing of the motion, so that I can determine which parties

15   had knowledge of their existence.

16     (Pause.)

17        THE COURT:  Okay.  That's what I have so far.

18        MR. CASH:  Your Honor, if I may for the record, I

19   would like to raise a procedural issue.

20        THE COURT:  Yes, you may.

21        MR. CASH:  Fidelity is not a party to this case.

22   Fidelity is not a creditor.  Fidelity has a contractual

23   relationship with a creditor, and when Dory Goebel signed the

24   affidavit, she signed it as an officer of that creditor, not on

25   behalf of Fidelity.  And so, this kind of widespread discovery

1  on Fidelity and who was responsible, Option One -- if

2  Fidelity did something wrong, Option One may well have a claim

3  against Fidelity.  The Debtors clearly do not.

4          THE COURT:  I don't know that.

5          MR. CASH:  Fidelity is --

6          THE COURT:  I don't know that, because at this point

7  I don't know who was making the decisions and under what

8  direction, and I don't know what correspondence was going

9  between employees of Fidelity and Counsel for the Debtor, and

10  what was communicated back and forth.  So no, you're --

11          MR. CASH:  But procedurally, Your Honor, we are

12  not --

13          THE COURT:  This is an Order to Show Cause and

14  procedurally you're -- Ms. Goebel and Fidelity have been

15  ordered into this Court to respond.

16          MR. CASH:  Your Honor, I understand that.  However,

17  at the same time, the Order to Show Cause had a very specific

18  and very narrow scope to which we have responded.

19          THE COURT:  It is being expanded based on the

20  testimony I have heard today, Mr. Cash.

21          MR. CASH:  I would ask for an additional order then,

22  Your Honor, so we would have a document from which to --

23          THE COURT:  I will be more than happy.  You've got

24  the order on the record of what is concerning the Court.  I

25  have authorized the U.S. Trustee to conduct discovery into

1    Fidelity, into Ms. Goebel's actions, specifically.  I have

2    told you I want all electronic information as well as written

3    data and any another other discoverable items to be turned over

4    to the U.S. Trustee.  I will allow the Trustee, the U.S.

5    Trustee's Office to define what it believes is relevant and

6    take whatever depositions it deems necessary in order to get to

7    the bottom of this particular issue.

8            I am not going to sit here and conduct my own

9    depositions in this.  Clear?

10           MR. CASH:  All I want, Your Honor, is something that

11   I can take where I need to take it, to challenge that order.  I

12   just needed to make sure that I have something.  So that

13   procedurally, I needed that, to put that on the record.

14           THE COURT:  Right now, you are on an Order to Show

15   Cause, no order holding you in contempt any further has been

16   entered.  We are still in the process of conducting discovery

17   on that.  If you want to move for the District Court to stay

18   it, you can try.

19           MR. CASH:  Thank you, Your Honor.  And we are moving

20   forward.  This discovery is in connection with the Order to

21   Show Cause that is currently in place?

22           THE COURT:  Yes.

23           MR. CASH:  Very well.  Thank you, Your Honor.

24           THE COURT:  All right.

25           MR. WIRTZ:  Your Honor --

1      MR. MYERS:  And Your Honor, if I could, just give

2  me a little bit of housekeeping.  Tell me where I want -- I

3  don't want to get on your bad side a la Fitch, I just -- tell

4  me what you want.  Now, you've got the U.S. Trustee in terms of

5  me being involved and I'm running fees on this, so if I need to

6  shut down and hand it off to him, that's great, I'll be

7  involved as little or as much as you think I can --

8      THE COURT:  I'm not going to tell you what to do now.

9  It's my Order to Show Cause at this point.  I have asked the

10  U.S. Trustee's Office to look into certain areas that I find

11  objectionable or questionable.  They have indicated that they

12  are here to help the Court discover the facts necessary to make

13  a decision on this particular issue.  So, I would coordinate

14  with them on what, and meaning you should coordinate with them

15  if you can be -- if they need information from you, I'm sure

16  that they will contact you.

17      MR. MYERS:  Of course.  I'm just asking the Court.

18  We left it open.  Your Order to Show Cause was specifically

19  left open to determine my fees.  I'm okay.  I mean, I've spent

20  four or five hours here today.  I don't know how much you want

21  me to spend on this case, if any, if the U.S. Trustee is going

22  to step up and handle it now, which apparently they are going

23  to do an able job.  If that avoids fees, I don't want to run a

24  meter on this like I have done in the past and then step on

25  toes and get in trouble and make people angry.

1          THE COURT:  All I can tell you is that to the

2     extent that you have information that might be helpful to them.

3          MR. MYERS:  Okay.

4          THE COURT:  You need to coordinate it with them.

5          MR. MYERS:  Okay.

6          THE COURT:  Okay.

7          MR. WIRTZ:  And Your Honor, am I to understand

8     correctly that the Trustee's Office will propound discovery in

9     accordance with the nine items that you brought up, in addition

10    to the document production?

11         THE COURT:  Yes.

12         MR. WIRTZ:  Okay.

13         MR. CASH:  Your Honor, and that was the housekeeping

14    matter that I wanted to work through.

15         THE COURT:  Yes.

16         MR. CASH:  What I would like to do, Your Honor, is to

17    order the transcript from today to assure that we are correctly

18    drafting our discovery to that.  And I don't know what the turn

19    around time is for that transcript.  We obviously are going to

20    go ahead and --

21         THE COURT:  It's usually about a week to ten days.

22         MR. CASH:  Okay, all right.  So, it might be a few

23    days after we get that transcript before we will have it

24    finalized, but we are going to begin working on that

25    immediately.  And then, that is correct, Mr. Wirtz has

1  anticipated that we would be issuing a discovery, formal

2  discovery interrogatories and request for production, and then,

3  this can take its course as it will.

4         THE COURT: I would anticipate that we won't have

5  another hearing on this until probably November, maybe even

6  later, depending on when the document production is actually

7  propounded and then delivered, and then if there is any follow

8  up that's required or depositions that are required.

9         MR. CASH: Thank you, Your Honor.

10        MR. WIRTZ: And it's my understanding, Your Honor,

11  that we are free to make objections to the discovery once it is

12  propounded --

13        THE COURT: Absolutely.

14        MR. WIRTZ: -- and we see it?

15        THE COURT: Absolutely. And that would be set for

16  hearing and let me -- as long as you're here let me tell you

17  that if you have difficulty either with receiving the discovery

18  or if you have objections to the discovery, the general

19  practice in this courtroom is to contact chambers, file your

20  objection. I will usually hear it very quickly, sometimes on

21  24 hours notice, usually at about 7:30 in the morning because I

22  know everybody is available at 7:30 in the morning. By

23  telephone is fine, and I can usually get to the bottom of it

24  very fast.

25        So, don't anybody think you have to file something

1   and wait 30 days and notice it, that's not the way I do

2   things.  I like to deal with discovery battles very, very

3   quickly so that things continue to move along.

4            Okay, fair enough?

5            MR. WIRTZ:  Yes, Your Honor.

6            MR. MYERS:  Your Honor, by way of housekeeping, I've

7   got four or five appeals that I'm playing with right now.  We

8   don't have an actual order.

9            THE COURT:  Okay.

10           MR. MYERS:  And we have a memo to record on my

11  motion, but there's no --

12           THE COURT:  You're talking about the motion --

13           MR. MYERS:  I think the Court has indicated that it's

14  the Court's order that is going to go forward?

15           THE COURT:  You're talking about --

16           MR. MYERS:  Can I get --

17           THE COURT:  -- my Order to Show Cause?

18           MR. MYERS:  Your Order to Show Cause.  Can I get an

19  actual order into the record consistent with the memo of record

20  saying --

21           THE COURT:  Yes.

22           MR. MYERS:  -- that the Motion for Relief was denied?

23           THE COURT:  Yes.

24           MR. MYERS:  That would kind of sort of directly take

25  me out of the loop.

1          THE COURT:  Yes.

2          MR. MYERS:  Thank you.

3          THE COURT:  If you submit it, you can.

4          MR. MYERS:  I'll be glad to submit it.  Thank you,

5   Your Honor.

6          THE COURT:  That was my intent.

7          MR. MYERS:  I understand.

8          MR. WIRTZ:  One other thing, Your Honor, and I have

9   briefly discussed it with Mr. Cash on this Exhibit 1.  There is

10  a bit of PII, personally identifiable information.

11         THE COURT:  They're redacted.

12         MR. WIRTZ:  Okay.

13         THE COURT:  Why don't you all -- do you have a marker

14  that we can get that redacted before we take it into the

15  record?

16         MR. CASH:  Your Honor, I don't need the marker.

17         THE COURT:  You have it?

18         MR. CASH:  Yes.

19         THE COURT:  Okay.

20         MR. WIRTZ:  For the record, I do have the other

21  exhibit that we had talked about.

22         THE COURT:  Oh, good.

23         MR. WIRTZ:  And I did retrieve it, and there it is

24  (indicating), Your Honor.

25         THE COURT:  All right.

1          MR. WIRTZ:  And I will hand it to your clerk.

2          THE COURT:  Can you hand that, please, to my law

3   clerk?  And then if you can identify which information and

4   maybe point that out after we have recessed and we will scratch

5   it out.

6          MR. MYERS:  Strike -- I was just going to do the

7   address and just leave the name Wilson there.

8          THE COURT:  Okay.

9          MR. WIRTZ:  That's fine.  That's fine.

10         MR. MYERS:  Okay, good.

11         THE COURT:  Anything else?

12         MR. MYERS:  Nothing else, Your Honor.

13         MR. CASH:  No.  Thank you, Your Honor.

14         THE COURT:  Okay, thank you.

15         MR. WIRTZ:  Thank you, Your Honor.

16         THE COURT:  Court is adjourned.

17         MR. CASH:  Thank you, Your Honor.

18                    *   *   *   *   *

19                 (Hearing is Concluded)

20

21

22

23

24

25

# **C E R T I F I C A T E**

       I certify that the foregoing is a correct transcript from the electronic sound recording of the proceeding in the above-entitled matter.

**S/Sherryl P. Robinson**                     **_9/5/08_**
**Sherryl P. Robinson**                      **Date**