**UNITED STATES BANKRUPTCY COURT**
**EASTERN DISTRICT OF LOUISIANA**

| | | |
|---|---|---|
| In re: | ) | |
| | ) | Case No. 07-11862 |
| RON WILSON, SR. and | ) | |
| LARHONDA WILSON, | ) | |
| | ) | Chapter 13 |
| Debtors. | ) | |

**OPTION ONE MORTGAGE CORPORATION'S OBJECTION TO**
**UNITED STATES TRUSTEE'S MOTION FOR ORDER COMPELLING**
**PRODUCTION FROM THE BOLES LAW FIRM**

TO THE HONORABLE ELIZABETH W. MAGNER, U.S. BANKRUPTCY JUDGE:

Option One Mortgage Corporation n/k/a Sand Canyon Corporation ("Option One") files

this Objection to the United States Trustee's Motion for Order Compelling Production from the

Boles law firm [D.I. 175] (the "Motion to Compel") and respectfully states as follows:

**I.     PRELIMINARY STATEMENT**

1.     The United States Trustee (the "UST") seeks to compel production of attorney-

client privileged communications between and among (i) Option One, (ii) Option One's former

counsel, The Boles Law Firm PLLC ("BLF"), and (iii) Fidelity National Foreclosure Solutions,

Inc. n/k/a Lender Processing Services, Inc. ("Fidelity"), a representative of Option One and BLF

for purposes of the privilege.

2.     The UST asserts various arguments in support of its Motion to Compel documents

listed on the privilege log prepared by BLF (the "Privilege Log Documents").  The UST argues

that Option One waived its attorney-client privilege for all Privilege Log Documents by

communicating through Fidelity or by relying on the advice of counsel in Option One's defense.

US_ACTIVE-101972784.10

3.      The fact that certain communications were made to or from Fidelity does not constitute a waiver of Option One's attorney-client privilege.  Fidelity was a representative of both Option One and BLF with respect to such privilege.

4.      By relying upon certain legal advice from BLF, Option One waived the attorney-client with respect to certain subject matter, namely, the handling of payments from the above-captioned debtors ("Debtors").  In Option One's document production of over one thousand (1,000) pages, Option One produced documents relating to this subject matter.  Option One, however, has not waived its attorney-client privilege with respect to any other subject matter.

5.      The UST also asserts that BLF improperly makes a "blanket" claim of attorney-client privilege.  BLF has not asserted a "blanket" claim of attorney-client privilege.  In fact, BLF properly prepared a privilege log setting forth information regarding specific documents subject to the attorney-client privilege and thus immune from disclosure (the "Privilege Log").  BLF also produced non-privileged documents to the UST.

6.      For the foregoing reasons, as discussed fully below, the Motion to Compel should be denied.

II.     **FACTUAL BACKGROUND**

7.      On May 9, 2008, the Court *sua sponte* issued an Order to Show Cause relating to the filing of an affidavit in this Case. [D.I. 30]

8.      On July 11, 2008, the Court sanctioned Option One and other parties a total of $11,000 (plus attorneys' fees) relating to the affidavit.  Option One promptly paid the sanctions that this Court imposed upon Option One. [D.I. 46 and 53]

9.      On August 21, 2008, the Court held a further hearing on the *sua sponte* Order to Show Cause and ordered the UST to conduct discovery. [D.I. 70 and 71]

A.   **The Production of Documents in Response to The UST's Subpoena to BLF and Discovery Requests to Option One**

10.      On October 2, 2008, the UST served BLF with a subpoena duces tecum (the "BLF Subpoena").  On or about October 1, 2008, the UST also served upon Option One interrogatories and document requests.

1.   **The BLF Subpoena and Document Production**

11.      The BLF Subpoena, included eighteen (18) document requests, and sought the production of "all documents that constitute a communication between Fidelity and [BLF] concerning the Wilson Case, occurring between September 29, 2007 and June 26, 2008" ("Request No. 6").  See BLF Subpoena, attached as Exhibit A, at p. 5, Document Request No. 6.

12.      In response to the BLF Subpoena, BLF produced approximately 131 pages of documents.  See BLF Bates-stamped 000 09-11, 14, 18-20, 23-24, 27-29, 33-34, 45, 57, 59, 60, 62, 72, 74, 89, 91, 92, 104-05, 110, 116, 123, 125-26, 143, and 178-79.  BLF identified the parties to such communications and further responded that "[t] here are other communications between Fidelity and Boles.  Boles respectfully asserts the attorney client privilege that has been claimed by Option relative to these communications occurring between September 29, 2007 and June 2, 2008 . . .  Boles' duty of confidentiality and the attorney/client privilege both extend to any communications between Fidelity, made in furtherance of providing legal advice to [Option One], and Boles."  See BLF's Responses to the United States Trustee's Subpoena Duces Tecum ("BLF's Responses"), attached as Exhibit B.

13.      In its General Objections, BLF objected to "each Request for Production to the extent that it seeks the production of information which . . . contains privileged attorney-client communications."  See Exhibit B at p. 1, General Objection No. 2.

14.     In compliance with Federal Rules of Civil Procedure 26 and 45, BLF submitted the Privilege Log with its 131-page production. The Privilege Log is attached as <u>Exhibit C</u>.

**2.      Option One's Document Production in Response to the UST's Document Requests**

15.     As of April 30, 2008, shortly after filing of the affidavit and motion for stay relief in this case, Option One sold its mortgage servicing business to American Home Mortgage Servicing, Inc. ("<u>AHMSI</u>"). Option One has approximately 10 remaining employees, none of whom have first-hand knowledge of specific underlying facts regarding the affidavit or the stay relief motion.

16.     Option One, however, undertook significant efforts to provide the UST with responsive and informative answers to the interrogatories and the document requests. Among other things, Option One contacted Arthur Simmons, who is now employed by AHMSI, to obtain relevant information and documents so that Option One could provide substantive answers to the interrogatories and documents responsive to the UST's requests. As a result of its efforts, Option One was able to *produce over one thousand (1,000) pages of documents* to the UST.

17.     In its production, Option One did *<u>not</u>* assert any privilege with respect to the subject matter of BLF's advice upon which Option One relies: Option One's document production included documents relating to the subject matter on which Option One relied upon BLF's advice. Option One produced documents relating to (a) BLF's instruction that Option One send the Debtors' payments to BLF and (b) posting or application of those payments.

18.     In its production, Option One also did *<u>not</u>* assert any privilege with respect to factual communications that were not made in furtherance of obtaining legal advice.

19.    Option One's document production included responsive non-privileged documents in the following categories:  (a) Option One's loan file, (b) documents obtained from AHMSI, (c) process management notes, (d) the Default Services Agreement, (e) the corporate resolution appointing Fidelity employees as Vice-Presidents or Assistant Secretaries of Option One, (f) Option One policies and procedures, and (g) NewTrak documents, consolidated notes and other miscellaneous documents.

**B.    <u>Fidelity's Relationship with Option One and its Counsel</u>**

20.    Option One and Fidelity entered into a Default Services Agreement dated as of January 13, 2006, (the "<u>DSA</u>").  A copy of the DSA is attached as <u>Exhibit D</u>.

21.    Pursuant to the DSA, Option One executed a Consent by Directors to Recitals and Resolutions In Lieu of Special Meeting (the "<u>Option One Resolution</u>"), effective August 1, 2007. The Option One Resolution appointed (a) six (6) Fidelity employees as Vice Presidents of Option One and (b) twenty-two (22) Fidelity employees as Assistant Secretaries of Option One. The Corporate Resolution is attached as <u>Exhibit E</u>.

22.    The Option One Resolution authorized twenty eight (28) Fidelity employees to perform numerous tasks in the name of Option One, such as executing various affidavits,[1] deeds of conveyance, and assignments of mortgages, preparing and executing proofs of claim, voting for trustees and creditors committees, attending and voting at creditors' meetings, executing ballots regarding plan confirmation, and executing reaffirmation agreements.  <u>See</u> Transcript of August 21, 2009 Hearing ("<u>Aug. 21 Tr.</u>") at 111:16-22 (Fidelity employee stating that she executed affidavits on behalf of, and as an officer of Option One); 115:12-16 (The Court:  "I see

---

[1]    Upon information and belief, Fidelity no longer executes affidavits.

a signature on an affidavit . . . that's who I order to come in.  They sign as representatives of the particular creditor.").

23.     Pursuant to the DSA, Fidelity, as an independent contractor, provided a wide variety of administrative support services for Option One with respect to foreclosure and bankruptcy proceedings.  See Exhibit D at p. 3.

24.     Fidelity also manages a nationwide network of attorneys selected by its clients. See DSA at § 1.1. p. 2 ("Fidelity Network" and "Fidelity Network Agreement"); § 2.5, p. 4 ("Option One shall be responsible for selecting, on an ongoing basis . . . Fidelity Network Law Firms . . . and Fidelity shall be responsible for managing Fidelity Network Law Firms").

25.     In addition to providing administrative support services for Option One, Fidelity also provided support services to assist BLF in providing legal services to Option One.  See Exhibit D (DSA) at Schedule A.II, pp. 22-23.

26.     Fidelity performed many of the administrative tasks that would otherwise be performed at greater expense by Option One or BLF's support staff.  For example, in the bankruptcy context, Fidelity performed the following services, among others:

- *Direct counsel to handle* filed adversary pursuant to Option One's instructions

- *Commence required action referral (i.e., proof of claim, plan objection, motion for relief)*

- *Assist counsel* in the preparation and submission of Proofs of Claim, including amended claims and obtain/manage fees and costs process for the purpose of filing Proof of Claim

- Obtain missing loan documents for purpose of filing Proof of Claim;

- *Assist counsel* in review of bankruptcy plans and objection to bankruptcy plans

- *Assist counsel* in preparation of Reaffirmation Agreements on Chapter 7 filings

- *Execute standards documents on Option One's behalf* within scope of power of attorney (or corporate resolution)

- Order property valuations

- Provide timeline management

- Execute declarations[2]

- *Assist counsel* in its negotiation of Agreed Orders/Stipulations

- *Preserve and protect deficiency rights* as directed on a loan level basis by Option One

- Provide process and event level reconciliation for Fidelity managed referrals.

- Refer agreed order default referrals to law firms

- Obtain and *provide counsel with information* necessary to facilitate reinstatements

See, e.g., DSA at Schedule A, pp. 22-23 (emphasis added).

27.     Pursuant to the DSA, Fidelity provided services as both a representative of Option One and as a representative of BLF.  See also Aug. 21 Tr. 39:11-17 (Fidelity employee used Option One system to review Option One information relative to Option One loans); 51:1-16 (Fidelity employee interacted with Option One's local counsel via telephone and via Fidelity's New/Trak System); 112:2-10 (same); 157:7-25 (Fidelity involved in settlement communications between Option One and Option One's borrowers); 162:14-20 (Option One communicated with its attorneys through Fidelity and vice-versa); 163:2-23 (same); 256:1-17 (same); 259:17-20 (same); 262:11 – 263:2 (same); 168:1 – 169:3 (when Option One's counsel has questions, they typically communicated with Option One through Fidelity); 182:15-17 (Option One employee had "day-to-day dealings" with Fidelity); 183:14-23 (Option One communicated with BLF through Fidelity); 201:5-24 (same); 187:23 – 188:12 (Option One employees could see "all communications" between all combinations of BLF, Fidelity and Option One on Fidelity's New/Trak System; all such communications were "most definitely" part of the same database);

---

[2] Upon information and belief, Fidelity no longer executes affidavits for its clients.

205:12 – 206:23 (Fidelity employee was stationed onsite at Option One's offices, took direction

from Option One's management and referred Option One files for legal action); 211:21 – 212:5

(same); 243:3 – 245:10 (same); 221:22 – 222:8 (Fidelity prepared ledgers from Option One's

information); 225:2-7 (Fidelity made decisions to file motion for stay relief) (in accordance with

Option One's procedures); 227:3-19 (same).

28.     Fidelity also provided Option One with a license to use Fidelity's proprietary

"New/Trak System," which enabled Option One, Fidelity, and BLF to communicate and track

bankruptcy processes (including BLF's invoices and fees) in an integrated, secure manner.

See DSA at § 4.4, p. 8.

29.     In light of Fidelity's role as an administrative support service provider to

Fidelity and BLF in bankruptcy cases, the DSA provided for the confidentiality of

communications.  See, e.g., DSA at § 5.1(b), p. 9.

**C.      The UST's Motion to Compel**

30.     On July 2, 2009, the UST filed the Motion to Compel.  The UST asserts that

BLF improperly withheld certain documents in response to the BLF Subpoena such as

(i) a Fidelity Network Attorney agreement between BLF and Fidelity, (ii) an invoice that

Fidelity issued to BLF[3] and (iii) the Privilege Log Documents.  In this Objection, Option One

addresses the UST's objection to the applicability of the attorney-client privilege to the

Privilege Log Documents.

31.     The UST argues that documents sent by or to Fidelity are not privileged because

Fidelity is a third-party outside the scope of Option One's attorney-client privilege.

---

[3] Upon information and belief, the Fidelity Network Attorney agreement and Fidelity invoice were withheld from Boles' production at Fidelity's urging to protect Fidelity's confidential, proprietary pricing information.  Option One does not address these documents in this Objection.

32.     The UST also argues that all of the Privilege Log Documents must be produced because the Motion to Lift Stay is a publicly-filed document.

33.     The UST further claims that BLF improperly asserts a "blanket" attorney client privilege.  See Motion to Compel at 12-13.

34.     Option One disagrees with the above-described UST's objections to the Privilege Log Documents.

35.     The UST also asserts that some of the Privilege Log Documents are not communications made in furtherance of obtaining legal advice.  See Motion to Compel at 10-11. Option One *agrees* with that objection.  Accordingly, in its production of over 1,000 pages, Option One did *not* assert the attorney-client privilege with respect to communications that were not made in furtherance of legal advice.  (Option One believes that its production likely includes the same documents to the extent they were listed in BLF's Privilege Documents.  Counsel for Option One, however, has discussed the issue with Jacob Edwards, Esquire, of BLF and authorized BLF to produce the same documents/information to the UST as Option One produced.  Accordingly, this issue is moot).

36.     The UST also argues that Option One waived the attorney-client privilege by asserting, at the August 21, 2008 hearing, advice of counsel as a defense.  Option One *did* specifically waive the attorney-client privilege with respect to BLF's instructions to send payments to BLF and related communications regarding the application or posting of the payments.  Accordingly, Option One has not asserted the attorney-client privilege with respect to such communications.  The UST, however, is *incorrect* that such waiver precludes Option One from asserting the attorney-client privilege with respect to other Privilege Log Documents.

III.   **OBJECTIONS**

A.   **The Attorney-Client Privilege in General**

37.     The attorney-client privilege is "the oldest of the privileges for confidential communications known to the common law," the purpose of which is "to encourage full and frank communication between attorneys and their clients and thereby promote broader public interests in the observance of law and administration of justice."   Upjohn Co. v. U.S., 449 U.S. 383, 389 (1981).  The privilege also "recognizes that sound legal advice or advocacy serves public ends and that such advice or advocacy depends upon the lawyer's being fully informed by the client."  Id.

38.     The attorney-client privilege applies to more than just legal advice.  It applies to information provided to the lawyer to enable sound legal advice.  As stated by the Supreme Court, the attorney-client privilege "exists to protect not only the giving of professional advice to those who can act on it but also the giving of information to the lawyer to enable him to give sound and informed advice."  Upjohn, 449 U.S. at 391 (citing Trammel v. United States, 445 U.S. 40, 51 (1980) and Fisher v. United States, 425 U.S. 391, 403 (1976)); Sims v. Roux Labs., Inc., 2007 WL 2571941, at *2 (E.D.La. Aug. 31, 2007) (quoting Upjohn).  On the other hand, the attorney-client privilege "does not protect disclosure of underlying facts by those who communicated with the attorney."  Upjohn, 449 U.S. at 385.

39.     "The attorney-client privilege is held is by the client and not the attorney."  In re Grand Jury Subpoena, 220 F.3d 406, 408 (5th Cir. 2000).[4]

---

[4] The UST argues that BLF improperly asserted attorney-client privilege on behalf of Option One.  As the privilege is held by Option One, the Boles firm has no authority to waive it.

### 1. The Attorney-Client Privilege Extends to Communications with a Representative of the Client or its Attorney.

40. The UST argues that communications between Option One and Fidelity are not privileged because Fidelity was a third-party stranger to Option One's attorney-client relationship with BLF. The UST is incorrect. Fidelity was a representative of both Option and BLF for purposes of the attorney-client privilege. Accordingly, communications by or to Fidelity are protected by the attorney-client privilege.

41. Courts in this District have recognized that proposed Federal Rule of Evidence 503 (also known as Supreme Court Standard 503) ("Standard 503") "provides a useful starting place" for a discussion of the attorney-client privilege. Freeport-McMoran Sulphur, LLC v. Mike Mullen Energy Equip. Resource, Inc., 2004 WL 1237450, *4 (E.D.La. June 2, 2004) (quoting Lenihan v. Steward Enters., 2002 WL 31001842, *3 (E.D.La. Sept. 4, 2002) (in turn quoting In re Bieter Co., 16 F.3d 929, 935 (8th Cir. 1994))). Standard 503 provides as follows:

> A client has a privilege to refuse to disclose and to prevent any other person from disclosing confidential communications made for the purpose of facilitating the rendition of professional legal services to the client, (1) between *himself or his representative and his lawyer or his lawyer's representative*, or (2) *between his lawyer and his lawyer's representative*, or (3) by him or his lawyer to a lawyer representing another in a common interest, or (4) *between representatives of the client* or *between the client and a representative of the client*, or (5) between lawyers representing the client.

Naquin v. UNOCAL Corp., 2002 WL 1837838, at *3-4 (E.D.La. Aug. 12, 2002) (quoting Supreme Court Standard 503(b) (emphasis added)); see U.S. v. Pipkins, 528 F.2d 559, 562 (5th Cir.) ("In appropriate circumstances the privilege may bar disclosures made by a client to non-lawyers who, like Somerford, had been employed as agents of an attorney."), cert. denied, 426 U.S. 952 (1976).

42.     Accordingly, as Supreme Court Standard 503(b) provides, the attorney-client privilege extends to communications other than those directly between the client and its attorney. The attorney-client privilege also extends to communications between a client or its representative and its attorney or the attorney's representative, to communications between the client and its representative, and to communications between the attorney and its representative.

43.     The case law also makes clear that a "representative" for purposes of the attorney-client privilege includes consultants or independent contractors retained by the client or its attorney where such consultants or independent contracts have an established working relationship with the client on the matters for which legal advice is sought.

44.     "In applying the principles set forth by the Supreme Court in Upjohn, *there is no reason to distinguish between a person on the corporation's payroll and a consultant hired by the corporation if each acts for the corporation and possesses the information needed by attorneys in rendering legal advice.*" In re Copper Market Antitrust Litigation, 200 F.R.D. 213, 219 (S.D.N.Y. 2001) (emphasis added) (citing In re Grand Jury Subpoenas dated January 20, 1998, 995 F.Supp. 332, 340 (E.D.N.Y. 1998) ("The court's particular concern is with identifying those representatives who can fairly be equated with the 'client' for purposes of the privilege.") (citing Bieter, 16 F.3d at 935)).

45.     The attorney-client privilege will extend to communications between a client's outside consultant or service provider that is "essentially incorporated into [the client's] staff to perform a corporate function that was necessary in the context of" legal matters then at issue. See Copper, 200 F.R.D. at 219-220. Stated differently, where a third-party performs services for the client as the functional equivalent of an employee, an independent consultant or service provider engaged by the client can be a representative of the client for purposes of applying the

attorney-client privilege. <u>Bieter</u>, 16 F.3d at 936-40 (attorney-client privilege applied to

communications between client's outside consultant and client's counsel); <u>see also</u> <u>Renda</u>

<u>Marine, Inc. v. U.S.</u>, 62 Fed. Cl. 371, 372 (Fed. Cl. 2004) (applying privilege to otherwise

attorney-client privileged email shared with outside consultant and stating, "The dissemination of

this message to non-lawyer employees and agents of the [client] does not alter the privileged

status of the communication."); <u>McCaugherty v. Siffermann</u>, 132 F.R.D. 234, 239 (N.D.Cal.

1990) ("[w]e can find no principled basis for distinguishing consultants Siffermann and Zech

from the kinds of employees to whom the Supreme Court extended the protection of the

privilege in <u>Upjohn</u>. Given our conclusion that the privilege can attach to communications

involving Siffermann and/or Zech, we must reject any suggestion that the fact that

communications otherwise privileged were shared with either or both of these consultants

results, by itself, in a waiver."); Paul R. Rice, Attorney-Client Privilege in the United States

§ 4:19 , at 4-68 (1993) (When "third parties have an established working relationship with the

corporate client that is similar to that of regular employees, they should be treated like regular

employees [for purposes of the attorney-client privilege]"); <u>Id.</u> at 4-70 ("There is little

justification for distinguishing between 'permanent' employees who communicate with counsel

on matters that are within the scope of their employment, and 'temporary' employees (outside

agents) who provide the same services to the corporation, often with the same continuity of

employment, ... and whose communications are equally important to the legal services that

counsel renders to the corporate client.").

      46.    As stated in <u>Bieter</u>:

> Too narrow a definition of "representative of the client" will lead
> to attorneys not being able to confer confidentially with
> nonemployees who, due to their relationship to the client, possess
> the very sort of information that the privilege envisions flowing

> most freely. It is only natural that, just as middle-level- and indeed
> lower-level-employees would have the relevant information
> needed by corporate counsel if he is adequately to advise the client
> with respect to actual or potential difficulties, so too would
> nonemployees who possess a significant relationship to the client
> and the client's involvement in the transaction that is the subject of
> legal services.

Bieter, 16 F.3d at 938.

47. So long as the consultant or independent contractor has an established working relationship with the client on the matters for which legal advice is sought, the client's communications with the consultant or contractor are within the attorney-client privilege. See FTC v. GlaxoSmithKline, 294 F.3d 141, 148 (D.C.Cir. 2002) (attorney-client privilege applied to independent contractors that worked with the client's attorneys in the same manner as the full time employees and "became integral members of the team assigned to deal" with the litigation because "[i]n these circumstances, there is no reason to distinguish between a person on the corporation's payroll and a consultant hired by the corporation if each acts for the corporation and possesses the information needed by attorneys in rendering legal advice."); Burlington Indus., Inc. v. Rosville Yarn, Inc., 1997 WL 404319, at *3 (N.D.Ga. June 3, 1997) ("Upjohn allows a corporation to invoke the attorney-client privilege when the information-giver is 'an employee, agent, or independent contractor with a significant relationship to the corporation and the corporation's involvement in the transaction that is the subject of legal services.'"); Energy Capital Corp. v. U.S., 45 Fed.Cl. 481, 490 (2000) (when independent contractors have "an established working relationship with the corporate client that is similar to that of regular employees, they should be treated like regular employees"); Copper, 200 F.R.D. at 219 ("Under the principles set out in Upjohn, RLM's independent contractor status provides no basis for

excluding RLM's communications with Sumitomo's counsel from the protection of the attorney-client privilege.")

48.     In addition, communications with an attorney's representative are also within the scope of the attorney-client privilege.  See U.S. v. Kovel, 296 F.2d 918, 921 (2d Cir. 1961) ("the privilege must include all the persons who act as attorney's agents") (quoting 8 Wigmore, Evidence, § 2301; Annot., 53 A.L.R. 369 (1928)); Robinson v. Texas Auto. Dealers Ass'n, 214 F.R.D. 432, 451 (E.D. Tex. 2003) ("Communications between an attorney's agent and the attorney's client can be protected by the privilege when the communication is made in confidence for the purpose of facilitating the rendition of legal services.") (citing United States v. White, 617 F.2d 1131, 1135 (5th Cir. 1980)), vacated in part on other grounds, In re Texas Auto. Dealers Assn., 2003 WL 21911333 (5th Cir. Jul 25, 2003); Abdallah v. Coca-Cola Co., 2000 WL 33249254, at *3 (N.D.Ga. Jan. 25, 2000) ("Where counsel seeks and obtains outside consulting services, the attorney-client privilege has been extended to such third parties employed to assist a lawyer in the rendition of legal services.").

**B.     Communications to or from Fidelity Are Protected by the Attorney-Client Privilege Because Fidelity Was a Representative of Option One and BLF.**

49.     As contemplated by the DSA, "Fidelity will handle a portion of the foreclosure and bankruptcy process on behalf of" Option One.  See Exhibit E at p.1. As described in detail above, (a) twenty eight (28) Fidelity employees served as Vice Presidents or Assistant Secretaries of Option; (b) Fidelity employees were authorized to execute documents on Option One's behalf; (c) Fidelity, as an independent contract, provided a variety of necessary support services to Option One in the Debtors' bankruptcy case, (d) Fidelity managed BLF as Fidelity network attorneys, (e) Fidelity provided timeline management services, and (f) Fidelity provided

other administrative assistance to BLF in this bankruptcy case in accordance with Schedule A.II to the DSA.  See Exhibits D and E.

50.     As those facts demonstrate, Fidelity had a well-established and critically important role providing administrative support services in Option One's servicing of defaulted loans in bankruptcy cases.  The administrative support services that Fidelity employees provided, as officers of Option One, or through Fidelity as independent contractor, would have been performed by Option One's regular employees absent the DSA and the Option One Resolution.

51.     Moreover, the support services that Fidelity provided involved its use of Option One's confidential information, which was protected from disclosure under the DSA.  See, e.g., DSA at § 5.1(b), p. 9.

52.     There can be no reasonable dispute that Fidelity, which had a significant day-to-day role in this case, was a "representative" of Option One for purposes of the attorney-client privilege.  See, e.g., Testimony from Aug. 21 Tr. discussed in ¶ 27 above.  Thus, communications to or from Fidelity are protected by the attorney-client privilege.

53.     Fidelity was also a "representative" of BLF for purposes of the attorney-client privilege.  Specifically, Boles paid Fidelity for administrative support services that Fidelity provided to BLF.  See, e.g., Exhibit D (DSA) at Schedule II.A. ("*Assist counsel*" in (i) the preparation and submission of Proofs of Claim, including amended claims and obtain/manage fees and costs process for the purpose of filing Proof of Claim, (ii) reviewing bankruptcy plans and objection to bankruptcy plans; in preparation of Reaffirmation Agreements on Chapter 7 filings, (iii) negotiating Agreed Orders/Stipulations) (Obtain and "*provide counsel with information*" necessary to facilitate reinstatements) (emphasis added).  See, e.g., DSA at

Schedule A.II (pp. 22-23) (emphasis added); <u>see also</u>, <u>e.g.</u>, Testimony from Aug. 21 Tr. discussed in ¶ 27 above.

54.     As the UST admits, the privilege includes communications to "third parties who *assist an attorney in rendering legal advice*."  <u>See</u> Motion to Compel at 19 (emphasis added).[5]

55.     As in <u>Bieter</u>, "[t]here is no principled basis to distinguish [Fidelity's] role from that of an employee, and [Fidelity's] involvement in the subject of the litigation makes [Fidelity] precisely the sort of person with whom [BLF] would wish to confer confidentially in order to understand [Option One's] reasons for seeking representation."  <u>Bieter</u>, 16 F.3d at 938.

56.     For the reasons set forth above, Option One did not waive the attorney-client privilege with regard to confidential information because such information was disclosed to Fidelity, a representative of Option One and BLF.

**C.     Option One's Waiver of the Attorney-Client Privilege Is Limited to BLF's Instructions Regarding the Handling of the Debtors' Payments.**

57.     On September 19, 2008, the President signed S. 2450, thereby creating Federal Rule of Evidence 502.  In relevant, part, Rule 502 provides as follows with respect to the scope of a waiver of the attorney-client privilege:

> a.      . . . Scope of a Waiver-  When the disclosure is made in a Federal proceeding or to a Federal office or agency and waives the attorney-client privilege or work-product protection, the waiver extends to an undisclosed communication or information in a Federal or State proceeding only if:
>
> 1.      the waiver is intentional;
>
> 2.      the disclosed and undisclosed communications or information *concern the same subject matter*; *and*

_____

[5] It appears that the UST did not have a copy of the DSA before it filed the Motion to Compel.  <u>See</u> Motion to Compel at 20 (". . . nor has Boles described specifically the services Fidelity provided in this case.  In short, Boles has not demonstrated that Fidelity's services were 'necessary, or at least highly useful' to Boles' representation of Option.").  The UST, however, did not discuss the filing of the Motion to Compel with Option One, the holder of the attorney-client privilege, before filing the Motion to Compel.

3.    *they ought in fairness to be considered together.*

<u>See</u> Fed.R.Evid. 502(a)(1)-(3) (emphasis added).

58.    Rule 502 applies in all actions commenced after September 18, 2008 and insofar as is just and practicable, in proceedings pending on September 19, 2008.

59.    Whether or not Rule 502 applies, the common law is consistent with Rule 502. Specifically, the relevant case law provides that a voluntary waiver of the privilege extends only to communications relating to the same subject matter that ought to in fairness be disclosed to avoid making the voluntary disclosure misleading.  <u>See</u> <u>Nguyen v. Excel Corp.</u>, 197 F.3d 200, 207 n.19 (5th Cir. 1999) ("a client's offer of his own or his attorney's testimony as to a specific communication constitutes a waiver as to all other communications on the same matter") (quoting <u>U.S. v. Woodall</u>, 438 F.2d 1317, 1324 (5th Cir. 1970) (en banc)); <u>Industrial Clearinghouse, Inc. v. Browning Mfg. Div. of Emerson Elec. Co.</u>, 953 F.2d 1004, 1007 (5th Cir. 1992) (if client "reveals confidential client communications, the client waives the privilege as to the subject matter of the disclosed communications") (emphasis added); <u>Conkling v. Turner</u>, 883 F.2d 431, 435 (5th Cir. 1989) (not allowing examination to go beyond communications with respect to which privilege was waived);  <u>Naquin</u>, 2002 WL 1837838, at *4 (stating that "[w]aiver by implication is determined by the standard of fairness. If the disclosure of privileged communications 'may be misleading because only favorable material has been disclosed, waiver is likely to be found for so much of the withheld information as will make the disclosure complete and not misleadingly one-sided.'") (quoting <u>Koster v. Chase Manhattan Bank</u>, 1984 WL 883, at *4 (S.D.N.Y. 1984)); <u>see also</u> <u>In re Sealed Case</u>, 877 F.2d 976, 981 (D.C. Cir. 1989) ("[A] waiver of the privilege in an attorney-client communication extends to 'all other communications relating to the same subject matter.'") (quoting <u>In re Sealed Case</u>, 676 F.2d 793,

809 (D.C.Cir. 1982)); <u>Akeya LLC V. Mizuno Corp.</u>, 243 F.Supp.2d 418, 422 (M.D.N.C. 2003)

("[s]ubject matter waiver does not mean all opinions as to all possible defenses, but does mean

all opinions of the specific issue of advice asserted as a defense"); <u>Micron Separations, Inc. v.</u>

<u>Pall Corp.</u>, 159 F.R.D. 361, 365 n.8 (D.Mass. 1995) ("I recognize in a case in which there is

more than one issue and reliance of the advice of counsel went to only one issue, the waiver

would not extend to the other issue ...."); <u>Koster v. Chase Manhattan Bank</u>, 1984 WL 883, at *4

(S.D.N.Y. Sept. 18, 1984) ("If the disclosure of privileged communications "may be misleading

because only favorable material has been disclosed, waiver is likely to be found for so much of

the withheld information as will make the disclosure complete and not misleadingly one-sided.").

60.     The UST also recognizes that Option One's waiver relates only to the subject

matter of Arthur Simmons' testimony.  <u>See</u> Motion to Compel at 14 ("Having failed to assert the

privilege during the hearing, Option waived the privilege with respect to all communications

*regarding the same subject matter.*") (emphasis added).  As the UST states, Simmons testified

regarding BLF's advice on the following subject matter:

> • Mr. Simmons testified regarding the inquiry to BLF about what should be done
> with the payments that Option One received from the Debtors, and BLF's advice
> regarding whether to post or not post those payments.  <u>See</u> Aug. 21 Tr. 136:9-13.
>
> • Mr. Simmons testified that BLF made the decision whether to deposit the
> payments that Option One received from the debtors.  <u>See</u> Aug. 21 Tr. 255:20.
>
> • Mr. Simmons testified that, although Option One ultimately made the decision
> whether to post the payments made by the debtors, Option based that decision
> upon the advice of its attorney, as such were "the instructions of our attorney."
> <u>See</u> Aug. 21 Tr. 257: 5-10.

<u>See</u> Motion to Compel at 16.

61.     BLF produced all documents relating to its instructions to Option One to send the

Debtors' payments to BLF.  The only documents that "ought in fairness" be considered with

those documents are the communications regarding whether or how the payments should be applied to the Debtors' account. In its document production, Option One produced documents between or among Option One, Fidelity, and BLF regarding the transmittal of the Debtors' payments to BLF *and* the posting or application of the payments.

62. The UST's assertion that all communications somehow relate to the delivery of the Debtors' payments to BLF or the posting of the Debtors' payments is simply untrue. Option One *has produced* the documents relating to that subject matter (and has authorized BLF to make the same production).

### D. **BLF Did Not Assert a "Blanket" Claim of Attorney-Client Privilege.**

63. The UST's argument that BLF asserted a blanket claim of privilege is based in a misreading of BLF's Responses and the relevant case law. See Motion to Compel at 12-13. General Objection No. 2 (objecting to each Request for Production *to the extent that* it seeks the production of information which . . . contains privileged attorney-client communications"). See Exhibit B at ¶ 2 (emphasis added). BLF begins each of its responses with the words, "Subject to the General Objections." Id. at Response Nos. 1 – 18. The prefatory clause of each response and General Objection No. 2 are not a "blanket" assertion of attorney-client privilege. Indeed, BLF produced non-privileged documents responsive to the UST's specific document requests.

64. In Nguyen, the Fifth Circuit stated that "[b]lanket claims of privilege are disfavored" and explained that "'[*t]he privilege must be specifically asserted with respect to particular documents.*'" See Nguyen, 197 F.3d at 206 n.16 (quoting U.S. v. El Paso Co., 682 F.2d 530, 539 (5th Cir. 1982) (emphasis added)). In El Paso, the Fifth Circuit similarly stated that "we have made clear that the attorney-client privilege may not be tossed as a blanket over an

undifferentiated group of documents.  The privilege must be *specifically asserted with respect to particular documents*."  El Paso, 682 F.2d at 539 (citations omitted) (emphasis added).

65.     BLF did not assert a "blanket" claim of attorney-client privilege.  BLF identified each document on which it claimed a privilege in the Privilege Log.  The UST's assertion of a "blanket" privilege claim is erroneous.

**E.      Attorney-Client Communications Concerning the Motion to Lift Stay are Privileged.**

66.     The UST asserts that all communications related to the Motion to Lift Stay are not privileged because the Motion to Lift Stay was intended to be a publicly-filed document.  See Motion to Compel at 9-10.  In support of this argument, the UST provides a patchwork of inapposite authority.

67.     For instance, the UST relies upon United States v. Pipkins, where the court refused to apply the attorney-client privilege to handwriting samples because, *inter alia*, "[o]ne's style of handwriting is not an intrinsically confidential attribute."  United States v. Pipkins, 528 F.2d 559, 563 (5th Cir. 1976).

68.     The UST's reliance on United States v. Davis similarly is misplaced.  In that case, the court held that workpapers produced in the course of preparing a client's tax returns and the tax records on which they were based were not privileged.  United States v. Davis, 636 F.2d 1028, 1043 (5th Cir. 1981).  The court stated, "[n]either category of documents is privileged, because although preparation of tax returns by itself may require some knowledge of the law, it is primarily an accounting service."  Id.

69.     The UST's selective quotation of United States v. Naegele is misleading.  The UST quotes the portion of Naegele indicating that underlying information communicated to an attorney for purposes of filing a bankruptcy petition is not privileged because such information is

intended to be publicly-disclosed.  See United States v. Naegele, 468 F.Supp.2d 165, 170

(D.D.C. 2007).  *The UST, however, did not quote the Naegele court's following statement*:  "That

said, any *legal* advice sought or obtained on the basis of confidential communications between

a client and his attorney, even in the context of the preparation of a bankruptcy petition, is

protected by the attorney-client privilege."  Id.  The Naegele court concluded that, "while

communications from the client which reveal information that was not meant to remain

confidential are not protected by the attorney-client privilege, any communications (or portions

thereof) that embody an attorney's confidential legal advice – or any facts provided by the client

in confidence, or questions asked by the client, in seeking such advice – are protected by the

attorney-client privilege."  Id.

70.     The cases cited by the UST simply stand for the proposition that the underlying

facts intended to be disclosed in a publicly-filed document are not privileged.  See Motion to

Compel at 9 ("The attorney-client privilege does not protect the underlying facts that Option

conveyed to Boles.").  *BLF and Option One produced documents regarding those underlying*

*facts*.

71.     The filing of a document, however, does not waive the attorney-client privilege

with respect to legal advice regarding the document.  So long as the filing of a document itself

does not reveal attorney-client privileged communications, the filing of the document does not

waive any portion of the privilege.  See Industrial Clearinghouse, Inc. v. Browning Mfg. Div. of

Emerson Elec. Co., 953 F.2d 1004, 1007 (5th Cir. 1992) ("The Original Petition simply accuses

Canterbury of various negligent actions in handling the Industrial dispute on Browning's behalf.

While the Original Petition reveals some things that Canterbury told Browning, it reveals no

communication from Browning either directly or by reference to Canterbury's statements.

We thus find no record support for the district court's finding that Browning waived its attorney-client privilege by suing Canterbury."); <u>Zenith Radio Corp. v. U.S.</u>, 764 F.2d 1577, 1580 (Fed.Cir. 1985) ("A party does not automatically waive [the attorney-client privilege] simply by bringing suit."); <u>Ideal Elec. Co. v. Flowserve Corp.</u>, 230 F.R.D. 603, 607-08 (D.Nev. 2005)..

72.     Option One's communications with its counsel concerning a litigation document filed with the Court bear no comparison to a handwriting sample or accounting assistance with preparation of a tax return or a bankruptcy petition.  Option One and/or Fidelity's communications with BLF concerning the Motion to Lift Stay are protected from disclosure pursuant to the attorney-client privilege.

73.     The UST's position would extinguish the attorney-client privilege in litigation. For example, filing a complaint would effect a waiver of the attorney-client privilege regarding counsel's discussion of the underlying facts with the plaintiff.  The attorney-client privilege dictates the opposite result.  There is no case law in support of the Trustee's argument.

**F.     The Privilege Log Fully Complies with the Requirements of Fed.R.Civ.P. 26(b)(5) and 45(d)(2)(A).**

74.     Finally, the UST complains in a footnote that BLF did not format the Privilege Log per the instructions in the BLF Subpoena.  The Privilege Log is more than sufficiently detailed in accordance the requirements of the Federal Rules of Civil Procedure.

75.     Federal Rules of Civil Procedure 26(b)(5) and 45(d)(2)(A) provide that a party claiming a privilege must expressly state a claim of privilege and describe the nature of the withheld documents, communications, or things in a manner that, "*without revealing information itself privileged or protected,*" will enable other parties to assess the applicability of the privilege or protection.  <u>See</u> Fed.R.Civ.P. 26(b)(5) and 45(d)(2)(A) (emphasis added).

76.     The 1993 Advisory Committee Notes to Rule 26(b)(5) provides that "[t]he rule does not attempt to define for each case what information must be provided when a party asserts a claim of privilege or work product protection.  Details concerning time, person, general subject matter, etc., may be appropriate if only a few items are withheld, but may be unduly burdensome when voluminous documents are claimed to be privileged or protected, particularly if the items can be described by categories."  See Fed.R.Civ.P. 26(b)(5) 1993 Advisory Committee Notes.

77.     "'Typically, a privilege log must identify each document and provide basic information, including the author, recipient, date and *general* nature of the document.'"  Mack v. GlobalSantafe Drilling Co., 2006 WL 980746, at *1 (E.D.La. April 11, 2006) (emphasis added) (quoting In re Papst Licensing, GmbH Patent Litig., 2001 WL 1135268, at *2 (E.D.La. Sept. 19, 2001) (Sear, J.)); see also Manual For Complex Litigation (Third) § 21.431 (1995) (Compliance with Rule 26(b)(5) and 45(d)(2)(A) is "accomplished by submission of a log identifying documents or other communications by date and by the names of the author(s) and recipient(s), and describing their *general* subject matter.") (emphasis added).

78.     The Privilege Log contains the following detail: (a) author, (b) recipients, (c) date on which the document was prepared, and (d) the ground for withholding production (attorney-client privilege).  Thus, the Privilege Log complied fully with the applicable Federal Rules of Civil Procedure.  See Baptiste v. Cushman & Wakefield, Inc., 2004 WL 330235, at *5 n.4 (S.D.N.Y. Feb. 20, 2004) (stating that "the identification of the e-mail in the privilege log was adequate" where "the log entry described the type of document (an e-mail), the general subject matter of the document ('Re: Ms. Baptiste, relaying advice from Howard Rothschild, Esq.'), the date of the document, its author, and its recipients."); Green v. Baca, 2003 WL 23181015, at *2 (C.D. Cal. Dec. 26, 2003) (citing In re Grand Jury Investigation, 974 F.2d 1068, 1071 (9th Cir.

1992)) (privilege log found sufficient where it identified the attorney and client involved, the nature of the document, all persons or entities receiving the document, and the date the document was generated)); Lakewood Eng'g and Mfg. Co. v. Lasko Prods., Inc., 2003 WL 1220254, at *3 (N.D.Ill. Mar. 14, 2003).

WHEREFORE, for the foregoing reasons, Option One respectfully requests that this Court enter an Order (a) denying the Motion to Compel and (b) granting to Option One such further relief as is appropriate.

Dated:  July 20, 2009                        Respectfully submitted,


By:  _s/ Susan Fahey Desmond_____
     Susan Fahey Desmond, Esquire
     Louisiana Bar No. 25380
     Watkins Ludlam Winter & Stennis, P.A.
     One Hancock Plaza
     2510 14th Street, Suite 1125 (39501)
     P.O. Box 160
     Gulfport, Mississippi  39502
     Telephone:  504-214-0112
     Facsimile:  228-864-0516

              - and -

     Kurt F. Gwynne, Esquire
     Admitted *pro hac vice*
     Reed Smith LLP
     1201 N. Market Street
     Suite 1500
     Wilmington, Delaware  19801
     Telephone:  302-778-7500
     Facsimile:  302-778-7575

     Counsel for Option One Mortgage Corporation
     n/k/a Sand Canyon Corporation

**<u>Certificate of Service</u>**

I certify that this Objection to United States Trustee's Motion for Order Compelling Production was filed via the Court's ECF system and the following parties will be served electronically:

Mary S. Langston: mary.langston@usdoj.gov
Carolyn S. Cole: carolyn.cole@usdoj.gov
Sean M. Haynes: sean.m.haynes@usdoj.gov
Kurt F. Gwynne: kgwynne@reedsmith.com
Michael P. Cash: mcash@gardere.com
Susan Fahey Desmond: sdesmond@watkinsludlam.com
Joseph G. Epstein: jepstein@winstead.com
Elisabeth D. Harrington: swamplaw@bellsouth.net
D. Clay Wirtz: dclay@centurytel.net

and that I caused to be served the following vial U. S. Mail, postage prepaid:

S.J. Beaulieu, Jr.
433 Metairie Road, Suite 307
Metairie, Louisiana 700

This the 20th day of July, 2009.

<u>*s/  Susan Fahey Desmond*</u>
Susan Fahey Desmond