UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| In re:<br><br>**RON WILSON,**<br>**LaRHONDA WILSON,**<br><br>    Debtors. | **CASE NO. 07-11862**<br><br>Section "A"<br><br>**CHAPTER 13** |

**MEMORANDUM OF LAW IN SUPPORT OF UNITED STATES TRUSTEE'S
MOTION FOR SANCTIONS AGAINST LENDER PROCESSING SERVICES, INC. AND
THE BOLES LAW FIRM**

TO THE HONORABLE ELIZABETH W. MAGNER:

The United States Trustee for Region 5 ("United States Trustee") files this memorandum of law ("Memorandum") in support of his motion for sanctions under the Court's inherent power to sanction bad faith conduct and 11 U.S.C. § 105(a) ("Motion"). The Motion seeks sanctions against the respondents, Lender Processing Services, Inc., f/k/a Fidelity National Information Services, Inc. ("Fidelity") and The Boles Law Firm ("Boles").

**I.    SUMMARY OF ARGUMENT**

During the course of the Court's sua sponte show-cause proceedings in this case[1] Fidelity[2] and Boles[3] materially misled this Court as to their knowledge of post-petition mortgage

---

[1] The show cause proceedings ("OSC proceeding") have been conducted pursuant to this Court's show cause Orders of May 9, 2008; July 11, 2008; and July 18, 2008.

[2] Fidelity appeared in the OSC proceeding and at the August 21, 2008 hearing through its counsel of record and its authorized representative, Dory Goebel.

[3] Boles made statements through D. Clay Wirtz, an attorney at the firm. The bankruptcy rules contemplate that "absent extraordinary circumstances, a law firm shall be held jointly

payments made by the debtors, Ron and LaRhonda Wilson. Boles misrepresented why those payments came to be in its possession. Fidelity made materially untruthful statements to this Court concerning its knowledge of and its role in communicating about the posting of those payments. Additionally, Fidelity materially misrepresented its role, denying that it functioned as a "go between" in this case, between Boles and the mortgage servicer.

This conduct must be sanctioned to ensure the efficient administration of justice and to protect the bankruptcy system. Untruthful statements made in bankruptcy proceedings undermine the integrity of the bankruptcy process. The bankruptcy system relies on the candor and accuracy of information presented by all parties, creditors and debtors alike. To ensure candor before this Court and to protect the integrity of the bankruptcy system, this Court should impose on Fidelity and Boles monetary sanctions and other non-monetary relief as this Court deems appropriate pursuant to its inherent authority to sanction abusive litigants coming before the Court, and pursuant to 11 U.S.C. § 105(a).

## II.  JURISDICTION

This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334; 11 U.S.C. § 105 (a); Fed.R.Bankr.P. 9014; and this Court's inherent authority. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A). Venue is proper and consistent with 28 U.S.C. § 1409 because the instant case is being administered in this District.

---

responsible for violations committed by its partners, associates, and employees." *See* Fed.R.Bankr.P. 9011(c)(1)(A) (concerning written representations). This standard is particularly appropriate in this case, where Boles employees, other than its attorneys appearing in Court, had relevant communications and possessed knowledge which was not revealed to the Court during the OSC proceeding.

**III.  STANDING OF THE UNITED STATES TRUSTEE**

The United States Trustee has standing to raise issues and be heard in this matter pursuant to 11 U.S.C. § 307 and 28 U.S.C. § 586.  The Bankruptcy Code provides that the "United States Trustee may raise and may be heard on any issue in any case or proceeding under [title 11] . . . ."  11 U.S.C. § 307.  Section 586 of Title 28 contains an additional grant of authority authorizing the United States Trustee to, *inter alia*, "supervise the administration of cases and trustees in cases under chapter 7, 11, 12, 13, or 15 of title 11 by, whenever the United States Trustee considers it to be appropriate—  . . . monitoring the progress of cases under title 11 and taking such actions as the United States trustee deems to be appropriate to prevent undue delay in such progress."  28 U.S.C. § 528(3)(G).  The United States Trustee assists in "protecting the public interest and ensuring that bankruptcy cases are conducted according to law."  *In re Revco, Inc.*, 898 F.2d 498, 499 (6th Cir. 1990).

United States Trustees also supervise the administration of chapter 13 bankruptcy cases.  28 U.S.C. § 586 (a)(3)(A)-(H).  When Congress granted the United States Trustee broad statutory standing under 11 U.S.C. § 307 and 28 U.S.C. § 586, it intended to "create an 'enforcer[] of the bankruptcy laws [who would bring] proceedings in the bankruptcy courts in particular cases in which particular action taken or proposed to be taken deviate[d] from the standards established by the . . . bankruptcy code.'"  *In re: A-1 Trash Pickup, Inc.*, 802 F.2d 774, 775 (4th Cir. 1986) *quoting*, H.Rep.No. 989, 95th Cong., 2d Sess. at 88 (brackets in original).  Hence, Congress expects the United States Trustee "to actively oversee the administration of bankruptcy cases and to intervene whenever particular actions threaten[] an abuse of the bankruptcy system or its procedures."  *A-1 Trash*, 802 F.2d at 775-776.  The standing conferred by § 307 of the

Bankruptcy Code is broad, and is intended to allow the United States Trustee to "protect the public interest by aiding bankruptcy judges and monitoring certain aspects of bankruptcy proceedings." *In re Countrywide Home Loans, Inc.* 384 B.R. 373, 389 (Bankr. W.D. Pa. 2008) (quoting *United Artists Theatre Co. v. Walton,* 315 F.3d 217, 225 (3rd Cir. 2003)); *see also Walton v. Countrywide Home Loans, Inc.*, 2009 WL 1905035 (S.D. Fla. 2009) (reversing bankruptcy court and holding United States Trustee had standing to bring action for sanctions for abusive bankruptcy practices by mortgage servicer). Therefore, the United States Trustee has standing to seek sanctions for the alleged abusive conduct in this case.

**IV.    BACKGROUND LEADING UP TO THE COURT'S ORDER TO SHOW CAUSE PROCEEDING**

The OSC proceedings centered on the March 10, 2008 Motion to Lift Stay ("2d MFR") filed by Boles on behalf of Option One Mortgage Corporation, n/k/a Sand Canyon Corporation ("Option").[4]  Dkt. # 20.  Boles supported the 2d MFR with an Affidavit of Debt signed by Dory Goebel (the "Goebel Affidavit"), a Fidelity officer and employee, claiming to act as an officer of Option. *Id*.  Boles attorney Wirtz signed the 2d MFR.  The 2d MFR alleged that the debtors had failed to make four post-petition payments.[5]

On March 31, 2008, the debtors filed a Response to the 2d MFR, asserting that they were "completely current" and had "made each and every payment" owed to Option.  Dkt. # 24.  The

---

[4]  Option filed its first Motion to Lift Stay ("1st MFR") in *Wilson* on January 7, 2008.  The Court, however, summarily denied the 1st MFR because the 1st MFR did not comply with local procedures requiring submission of an affidavit.  *See* Order entered February 8, 2008, Dkt. # 18.

[5]  The 2d MFR itself indicated that the debtors had not made the required payments for December 1, 2007 through March 1, 2008.  The Goebel Affidavit, which the Court found to be false, was internally contradictory in indicating that the account was past-due for the November 1, 2007 payment (¶ 6) and the December 1, 2007 payment (spreadsheet).

debtors submitted documentation at a hearing on April 8, 2008 concerning all payments that they had made. Dkt. # 25. The Court ordered Option and the debtors to exchange payment records, and reset the hearing for April 22, 2008.[6] Option did not provide sufficient payment records by that date. April 22, 2008 Tr. 8:14-15. The Court entered an Order to show cause requiring Wirtz; a representative of Option; and Goebel to appear in person before the Court on June 26, 2008. Dkt. # 30; and April 22, 2008 Tr. 5:8-11.

At the June 26, 2008 show cause hearing, Wirtz appeared, but neither Goebel[7] nor a representative of Option appeared. The Court determined based on the record that the debtors had made every payment due to Option and deemed the debtors to be current on their post-petition obligations. June 26, 2008 Tr. 46:11-15. The Court further found the Goebel Affidavit to be "false." *Id.* at 35:16-36:5. The Court jointly sanctioned Goebel and Option $5,000 for filing the false Goebel Affidavit, and the Court additionally jointly sanctioned Goebel and Option $5,000 for failing to appear or timely seek a continuance of the hearing. July 11, 2008 Order, Dkt. # 46; and *see* June 26, 2008 Tr. 45:16 - 47:1 (discussing untimely continuance request). The Court further ordered Goebel and a representative of Option to appear on August 21, 2008 to provide further explanation about the amount due on the debtors' mortgage. *Id*. Finally, the

---

[6] Dkt. # 26; and Transcript of April 8, 2008 hearing, 5:10-12. The Court conducted other hearings with respect to the 2d MFR (on April 22, 2008) and OSC proceeding (on June 26, 2008; August 21, 2008; and November 21, 2008). Hereinafter, those transcripts are referred to respectively as April 8, 2008 Tr. Page:Line; April 22, 2008 Tr. Page:Line; June 26, 2008 Tr. Page:Line; August 21, 2008 Tr. Page:Line; and November 21, 2008 Tr. Page:Line.

[7] That same day, June 26, 2008, Goebel was present in an Ohio bankruptcy court on two OSC's issued by the Ohio court concerning affidavits signed by Goebel.

Court sanctioned Wirtz $1,000 for failing to amend or withdraw the 2d MFR once he became aware of the debtors' payments that Option had received but not disclosed. *Id*.

The United States Trustee participated in the August 21, 2008 OSC hearing. At the hearing, Goebel and Option representative Arthur Simmons ("Simmons") testified. Due to conflicting and insufficient information, the Court continued the OSC proceeding to permit the United States Trustee to pursue discovery. August 21, 2008 Tr. 264:13-267:15.

### V.    BOTH FIDELITY AND BOLES, WHO HAD KNOWLEDGE OF THE DEBTORS' MORTGAGE PAYMENTS THAT OPTION DID NOT POST, MISREPRESENTED TO THE COURT INFORMATION KNOWN TO THEM ABOUT THE STATUS OF PAYMENTS

The payments addressed by this Motion were made after December 20, 2007 (date of MFR referral) and before April 22, 2008 (date the Court determined to enter a rule to show cause). During that time frame, Option received four monthly payments from the debtors. Option, though, did not post or credit three of those payments to the debtors' account. The dates of those payments received but not posted by Option are: January 2, 2008; January 31, 2008; and March 3, 2008, hereinafter, the "Unposted Payments."[8]

---

[8] The dates referenced are the dates upon which Option received each of the Unposted Payments. Upon information and belief, Option received:
- on January 2, 2008, personal check # 1151, in the amount of $1,546.84;
- on January 31, 2008, cashier's check # 9427116 in the amount of $1,000.00 and simultaneously received personal check # 1180 in the amount of $546.84 (and personal check # 1181 in the amount of $312.00, apparently payment of late fees); and
- on March 3, 2008, cashier's check # 9322069 in the amount of $1,546.84 (and personal check # 1207 in the amount of $77.33, apparently payment of late fees).

A. **What Boles told the Court about its knowledge of the debtors' post-petition mortgage payments**

At the June 26, 2008 hearing, the Court queried about the failure of the 2d MFR to reference the Unposted Payments. During the hearing, the Court explored potential causes (such as Option's standard operating procedure or, alternatively, Option's inadvertence) for Option's failure to advise Boles about its receipt of post-petition payments. Wirtz responded for Boles:

> In this particular case the way - - the only way that we found out, my law firm found out that there were additional payments made is when we received them in the mail with a letter which was from Option One [interjection by court] - - stating that, you know, the funds [were] insufficient to bring [the] plan current or bring . . . .

June 26, 2008 Tr. 31:22 - 32:3.

Later in the hearing, the Court summarized its understanding: "Now, granted they didn't tell you a lot of other facts that made it [the Affidavit] also incorrect . . . ." *Id.* at 37:3-5. "[T]he affidavit didn't disclose that those funds existed and now all of a sudden they've popped into your office." *Id.* at 39:24-40:1. In each exchange with the Court, Wirtz did not indicate that Boles knew about the Unposted Payments prior to their receipt. Rather, Wirtz left the impression that the Unposted Payments arrived at Boles' office via unanticipated correspondence from Option at some point.

B. **What Fidelity told the Court about its knowledge of payments**

Goebel, an employee and officer of Fidelity, testified on August 21, 2008 at the OSC hearing. She testified concerning the procedures that she used for confirming the contents of an affidavit prior to signing. She indicated she would review three screens of information: the post-

7

petition date due; any payment amount changes; and total amount due. August 21, 2008 Tr. 61:13-15; 64:1-3; and 66:6-13.

She was questioned concerning Fidelity's role with respect to post-referral payments, i.e., received after the MFR referral had been made to Boles. In response to questioning by the Court, Goebel testified that Option would not apprise Fidelity, on a daily or real-time basis, of Option's receipt of funds. August 21, 2008 Tr. 78:16-79:17. Goebel offered, "No, we don't [interjection by the court] work with Option One on their postings." *Id.*, 79:8-11. Goebel further testified on the specific issue of whether Fidelity communicated with counsel concerning post-referral payments from borrowers. Goebel testified that Fidelity would not have communicated with the Boles law firm regarding post-referral payments; rather, Option was responsible for notifying its counsel directly about such payments. Goebel further testified that she reviewed the Wilson file, and that were no communications between Fidelity and Boles regarding the Unposted Payments because "[n]o, that is not the responsibility of Fidelity. We would not know of additional payments, Option One would." August 21, 2008 Tr. 110:18 - 111:5. Goebel's testimony thus portrayed that Fidelity would not even know that a borrower's post-referral payment had been received unless Option posted the payment on Option's accounting system; and that Fidelity would not communicate with Option's counsel about payments received. However, Goebel's testimony simply does not comport with the evidence the United States Trustee has obtained from Option, Fidelity, and Boles through discovery.

**C.** **Both Fidelity and Boles had knowledge about the Unposted Payments which they misrepresented to this Court**

As demonstrated below, the evidence establishes that both Boles and Fidelity had knowledge about the Unposted Payments which they misrepresented to the Court. Upon information and belief, Fidelity and Boles played an integral role in communicating about those very payments, participating in queries about how to handle the Unposted Payments.

Wirtz's statements to this Court materially distorted the true picture of Boles' knowledge about the Unposted Payments. Upon information and belief, the evidence will show the following: that Boles knew about the first two Unposted Payments before Goebel signed the Affidavit; that Boles knew of all three Unposted Payments before filing the 2d MFR; that Boles knew about the Unposted Payments because posting instructions had been sought from it with respect to each payment; that Boles instructed that each Unposted Payment be sent to it; and that Option had sent all three of the Unposted Payments to Boles prior to Boles' having filed the 2d MFR. Boles, thus, received the Unposted Payments *because* Boles instructed that the Unposted Payments should be sent to it. Boles' receipt of the Unposted Payment, thus, was not unanticipated or inexplicable, per the impression left by Wirtz. The Court should impute Wirtz's misrepresentation to Boles. *See* November 21, 2008 Tr. 78:15-16 (Boles' counsel accepting that Wirtz's "actions are imputed to our law firm").

Further, the evidence obtained through the United States Trustee's discovery contradicts Fidelity's assertions that it had no knowledge of and did not communicate with Boles regarding the Unposted Payments. Upon information and belief, a formal policy and procedure existed, involving Option, Fidelity, and Option's attorney, concerning the processing of post-referral

9

payments. Upon information and belief, pursuant to that procedure, Option would alert that it had received funds post-MFR referral. In turn, Fidelity was to notify Option's attorney that funds had been received.

Option's representative, Arthur Simmons, testified at the August 21, 2008 OSC hearing concerning Boles' and Fidelity's roles regarding the Unposted Payments. Simmons' testimony corroborated the existence of an applicable policy and procedure for processing such payments. Simmons referred to Option's "policy" concerning the processing of payments "that came in after the loan had been referred out for a Motion for Relief." August 21, 2008 Tr. 135:9-17. Simmons concisely described the policy and procedure this way: "We send an e-mail to Fidelity [after a mortgage payment comes in to Option]. Fidelity in turn contacts our attorney, and our attorney makes a decision on whether we should post a payment or not post a payment." *Id*. at 136:2-13. The testimony from Simmons, thus, corroborates the referenced policy and procedure.

Additionally, documentary evidence of Fidelity's communications with Boles about each of the Unposted Payments corroborates Simmons' basic explanation: a payment would be received by Option; Option would ask Fidelity what it should do with the payment; Fidelity would in turn ask Boles what to do; and Boles would respond with instructions which were ultimately received by Option.[9]

---

[9] The United States Trustee has been unable to verify, through discovery during the OSC proceeding, that Fidelity relayed to Option the advice from Boles. As the documentary evidence shows, Fidelity posed queries to Boles as to what should be done with each Unposted Payment, and Boles responded to Fidelity's query. Option then acted in conformance with the advice Boles rendered. By some means, Option had access to Boles' instructions in response to Fidelity's queries, whether directly from Fidelity or otherwise.

In connection with each of the three Unposted Payments, thus, Boles and Fidelity misrepresented material information about their knowledge. Boles' receipt of each Unposted Payment was not a surprise or unanticipated; rather, Boles instructed that each be sent to it. Boles gave instructions as to the first two Unposted Payments before the Goebel Affidavit was signed; and as to all three before the 2d MFR was filed. Contrary to Goebel's testimony before this Court, Fidelity had actual knowledge of each Unposted Payment shortly after each was received by Option. Indeed, Fidelity knew of the first two before Goebel signed her Affidavit; and Fidelity knew of all three before the 2d MFR was filed. Fidelity further sought direction from Boles on behalf of Option as to what should be done with each Unposted Payment.

## VI.  FIDELITY MISREPRESENTED ITS ROLE IN THIS CASE AS A "GO BETWEEN"

Fidelity voluntarily appeared and requested to be heard at the August 21, 2008 show cause proceedings before this Court to "clarify Fidelity's limited role and limited actions relating to the Debtors in this case." *See* Dkt. # 43 at para. 1. At the August 21, 2008 hearing, Fidelity took the affirmative position that its basic role in this case was "as a conduit and storage of information" between Option and Boles, and as a "library" of information. August 21, 2008 Tr. 14:5-24; and 41:7-9 (Goebel adopting counsel's description that Fidelity "houses information" and functions as "kind of a storage library"). Fidelity also disclosed that in this case it provided an employee (Dory Goebel) to execute Option's affidavit of debt and that it also provided some other services among Boles, Fidelity and Option, including time-monitoring, billing, and communication services.

11

As noted *supra*, Goebel, Fidelity's representative, testified that Fidelity would not have ordinarily communicated with Boles and Option regarding payments that had not posted; and that per her review before testifying, the file indicated no such communications had occurred. August 21, 2008 Tr. at 110:18-111:5. Goebel, when questioned by Fidelity's counsel to clarify Fidelity's role, testified on re-direct as follows:

> Q. [by Mr. Cash]. And I think there was a question asked, and I don't remember who asked it, but it was: And if Option One got a payment and they notified you, then would you notify the lawyer to stop? Fidelity isn't a go between, are they?
>
> A. No.
>
> Q. Option One uses our system, like the Verizon network, the guy with those friends in the helicopter, they use our network to communicate directly with their lawyer, is that correct?
>
> A. Correct.

August 21, 2008 Tr. at 112:2-10

Goebel's testimony, that Fidelity did not function as a "go between," was without factual basis. To the contrary, documentary evidence demonstrates that Fidelity indeed functioned as a "go between" for Option and Boles concerning the posting of payments.

Fidelity's contractual obligations to Option as contained in the parties' default services agreement dated January 23, 2006 (the "DS Agreement"), required Fidelity to substantially manage the services provided by local counsel to Option, including litigation services in "standard proceedings."[10] Read in context, the DS Agreement makes clear that Fidelity, not

---

[10] The default services agreement states that Option itself is required to "manage 'litigation' matters outside the normal scope of standard proceedings." DS Agreement, Appendix A, Pt. II. Presumably, therefore, Fidelity is tasked with managing litigation matters inside the normal scope of standard proceedings. Such a reading of the agreement is consistent

Option, was tasked with managing the motions for relief filed in the *Wilson* case once Option referred the case to Fidelity for set-up of the Bankruptcy Work Station.

Further, communications obtained through discovery establish Fidelity's role as a "go between" and manager. For example, the debtors' contentions (described *supra*, that they had made all post-petition payments owed to Option) came to the attention of a Boles paralegal, Terrie Jones. Upon information and belief, on February 6, 2008, Jones raised a "BK Payment Research/Dispute Issue" (the "Payment Dispute"). Jones apparently sought a reconciliation of the payments that Option had received. On February 15, 2008, a Fidelity employee responded to Jones. Over the next thirteen days, Fidelity and Boles exchanged communications about the status of payments. On February 28, 2008, Fidelity, not Option, "closed" Boles' Payment Dispute issue.[11] Fidelity instructed Jones to "refer to PAYMENT RESEARCH dated 2/28/08."[12]

Option's communication notes log for the Wilson file indicates that Fidelity employees made a number of entries indicating communications with Boles regarding the Unposted Payments. Indeed, documents produced in discovery indicate that Fidelity, not Option, initiated contact with Boles concerning every one of the Unposted Payments; and that the only

---

with the intent that "Option One desires to enhance its overall servicing capabilities by capitalizing on Fidelity's expertise in managing defaulted and bankrupt loans as well as the cost efficiencies Fidelity delivers through its management expertise . . ." DS Agreement at pg. 1, ¶ 4.

[11] The Payment Dispute was "closed" by Fidelity on the same day that Goebel executed the Affidavit of Debt accompanying the 2d MFR.

[12] It is unknown what the "PAYMENT RESEARCH" document is. Possibly, it is the spreadsheet dated 2/28/08, attached to Goebel's Affidavit. If so, that PAYMENT RESEARCH document may accurately summarize which payments were posted to Option's bankruptcy accounting software. Documents produced in discovery, though, do not indicate that Option or Fidelity Boles ever answered Jones' ultimate query from February 6, 2008, concerning whether payments had been received that had not posted.

communication that Option initiated with Boles concerning them was creating cover letters to accompany the Unposted Payments when delivered to Boles. The evidence shows that, contrary to its representations to this Court, Fidelity was in fact a "go between" for Option and Boles.[13]

### VII. FIDELITY AND BOLES SHOULD BE SANCTIONED PURSUANT TO THIS COURT'S INHERENT POWERS TO PREVENT MISCONDUCT AND UNDER 11 U.S.C. § 105 TO PREVENT ABUSE OF PROCESS

#### A. The Court's Authority to Sanction

It is well established that the federal courts, including bankruptcy courts, possess the inherent powers necessary to sanction litigants for misconduct occurring before the Court. *Chambers v. NASCO, Inc.*, 501 U.S. 32, 45-48; *see also In re Evergreen Security, Ltd.* 570 F.3d 1257, 1263 (11th Cir. 2009)(noting that bankruptcy courts are federal courts that have the inherent power to sanction); *In re Yorkshire, LLC*, 540 F.3d 328, 332 (5th Cir. 2008) (affirming sanctions under bankruptcy court's inherent powers). Further, the fact that conduct may arguably fall afoul of, or be governed by, other rules and statutes does deprive a court of its inherent power to sanction bad faith conduct. *Chambers*, 501 U.S. at 46-47. To invoke its inherent powers, a court must find that the party being sanctioned acted in bad faith. *Yorkshire*, 540 F.3d at 332 (citing *Elliot v. Tilton*, 64 F.3d 213, 217 (5th Cir. 1995)); *see also Fink v. Gomez*, 239 F.3d 989, 993-94 (9th Cir. 2001) (reckless statements made to the court coupled with an improper purpose, such as the manipulation of proceedings, was tantamount to bad faith and sufficient to impose sanctions under court's inherent authority). The Fifth Circuit has affirmed a bankruptcy court's

---

[13] At least one other court has found that Fidelity's "involvement goes beyond passing data through their automated system." *In re Taylor,* 407 B.R. 618, 650 (Bankr. E.D. Pa. 2009) rev'd on other grounds by *In re Taylor*, No. 09-CV-2479-JF, 2010 WL 624909 (E.D. Pa. 2010) appeal docketed No. 10-2154 (3rd Cir. April 24, 2010).

power to issue monetary sanctions if the sanction is "what is sufficient to deter repetition of such conduct by others similarly situated."[14]  *Yorkshire*, 540 F.3d at 332-33.

Under the circumstances presented here, a monetary sanction cannot be considered "criminal contempt".[15]  At least one circuit has recognized that there is a difference between the exercise of contempt authority, and the exercise of inherent authority.  *In re Dyer*, 322 F.3d 1178, 1196 (9th Cir. 2003) ("The inherent sanction authority allows a bankruptcy court to deter and provide compensation for a broad range of improper litigation tactics.").  Had Fidelity and Boles made representations to the Court which were lacking in factual support in written papers, there is no question that sanctions would be appropriate and authorized by Fed .R. Bankr. P. 9011(b)(3).  A monetary penalty is specifically authorized by Fed. R. Bankr. P. 9011(c)(2).  The key difference in this case is that Fidelity and Boles made their representations in open court, rather than in written pleadings.  The sanction for making representations about factual matters

---

[14] The bankruptcy court in *Yorkshire* specifically looked to Rule 9011(c) for guidance on imposing sanctions under the court's inherent powers and rejected the notion that an award of attorneys fees was the sole remedy available. *In re TAGT, L.P.,* 393 B.R. 143, 154 (Bankr. S.D. Tex. 2006) *aff'd sub nom. In re Yorkshire LLC*, 540 F.3d 328 (5th Cir. 2008).  Rule 9011(c)(2) permits the imposition of monetary sanctions "limited to what is sufficient to deter repetition of such conduct or comparable conduct by others similarly situated."

[15] Further, the United States Trustee notes that offending conduct occurred in the presence of the Court.  The Supreme Court has recognized that the traditional criminal/civil contempt distinction does not apply when the offending conduct occurs in the presence of the court. *International Union, United Mine Workers of America v. Bagwell* 512 U.S. 821, 827 n.2 (1994).  While a bankruptcy court does not have the power to issue criminal contempt sanctions for indirect contempt, the Fifth Circuit has not addressed whether bankruptcy courts retain the power to sanction for direct contempt. *Matter of Hipp, Inc.*, 895 F.2d 1503, 1509 (5th Cir. 1990).  ("We conclude the bankruptcy court lacks such power [of criminal contempt], **at least as to contempts not committed in (or near) its presence . . ..**")(emphasis added).  Additionally, the Second Circuit has held that a "serious" criminal contempt requiring a trial by jury occurs upon the imposition of fine on a corporation exceeding $100,000. *U.S. v. Twentieth Century Fox Film Corp.* 882 F.2d 656 (2nd Cir. 1989).

which tend to mislead the Court should be no different if the misrepresentations were made in a written pleading, or in open court. In fact, the harm is actually greater if such false representations are made in open court, as there is less opportunity for the parties and the Court to ensure that a miscarriage of justice does not occur based on those false representations.[16]

Further, pursuant to section 105(a), this "court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title . . . or mak[e] any determination necessary or appropriate to enforce or implement court orders or rules, or to prevent an abuse of process." 11 U.S.C. § 105(a). Section 105(a) has granted "broad authority" to bankruptcy courts. *Marrama v. Citizens Bank of Massachusetts*, 549 U.S. 365, 375 (2007). This Court is entitled to exercise that authority at its discretion. *In re Sadkin*, 36 F.3d 473, 478-79 (5th Cir. 1994) (section 105(a) "provides equitable powers for the bankruptcy court to use at its discretion"). It is well established that section 105(a) may be invoked to protect the bankruptcy process from abuse. *See Campbell v. Countrywide Home Loans, Inc.*, 545 F.3d 348, 356 n. 1 (5th Cir. 2008) (noting that section 105 is available to discipline parties who "attempt to abuse the procedural mechanisms with the bankruptcy court"); *see also Walton v. LaBarge (In re Clark)*, 223 F.3d 859, 864 (8th Cir. 1999); *In the Matter of Volpert*, 110 F.3d 494, 500 (7th Cir. 1997); *Caldwell v. Unified Capital Corp. (In re Rainbow Magazine, Inc.)*, 77 F.3d 278, 283-84 (9th Cir. 1996); *Jones v. Bank of Sante Fe (In re Courtesy Inns, Ltd. Inc.)*, 40 F.3d 1084, 1089

---

[16] Rule 9011 provides a 20 day "safe harbor" in which a party may withdraw the challenged written representations, unless they are contained in the bankruptcy petition. If the challenged paper is withdrawn, it would not be considered by the court in its decision making process. However, there can be no safe harbor for untruthful statements made in open court, because the harm that results is likely to be immediate.

(10th Cir. 1994).[17]  Section 105(a), for example, is an appropriate tool to sanction testimony given before a bankruptcy court that lacked "candor" or was at least "inconsistent" with prior testimony.  *See In re Morgan*, 573 F.3d 615, 626 - 27 (8th Cir. 2009) (affirming bankruptcy court's termination of a Chapter 13 trustee under § 105(a) in all cases pending before the court).  It is unnecessary that this Court make a bad faith finding to invoke section 105(a).  *In re Stewart*, __ F.Supp.2d __, 2009 WL 2448054, *13 (E.D.La. 2009) ("The Fifth Circuit has never so explicitly held" that a bankruptcy court is required to find fraud or bad faith before exercising its authority under section 105).

B.   **Fidelity's and Boles' Conduct Warrant the Imposition of Sanctions**

In this case, remedial sanctions, including a monetary fine, should be ordered to deter such future conduct by similarly situated parties.  Fidelity and Boles misled this Court in regard to the Unposted Payments.  The bankruptcy system requires that creditors, their agents and attorneys exercise a degree of candor with this court necessary for the swift adjudication of claims required by the bankruptcy code and rules.

The United States Trustee asserts that Boles and Fidelity should be sanctioned for their misrepresentations made in open court during the OSC proceeding.[18]  The Court made plain the

---

[17] It is true that a bankruptcy court's equitable authority "must be exercised in a manner that is consistent with the Bankruptcy Code." *In re Oxford Management, Inc.*, 4 F.3d 1329, 1334 (5th Cir. 1993).  As one court observed, however, "the scope of that restriction should not be exaggerated to the point at which bankruptcy courts feel powerless to act unless a party can present a specific textual quotation which precisely identifies the availability of a specific remedy." *In re Barron*, 264 B.R. 833, 844 (Bankr. E.D. Tex. 2001).

[18] The United States Trustee asserts that sanctions are sought herein only as to Fidelity's and Boles' misrepresentations made during the course of the OSC proceedings.  The United States Trustee takes no position with regard to whether Fidelity and Boles should be separately sanctioned for their respective roles in the filing of the 2d MFR supported by the false Goebel

importance of determining why the Unposted Payments were not disclosed in the 2d MFR. The Court indicated that such determination would equip the Court to understand the system or process that led to a materially inaccurate motion for relief being filed. The Court noted that it had no desire to write procedures for the parties to follow; however, the Court pointed out that it could enjoin certain actions of the parties if such was necessary to protect the integrity of the bankruptcy process. November 21, 2008 Tr. 12-20.

Boles and Fidelity impeded the Court's inquiry. Their representatives made statements in open court tending to misrepresent vital information about their roles. If Boles succeeded, the Court might have viewed Boles as less culpable. Boles, through Wirtz's statements, left the impression that it played no role in the decision that it should receive and hold the Unposted Payments. In fact, just the opposite was true. Boles advised that Option should send the payments to Boles. Option acted consistent with the advice that Boles rendered.

Likewise, Fidelity's assertions that its role was "limited" and Goebel's testimony tended to limit or downplay Fidelity's responsibility. Goebel claimed that, in verifying affidavits, protocol was for her to access compartmentalized information (post-petition date due; payment change; and total due). Goebel further testified that Fidelity would not know of payments not posted nor communicate about them with Option's counsel. If Fidelity did not know about the Unposted Payments, much less communicate about them, then Fidelity would seem less responsible for the execution and filing of the false Goebel Affidavit. Just the opposite was true. With respect to the Unposted Payments, Fidelity communicated with Boles to determine whether those payments should be posted. Fidelity functioned as more than a mere "storage library"; it

---

Affidavit. Such matter is within the Court's discretion in the context of the OSC proceeding.

played an integral role in communicating about the Unposted Payments. Fidelity, indeed, functioned as a "go between" for Boles and Option, and Fidelity had direct knowledge regarding the two Unposted Payments that had been made by the date its employee executed the false affidavit in support of the 2d MFR.

Boles and Fidelity acted in bad faith in presenting positions to this Court that were not well grounded in fact. Their conduct needlessly protracted the litigation in this case, including causing months of discovery supervised by the Court to obtain the truth. Therefore, sanctions tailored to deter such conduct in the future are clearly warranted.

WHEREFORE, the United States Trustee requests that the Court:

1. Grant the Motion and enter an order imposing on the respondents sanctions or other monetary or non-monetary relief as this Court deems appropriate.

2. Grant the United States Trustee such additional general relief to which the United States Trustee may be entitled including the award of attorney's fees and costs as may be allowed by law.

Respectfully submitted,

R. MICHAEL BOLEN
United States Trustee
Region 5, Judicial Districts of
Louisiana and Mississippi

by: *s/ Mary Langston*
MARY LANGSTON (22818)
Assistant U.S. Trustee
400 Poydras Street, Suite 2110
New Orleans, LA 70130
Telephone no. (504) 589-4018
Direct telephone no. (504) 589-4093
Facsimile no. (504) 589-4096

              SEAN M. HAYNES (TN # 14881)
              LR 11.2 Trial Attorney
              Admitted *pro hac vice*
              Office of United States Trustee
              200 Jefferson Avenue, Suite 400
              Memphis, TN 38103
              Telephone no. (901) 544-3251
              Direct telephone no. (901) 544-3486
              Facsimile no. (901) 544-4138