UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF LOUISIANA

IN RE:                                                                           CASE NO.

**RON WILSON, SR.**                                                      **07-11862**
**LARHONDA WILSON**                                            SECTION A

DEBTORS                                                                  CHAPTER 13

## MEMORANDUM OPINION

On December 1, 2010, the Motion for Sanctions[1] filed by the United States Trustee (UST) came before the Court. At the beginning of the hearing, a request to bifurcate the issues presented was granted. Hearing on the sanctions to be awarded was deferred to a separate hearing, pending determination of liability for sanctionable conduct. After trial on the merits, the Court ordered that simultaneous briefs be submitted no later than February 1, 2011. Upon the filing of briefs, the matter was taken under advisement.

### I. Procedural History and Facts Leading to Expanded Order to Show Cause

Option One Mortgage Corporation ("Option One") holds a mortgage on Ron and LaRhonda Wilson's ("Debtors") home payable in monthly installments. On September 29, 2007, Debtors filed a voluntary petition under chapter 13 of the Bankruptcy Code. At the time of their bankruptcy filing, Debtors were in default on the mortgage, and a prepetition arrearage was owed. Debtors' plan of reorganization provided for monthly payments to the trustee for satisfaction of the prepetition arrearage, and Debtors' direct payment of monthly postpetition mortgage installments to Option One. The plan was confirmed on December 21, 2007.[2]

---

[1] P-219.

[2] P-13.

Option One filed a Motion for Relief From Stay on January 7, 2008 ("First Motion").[3]  The First Motion alleged that Debtors had failed to make the monthly postpetition installment payments for November 2007 through January 2008.  The First Motion requested relief from the automatic stay to enforce payment of the debt in a foreclosure action.  On February 4, 2008, Debtors responded averring they were current and that Option One had failed to credit several postpetition payments to their account.[4]

Because Option One failed to supply evidence of default, the First Motion was denied without prejudice.[5]  Option One filed a new Motion for Relief From Stay on March 10, 2008 ("Second Motion").[6]  The Second Motion alleged that Debtors were in default for "over four (4) months now..." Option One also stated that  "Due to the Debtors' failure to maintain the monthly [postpetition] payments, there exists the possibility that real estate taxes may go unpaid or insurance on the property may lapse because of the shortage in the Debtors' escrow account."

The Second Motion was supported by an affidavit of Dory Goebel, Assistant Secretary for Option One.  In the affidavit, Ms. Goebel averred under oath that Option One was the holder of the secured claim in Debtors' case.  To support her affidavit,  Ms. Goebel attached a copy of a note and mortgage executed by Debtors and an endorsement to Option One by America's Mortgage Resource, the original payee on the note.

---

[3] P-15.

[4] P-17.

[5]  P-18. Pursuant to the local procedures of the Court, Motions for Relief must be accompanied by an affidavit of default by the mover attesting to the facts relevant to the motion and supporting the relief requested.  The affidavit is taken into evidence in lieu of testimony if the matter is otherwise uncontested and if the court determines that it establishes a basis for granting relief.

[6] P-20.

Ms Goebel affirmed:

Appearer has reviewed and is familiar with the mortgage loan account of RON WILSON, Sr. And LA RHONDA WILSON ("Mortgagor") represented by the afore described note and mortgage and the records and data complications [sic] pertaining thereto, which business records reflect acts, events or condition made at or near the time by Dory Goebel, or from information transmitted by a person with knowledge thereof and which records and data complications [sic] are made and kept as a regular practice of the regularly conducted business activities of OPTION ONE MORTGAGE CORPORATION.

Ms. Goebel then declared that the balance due on the note was $176,063.27 and that Debtors were in default under their plan for failure to pay the monthly installments accruing from November 1, 2007, through February 1, 2008.  Ms. Goebel represented that the last payment on the note was applied to the October 1, 2007 installment.

Debtors opposed the Second Motion alleging that all postpetition installments were paid by money order, cashier's, or personal check and that all payments by cashier's or personal check were delivered by certified mail.[7]  At the initial hearing on the Second Motion on April 8, 2008, Debtors offered into evidence proof of payment for installments made on the Option One note.  Debtors' evidence included:

1. October 2007 payment- confirmation by Western Union that a money order was delivered to Option One on October 20, 2007, in the amount of $1546.64 and receipt was acknowledged by Option One on October 27, 2007.

2. November 2007 payment- confirmation by Western Union that a money order was delivered to Option One on November 30, 2007, in the amount of $1546.64 and receipt was acknowledged by Option One on November 30, 2007.

3. December 2008 payment-copy of a certified mail receipt showing delivery to Option One on January 2, 2008.  Debtors alleged tender of a cashier's check #70060810000560554786 for $1546.84.

---

[7] P-24.

4. January 2008 payment-a copies of a cashier's check for $1000.00 and two money orders for $546.84 and $312.00 both dated January 25, 2008; certified mail receipts evidencing delivery to and acknowledging receipt by Option One on January 31, 2008.

5. February 2008 payment- copies of a cashier's check for $1546.84 and a personal check for $78.00; as well as a receipt for certified mail delivery on February 28, 2008, and acknowledging receipt by Option One on March 3, 2008.

6. March 2008 payment- copies of two cashier's checks for $1546.84 and $78.00; as well as a receipt for certified mail delivery on March 28, 2008, and confirmation of delivery to Option One by the United States Postal Service on March 31, 2008.[8]

Both the First and Second Motions were filed by Mr. Clay Writz of the Boles Law Firm ("Boles") representing Option One. However, Mr. Timothy Farrelly of Nicaud, Sunseri, & Fradella appeared on behalf of Option One at the hearing on the Second Motion. At the conclusion of the hearing, the Court continued the matter until April 22, 2008, in order to allow Option One the opportunity to trace the alleged payments and provide an accounting of the loan's payment history from petition date through April 2008.

On April 22, 2008, the continued hearing on the Second Motion was held. Mr. Farrelly again appeared on behalf of Option One. At the hearing, Debtors' counsel represented that Mr. Wirtz had contacted him at 5:30 p.m. the night before requesting a continuance due to a conflict in another court. Mr. Wirtz stated that he had not reviewed the prior evidence and was not prepared to address the issues raised by Debtors in their Opposition. Option One did acknowledge, through a pleading filed by Mr. Wirtz the night before the hearing, the receipt of three (3) additional and previously undisclosed payments:

1. Payment dated October 22, 2007, in the amount of $1546.84 applied to the installment due October 1, 2007;

---

[8] P-25.

2.  Payment dated December 3, 2007, in the amount of $1546.84 applied to the installment due November  1, 2007; and

3.  Payments of $1546.84 and $78.00 dated April 2, 2008, applied to installment due December 1, 2007.

The pleading was not the accounting ordered by the Court, but instead a chart reflecting the receipt and application of three (3) payments postpetition.  The pleading again asserted that the funds delivered were insufficient to satisfy the amounts due and reasserted Option One's request for relief.[9]

Since Debtors' evidence indicated 1) additional payments not acknowledged by Option One; 2) Option One had failed to supply the ordered accounting or address the additional payments made by Debtors; and 3) Mr. Farrelly lacked any knowledge regarding the loan, the Court determined that Option One's response was insufficient and issued show cause orders for Mr. Wirtz, Dory Goebel, and Option One.[10]  The merits of the Second Motion were again continued to afford Option One and Ms. Goebel the opportunity to respond to the allegations raised by the Opposition and subsequent admission by Option One that three (3)  unaccounted for payments were not included in its motion.[11]

On June 26, 2008, a third hearing on the Second Motion and the initial hearing on the show cause orders was conducted.  Mr. Wirtz appeared at the hearing, but Ms. Goebel was not present. Mr. Wirtz admitted that Debtors were in fact current on their loan.  Mr. Wirtz also admitted receipt of $7,513.53 in funds on Debtors' account and stipulated that Debtors were current through and

---

[9] P-28.

[10] P-30.

[11] *Id.*

5

including May 2008.  Mr. Wirtz admitted that between the filing of the First and Second Motions, Option One located one (1) payment which was applied to the October 2007 installment.

Regarding the show cause order, Mr. Writz represented that his contact was Fidelity National Foreclosure Solutions, n/k/a Lender Processing Services ("LPS") and that all information regarding payments, defaults, or inquires were taken by him from a LPS website or LPS personnel.[12]

Mr. Wirtz represented that additional unapplied payments were only discovered when they arrived at his office.[13]  Specifically, he stated that payments were delivered on February 18, 2008, in the amount of $1,858.84; March 7, 2008, in the amount of $1,624.17; May 12, 2008, in the amount of $1,624.84; and May 22, 2008, in the amount of $1,524.84.  Because payments were received by Mr. Wirtz on February 18 and March 7 and prior to the filing of the Second Motion, Mr. Wirtz was sanctioned for his failure to disclose this fact in the Second Motion or correct the representations made in his pleadings.

Nevertheless, based on the information available to Mr. Writz when the Second Motion was filed, it appeared that the payments received from Option One were insufficient to alert Mr. Wirtz that the loan was entirely current.  As a result, the Court ordered further investigation into the receipt and application of payments by Option One in a continued effort to uncover the cause of the erroneous filing.   The Court jointly sanctioned Option One and Ms. Goebel $5,000.00 for failure to appear and $5,000.00 for filing a false affidavit.[14]   Option One was also ordered to pay $900.00 in attorney's fees to Debtors' counsel.  The Court sanctioned Mr. Wirtz $1,000.00 for failing to

---

[12] 6/26/08 TT 25:15-30:25.

[13] 6/26/08 TT 31:22- 32:23.

[14] P-46.

6

amend the Second Motion and Default Affidavit once he obtained information which revealed that they were false.[15]  The Court continued the hearing on the show cause order against Ms. Goebel and Option One to August 21, 2008.[16]  Based on Mr. Wirtz's representations, an additional show cause order was issued for LPS.[17]

On July 9, 2008, LPS voluntarily intervened "to clarify its role in this matter and to address any misconceptions or misunderstandings which may have been left with the Court regarding that role."[18]  On August 21, 2008, the Court held an evidentiary hearing on the Orders to Show Cause. Participating at the hearing were representatives and counsel for Boles, LPS, Option One, the UST and Debtors.

Mr. Michael Cash, representing LPS, explained LPS' role in the administration of Debtors' loan:

> Fidelity does work for Option One, and basically Fidelity's role is almost as a conduit and storage of information and data.  Option One will send their information to Fidelity, and then attorneys such as Clay [Wirtz] can access that information.[19]
>
> ***
>
> ...[B]asically Fidelity became–if you think if it almost as a library, various clients could put their information in that library.  The attorneys would go to the library, check out the information, and that's how things would happen.  One of the services that we provided, and no longer do, but one that we did is executing affidavits such

---

[15] *Id.*

[16] *Id.*

[17] P-45.

[18] P-43.  On July 11, 2008, the Court entered an additional Order to Show Cause against LPS directing its presence to explain its calculation of the amounts due on the Wilson loan. P-45.

[19] 8/21/08 TT 14:5-9.

7

as the one in this case.[20]

***

Ms. Goebel is an employee of Fidelity.  The various clients in this case, including Option One, would sign a corporate resolution, and I have a copy of a corporate resolution, that would give her limited authority as a vice president for particular purposes.  And in this case one of the purposes was executing the affidavit.[21]

***

Court:...if Fidelity is merely storing information...why wouldn't Option One sign the affidavit?

Cash:..a number of clients sign their own, Your Honor.  Sometimes they would want us to, simply because we have people like Ms. Goebel who handle the accounts on a daily basis, who review the material, who have access to the material, and it was simply one less thing that the client had to do, that we would do.[22]

***

Cash: ...and when Ms. Goebel would execute the affidavit she would have access to the same information as someone at Option One.  She would go into their system, *look at what has been posted, what hasn't been posted*.  And I think what happened here was just a series of miscommunications...[23]

***

Cash: ...And I think that the simple explanation here,...and I think it's one that's clearly human error that can happen, is there was a payment sent.  There was an error made where that payment was sent, because this was in bankruptcy....that payment was sent to the Boles Firm, rather than being posted.  *And that was basically, I think, someone in Mr. Wirtz's office had instructed Option One, "Send us the checks and we will send them back," or "we will take care of that."*[24]

---

[20] 8/21/08 TT 14:21-15:1.

[21] 8/21/08 TT 15:3-8.

[22] 8/21/08 TT 26:13-21.

[23] 8/21/08 TT 15:11-15 (emphasis added).

[24] 8/21/08 TT 18:11-20 (emphasis added).

Mr. Cash then offered the testimony of Ms. Goebel who is both an employee of LPS and

was an authorized signer of default affidavits for Option One.  Ms. Goebel testified as to the process

by which a default affidavit is executed.  In particular, Ms. Goebel explained:

> To execute such an affidavit, once I receive the affidavit, I will review the
> information that is in the affidavit with Option One's system.  So, I will validate the
> information based on their system and the information that is there.[25]

At the August 21, 2008, hearing, Ms. Goebel represented that from her desk she would log

into Option One's computer system and verify the information in the affidavit.  She also represented

that she had access to Option One's entire record of the loan.[26]  She stated that she verified this

information with LPS' own system which reflected the communications between Option One's law

firm and Option One.[27]  Ms. Goebel represented that LPS only maintained a "library" of information

that Option One supplied.[28]

She confirmed that she reviewed a debtors' entire loan history prior to executing the

affidavit[29] and would also review communications between counsel and LPS in connection with the

signing of the affidavit.  She, however, would not review communications between counsel and

Option One.[30]

---

[25] 8/21/08 TT 38:22-39:1.

[26] 8/21/08 TT 39:2-23.

[27] 8/21/08 TT 40:10-41:3.

[28] 8/21/08 TT 41:16-20.

[29] 8/21/08 TT 60:1-15.

[30] 8/21/08 TT 97:14-20.

Ms. Goebel explained that LPS had no way to verify unposted payments.[31]   She stated emphatically that after reviewing Debtors' file, she found no communications between LPS and Boles about any additional payments tendered after the filing of the motions.[32]  Ms Goebel also testified that after reviewing Debtors' loan file before testifying, she saw no communications between LPS and Option One.[33]   She asserted that it was Option One's responsibility to notify counsel should a change in circumstance warrant the withdrawal of a motion for relief[34]  and that LPS never stopped legal actions once it referred a loan to counsel.[35]

The testimony presented by Option One, however, did not agree with Mr. Cash or Ms. Goebel's representations. Mr. Arthur Simmons of American Home Mortgage, formerly Option One, testified for Option One.  Mr. Simmons was the person tasked with the day to day administration of Debtors' loan once their bankruptcy was filed.

Mr. Simmons testified that once a borrower filed for bankruptcy, LPS opened a bankruptcy workstation or subprogram to administer the loan.  Option One was given notice that this had occurred.[36]

Once a bankruptcy workstation is opened, Option One would take no action unless requested by LPS, who was described as actually administering the loan.[37] As previously explained in *In re*

---

[31] 8/21/08 TT 78:14-79:24.

[32] 8/21/08 TT 110:24-111:5.

[33] 8/21/08 TT 47:20-23.

[34] 8/21/08 TT 81:14-16.

[35] 8/21/08 TT 81:25-82:5.

[36] 8/21/08 TT 123:18-124:25.

[37] 8/21/08 TT 125:15-20.

*Stewart*,[38] LPS markets to loan servicing companies and note holders a very sophisticated loan

management program commonly referred to in the industry as "MSP."  MSP interfaces with a

client's computer system collecting information and monitoring a loan's status. When certain events

occur, the program is designed to take action without human intervention.  For example, when a loan

reflects past due payments for a specified period of time, generally forty-five (45) days, MPS will

generate a demand or default letter to the borrower.   The timing or triggers for various loan

administrative actions are set by the lender or servicer but executed by MSP as overseen by LPS.[39]

When a bankruptcy is filed, the bankruptcy workstation is activated and provides a set of

additional parameters, tasks and actions that can be performed by the program or those that use it

in a bankruptcy.  For example, when a loan is sixty (60) days postpetition delinquent, the system will

notify of this event and typically trigger a referral to counsel for the filing of a motion for relief.[40]

Mr. Simmons represented that LPS manages all tasks required during the administration of

a loan during bankruptcy.  If counsel needs instruction, LPS is contacted and only if LPS cannot

solve counsel's problem, is Option One involved.[41]

Although Debtors' filed for bankruptcy relief on September 29, 2007, the bankruptcy

workstation was not activated by LPS until November.  Because LPS delayed setting up the

workstation, Debtors' first postpetition payment, made in October 2007, was not posted to the

---

[38] *In re Stewart,* 391 B.R. 327 (Bankr.E.D.La. 2008).  LPS confirmed that the program utitlized in this case
was MSP.  12/1/10 TT 176:2-16.

[39] *Id.*

[40] 8/21/08 TT 127:8-21.

[41] 8/21/08 TT 130:2-23.

11

October installment but to June 2007, the earliest outstanding prepetition installment.  As a result, the system showed October 2007 installment as past due.[42]

When Debtors' file was reviewed by LPS for referral to counsel, the postpetition due date was not accurate because it did not reflect the October payment.[43]   To avoid this type of problem, Option One had procedures in place for LPS to follow if activation of a bankruptcy workstation was delayed.  In such a case, LPS was directed to search for payments that might have been delivered after the bankruptcy filing date but prior to activation of the workstation.  If any were found, LPS was to apply the payments to postpetition installments correcting the posting error.  Mr. Simmons testified that LPS had the ability to adjust the application of payment in this circumstance and it was their responsibility to do so.[44]

Mr. Simmons also testified that Option One's computer system generated reports when a debtor was 45 to 60 days postpetition past due.[45]   In this case, a delinquency report was generated in December, when the incorrect posting for October led the computer to read a 60 day postpetition delinquency.

LPS maintained an on site employee at Option One who reviewed the post bankruptcy delinquency reports.  That employee reviewed the list, then entered a request on LPS' system for a motion for relief referral.[46]

---

[42] 8/21/08 TT 133:6-133:20; 134:1-13.

[43] 8/21/08 TT 222:23-223:2.

[44] 8/21/08 TT 223:9-225:1.

[45] 8/21/08 TT 214:6-10.

[46] 8/21/08 TT 205:14-206:10; 225:2-7.

If a payment was received after a file had been referred to counsel for action (i.e. the filing of a motion for relief from stay), Option One's policy was to request that LPS contact counsel for instruction. If LPS could not satisfy counsel's request, only then would LPS contact Option One. Although direct communications between counsel and Option One were not prohibited, they were rare because it was LPS' responsibility to manage the loan. This case appears to have followed the normal chain of administration because there was no evidence that Boles had any, or attempted any, direct communications with Option One.[47]

When Option One received the payment for December 2007, LPS sent an inquiry to Boles for instructions. Boles replied that Option One should send the payment to it.[48] Option One contacted LPS for instructions on each payment as it was received from December through March.[49] As each postpetition payment arrived from Debtors, Option One communicated with LPS, LPS with Boles, and then LPS reported back to Option One the instruction received.[50] As a result, Debtors' postpetition payments for December 2007 through March 2008 were not posted, but instead were reflected on a cash log that was not available to either Mr. Wirtz or LPS.[51] However, LPS knew of the payments because it was communicating directly with Mr. Wirtz and Option One on the issue.[52]

---

[47] 8/21/08 TT 136:10-17.

[48] 8/21/08 TT 137:2-8.

[49] 8/21/08 TT 141:19-23.

[50] 8/21/08 TT 142:1-10.

[51] 8/21/08 TT 138:15-139:21.

[52] 8/21/08 TT 256:4-257:1.

All Motions for Relief from Stay or Affidavits of Default are submitted by counsel directly to LPS. Option One neither proof reads nor reviews these documents.[53]   If an Opposition is filed, Option One does not read it.  Instead, Option One employs LPS for the purpose of handling any issues pertaining to the loan or Motion for Relief.  LPS contacts Option One only if it cannot handle a matter.[54]

In this case, LPS contacted Option One about Debtors' claim of missing payments.  Option One replied that the payments were with Mr. Wirtz.[55]

The UST made an appearance for the purpose of assisting the Court in its investigation.[56] The obvious conflict between the testimony of Mr. Simmons and Ms. Goebel and representations by counsel for LPS led the Court to accept the UST's offer for assistance.  As a result of the foregoing, the Court continued the hearing on August 21, 2008, without date to allow formal discovery.[57]

From July 9, 2008, through December 2010, the parties conducted contentious discovery. Ten (10) motions to quash, compel, clarify, reconsider orders, stay proceedings, request protective orders; and appeal interlocutory orders were considered along with responses, oppositions and replies to each.  On May 21, 2010, the UST filed a Motion for Sanctions against LPS and Boles.[58]

---

[53] 8/21/08 TT 147:15-20; 148:7-15.

[54] 8/21/08 TT 150:3-13; 20-22.

[55] 8/21/08 TT 155:11-22.

[56] P-62, 70.

[57] P-70.

[58] On October 27, 2010, this Court approved a Stipulation between the UST and Boles. P-275.

On December 1, 2010, trial on the merits of the UST's intervening Motion for Sanctions[59] against

LPS was heard.

## II.  Law and Discussion

Q:  Mr. Simmons, what was the amount due on the...Wilson account on February,
28th, 2008? ...

A:  Actually, the loan was current, if in fact we would have accounted for all the
monies received. ...

Q: What about on March 10, 2008?  What was the amount due on the mortgage loan
at that date?

A: Again, the loan would have been current.....[60]

Debtors filed bankruptcy on September 29, 2007.  Notification of that fact was mailed to

Option One on October 6, 2007.[61]  LPS encoded the bankruptcy filing on November 21, 2008.  The

process was completed on November 23, 2008.[62]

Debtors sent their first postpetition mortgage payment of $1,546.84 *via* Western Union on

October 21, 2007.  Because LPS failed to alert its system that a bankruptcy had been filed, this

payment was applied to Debtors' earliest past due prepetition installment, June 2007.

Debtors forwarded another $1,546.84 payment to Option One on November 30, 2007.  That

payment was intended to satisfy the postpetition installment due November 1, 2007. Instead, Option

---

[59] P-219.

[60] 8/21/08 TT 234:5-10; 18-20.

[61] P-7.

[62] Exh 5, nos. 353, 349.

One applied the payment to the October 1, 2007, installment, the date showing due on the system.[63]

On December 21, 2007, LPS entered a referral to Boles requesting a Motion for Relief from Stay based on two (2) past due postpetition payments (November 1 and December 1, 2007).[64]  The First Motion was filed by Boles on January 7, 2008.[65]  In the interim, LPS received notification that a payment of $1,546.84, one (1) monthly installment, had been made by Debtors.[66]  LPS requested posting instructions from Boles, who directed LPS to send the payment to the firm.[67]

On January 25, 2008, Debtors sent $1,858.84 to Option One.  That payment was received on January 31, 2008.  Again, LPS was notified by Option One of the payment, and on February 1, 2008, LPS requested posting instructions from Boles.[68]  Boles responded three (3) days later directing LPS to send the payment to it.[69] On February 4, 2008, Boles advised LPS that the First Motion would go to hearing on February 12, 2008.  Boles cited "Judge delay" as the reason, but in

---

[63]  LPS did not manually adjust Debtors' account for the October 2007 payment until February 2008.  Exh. 5, no. 265.  As a result, Debtors' account showed past due for October until the adjustment was made.

[64]  Exh. 5, no. 311.  The referral of a file to counsel  in actuality opens an internal monitoring process for a requested action or "issue."  The referral is sent *via* internal transmission, similar to email.  When the Boles firm opens the request, the computer notes the receipt of the referral by date and time, i.e. Exh. 5, no. 306. The issue will remain open until the task is completed at which time the computer will note the time and date of completion and close the request.  Through the use of the "issue" process, those managing a file can see the status of a task  and its anticipated date of completion.

[65]  P-15.

[66]  Exh 5, no.305.  The payment was intended to satisfy Debtors' December installment.  It was dated December 27 and received by Option One on January 2.

[67]  Exh.5, nos. 305, 301, 299.

[68]  Exh.5, nos. 290, 289, 287, 286.

[69]  Exh. 5, no. 281.

16

reality, Debtors opposed the First Motion.[70]  In the Opposition, Debtors alleged that all payments had been made on the loan postpetition, challenging the allegations of Option One's First Motion that the loan was postpetition delinquent for November 1, 2007, and all installments thereafter.

Putting aside the posting issue created by LPS's failure to properly account for Debtors' bankruptcy filing, the allegations of the First Motion also failed to acknowledge Option One's receipt of $1,546.84 on January 2, 2008.[71]

LPS was also alerted by Boles on February 6, 2008, of Debtors' Opposition.  Boles requested a "pencil post" of the loan.[72]  Boles' understanding of a "pencil post" was a manual accounting of a loan payment history used to verify the status reflected by the computer file.  In reality, LPS only manually reviews what is already on the computer system and recopies it onto a spread sheet.

Evidently in performing the "pencil post," LPS discovered the misapplied October payment and requested correction on February 11, 2008.  The manual adjustment also corrected the application of  the two (2) Western Union payments received postpetition.  However, no mention was made of the two (2) additional unposted payments discussed in the preceding communications between LPS, Option One, and Boles.  On February 15, 2009, LPS sent a message to Boles that according to Option One, its cash log reflected  forwarded payments to Boles in an amount sufficient to bring the loan current.  However, *LPS instructed* Boles that if in fact the funds Boles held were

---

[70]  Exh. 5, no. 272, Response to Option One's Motion to Lift, filed February 4, 2008, P-17.

[71]  The funds were received and counsel was notified of receipt four (4) days prior to the filing of the First Motion.  While the First Motion was pending, Debtors forwarded and counsel was notified of an additional $1,858.84 in payments.

[72]  Exh. 5, no.270.

insufficient to bring the loan current, Boles should consider the loan past due as of December 1, 2007.[73]

In response to LPS' message on February 15, 2008, Boles acknowledged receipt of $1,858.84 in funds.  Assuming they were applied to the December 2007 installment, payments for January and February 2008 were still due.[74]  Therefore, as of February 15, Boles had not received enough funds to bring the loan current and communicated this fact to LPS.[75]  On February 27, 2008, Debtors' account was adjusted to show a past due date of December 1, 2007.[76]  No further investigation or response was made as to the whereabouts of the missing January 2008 payment. On February 27, 2008, Boles forwarded an affidavit to Ms. Goebel at LPS for execution in connection with the Second Motion.  The affidavit alleged Debtors were past due as of November 2007, which was in conflict with the allegations contained in the Second Motion which now reflested a past due date as of December 1, 2007.[77]

As part of its default services, LPS executed Affidavits of Default in support of Motions for Relief from Stay.  LPS testified that it was just one of the services that LPS provided to clients.[78] The affidavit is typical.  It purports to be executed under oath before a notary and two (2) witnesses.

---

[73]  Exh. 5, no.253.

[74]  February's installment was due on the 1st of the month and past due on the 15th.

[75]  Exh.5, no.234.  Evidently, the payment acknowledged by Option One on January 3, 2007, for $1,546.68 was not forwarded to Boles as requested. See, Exh. 5 no. 305, 301, 299.  If it had been, Boles would have had both the December and January installments in its possession making the loan only due for February.  As it was, the one (1) payment held by Boles brought Debtors within 45 days of current.  It should also be noted that Debtors were not only making payments on a monthly basis, but were also forwarding payment of late charges with each installment.

[76]  Exh. 5, no. 192.

[77]  P-15.

[78]  12/1/10 TT 159:24-160:12.

It provides the name and title of the affiant and represents that the affiant has personal knowledge of the facts contained in the affidavit.[79]  In fact, it is a sham.

When an affidavit is received by LPS, an employee prints the document and delivers it to one of twenty-eight (28) LPS employees authorized by Option One to execute the document on its behalf.[80]  By corporate resolution, Option One grants these individuals "officer" status, but limits their authority to the signing of default affidavits.    These "officers" execute 1,000 documents per day for Option One and other clients similar to the one used in this case.[81]    In fact, Ms. Goebel is an employee of LPS with little or no connection to Option One.  Each day Ms. Goebel receives approximately thirty (30) documents to sign.[82]  The process of signing default affidavits is rote and elementary.

As Ms. Goebel is also a manager of a work unit at LPS, she allocates two (2) hours per day for document execution and estimates that it takes her five (5) to ten (10) minutes to sign each affidavit she receives.[83] Before signing an affidavit, Ms. Goebel follows the procedures directed by LPS.  She checks three (3) computer screens that provide the amount of the installment payment, the total balance due on the loan, and the due date for the earliest past due installment.[84]  She

---

[79] 12/1/10 TT 247:16-248:8.

[80] 12/1/10 TT 252:12-15.

[81] TT 12/1/10 249:29-22; 250:8-10.

[82] TT 12/1/10 253:7-14; 345-6-9.

[83] TT 12/1/10 334:5-8.

[84] TT 12/1/10 320:19-321:3; 326:1-327:22; 328:7-17; 334:9-14.

matches this information with that contained in the affidavit.  If it is correct, she signs the document and forwards it to a notary for execution.[85]

Although the affidavit in this case purported to verify that Option One was the holder of the note owed by Debtors through an assignment, Ms. Goebel does not personally know this to be a fact and made no effort to verify her assertion.[86]  Similarly, the affidavit identifies the mortgage and note as exhibits to the affidavit, but Ms. Goebel neither checks the attachments nor verifies that they are correct.  In fact, the affidavits she signs *never* have any attachments when forwarded to her for execution, and she never adds any.[87]

Although the affidavit represents that it was executed in the presence of a notary and witnesses under oath, no oath is ever administered, and the signatures of the affiant, notary, and witnesses are separately affixed and outside the presence of each other.[88]  Ms. Goebel has no personal knowledge regarding the loan file save for the three (3) or four (4) facts read off a computer screen that she neither generates nor understands.[89]  She does not review any other information pertaining to the loan file, even information available to her.[90]  LPS admitted that Ms. Goebel followed its procedures and that those procedures were used in all cases.[91]

---

[85] TT 12/1/10 334:5-21; 335:19-22; 336:9-24.

[86] TT 12/1/10 267:1-11; 341:1-342:6; 342:11-343:3.

[87] 12/1/10 TT 12/1/11 340:20-341:8.

[88] 12/1/10 TT 245:2-21; 276:4-277:13; 336:9-337:22.

[89] 12/1/10 TT 161:18-162:2; 247:16-248:8, 15-22; 275:1-6.

[90] 12/1/10 TT 331:4-11; 355:12-25; 36713-20.

[91] 12/1/10 TT 275:3-11.

Ms. Goebel's training on the seriousness of her task was sorely lacking.  She could not remember who "trained" her when she was promoted in 2007 to a document execution position.[92] She could not remember the extent or nature of her training. [93] She did surmise that written procedures were given to her and then she began "signing."[94]  She described her task as "clerical"[95] and repeatedly expressed the belief that the affidavits were counsel's affidavits, and therefore, she relied upon counsel regarding their accuracy.[96]  In this admission, the real problem surfaces.

Default affidavits are a lender's representation as to the status of a loan.  They are routinely accepted in both state and federal courts *in lieu* of live testimony.  They are an accommodation to the lending community based on a belief by the courts that the facts they present are virtually unassailable.  The submission of evidence by affidavit allows lenders to save countless  hours and expense establishing a borrower's default without the need for testimony from a lending representative.  While they can be refuted by a borrower, too often, a debtor's offer of alternative and conflicting facts is dismissed by those who believe that a lender's word is more credible than that of a debtor.  The deference afforded the lending community has resulted in an abuse of trust.

The abuse begins with a title.  In this case, Ms. Goebel was cloaked with the position of "Assistant Secretary," in a purposeful attempt to convey an experience level and importance beyond her actual abilities.  Ms. Goebel is an earnest young woman, but with no training or experience in banking or lending.  By her own account, she has rocketed through the LPS hierarchy receiving

---

[92]  12/1/10 TT 382:5-8.

[93]  12/1/10 TT 382:9-384:21.

[94] *Id.*

[95]  12/1/10 TT 342:25-343:10.

[96] 12/1/10 TT 341:5-8, 14-19.

promotions at a pace of one (1) promotion per six (6) to eight (8) month period.[97]  Her ability to

slavishly adhere to LPS' procedures has not only been rewarded, but has assured the development

of her tunnel vision.  Ms. Goebel does not understand the importance of her duties, and LPS failed

to provide her with the tools to question the information to which she attests.

     For example, the following exchange occurred between the Court and Ms. Goebel:

Q:...if you look at paragraph 2 at the bottom there is "see attached copy of the
Notice, Exhibit A, certified copy of the mortgage is Exhibit B , and copy of the
assignments is Exhibit C." Is your testimony that those documents were not attached
to the affidavit when you signed it..?

A: Typically, those exhibits would not be attached.

Q:..So,...counsel would attach those after you signed..?

A: ...we relied on the attorney.  We believed the information that they were giving
us and what they were going to attach, because this is their affidavit.  It would be
accurate.[98]

***

Q:...Did you check any screen to see if in fact there was a note, there was a
mortgage, there were assignments?

A: That would be the responsibility of the attorney.

Q:..so you didn't verify that information at all?

A: No...[99]

***

Q:...And you don't sign it [the affidavit] in the presence of the notary or the
witnesses?

---

[97] 12/1/10 TT 292:9-301:9.

[98] 12/1/10 TT 340:20-341:8.

[99] 12/1/10 TT 341:10-16.

A: That's correct.[100]

***

Q: You weren't put under oath by a notary before you signed the Affidavit of Debt?

A: No.

Q: And you didn't really have personal knowledge of the contents [of the affidavit] because you just said the information involving the existence of the mortgage and the note and so on you relied on the Boles Law Firm to have that information correct.

A: Right.  As I stated earlier, it was the Boles Law Firm.  Option One had hired them to kind of handle this work and had asked LPS to help clerically sign these.  We relied on the Boles Law Firm.

Q: So you considered this a clerical function?

A: Part of our administrative services with LPS.

Q: But you just used the word "clerical."

A; Well, it's signing a document, more you know administrative work, clerical work, yes.[101]

***

Q: Ms Goebel...Have you ever refused to sign an affidavit for a reason other than the note payment amount was incorrect, the due date on the affidavit was incorrect, the number of installment payments that were past due was incorrect, or ...that you were not a [authorized] signatory...?

A: Not to my recollection, no.

Q:.. So if, ...you had know[n] that there were three payments that were not posted on this account...that were in the possession of either Option One or the law firm, would you have still signed the affidavit?

A: In my opinion, yes.  I was getting an affidavit from a law firm that I trusted. They're the legal experts on the matter and Option One is in charge of their cash

---

[100] 12/1/10  TT 342:3-5.

[101] 12/1/10 TT 342:18-343:10.

23

posting.  I'm not the decision maker of, you know, should they proceed.  The attorney would have that knowledge.[102]

It is evident that the training provided Ms. Goebel by LPS was insufficient and negligent. LPS was the first line of communication with counsel. The evidence was clear that Option One was contacted only if LPS employees could not satisfy counsel's requests. Counsel did not communicate directly with Option One, and although Option One controlled the physical posting of payments, LPS managed the communications between Option One and its counsel regarding them. In this case, LPS had personal knowledge of four (4)  critical facts.  First, that as of February 15, 2008, Option One had received two (2) payments from Debtors in amounts sufficient to satisfy the installments due for December and January.  Second, counsel had directed that the payments be sent to it rather than posted.  Third, Option One alerted LPS in February that the amounts forwarded were sufficient to bring the loan current.  Fourth, counsel reported to LPS that they had only received $1,846.84, a fact LPS neglected to forward to Option One.  As a result of this knowledge, LPS should have known that a payment was unaccounted for between Option One and Boles.  An inquiry to either might have brought the problem to light.  Instead, LPS ignored the facts.

Ms. Goebel presented another opportunity for LPS to get it right.  If she had reviewed the file and familiarized herself with the communications between the parties, she might have also noticed that the December payment was forwarded to Boles, but evidently not received.  She certainly would have noted the receipt of an additional payment by Boles but not posted and the inconsistency in due dates contained in the Second Motion and affidavit.  However, Ms. Goebel was trained to rotely check three (3) finite pieces of information.  She candidly admitted that even if she

---

[102] 12/1/10 TT 378:20-379:13.

had known of the unposted payments, she would have signed the affidavit without questioning its content because it was counsel's.[103]

Of course, the affidavit is anything but counsel's. It is the sworn statement of the loan's status by the holder of the note. It is evident that LPS blindly relied on counsel to account for the loan and all material representations. In short, the affidavit was nothing other than a farce and hardly the evidence required to support relief. The facts supporting a default are the lender's to prove, not counsel's. In this case the lender and LPS cloaked Ms. Goebel with a title that implied knowledge and gravity. LPS could have identified Ms. Goebel as a document execution clerk but it didn't. The reason is evident, LPS wanted to perpetrate the illusion that she was both Option One's employee and a person with personal and detailed knowledge of the loan. Neither was the case.

### III.  Conclusion

The fraud perpetrated on the Court, Debtors, and trustee would be shocking if this Court had less experience concerning the conduct of mortgage servicers. One too many times, this Court has been witness to the shoddy practices and sloppy accountings of the mortgage service industry. With each revelation, one hopes that the bottom of the barrel has been reached and that the industry will self correct. Sadly, this does not appear to be reality. This case is one example of why their conduct comes at a high cost to the system and debtors.

The hearing on the Motion for Sanctions provides yet another piece to in the puzzle of loan administration. In *Jones v. Wells Fargo*,[104] this Court discovered that a highly automated software

---

[103] 12/1/10 TT 341:5-8, 14-19; 379:4-13.

[104] *Jones v. Wells Fargo*, 366 B.R. 584 (Bankr.E.D.La. 2007).

package owned by LPS and identified as MSP administered loans for servicers and note holders but was programed to apply payments contrary to the terms of the notes and mortgages. In *In re Stewart*,[105] additional information was acquired regarding postpetition administration under the same program, revealing errors in the methodology for fees and costs posted to a debtor's account. *In re Fitch*,[106] delved into the administration of escrow accounts for insurance and taxes. In this case, the process utilized for default affidavits has been examined. Although it has been four (4) years since *Jones*, serious problems persist in mortgage loan administration. But for the dogged determination of the UST's office and debtors' counsel, these issues would not come to light and countless debtors would suffer. For their efforts this Court is indebted.

For the reasons assigned above, the Motion for Sanctions is granted as to liability of LPS. The Court will conduct an evidentiary hearing on sanctions to be imposed.

New Orleans, Louisiana, April 6, 2011.

Hon. Elizabeth W. Magner
U.S. Bankruptcy Judge

---

[105] *In re Stewart*, 391 BR 327 (Bankr.E.D.La. 2008).

[106] *In re Fitch*, 390 B.R. 834 (Bankr.E.D.La. 2008).