UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF LOUISIANA

IN RE:                                          CASE NO.

**RON WILSON, SR.**                             **07-11862**
**LARHONDA WILSON**

                                                SECTION A
DEBTOR                                          CHAPTER 11

### REFERRAL CONCERNING
### ORDER TO SHOW CAUSE

Based on previous findings of fact, this Court refers to the United States District Court for

the Eastern District of Louisiana ("District Court") the Motion for Sanctions filed by the Office of

The United States Trustee ("UST") for the purpose of entering sanctions against Fidelity National

Foreclosure Solutions n/k/a Lender Processing Services ("LPS" or "Fidelity") as a result of the

following conduct:

1.  LPS' representations during the August 21, 2008, hearing of its role in connection with Debtors' loan; specifically, that LPS was not an active participant or decision maker in the administration and management of Debtors' loan in bankruptcy, but merely a storage facility for information;

2.  LPS' submission of an affidavit to the Court, purportedly sworn under oath, in the presence of two (2) witnesses and a notary public, which was neither sworn under oath nor signed in the presence of witnesses or the notary public.

3.  Ms. Goebel's testimony, as representative of LPS, at the August 21, 2008, hearing that she executed affidavits in the presence of notaries public.

4.  LPS' submission of an affidavit to the Court which falsely represented Ms. Goebel's personal knowledge and management of Debtors' loan.

5.  LPS' submission of an affidavit to the Court which falsely represented Ms. Goebel's personal knowledge of Option One Mortgage Corporation's ("Option One") ownership of the mortgage note and mortgage; and her attestation that copies of the note, mortgage, and allonge were copies of original documents in the possession of Option One.

6.      LPS' submission of an affidavit to the Court which falsely represented Ms. Goebel's personal knowledge of the circumstances giving rise to the alleged default on Debtors' loan and the amounts past due.

7.      LPS' representation at the hearing on August 21, 2008, that no communications existed between LPS and Option One regarding unposted payments and that Ms. Goebel reviewed the records of LPS for same.

8.      LPS' representation at the hearing on August 21, 2008, that no communications between LPS and the Boles Law Firm existed.

9.      LPS' representation at the hearing on August 21, 2008, that it had no information from either Option One or the Boles Law Firm regarding the existence of unapplied payments and had no reason to believe or verify whether unapplied payments existed.

## I.  Background

Option One holds a mortgage on Ron and LaRhonda Wilson's ("Debtors") home payable in monthly installments.  On September 29, 2007, Debtors filed a voluntary petition under chapter 13 of the Bankruptcy Code.  At the time of their bankruptcy filing, the mortgage note was in default, resulting in a prepetition arrearage.  Debtors' plan of reorganization provided for monthly payments to the trustee to satisfy the prepetition arrearage as well as direct payments to Option One by Debtors for accruing monthly postpetition mortgage installments.  The plan was confirmed on December 21, 2007.[1]

Option One filed a Motion for Relief From Stay on January 7, 2008 ("First Motion").[2]  The First Motion alleged that Debtors had failed to make monthly postpetition installment payments from November 2007 through January 2008.  The First Motion requested relief from the automatic stay to enforce payment through a foreclosure action.  On February 4, 2008, Debtors responded

---

[1] Docket no.13.

[2] Docket no.15.

averring they were current and that Option One had failed to credit several postpetition payments to their account.[3]

Because Option One failed to supply evidence of default, the First Motion was denied without prejudice.[4]  Option One filed a new Motion for Relief From Stay on March 10, 2008 ("Second Motion").[5]  The Second Motion alleged that Debtors were past due for more than four (4) months.

The Second Motion was supported by an Affidavit of Debt ("Default Affidavit") of Dory Goebel, Assistant Secretary for Option One.  In the Default Affidavit, Ms. Goebel averred under oath that Option One was the holder of the secured claim in Debtors' case.  To support her Default Affidavit,  Ms. Goebel attached a copy of a note and mortgage executed by Debtors and an Allonge to Note by America's Mortgage Resource, the original payee on the note, assigning it to Option One. Ms. Goebel also represented that she had personal knowledge of Debtors' account and it was in default as a result of Debtors' failure to make four (4) postpetition installments.

Debtors opposed the Second Motion alleging that all postpetition installments were paid by money order, cashier's, or personal check and that all payments by cashier's or personal check were

---

[3] Docket no.17.

[4] Docket no.18. Pursuant to the local procedures of the Court, Motions for Relief must be accompanied by an affidavit of default by the mover attesting to the facts relevant to the motion and supporting the relief requested.  The affidavit is taken into evidence *in lieu* of testimony if the matter is otherwise uncontested and if the court determines that it establishes a basis for granting relief.

[5] Docket no.20.

delivered by certified mail.[6]  At the initial hearing on the Second Motion, Debtors offered into

evidence proof of payment for all postpetition installments on the Option One note.

 Both the First and Second Motions were filed by Mr. Clay Wirtz of the Boles Law Firm

("Boles") representing Option One.  However, Mr. Timothy Farrelly of Nicaud, Sunseri, & Fradella

appeared on behalf of Option One at the hearing on the Second Motion.  Despite Debtors' detailed

Opposition to the Second Motion, Mr. Farrelly was completely unprepared to address Debtors'

allegations that all postpetition payments had been made.  Based on Debtors' evidence of payment,

the hearing was continued in order to allow Option One to trace the alleged payments and provide

an accounting of the loan's payment history from petition date through April 2008.

 On April 22, 2008, the continued hearing on the Second Motion was held.  Debtors' counsel

represented that Mr. Wirtz had contacted him the night before requesting a continuance due to a

conflict in another court.  Mr. Wirtz also informed Debtors' counsel that he still had not reviewed

the prior evidence and was not prepared to address the issues raised by Debtors in their Opposition.

Although Mr. Wirtz did not appear, Option One did acknowledge, through a pleading filed by Mr.

Wirtz the night before the hearing, the receipt of three (3) additional and previously undisclosed

payments.[7]

 The pleading was not the accounting ordered by the Court, but instead a chart reflecting the

receipt of three (3) payments postpetition.  Although Option One admitted to three (3) previously

undisclosed postpetition payments, it still insisted that the loan continued to be in default and

---

[6] Docket no.24.

[7] Docket no. 28.

4

reasserted its request for relief.[8]  Because Mr. Wirtz's request for continuance was not filed with the

Court, Mr. Farrelly appeared on behalf of Option One.   However, Mr. Farrelly possessed no

information, knowledge or evidence on Debtors' loan.

Since Debtors' evidence indicated 1) additional payments not acknowledged by Option

One; 2)  Option One had failed to supply the ordered accounting or address the additional payments

made by Debtors; and 3)  Mr. Farrelly lacked any knowledge regarding the loan, the Court

determined that Option One's response was insufficient and issued Orders to Show Cause for Mr.

Wirtz, Ms. Dory Goebel, and Option One.[9]  The merits of the Second Motion were again continued

to afford Option One and Ms. Goebel the opportunity to respond to the Orders to Show Cause and

the request for sanctions contained in Debtors' Opposition.[10]

On June 26, 2008, a third hearing on the Second Motion and the initial hearing on the Orders

to Show Cause was conducted.   Mr. Wirtz appeared at the hearing, but neither Ms. Goebel nor

Option One were present despite being ordered to appear.   At this hearing, Mr. Wirtz represented

that Option One had located one (1) additional postpetition payment and admitted the loan was

current.  However, Mr. Wirtz could not explain how Option One lost four (4) payments, and in the

process filed two (2)  motions for relief requiring three (3) separate evidentiary hearings spanning

six (6) months.

---

[8] *Id.*

[9] Docket no.30.

[10] *Id.*

5

By this hearing, the evidence established that on February 18th and March 7th of 2008, Option One had forwarded Mr. Wirtz two (2) monthly, uncashed payments sent by Debtors.[11] Both payments were received by Mr. Wirtz prior to the filing of the Second Motion on March 10, 2008. Although Mr. Wirtz acknowledged the receipt of these payments, he professed no knowledge as to why they were delivered to him. Further, his representations to the Court denied any knowledge of these two (2) unposted payments prior to their arrival at his office.[12] The existence of two (2) unapplied payments should have raised serious question in Mr. Wirtz's mind regarding the accuracy of the default alleged by Option One. Instead, Mr. Wirtz drafted both the Default Affidavit and Second Motion to allege a four (4) month postpetition default by Debtors. Because these payments were received by Mr. Wirtz on February 18 and March 7, 2008, and prior to the filing of the Second Motion, Mr. Wirtz was sanctioned for his failure to disclose this fact in the Second Motion or take corrective action.[13] Nevertheless, the receipt of only two (2) payments by Mr. Wirtz would have left the loan two (2) additional months in arrears and thus, in default. Option One had, therefore, failed to explain how it persisted in its demands to foreclose even while holding the missing two (2) payments that made the loan current.

As a result, the Court ordered further investigation into the receipt and application of payments by Option One in a continued effort to uncover the cause of the erroneous filing. Since Mr. Wirtz represented that LPS was his contact and it was LPS who supplied the information

---

[11] 6/26/08 Tr.T. 32:20-23, 33:15-17, 33:19-34:15. Uncashed payments of $1,858.84 and $1,624.17 were received by Mr. Wirtz from Option One on February 18, 2008 and March 7, 2008 respectively. Following the filing of the Second Motion, payments of $1,624.84; and $1,524.84 also arrived.

[12] 6/26/08 Tr.T. 31:22- 32:23.

[13] Docket no. 46.

6

regarding payments, defaults, or inquires,[14] an additional show cause order was issued for LPS.[15]

The hearing on the Orders to Show Cause against Ms. Goebel and Option One was continued to

August 21, 2008.[16]  Subsequently, LPS voluntarily intervened "to clarify its role in this matter and

to address any misconceptions or misunderstandings which may have been left with the Court

regarding that role."[17]

On August 21, 2008, the Court held an evidentiary hearing on the Orders to Show Cause.

Participating at the hearing were representatives and counsel for Boles, LPS, Option One, the UST,

and Debtors.[18]   Mr. Michael Cash appeared as counsel for LPS.  Ms. Dory Goebel appeared

individually, and as an employee/representative of LPS.[19]  Mr. Arthur Simmons appeared as a

representative of Option One.

During the hearing, LPS described its role as merely a storage facility for information.[20]

Through the representations of Mr. Cash and the testimony of Ms. Goebel, LPS' only representative,

LPS attempted to exculpate itself from any responsibility for the errors or omissions in the Default

---

[14] 6/26/08 Tr.T. 25:15-30:25.

[15] Docket no. 45.

[16] Docket no. 46.

[17]  Docket no.43, 50.

[18]  The UST's appearance was for the purpose of assisting the Court in its investigation.
Docket nos. 62, 70.

[19]  Although Ms. Goebel signed the Default Affidavit as an officer of Option One, she
was actually trained, supervised, and paid as an employee of LPS.  Her authority to execute
affidavits was through a corporate resolution limited to this function.  12/1/10 Tr.T. 348:5-
349:10.  She appeared before the Court in response to the individual Order to Show Cause, as
well as, in response to LPS' Order to Show Cause.  She testified as a representative of LPS.

[20] 8/21/08 Tr.T. 14:5-7, 41:7-9.

Affidavit.  According to Mr. Cash and Ms. Goebel, LPS had no management or decision making responsibilities on Debtors' loan. Instead, LPS merely provided Option One and its counsel efficient access to documents and records maintained by Option One.  Ms. Goebel represented that there were no communications between Option One and LPS or LPS and Boles on the subject of missing payments or unapplied funds.[21]  While LPS admitted responsibility for execution of the Default Affidavit, it testified that the amounts in default were copied directly from Option One's computer records.  Since Option One's system did not record the receipt of unposted payments, LPS had no way of ascertaining the existence of Debtors' missing, unapplied payments or the error in the loan balance.

Option One, in contrast, painted a very different picture of its relationship with LPS.   Mr. Simmons testified that LPS was actually responsible for the day to day management of Debtors' loan.  He explained that LPS, utilizing proprietary software, administered Debtors' loan, including the filing of a proof of claim, motions for relief, and the Default Affidavit.[22]  Although Ms. Goebel signed the Default Affidavit as a representative of Option One, she was physically located at LPS' business facility, supervised, and paid by LPS.[23]  Further, although Option One had the ability to communicate directly with its own counsel, the evidence established that it rarely did so and, in this case, did not communicate with Mr. Wirtz or Boles at all.   Instead, Mr. Wirtz and Boles were managed directly by LPS; only if LPS could not resolve an issue, was Option One contacted.

---

[21] 8/21/08 Tr.T. 47:5-23.

[22] 8/21/08 Tr.T. 127:16-21; 129:21-130:15; 138:4-8; 150:20-23; 167:22-168:8; 225:2-7.

[23] 8/21/08 Tr.T. 111:6-6;19-22; 12/1/10 Tr.T. 348:5-349:10.  Ms. Goebel had authority from Option One, through a continuing resolution, to execute affidavits as a representative of Option One.   However, as she testified, she was not an employee of Option One.  8/21/08 Tr.T. 101:17-102:3.

Mr. Simmons testified that as payments were received from Debtors, LPS was notified and asked for direction regarding their application.  In each case, LPS, after conferring with Boles, directed Option One to send the payment to Mr. Wirtz.  To corroborate his testimony, Mr. Simmons referred to correspondence in Debtors' loan file maintained by LPS.[24]  According to Mr. Simmons, LPS was aware of each payment as it was received, and LPS corresponded with both Boles and Option One on the issue throughout the relevant period.[25]

The obvious conflict between the testimony of Ms. Goebel and Option One's representative, Mr. Simmons, coupled with the representations by counsel for LPS, led the Court to accept the UST's offer for assistance.  As a result of the foregoing, the Court continued the hearing on the Orders to Show Cause, without date to allow formal discovery.[26]

From July 9, 2008, through December 2010, the parties conducted contentious discovery. Ten (10) motions to quash, compel, clarify, reconsider orders, stay proceedings, request protective orders, and appeal interlocutory orders were considered along with responses, oppositions, and replies to each.

On May 21, 2010, the UST filed a Motion for Sanctions against LPS and Boles.[27]  The Motion for Sanctions alleged that LPS had misled the Court in connection with the preceding hearings both as to its role and responsibility for filing the First and Second Motions and the false

---

[24] Evidence of the correspondence was not supplied by either party at this hearing.

[25] 8/21/08 Tr.T. 136:18-137:17.

[26] Docket no. 70.

[27] Docket no. 219. On October 27, 2010, this Court approved a Stipulation between the UST and Boles. Docket no. 275.

9

Default Affidavit.  On December 1, 2010, trial on the merits of the UST's Motion for Sanctions against LPS was heard.

At the beginning of the hearing, a request to bifurcate the issues presented was granted. Hearing on any sanctions to be awarded was deferred to a separate hearing, pending determination of liability for sanctionable conduct.  After trial on the merits, additional briefing was ordered after which the matter was taken under advisement.   On April 6, 2011, this Court rendered a Memorandum Opinion concluding that LPS' conduct was sanctionable.[28]

The parties were given additional time to conduct discovery on the proper measure of sanctions and submit briefs on the subject.[29]   Discovery and briefing were not complete until December 14, 2011,[30] after which the Court intended to set the hearing on the measure of sanctions for hearing.

## II.  Jurisdiction

Following this Court's initial hearing on the merits of the UST's Motion, two (2) separate opinions of the United States District Court for the Eastern District challenged this Court's authority to grant the monetary sanctions and other requested relief sought by the UST.  In addition, on June 23, 2011, the United States Supreme Court entered its opinion in *Stern v. Marshall*[31] calling into question the scope of authority granted to bankruptcy courts under the United States Constitution. Further, the United States Court of Appeal for the Fifth Circuit also modified a sanction ruling

---

[28] Docket no. 304.

[29] Docket no. 321.

[30] Docket no. 323, 325.

[31] *Stern v. Marshall*, 131 S.Ct. 2594, 180 L.Ed.2d 475 (2011).

entered by this Court granting injunctive relief analogous to that requested by the UST in its Motion

for Sanctions.[32]   A status conference was held on November 7, 2011, to discuss the effect these

decisions might have on the pending request for sanctions.   After that conference,  the issues

pertaining to the Court's jurisdiction and authority were taken under advisement.

### A.  *In re Ritter* and *In re Ho*

Although factually distinguishable, the legal underpinnings of two (2) recent opinions of the

District Court impact this matter.  In the cases of *In re Ritter* and *In re Ho*,[33] counsel for the debtors

failed to comply with specific court orders causing significant delay in proceedings, the expenditure

of judicial effort, and the waste of both judicial resources and the resources of the chapter 13 trustee.

Two (2) different divisions of the District Court reversed monetary sanctions imposed

against counsel.  The decisions make clear that bankruptcy courts lack the power to punish those that

violate orders of the court.  The District Courts determined that because the sanctions in *Ho* and

*Ritter* were designed to punish rather than coerce future behavior or compensate those harmed by

counsel's inactions, they were criminal in nature.  As a result, the bankruptcy court was without

authority to impose the relief ordered.

This matter presents similar issues.  Although LPS, Ms. Goebel, and Mr. Cash have not

violated an order of the court, they have misled the Court through false statements and testimony,

as well as, false evidence.  In addition, substantial judicial resources were expended in addressing

the allegations presented.  The conduct of LPS, Ms. Goebel, and Mr. Cash compounded the

---

[32] *Wells Fargo Bank, N.A. v. Stewart (In re Stewart)*, 647 F.3d 553 (5th Cir. 2011).

[33] *In re Ritter*, 2011 WL 5974623 (E.D.La. 2011); *In re Ho*, 2012 WL 405092 (E.D.La. 2012).

problems already present and significantly increased the cost to Debtors' and the UST. Two (2) separate Motions for Relief from the Stay and three (3) separate hearings were conducted regarding the allegations of Option One in its Motions and Default Affidavit. At each hearing, counsel for Option One was unprepared to address the Motion. In fact, trial counsel appeared with no personal knowledge of the case or its facts despite being given multiple opportunities to offer evidence in support of Option One's request.

Despite failure of proof, Option One continued to assert Debtors' default until the third hearing on the matter. Only after the Orders to Show Cause were issued, did Option One and its counsel provide the complete information necessary to confirm that Debtors were current on their loan. Further, it was only at the hearing on the Orders to Show Cause that Option One admitted to filing the motions and Default Affidavit in error. However, although Mr. Wirtz belatedly admitted Option One's error, he failed to supply the facts concerning why it took multiple hearings over six (6) months to uncover the truth. It is worth noting that despite being ordered to appear, neither Option One nor Ms. Goebel were present at this hearing to explain what actually happened. With no evidence or witnesses, the Court was stymied from ascertaining the root of the problem.

The Orders to Show Cause were issued against multiple parties by the Court in an effort to identify the party responsible for the abuse of process. Specifically, Ms. Dory Goebel was personally ordered to appear because she signed the Default Affidavit as a representative of Option One. Ms. Goebel asserted not only the existence of defaults, but her personal knowledge of the loan and its status. The holder of Debtors' loan, Option One, was also ordered to appear because all pleadings were filed in its name. Mr. Clay Wirtz was ordered to appear because he signed all

relevant pleadings as counsel for Option One.  Finally, LPS' Order to Show Cause was issued when Mr. Wirtz identified it both as the source of information on the loan and direction of counsel.

The Orders to Show Cause were designed to ascertain and punish those responsible, if any, for the filing of false pleadings.  All of the Orders to Show Cause were designed to compensate Debtors and their counsel for the time and effort expended in protecting Debtors' rights.  However, at the hearing on the Orders to Show Cause, LPS compounded its responsibility by misrepresenting its role in connection with this matter and its knowledge.  This necessitated the expenditure of large governmental resources by the UST to uncover its misconduct.  Thus, the UST's resulting Motion for Sanctions was filed in an effort to both punish LPS for its conduct in connection with the hearings on the Orders to Show Cause, compensate the UST for the expenditure of its resources, and deter future misconduct.    The conduct of Ms. Goebel and Mr. Cash, individually, also warrant serious review and sanctions in addition to those complained of by the UST.

Because this matter involves components of punishment for past offensive conduct and for violation of the duty of candor and truthfulness in dealings with this Court; compensation for the expenditure of Debtors' and UST's resources; and a need to deter future misconduct, this Court lacks the ability to enter the full measure of relief requested and warranted.  As a result, the matter is referred to the United States District Court for its consideration.

### B. *Stern v. Marshall*

The *Stern* decision raises doubts concerning the authority of bankruptcy courts to enter sanctions based on Ms. Goebel's, Mr. Cash's, and LPS' conduct.  *Stern* questions the statutory grant, to the bankruptcy courts, of authority to issue orders, process, or final judgments.  Although 11 U.S.C. §105 grants the power and provides that no provision of title 11 may be construed as

13

precluding a bankruptcy court from *"sua sponte* taking any action or making any determination necessary or appropriate to enforce or implement court orders, or rules, or to prevent an abuse of process"[34]   *Stern* found the delegation of authority by Congress to bankruptcy courts unconstitutional.

As a legislatively created institution, bankruptcy courts lack the protections afforded Article III jurists.  As a result, the Constitutional powers reserved for the judicial branch cannot be exercised by an Article I court.  Nevertheless, in limited circumstances, the Constitutional division of power between the branches of government overlaps.  When this occurs between the legislative or executive branches and the judicial branch, the exercise of *quasi* judicial power by either the legislative or executive branches does not offend the exercise of judicial power.

For many years, the authority of a bankruptcy court to sanction for civil contempt those who violated its orders, the rules of procedure, or ethics was virtually unquestioned.  Particularly when the offensive conduct occurred in pleadings before the court or in testimony offered in open court, bankruptcy courts were thought to have an inherent power to protect the sanctity of the court and its process.[35]  The grant under 11 U.S.C. § 105, as well as, the specific grant under bankruptcy rule 9011 allowed a bankruptcy court to both manage its docket and the behavior of the parties that appear or practice before it.  The *Stern* decision challenges these broad grants of power.  *Stern*

---

[34] 11 U.S.C. § 105.

[35] The Fifth Circuit has ruled that "there is no legal basis for equating" Rule 9011 sanctions and criminal contempt.  *In re Tbyrd Enterprises, LLC*, 354 Fed.Appx. 837, *1 (5th Cir. 2009).  The Fifth Circuit also found that "imposition of [Rule 9011] sanctions on litigants in a bankruptcy case is clearly a matter 'arising in' such a case, 28 U.S.C. § 157(b)(1), so bankruptcy courts have jurisdiction to issue such orders."  *Id.*  (citations omitted).  *See also*, *Matter of Terrebonne Fuel and Lube, Inc*., 108 F.3d 609 (5th Cir. 1997) (Bankruptcy courts have the power, pursuant to 11 U.S.C. § 105, to order civil contempt.)

14

leaves the lower courts with only broad parameters for determining what matters may or may not be referred to bankruptcy courts. Since *Stern* recognized that the power exercised was that conferred, the bankruptcy code cannot be used to justify the authority exercised by a bankruptcy court. Instead, one must determine if the power exercised is within a legislative court's traditional purview.

Since 1898, the Bankruptcy Act allowed non-judicial referees to marshal a debtor's assets, liquidate, and distribute the proceeds to those filing valid claims against a debtor's estate. In the process, the claims of secured parties were subject to examination as were the rights of those with conflicting claims in the property. Jurisdiction over the *res* supported a referee or trustee's right to deny an invalid claim, challenge a security interest, or determine the ranking of competing claims. The Bankruptcy Act also included reorganization of both businesses and individuals, plan confirmation, and voting all under the supervision of a trustee or referee.

If one assumes that the bankruptcy code constitutes a regulatory scheme which may be administered by a legislative court, the exercise of jurisdiction over matters historically handled by trustees or referees under the 1898 Bankruptcy Act should fall within its power without offending the separation of powers doctrine. Plan confirmation, discharge, liquidation of estate assets, distribution and ranking of claims against estate assets, voting, and classification of claims appear to be well within this traditional exercise of power. However, even within these areas, some commonly occurring issues arise and may be affected by *Stern*.

While legislative courts or agencies may impose fines, penalties, and sanctions for objectionable conduct, as well as, the violation of orders or regulations, they typically lack the authority to enforce those sanctions. Instead, the decision of a legislative court or agency is referred to a district court empowered with the ability to enter judgment and enforce the ruling. In contrast,

bankruptcy courts have been given broad authority to enforce rulings and implement the provisions

of the code and its purposes.  Pursuant to 11 U.S.C. § 105(a):

> The court may issue any order, process, or judgment that is necessary
> or appropriate to carry out the provisions of this title.  No provision
> of this title providing for the raising of an issue by a party in interest
> shall be construed to preclude the court from, *sua sponte,* taking any
> action or making any determination necessary or appropriate to
> enforce or implement court orders or rules, or to prevent an abuse of
> process.

The denial of the right to issue and enforce orders or utilize any process necessary to

implement the provisions of the bankruptcy code  would be a serious shift in the context of

bankruptcy law.  Although implied by the historical limitations on administrative power, the *Stern*

decision does not support such a sweeping affect.  Justice Roberts' characterization of his own

opinion as "narrow" and of "limited effect" indicates as much.  However, because in their two (2)

recent opinions, two (2) different judges have found that bankruptcy courts lack the power to issue

sanctions for violations of their orders or rules, this Court must adhere to their ruling.

As a result, this Court finds that it lacks both the authority and jurisdiction to determine the

amount of, enter, or enforce the request for sanctions by the UST or to adjudicate the appropriate

sanctions resulting from the conduct of LPS, Mr. Cash, or Ms. Goebel *sua sponte*.

### A.  Rule 9011

Federal Rule of Bankruptcy Procedure 9011 ("Rule 9011") is substantially similar to Federal

Rule of Civil Procedure 11 ("FRCP 11") as to all counsel signing pleadings or advocating before

the court.[36]  Rule 9011(b) provides in pertinent part:

---

[36] *Citizens Bank & Trust Co. v. Case (Matter of Case)*, 937 F.2d 1014, 1022 (5th Cir. 1991).

By presenting to the court (whether by signing, filing, submitting, or later advocating) a petition, pleading, written motion, or other paper, an attorney or unrepresented party is certifying that to the best of the person's knowledge, information, and belief, formed after an inquiry reasonable under the circumstances,-- ...

(3) the allegations and other factual contentions have evidentiary support or, if specifically so identified, are likely to have evidentiary support after a reasonable opportunity for further investigation or discovery; and

(4) the denials of factual contentions are warranted on the evidence or, if specifically so identified, are reasonably based on a lack of information or belief.

If Rule 9011 has been violated, a court, after notice and opportunity to respond, may impose sanctions.[37]

LPS' counsel, Mr. Cash, violated Rule 9011 by falsely representing during the August 21, 2008, hearing that LPS' role was as a "storage library" rather than an active participant in the administration and management of Debtors' loan in bankruptcy.  An assertion by an attorney that is not reasonably based in fact is sanctionable under Rule 9011.[38]  "Even if [a] pleading is the product of careless mistake rather than evil intent, it cannot be tolerated."[39]  Sanctions are appropriate even when statements are made with "reckless disregard for the truth."[40]  The Court finds that Mr. Cash made false representations to the Court with reckless disregard for the truth and should be sanctioned.

---

[37] FRBP 9011(c).

[38] *In re Standfield*, 152 B.R. 528, 542 (Bankr.N.D.Ill. 1993).

[39] *In re Brown*, 319 B.R. 876, 882 (Bankr.N.D.Ill. 2005).

[40] *In re 1095 Commonwealth Corp.*, 236 B.R. 530, 538 (D.Mass. 1999).

17

A represented party can also be sanctioned under FRCP 11 in some instances.[41]  Because Rule 9011 and FRCP 11 are substantially similar, cases decided under FRCP 11 are applicable when deciding a cause under Rule 9011.[42]   "To be sanctioned individually, the client must have been 'personally aware of or otherwise responsible for the bad faith procedural action.'"[43]

LPS' representative, Ms. Goebel, signed the false Default Affidavit that was submitted to the Court in connection with the Second Motion.  The Default Affidavit falsely asserted that it was sworn under oath, in the presence of a notary and two (2) witnesses.   The Default Affidavit also falsely represented the affiant's personal knowledge and management of the loan, confirmed the ownership by Option One of the note and mortgage, identified the note and mortgage as documents held by Option One, and  set forth the amounts due including the defaults.  Testimony revealed that the affiant was following LPS' procedures and was inadequately trained.  Despite her attestations, Ms. Goebel was not personally knowledgeable about Debtors' loan, and she could not and did not identify the critical documents prior to signing the Default Affidavit.  LPS is also responsible for the false affidavit under Rule 9011.

### B.  Ethical Violation

Although state rules of professional conduct "do not expressly apply to sanctions in federal courts, ... a federal court may nevertheless hold attorneys accountable to the state code of professional conduct."[44]  Under Louisiana Rule of Professional Conduct 3.3, ("Rule 3.3") attorney's

---

[41] *Topalian v. Ehrman*, 3 F.3d 931, 934-935 (5th Cir. 1993), citing *Jennings v. Joshua Independent School District*, 948 F.2d 194 (5th Cir. 1991).

[42] *See Case*, 937 F.2d at 1022.

[43] *Moore v. Western Sur. Co.*, 140 F.R.D. 340, 345 (N.D.Miss. 1991), quoting *Friesing v. Vandergrift*, 126 F.R.D. 527, 529 (S.D.Tex. 1989).

[44] *Resolution Trust Corp. v. Bright*, 6 F.3d 336, 341 (5th Cir. 1993) (citations omitted).

18

owe a duty of candor to the court, which includes the duty not to knowingly "make a false statement of fact." Mr. Cash violated Rule 3.3 when he falsely represented that LPS' role was as a "storage library" not an active participant in the administration and management of Debtors' loan in bankruptcy.

### C. Power of the Court

Federal courts have the inherent power to impose sanctions for contempt.[45] When a party's false testimony and false evidence is not effectively sanctionable pursuant to an existing rule or statute, it is appropriate for a district court to rely on its inherent power to impose sanctions.[46] [A] court may assess attorney's fees when a party has "'acted in bad faith, vexatiously, wantonly, or for oppressive reasons.'"[47] LPS and its counsel acted wantonly and in bad faith when they filed the false Default Affidavit and made other misrepresentations to the Court.

### D. Perjury

Although a bankruptcy court cannot impose criminal contempt sanctions for perjury, the District Court has that power.

> False testimony in a formal proceeding is intolerable. We must neither reward nor condone such a "flagrant affront" to the truth-seeking function of adversary proceedings. ... In any proceeding, whether judicial or administrative, deliberate falsehoods "well may affect the dearest concerns of parties before a tribunal," and may put the fact finder and parties "to the disadvantage, hindrance, and delay of ultimately extracting the truth by cross examination, by extraneous

---

[45] *Chambers v. NASCO, Inc*. 501 U.S. 32, 43, 111 S.Ct. 2123, 2132 (1991).

[46] *Carroll v. Jaques Admiralty Law Firm, P.C.*, 110 F.3d 290, 292 (5th Cir. 1997).

[47] *Chambers*, 501 U.S. at 45-46 (citations omitted).

investigation or other collateral means."  Perjury should be severely sanctioned in appropriate cases.[48]

In this case, Ms. Goebel testified that she reviewed all records, including correspondence between Option One and their counsel, prior to signing any affidavit of default.  She also testified that she had reviewed Debtors' file prior to testifying and no correspondence existed between Option One and Boles or Option One and LPS.  In fact, correspondence existed in Debtors' file between Option One and LPS as well as between LPS and Boles on the subject of unposted payments.  That correspondence was contemporaneous with the receipt of each payment from Debtors and alerted LPS to the existence of unposted payments and their significance.  In fact, one communication by LPS to Boles indicates that Option One warned LPS that the forwarded payments, if still held by Boles, were sufficient to bring the loan current.[49]  Ms. Goebel's testimony was not only false, but designed to misled the Court into believing that LPS had no knowledge as to the unposted payments and no ability to ascertain their existence.

### E.  Other violations

The case also reveals a systemwide problem exceeding the immediate bounds of this one (1) matter and brings into focus the potential liability under Rule 9011 for filing a false statement into the records of other cases filed in this district.  Whether or not this conduct is subject to sanction, the scope of LPS' fraud on the system is a factor to be considered in awarding sanctions in this case.

---

[48] *ABF Freight System, Inc. v. N.L.R.B.*, 510 U.S. 317, 323, 114 S.Ct. 835, 839 (1994) (citations omitted).

[49] 12/1/10 Tr.T. 96:1-8.

### III.  Due Process

Because the UST's Motion for Sanctions only sought relief against LPS, it did not encompass the conduct of Mr. Cash or Ms. Goebel, individually, in response to the LPS Order to Show Cause.  Thus, prior to the imposition of penalty or sanction against either individual, an opportunity to be heard should be afforded.

> An elementary and fundamental requirement of due process in any proceeding in which is to be accorded finality is notice reasonably calculated, under all circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections.[50]

This Court recommends that should the District Court expand the scope of conduct for which LPS, Ms. Goebel, or Mr. Cash  might be sanctioned beyond that contained in the UST's Motion for Sanctions, a supplemental Order to Show Cause be issued setting forth the allegations against and affording the subject ample opportunity to respond.

### IV.  Findings of Fact

This Court submits the prior findings of fact contained in its Memorandum Opinion dated April 6, 2011.[51]  The prior findings of this Court conclude:

> 1.  Ms. Goebel's affidavit falsely represented personal knowledge that Option One owned and physically held Debtors' note, mortgage, and account;[52]
>
> 2.  Ms. Goebel's affidavit falsely represented personal knowledge of the defaults on Debtors' loan including the amounts past due;[53]

---

[50] *Mullane v. Central Hanover Bank & Trust Co*., 339 U.S. 306, 314-315, 70 S.Ct. 652, 657, 94 L.Ed. 865 (1950) (citations omitted).

[51] Docket no. 304, Memorandum Opinion, attached as Exhibit A.

[52] *Id.* at 19-20, 23.

[53] *Id.* at 20.

3.  Ms. Goebel's affidavit falsely represented that the affidavit was executed before a notary public and two (2) witnesses;[54]

4.  Ms. Goebel falsely testified[55] during the August 21, 2008, hearing that she always executed affidavits in the presence of a notary public;[56]

5.  Ms. Goebel falsely testified during the August 21, 2008, hearing that she searched Debtors' file for correspondence regarding the receipt of postpetition payments and none existed between either Option One and LPS or LPS and Boles;[57]

6.  LPS' false representation during the August 21, 2008, hearing of its role in connection with Debtors' loan; specifically that LPS was not an active participant or decision maker in the administration and management of Debtors' loan in bankruptcy, but merely a storage facility for information;[58] and

7.  LPS' false representation at the hearing on August 21, 2008, that it had no information from either Option One or the Boles regarding the existence of unapplied payments and had no reason to believe or verify whether unapplied payments existed.[59]

The filing of false statements and false testimony before the bankruptcy court support this Court's conclusion that the conduct of LPS, Ms. Goebel, and Mr. Cash is sanctionable.  The most benign interpretation of LPS, Ms. Goebel, and Mr. Cash's conduct supports a finding that they both misled and exhibited a lack of candor to the Court.

---

[54]  *Id.* at 20, 22-23.

[55]  Ms. Goebel testified both individually and LPS' representative.

[56]  8/21/08 Tr.T. 109:12-17.

[57]  Docket no. 304, Memorandum Opinion at 9-10.

[58]  *Id.* at 7-8.

[59]  *Id.* at 8, 13-18, 24.

The Court finds the following additional facts specifically with regard to the individual conduct of Mr. Cash and Ms. Goebel:

At the start of the August 21, 2008, hearing Mr. Cash opened with a representation that LPS wished to clarify its role in connection with the filing of the false affidavit and misstatement of account.  Mr. Cash represented to the Court that "... Fidelity's role is almost as a conduit and storage of information and data. Option One will send their information to Fidelity, and then attorneys such as Clay [Wirtz] can access that information."[60]

> Cash:  What would happen, Your Honor, is that basically Fidelity became–if you think if it almost as a library, various clients could put their information in that library.  The attorneys would go to the library, check out the information, and that's how things would happen.  One of the services that we provided, and no longer do, but one that we did is executing affidavits such as the one in this case.[61]

> *                              *                              *

> Cash:  I think what we are going to see here is that, and when Ms. Goebel would execute the affidavit she would have access to the same information as someone at Option One.  She would go into their system, look at what has been posted, and what hasn't been posted.  And I think what happened here was just a series of miscommunications and we'll put on the testimony.[62]

> *                              *                              *

> Cash:  [Clients like Option One] want to utilize our system because it basically cuts out a lot of work for them.  They don't have to process a lot of things that Fidelity will basically do that in their stead.[63]

> *                              *                              *

---

[60]  8/21/08 T.Tr. 14:6-9.

[61]  8/21/08 T.Tr. 14:20-15:1.

[62]  8/21/08 T.Tr. 15:10-16.

[63]  8/21/08 T.Tr. 19:11-14.

Cash:  For example, organizing the documents, having a place where the attorneys can access it quickly, rather than having 20 phone calls to people who are–there is a laptop, a desktop where you can go to and you can access all of the information if you are the attorney.[64]

      *                        *                      *

Cash:  [A]ll of the things that they need, the attorneys can get through our system.

The Court: And when you say "need," need for collection?

Cash:  Need for collection, need for negotiation with the Debtor, need for foreclosure, need for bankruptcy proceedings.[65]

      *                        *                      *

Cash:  Correct, like I say, a library.[66]

However, Mr. Cash also admitted during the course of the hearing:

The affidavits were prepared by the law firm.  We would review the screen shots, which is basically the system, to see what was posted, what wasn't posted, what the amounts were that were due and owing, and then we would, our employee would execute the affidavit based upon that information.[67]

When questioned by the Court as to why LPS would execute affidavits if it was merely storing information,[68] Mr. Cash replied:

--------

[64]  8/21/08 T.Tr.19:16-20.

[65]  8/21/08 T.Tr. 20:3-9.

[66]  8/21/08 T.Tr. 20:12.

[67]  8/21/08 T.Tr. 25:14-19.

[68]  8/21/08 T.Tr. 26:10-15.

24

> You know, a number of clients sign their own, Your Honor. Sometimes they would want us to, simply because we have people like Ms. Goebel who handle the accounts on a daily basis, who review the material, who have access to the material, and it was simply one less thing that the client had to do, that we would do.[69]

Mr. Cash was then asked to present his case.  He called Ms. Goebel to the stand as an employee of LPS.  Mr. Cash questioned Ms. Goebel on the process she employed when executing affidavits since she had also testified that she had no specific recollection of the affidavit in question.[70]

Under direct examination by Mr. Cash, Ms. Goebel  testified as to the general procedures she followed in the execution of default affidavits.  Ms. Goebel stated that once she received the affidavit, she reviewed the information in it with Option One's system.[71]  Ms. Goebel represented that she had access to Option One's actual data base, and the LPS system allowed her to view all communications between the law firms and Option One.[72]

Ms. Goebel testified that she had reviewed Debtors' file before testifying and *no communications between LPS and Option One* existed.[73]  *Nor did she admit to any communications between LPS and Boles.*  However, on cross examination, Ms. Goebel admitted that *Option One* had notified the Boles that payments had been received both before and after she executed the affidavit.[74]

---

[69]  8/21/08 T.Tr. 26:16-21.

[70]  8/21/08 T.Tr. 38:16-21.

[71]  8/21/08 T.Tr. 38:20-39:1; 39:11-23.

[72]  8/21/08 T.Tr. 40:5-17; additional testimony under cross examination represented that she was testifying to company procedures in the execution of the affidavit; procedures she followed. T. Tr. 67:2-15.

[73]  8/21/08 T.Tr. 47:20-23; 94:23-95:13.

[74] 8/21/08 T.Tr. 97:97-98-5; 99:7-15.

Ms. Goebel testified that prior to signing an affidavit, she only reviewed correspondence to LPS, not correspondence between Option One and the attorney, even though it was available.[75]  She continued to assert that no communications between LPS and Option One or LPS and Boles on the subject of unposted payments were in the LPS file,[76] *and* that she reviewed the LPS file for such communications prior to signing the affidavit.

> The Court: ...So, an additional screen then that you would look at when you were verifying the affidavit would be a quick check of the correspondence between Fidelity and Option One?
>
> Goebel: Right.
>
>       *              *              *
>
> Goebel: We would look within our system to see the communication, yes.[77]

In reality, LPS communicated many times with Option One and Boles on this subject, and all the communications were available in the LPS system.[78]  Ms. Goebel's testimony was not only false, but designed to mislead the Court into believing that LPS had no direct communications with either Option One or Boles regarding unposted, unapplied, and missing payments and that LPS was totally ignorant of this fact and could not be held accountable for their failure to advise of unposted payments.

After the fact, both Ms. Goebel and Mr. Cash tried to distance LPS from any knowledge regarding the administration of the loan, maintaining that they were merely a "storage facility" or

---

[75] 8/21/08 T.Tr. 98:10-25; 101:13-16.

[76]  8/21/08 T.Tr. 97:23-98:17; 110:24-111.5; 47:20-23.

[77] 8/21/08 T.Tr. 98:21-99:6.

[78]  12/1/010 T.Tr. 77-96; 100-102; 212:7-213:9. Trial Exh. 5, Nos. 305, 301, 299, 281, 290, 289, 287, 286, 253, 234, 192.  Docket no. 304, Memorandum Opinion at 15-18.

"library" for documents, again with the goal of exculpating LPS from responsibility for signing a false affidavit. Nevertheless the foregoing testimony and legal position are directly contrary to Ms. Goebel's attestation in her affidavit that she had personal knowledge of Debtors' loan.

Ms. Goebel's Default Affidavit was false in other material aspects. Although it represented personal knowledge of Option One's ownership of the note and mortgage, Ms. Goebel possessed no such knowledge.[79] Further, she identified and attested to the possession by Option One of the note and mortgage but never saw, much less verified, either document.[80] The Default Affidavit asserted its execution before a notary and two (2) witnesses, none of whom were actually present when she signed.[81] Nor was she placed under oath.[82] However, the most disturbing exchange occurred when Ms. Goebel admitted that even if she had been aware of the unposted payments, she still would have signed the affidavit of default rather than question or stop the filing for relief.[83] This admission underscores her lack of knowledge and ability to attest to a loan's status as in default.

The above conclusions are based in part on the following exchange occurring between the Court and Ms. Goebel:

Q:...if you look at paragraph 2 at the bottom there is "see attached copy of the Notice, Exhibit A, certified copy of the mortgage is Exhibit B , and copy of the assignments is Exhibit C." Is your testimony that those documents were not attached to the affidavit when you signed it...?

A: Typically, those exhibits would not be attached.

---

[79] 12/1/10 Tr.T. 342:21-25.

[80] 12/1/10 Tr.T. 344:23-25.

[81] 12/1/10 Tr.T. 336:9-337:22.

[82] 12/1/10 Tr.T. 342:18-20.

[83] 12/1/10 Tr.T. 379:4-13.

Q:..So,...counsel would attach those after you signed?

A: ...we relied on the attorney.  We believed the information that they were giving us and what they were going to attach, because this is their affidavit.  It would be accurate.[84]

\*                              \*                              \*

Q:...Did you check any screen to see if  in fact there was a note, there was a mortgage, there were assignments?

A: That would be the responsibility of the attorney.

Q:..so you didn't verify that information at all?

A: No...[85]

\*                              \*                              \*

Q:...And you don't sign it [the affidavit] in the presence of the notary or the witnesses?

A: That's correct.[86]

\*                              \*                              \*

Q: You weren't put under oath by a notary before you signed the Affidavit of Debt?

A: No.

Q: And you didn't really have personal knowledge of the contents [of the affidavit] because you just said the information involving the existence of the mortgage and the note and so on you relied on the Boles Law Firm to have that information correct.

A: Right.  As I stated earlier, it was the Boles Law Firm.  Option One had hired them to kind of handle this work and had asked LPS to help clerically sign these.  We relied on the Boles Law Firm.

Q: So you considered this a clerical function?

---

[84] 12/1/10 Tr.T. 340:20-341:8.

[85] 12/1/10 Tr.T. 341:10-16.

[86] 12/1/10  Tr.T. 342:3-5.

28

A: Part of our administrative services with LPS.

Q: But you just used the word "clerical."

A; Well, it's signing a document, more you know administrative work, clerical work, yes.[87]

*                          *                          *

Q: Ms Goebel...Have you ever refused to sign an affidavit for a reason other than the note payment amount was incorrect, the due date on the affidavit was incorrect, the number of installment payments that were past due was incorrect, or ...that you were not a [authorized] signatory...?

A: Not to my recollection, no.

Q:.. So if, ...you had know[n] that there were three payments that were not posted on this account...that were in the possession of either Option One or the law firm, would you have still signed the affidavit?

A: In my opinion, yes.  I was getting an affidavit from a law firm that I trusted. They're the legal experts on the matter and Option One is in charge of their cash posting. I'm not the decision maker of, you know, should they proceed.  The attorney would have that knowledge.[88]

Ms. Goebel signed affidavits as a representative of Option One and that LPS wasn't a "go-between" for Option One and its counsel.[89]  Apparently this was an attempt to place any blame for false statements in the affidavit on Option One and Ms. Goebel as their "officer."  However, the record clearly establishes that LPS trained, supervised, and employed Ms. Goebel, and Option One's relationship with her was merely to authorize her to sign on their behalf.[90]

---

[87] 12/1/10 Tr.T. 342:18-343:10.

[88] 12/1/10 Tr.T. 378:20-379:13.

[89] 8/21/08 T.Tr. 111:16-112:10.

[90] 8/21/08 Tr.T. 101:17-102:3, 111:6-6;19-22; 12/1/10 Tr.T. 348:5-349:10; 381:20-384:9.

29

## V.  Sanctions to be Imposed

"[T]he district court should carefully choose sanctions that foster the appropriate purpose of the rule, depending on the parties, the violation, and the nature of the case."[91]

It is vital that bankruptcy judges be able to expect secured creditors to present truthful information on motions to modify stay in Chapter 13 cases when they seek foreclosure of the homes and autos of debtors.  The consequences to debtors of false pleadings are dire, including expenses to defend and even the loss of the vehicle or home with consequent destruction of income, residence rights, and family life.  Even if such false pleading is the product of careless mistake rather than evil intent, it cannot be tolerated.[92]

The Fifth Circuit has enumerated four (4) factors[93] to be considered in ordering sanctions:

1.    What conduct is being punished or sought to be deterred by the sanction?

2.    What expenses or costs were caused by the violation of the rule?[94] ...

3.    Were the costs or expenses "reasonable," as opposed to self-imposed, mitigatable, or the result of delay in seeking court intervention? ...

4.    Was the sanction the least severe sanction adequate to achieve the purpose of the rule under which it was imposed?

---

[91] *Thomas v. Capital Security Services*, 836 F.2d 866, 877 (5th Cir. 1988).

[92] *Brown*, 319 B.R. at 882.

[93] *Topalia*n, 3 F.3d at 937.

[94] The parties have not yet submitted evidence of expenses or costs.

## VI. Conclusion

For the foregoing reasons, this Court respectively refers this matter for imposition of sanctions.

New Orleans, Louisiana, April 4, 2012.

Hon. Elizabeth W. Magner
U.S. Bankruptcy Judge

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF LOUISIANA

IN RE:                                                              CASE NO.

**RON WILSON, SR.**                                                 **07-11862**
**LARHONDA WILSON**                                                 SECTION A

DEBTORS                                                             CHAPTER 13

<u>**MEMORANDUM OPINION**</u>

On December 1, 2010, the Motion for Sanctions[1] filed by the United States Trustee (UST)

came before the Court.   At the beginning of the hearing, a request to bifurcate the issues presented

was granted.  Hearing on the sanctions to be awarded was deferred to a separate hearing, pending

determination of liability for sanctionable conduct.  After trial on the merits, the Court ordered that

simultaneous briefs be submitted no later than February 1, 2011.  Upon the filing of briefs, the

matter was taken under advisement.

### I. Procedural History and Facts Leading to Expanded Order to Show Cause

Option One Mortgage Corporation ("Option One") holds a mortgage on Ron and LaRhonda

Wilson's ("Debtors") home payable in monthly installments.  On September 29, 2007, Debtors filed

a voluntary petition under chapter 13 of the Bankruptcy Code.  At the time of their bankruptcy filing,

Debtors were in default on the mortgage, and a prepetition arrearage was owed.   Debtors' plan of

reorganization provided for monthly payments to the trustee for satisfaction of the prepetition

arrearage, and Debtors' direct payment of  monthly postpetition mortgage installments to Option

One.  The plan was confirmed on December 21, 2007.[2]

---

[1] P-219.

[2]  P-13.

Option One filed a Motion for Relief From Stay on January 7, 2008 ("First Motion").[3]  The First Motion alleged that Debtors had failed to make the monthly postpetition installment payments for November 2007 through January 2008.  The First Motion requested relief from the automatic stay to enforce payment of the debt in a foreclosure action.  On February 4, 2008, Debtors responded averring they were current and that Option One had failed to credit several postpetition payments to their account.[4]

Because Option One failed to supply evidence of default, the First Motion was denied without prejudice.[5]  Option One filed a new Motion for Relief From Stay on March 10, 2008 ("Second Motion").[6]  The Second Motion alleged that Debtors were in default for "over four (4) months now..." Option One also stated that  "Due to the Debtors' failure to maintain the monthly [postpetition] payments, there exists the possibility that real estate taxes may go unpaid or insurance on the property may lapse because of the shortage in the Debtors' escrow account."

The Second Motion was supported by an affidavit of Dory Goebel, Assistant Secretary for Option One.  In the affidavit, Ms. Goebel averred under oath that Option One was the holder of the secured claim in Debtors' case.  To support her affidavit,  Ms. Goebel attached a copy of a note and mortgage executed by Debtors and an endorsement to Option One by America's Mortgage Resource, the original payee on the note.

---

[3] P-15.

[4] P-17.

[5]  P-18. Pursuant to the local procedures of the Court, Motions for Relief must be accompanied by an affidavit of default by the mover attesting to the facts relevant to the motion and supporting the relief requested.  The affidavit is taken into evidence in lieu of testimony if the matter is otherwise uncontested and if the court determines that it establishes a basis for granting relief.

[6] P-20.

2

Ms Goebel affirmed:

Appearer has reviewed and is familiar with the mortgage loan account of RON WILSON, Sr. And LA RHONDA WILSON ("Mortgagor") represented by the afore described note and mortgage and the records and data complications [sic] pertaining thereto, which business records reflect acts, events or condition made at or near the time by Dory Goebel, or from information transmitted by a person with knowledge thereof and which records and data complications [sic] are made and kept as a regular practice of the regularly conducted business activities of OPTION ONE MORTGAGE CORPORATION.

Ms. Goebel then declared that the balance due on the note was $176,063.27 and that Debtors were in default under their plan for failure to pay the monthly installments accruing from November 1, 2007, through February 1, 2008.  Ms. Goebel represented that the last payment on the note was applied to the October 1, 2007 installment.

Debtors opposed the Second Motion alleging that all postpetition installments were paid by money order, cashier's, or personal check and that all payments by cashier's or personal check were delivered by certified mail.[7]  At the initial hearing on the Second Motion on April 8, 2008, Debtors offered into evidence proof of payment for installments made on the Option One note.  Debtors' evidence included:

1. October 2007 payment- confirmation by Western Union that a money order was delivered to Option One on October 20, 2007, in the amount of $1546.64 and receipt was acknowledged by Option One on October 27, 2007.

2.  November 2007 payment- confirmation by Western Union that a money order was delivered to Option One on November 30, 2007, in the amount of $1546.64 and receipt was acknowledged by Option One on November 30, 2007.

3.  December 2008 payment-copy of a certified mail receipt showing delivery to Option One on January 2, 2008.  Debtors alleged tender of a cashier's check #70060810000560554786 for $1546.84.

---

[7] P-24.

3

4.  January 2008 payment-a copies of a cashier's check for $1000.00 and two money orders for $546.84 and $312.00 both dated January 25, 2008; certified mail receipts evidencing delivery to and acknowledging receipt by Option One on January 31, 2008.

5.  February 2008 payment- copies of a cashier's check for $1546.84 and a personal check for $78.00; as well as a receipt for certified mail delivery on February 28, 2008, and acknowledging receipt by Option One on March 3, 2008.

6.  March 2008 payment- copies of two cashier's checks for $1546.84 and $78.00; as well as a receipt for certified mail delivery on March 28, 2008, and confirmation of delivery to Option One by the United States Postal Service on March 31, 2008.[8]

Both the First and Second Motions were filed by Mr. Clay Writz of the Boles Law Firm ("Boles") representing Option One. However, Mr. Timothy Farrelly of Nicaud, Sunseri, & Fradella appeared on behalf of Option One at the hearing on the Second Motion. At the conclusion of the hearing, the Court continued the matter until April 22, 2008, in order to allow Option One the opportunity to trace the alleged payments and provide an accounting of the loan's payment history from petition date through April 2008.

On April 22, 2008, the continued hearing on the Second Motion was held. Mr. Farrelly again appeared on behalf of Option One. At the hearing, Debtors' counsel represented that Mr. Wirtz had contacted him at 5:30 p.m. the night before requesting a continuance due to a conflict in another court. Mr. Wirtz stated that he had not reviewed the prior evidence and was not prepared to address the issues raised by Debtors in their Opposition. Option One did acknowledge, through a pleading filed by Mr. Wirtz the night before the hearing, the receipt of three (3) additional and previously undisclosed payments:

1.  Payment dated October 22, 2007, in the amount of $1546.84 applied to the installment due October 1, 2007;

---

[8] P-25.

2. Payment dated December 3, 2007, in the amount of $1546.84 applied to the installment due November 1, 2007; and

3. Payments of $1546.84 and $78.00 dated April 2, 2008, applied to installment due December 1, 2007.

The pleading was not the accounting ordered by the Court, but instead a chart reflecting the receipt and application of three (3) payments postpetition. The pleading again asserted that the funds delivered were insufficient to satisfy the amounts due and reasserted Option One's request for relief.[9]

Since Debtors' evidence indicated 1) additional payments not acknowledged by Option One; 2) Option One had failed to supply the ordered accounting or address the additional payments made by Debtors; and 3) Mr. Farrelly lacked any knowledge regarding the loan, the Court determined that Option One's response was insufficient and issued show cause orders for Mr. Wirtz, Dory Goebel, and Option One.[10] The merits of the Second Motion were again continued to afford Option One and Ms. Goebel the opportunity to respond to the allegations raised by the Opposition and subsequent admission by Option One that three (3) unaccounted for payments were not included in its motion.[11]

On June 26, 2008, a third hearing on the Second Motion and the initial hearing on the show cause orders was conducted. Mr. Wirtz appeared at the hearing, but Ms. Goebel was not present. Mr. Wirtz admitted that Debtors were in fact current on their loan. Mr. Wirtz also admitted receipt of $7,513.53 in funds on Debtors' account and stipulated that Debtors were current through and

---

[9] P-28.

[10] P-30.

[11] Id.

including May 2008.  Mr. Wirtz admitted that between the filing of the First and Second Motions, Option One located one (1) payment which was applied to the October 2007 installment.

Regarding the show cause order, Mr. Writz represented that his contact was Fidelity National Foreclosure Solutions, n/k/a Lender Processing Services ("LPS") and that all information regarding payments, defaults, or inquires were taken by him from a LPS website or LPS personnel.[12]

Mr. Wirtz represented that additional unapplied payments were only discovered when they arrived at his office.[13]  Specifically, he stated that payments were delivered on February 18, 2008, in the amount of $1,858.84; March 7, 2008, in the amount of $1,624.17; May 12, 2008, in the amount of $1,624.84; and May 22, 2008, in the amount of $1,524.84.  Because payments were received by Mr. Wirtz on February 18 and March 7 and prior to the filing of the Second Motion, Mr. Wirtz was sanctioned for his failure to disclose this fact in the Second Motion or correct the representations made in his pleadings.

Nevertheless, based on the information available to Mr. Writz when the Second Motion was filed, it appeared that the payments received from Option One were insufficient to alert Mr. Wirtz that the loan was entirely current.  As a result, the Court ordered further investigation into the receipt and application of payments by Option One in a continued effort to uncover the cause of the erroneous filing.   The Court jointly sanctioned Option One and Ms. Goebel $5,000.00 for failure to appear and $5,000.00 for filing a false affidavit.[14]   Option One was also ordered to pay $900.00 in attorney's fees to Debtors' counsel.  The Court sanctioned Mr. Wirtz $1,000.00 for failing to

---

[12] 6/26/08 TT 25:15-30:25.

[13] 6/26/08 TT 31:22- 32:23.

[14] P-46.

amend the Second Motion and Default Affidavit once he obtained information which revealed that

they were false.[15]   The Court continued the hearing on the show cause order against Ms. Goebel and

Option One to August 21, 2008.[16]  Based on Mr. Wirtz's representations, an additional show cause

order was issued for LPS.[17]

On July 9, 2008, LPS voluntarily intervened "to clarify its role in this matter and to address

any misconceptions or misunderstandings which may have been left with the Court regarding that

role."[18]  On August 21, 2008, the Court held an evidentiary hearing on the Orders to Show Cause.

Participating at the hearing were representatives and counsel for Boles, LPS, Option One, the UST

and Debtors.

Mr. Michael Cash, representing LPS, explained LPS' role in the administration of Debtors'

loan:

> Fidelity does work for Option One, and basically Fidelity's role is almost as a
> conduit and storage of information and data.  Option One will send their information
> to Fidelity, and then attorneys such as Clay [Wirtz] can access that information.[19]
>
> ***
>
> ...[B]asically Fidelity became–if you think if it almost as a library, various clients
> could put their information in that library.  The attorneys would go to the library,
> check out the information, and that's how things would happen.  One of the services
> that we provided, and no longer do, but one that we did is executing affidavits such

---

[15] *Id.*

[16] *Id.*

[17] P-45.

[18]  P-43.  On July 11, 2008, the Court entered an additional Order to Show Cause against LPS directing its
presence to explain its calculation of the amounts due on the Wilson loan. P-45.

[19] 8/21/08 TT 14:5-9.

as the one in this case.[20]

***

Ms. Goebel is an employee of Fidelity.  The various clients in this case, including Option One, would sign a corporate resolution, and I have a copy of a corporate resolution, that would give her limited authority as a vice president for particular purposes.  And in this case one of the purposes was executing the affidavit.[21]

***

Court:...if Fidelity is merely storing information...why wouldn't Option One sign the affidavit?

Cash:..a number of clients sign their own, Your Honor.  Sometimes they would want us to, simply because we have people like Ms. Goebel who handle the accounts on a daily basis, who review the material, who have access to the material, and it was simply one less thing that the client had to do, that we would do.[22]

***

Cash: ...and when Ms. Goebel would execute the affidavit she would have access to the same information as someone at Option One.  She would go into their system, *look at what has been posted, what hasn't been posted.*  And I think what happened here was just a series of miscommunications...[23]

***

Cash: ...And I think that the simple explanation here,...and I think it's one that's clearly human error that can happen, is there was a payment sent.  There was an error made where that payment was sent, because this was in bankruptcy....that payment was sent to the Boles Firm, rather than being posted.  *And that was basically, I think, someone in Mr. Wirtz's office had instructed Option One, "Send us the checks and we will send them back," or "we will take care of that."*[24]

---

[20] 8/21/08 TT 14:21-15:1.

[21] 8/21/08 TT 15:3-8.

[22] 8/21/08 TT 26:13-21.

[23] 8/21/08 TT 15:11-15 (emphasis added).

[24] 8/21/08 TT 18:11-20 (emphasis added).

Mr. Cash then offered the testimony of Ms. Goebel who is both an employee of LPS and was an authorized signer of default affidavits for Option One. Ms. Goebel testified as to the process by which a default affidavit is executed. In particular, Ms. Goebel explained:

> To execute such an affidavit, once I receive the affidavit, I will review the information that is in the affidavit with Option One's system. So, I will validate the information based on their system and the information that is there.[25]

At the August 21, 2008, hearing, Ms. Goebel represented that from her desk she would log into Option One's computer system and verify the information in the affidavit. She also represented that she had access to Option One's entire record of the loan.[26] She stated that she verified this information with LPS' own system which reflected the communications between Option One's law firm and Option One.[27] Ms. Goebel represented that LPS only maintained a "library" of information that Option One supplied.[28]

She confirmed that she reviewed a debtors' entire loan history prior to executing the affidavit[29] and would also review communications between counsel and LPS in connection with the signing of the affidavit. She, however, would not review communications between counsel and Option One.[30]

---

[25] 8/21/08 TT 38:22-39:1.

[26] 8/21/08 TT 39:2-23.

[27] 8/21/08 TT 40:10-41:3.

[28] 8/21/08 TT 41:16-20.

[29] 8/21/08 TT 60:1-15.

[30] 8/21/08 TT 97:14-20.

Ms. Goebel explained that LPS had no way to verify unposted payments.[31]   She stated emphatically that after reviewing Debtors' file, she found no communications between LPS and Boles about any additional payments tendered after the filing of the motions.[32]  Ms Goebel also testified that after reviewing Debtors' loan file before testifying, she saw no communications between LPS and Option One.[33]   She asserted that it was Option One's responsibility to notify counsel should a change in circumstance warrant the withdrawal of a motion for relief[34]  and that LPS never stopped legal actions once it referred a loan to counsel.[35]

The testimony presented by Option One, however, did not agree with Mr. Cash or Ms. Goebel's representations.  Mr. Arthur Simmons of American Home Mortgage, formerly Option One, testified for Option One.  Mr. Simmons was the person tasked with the day to day administration of Debtors' loan once their bankruptcy was filed.

Mr. Simmons testified that once a borrower filed for bankruptcy, LPS opened a bankruptcy workstation or subprogram to administer the loan.  Option One was given notice that this had occurred.[36]

Once a bankruptcy workstation is opened, Option One would take no action unless requested by LPS, who was described as actually administering the loan.[37] As previously explained in *In re*

---

[31] 8/21/08 TT 78:14-79:24.

[32] 8/21/08 TT 110:24-111:5.

[33] 8/21/08 TT 47:20-23.

[34] 8/21/08 TT 81:14-16.

[35] 8/21/08 TT 81:25-82:5.

[36] 8/21/08 TT 123:18-124:25.

[37]  8/21/08 TT 125:15-20.

*Stewart*,[38] LPS markets to loan servicing companies and note holders a very sophisticated loan management program commonly referred to in the industry as "MSP." MSP interfaces with a client's computer system collecting information and monitoring a loan's status. When certain events occur, the program is designed to take action without human intervention. For example, when a loan reflects past due payments for a specified period of time, generally forty-five (45) days, MPS will generate a demand or default letter to the borrower. The timing or triggers for various loan administrative actions are set by the lender or servicer but executed by MSP as overseen by LPS.[39]

When a bankruptcy is filed, the bankruptcy workstation is activated and provides a set of additional parameters, tasks and actions that can be performed by the program or those that use it in a bankruptcy. For example, when a loan is sixty (60) days postpetition delinquent, the system will notify of this event and typically trigger a referral to counsel for the filing of a motion for relief.[40]

Mr. Simmons represented that LPS manages all tasks required during the administration of a loan during bankruptcy. If counsel needs instruction, LPS is contacted and only if LPS cannot solve counsel's problem, is Option One involved.[41]

Although Debtors' filed for bankruptcy relief on September 29, 2007, the bankruptcy workstation was not activated by LPS until November. Because LPS delayed setting up the workstation, Debtors' first postpetition payment, made in October 2007, was not posted to the

---

[38] *In re Stewart,* 391 B.R. 327 (Bankr.E.D.La. 2008). LPS confirmed that the program utitlized in this case was MSP. 12/1/10 TT 176:2-16.

[39] *Id.*

[40] 8/21/08 TT 127:8-21.

[41] 8/21/08 TT 130:2-23.

October installment but to June 2007, the earliest outstanding prepetition installment.  As a result, the system showed October 2007 installment as past due.[42]

When Debtors' file was reviewed by LPS for referral to counsel, the postpetition due date was not accurate because it did not reflect the October payment.[43]  To avoid this type of problem, Option One had procedures in place for LPS to follow if activation of a bankruptcy workstation was delayed.  In such a case, LPS was directed to search for payments that might have been delivered after the bankruptcy filing date but prior to activation of the workstation.  If any were found, LPS was to apply the payments to postpetition installments correcting the posting error.  Mr. Simmons testified that LPS had the ability to adjust the application of payment in this circumstance and it was their responsibility to do so.[44]

Mr. Simmons also testified that Option One's computer system generated reports when a debtor was 45 to 60 days postpetition past due.[45]  In this case, a delinquency report was generated in December, when the incorrect posting for October led the computer to read a 60 day postpetition delinquency.

LPS maintained an on site employee at Option One who reviewed the post bankruptcy delinquency reports.  That employee reviewed the list, then entered a request on LPS' system for a motion for relief referral.[46]

---

[42] 8/21/08 TT 133:6-133:20; 134:1-13.

[43] 8/21/08 TT 222:23-223:2.

[44] 8/21/08 TT 223:9-225:1.

[45] 8/21/08 TT 214:6-10.

[46] 8/21/08 TT 205:14-206:10; 225:2-7.

If a payment was received after a file had been referred to counsel for action (i.e. the filing of a motion for relief from stay), Option One's policy was to request that LPS contact counsel for instruction.  If LPS could not satisfy counsel's request, only then would LPS contact Option One.  Although direct communications between counsel and Option One were not prohibited, they were rare because it was LPS' responsibility to manage the loan.  This case appears to have followed the normal chain of administration because there was no evidence that Boles had any, or attempted any, direct communications with Option One.[47]

When Option One received the payment for December 2007, LPS sent an inquiry to Boles for instructions.  Boles replied that Option One should send the payment to it.[48]  Option One contacted LPS for instructions on each payment as it was received from December through March.[49]  As each postpetition payment arrived from Debtors, Option One communicated with LPS, LPS with Boles, and then LPS reported back to Option One the instruction received.[50]  As a result, Debtors' postpetition payments for December 2007 through March 2008 were not posted, but instead were reflected on a cash log that was not available to either Mr. Wirtz or LPS.[51]  However, LPS knew of the payments because it was communicating directly with Mr. Wirtz and Option One on the issue.[52]

---

[47] 8/21/08 TT 136:10-17.

[48] 8/21/08 TT 137:2-8.

[49] 8/21/08 TT 141:19-23.

[50] 8/21/08 TT 142:1-10.

[51] 8/21/08 TT 138:15-139:21.

[52] 8/21/08 TT 256:4-257:1.

All Motions for Relief from Stay or Affidavits of Default are submitted by counsel directly to LPS. Option One neither proof reads nor reviews these documents.[53]   If an Opposition is filed, Option One does not read it.  Instead, Option One employs LPS for the purpose of handling any issues pertaining to the loan or Motion for Relief.  LPS contacts Option One only if it cannot handle a matter.[54]

In this case, LPS contacted Option One about Debtors' claim of missing payments.  Option One replied that the payments were with Mr. Wirtz.[55]

The UST made an appearance for the purpose of assisting the Court in its investigation.[56] The obvious conflict between the testimony of Mr. Simmons and Ms. Goebel and representations by counsel for LPS led the Court to accept the UST's offer for assistance.  As a result of the foregoing, the Court continued the hearing on August 21, 2008, without date to allow formal discovery.[57]

From July 9, 2008, through December 2010, the parties conducted contentious discovery. Ten (10) motions to quash, compel, clarify, reconsider orders, stay proceedings, request protective orders; and appeal interlocutory orders were considered along with responses, oppositions and replies to each.  On May 21, 2010, the UST filed a Motion for Sanctions against LPS and Boles.[58]

---

[53] 8/21/08 TT 147:15-20; 148:7-15.

[54] 8/21/08 TT 150:3-13; 20-22.

[55] 8/21/08 TT 155:11-22.

[56] P-62, 70.

[57] P-70.

[58] On October 27, 2010, this Court approved a Stipulation between the UST and Boles. P-275.

On December 1, 2010, trial on the merits of the UST's intervening Motion for Sanctions[59] against

LPS was heard.

## II.  Law and Discussion

Q:  Mr. Simmons, what was the amount due on the...Wilson account on February,
28th, 2008? ...

A:  Actually, the loan was current, if in fact we would have accounted for all the
monies received. ...

Q: What about on March 10, 2008?  What was the amount due on the mortgage loan
at that date?

A: Again, the loan would have been current.....[60]

Debtors filed bankruptcy on September 29, 2007.  Notification of that fact was mailed to

Option One on October 6, 2007.[61]  LPS encoded the bankruptcy filing on November 21, 2008.  The

process was completed on November 23, 2008.[62]

Debtors sent their first postpetition mortgage payment of $1,546.84 *via* Western Union on

October 21, 2007.  Because LPS failed to alert its system that a bankruptcy had been filed, this

payment was applied to Debtors' earliest past due prepetition installment, June 2007.

Debtors forwarded another $1,546.84 payment to Option One on November 30, 2007.  That

payment was intended to satisfy the postpetition installment due November 1, 2007. Instead, Option

---

[59] P-219.

[60] 8/21/08 TT 234:5-10; 18-20.

[61] P-7.

[62] Exh 5, nos. 353, 349.

One applied the payment to the October 1, 2007, installment, the date showing due on the system.[63]

On December 21, 2007, LPS entered a referral to Boles requesting a Motion for Relief from Stay based on two (2) past due postpetition payments (November 1 and December 1, 2007).[64]  The First Motion was filed by Boles on January 7, 2008.[65]  In the interim, LPS received notification that a payment of $1,546.84, one (1) monthly installment, had been made by Debtors.[66]  LPS requested posting instructions from Boles, who directed LPS to send the payment to the firm.[67]

On January 25, 2008, Debtors sent $1,858.84 to Option One.  That payment was received on January 31, 2008.  Again, LPS was notified by Option One of the payment, and on February 1, 2008, LPS requested posting instructions from Boles.[68]  Boles responded three (3) days later directing LPS to send the payment to it.[69] On February 4, 2008, Boles advised LPS that the First Motion would go to hearing on February 12, 2008.  Boles cited "Judge delay" as the reason, but in

---

[63]  LPS did not manually adjust Debtors' account for the October 2007 payment until February 2008.  Exh. 5, no. 265.  As a result, Debtors' account showed past due for October until the adjustment was made.

[64]  Exh. 5, no. 311.  The referral of a file to counsel  in actuality opens an internal monitoring process for a requested action or "issue."  The referral is sent *via* internal transmission, similar to email.  When the Boles firm opens the request, the computer notes the receipt of the referral by date and time,  i.e. Exh. 5, no. 306. The issue will remain open until the task is completed at which time the computer will note the time and date of completion and close the request.  Through the use of the "issue" process, those managing a file can see the status of a task  and its anticipated date of completion.

[65]  P-15.

[66]  Exh 5, no.305.  The payment was intended to satisfy Debtors' December installment.  It was dated December 27 and received by Option One on January 2.

[67]  Exh.5, nos. 305, 301, 299.

[68]  Exh.5, nos. 290, 289, 287, 286.

[69]  Exh. 5, no. 281.

16

reality, Debtors opposed the First Motion.[70]  In the Opposition, Debtors alleged that all payments had been made on the loan postpetition, challenging the allegations of Option One's First Motion that the loan was postpetition delinquent for November 1, 2007, and all installments thereafter.

Putting aside the posting issue created by LPS's failure to properly account for Debtors' bankruptcy filing, the allegations of the First Motion also failed to acknowledge Option One's receipt of $1,546.84 on January 2, 2008.[71]

LPS was also alerted by Boles on February 6, 2008, of Debtors' Opposition.  Boles requested a "pencil post" of the loan.[72]  Boles' understanding of a "pencil post" was a manual accounting of a loan payment history used to verify the status reflected by the computer file.  In reality, LPS only manually reviews what is already on the computer system and recopies it onto a spread sheet.

Evidently in performing the "pencil post," LPS discovered the misapplied October payment and requested correction on February 11, 2008.  The manual adjustment also corrected the application of  the two (2) Western Union payments received postpetition.  However, no mention was made of the two (2) additional unposted payments discussed in the preceding communications between LPS, Option One, and Boles.  On February 15, 2009, LPS sent a message to Boles that according to Option One, its cash log reflected  forwarded payments to Boles in an amount sufficient to bring the loan current.  However, *LPS instructed* Boles that if in fact the funds Boles held were

---

[70]  Exh. 5, no. 272, Response to Option One's Motion to Lift, filed February 4, 2008, P-17.

[71]  The funds were received and counsel was notified of receipt four (4) days prior to the filing of the First Motion.  While the First Motion was pending, Debtors forwarded and counsel was notified of an additional $1,858.84 in payments.

[72]  Exh. 5, no.270.

17

insufficient to bring the loan current, Boles should consider the loan past due as of December 1, 2007.[73]

In response to LPS' message on February 15, 2008, Boles acknowledged receipt of $1,858.84 in funds.  Assuming they were applied to the December 2007 installment, payments for January and February 2008 were still due.[74]  Therefore, as of February 15, Boles had not received enough funds to bring the loan current and communicated this fact to LPS.[75]  On February 27, 2008, Debtors' account was adjusted to show a past due date of December 1, 2007.[76]  No further investigation or response was made as to the whereabouts of the missing January 2008 payment.  On February 27, 2008, Boles forwarded an affidavit to Ms. Goebel at LPS for execution in connection with the Second Motion.  The affidavit alleged Debtors were past due as of November 2007, which was in conflict with the allegations contained in the Second Motion which now reflested a past due date as of December 1, 2007.[77]

As part of its default services, LPS executed Affidavits of Default in support of Motions for Relief from Stay.  LPS testified that it was just one of the services that LPS provided to clients.[78]  The affidavit is typical.  It purports to be executed under oath before a notary and two (2) witnesses.

---

[73] Exh. 5, no.253.

[74] February's installment was due on the 1st of the month and past due on the 15th.

[75] Exh.5, no.234.  Evidently, the payment acknowledged by Option One on January 3, 2007, for $1,546.68 was not forwarded to Boles as requested. See, Exh. 5 no. 305, 301, 299.  If it had been, Boles would have had both the December and January installments in its possession making the loan only due for February.  As it was, the one (1) payment held by Boles brought Debtors within 45 days of current.  It should also be noted that Debtors were not only making payments on a monthly basis, but were also forwarding payment of late charges with each installment.

[76] Exh. 5, no. 192.

[77] P-15.

[78] 12/1/10 TT 159:24-160:12.

It provides the name and title of the affiant and represents that the affiant has personal knowledge

of the facts contained in the affidavit.[79]  In fact, it is a sham.

When an affidavit is received by LPS, an employee prints the document and delivers it to one

of twenty-eight (28) LPS employees authorized by Option One to execute the document on its

behalf.[80]  By corporate resolution, Option One grants these individuals "officer" status, but limits

their authority to the signing of default affidavits.    These "officers" execute 1,000 documents per

day for Option One and other clients similar to the one used in this case.[81]    In fact, Ms. Goebel is

an employee of LPS with little or no connection to Option One.  Each day Ms. Goebel receives

approximately thirty (30) documents to sign.[82]  The process of signing default affidavits is rote and

elementary.

As Ms. Goebel is also a manager of a work unit at LPS, she allocates two (2) hours per day

for document execution and estimates that it takes her five (5) to ten (10) minutes to sign each

affidavit she receives.[83] Before signing an affidavit, Ms. Goebel follows the procedures directed by

LPS.  She checks three (3) computer screens that provide the amount of the installment payment,

the total balance due on the loan, and the due date for the earliest past due installment.[84]  She

---

[79] 12/1/10 TT 247:16-248:8.

[80] 12/1/10 TT 252:12-15.

[81] TT 12/1/10 249:29-22; 250:8-10.

[82] TT 12/1/10 253:7-14; 345-6-9.

[83] TT 12/1/10 334:5-8.

[84] TT 12/1/10 320:19-321:3; 326:1-327:22; 328:7-17; 334:9-14.

matches this information with that contained in the affidavit.  If it is correct, she signs the document and forwards it to a notary for execution.[85]

Although the affidavit in this case purported to verify that Option One was the holder of the note owed by Debtors through an assignment, Ms. Goebel does not personally know this to be a fact and made no effort to verify her assertion.[86]  Similarly, the affidavit identifies the mortgage and note as exhibits to the affidavit, but Ms. Goebel neither checks the attachments nor verifies that they are correct.  In fact, the affidavits she signs *never* have any attachments when forwarded to her for execution, and she never adds any.[87]

Although the affidavit represents that it was executed in the presence of a notary and witnesses under oath, no oath is ever administered, and the signatures of the affiant, notary, and witnesses are separately affixed and outside the presence of each other.[88]  Ms. Goebel has no personal knowledge regarding the loan file save for the three (3) or four (4) facts read off a computer screen that she neither generates nor understands.[89]  She does not review any other information pertaining to the loan file, even information available to her.[90]  LPS admitted that Ms. Goebel followed its procedures and that those procedures were used in all cases.[91]

---

[85] TT 12/1/10 334:5-21; 335:19-22; 336:9-24.

[86] TT 12/1/10 267:1-11; 341:1-342:6; 342:11-343:3.

[87] 12/1/10 TT 12/1/11 340:20-341:8.

[88]  12/1/10 TT 245:2-21; 276:4-277:13; 336:9-337:22.

[89]  12/1/10 TT 161:18-162:2; 247:16-248:8, 15-22; 275:1-6.

[90] 12/1/10 TT 331:4-11; 355:12-25; 36713-20.

[91]  12/1/10 TT 275:3-11.

Ms. Goebel's training on the seriousness of her task was sorely lacking.  She could not remember who "trained" her when she was promoted in 2007 to a document execution position.[92] She could not remember the extent or nature of her training. [93] She did surmise that written procedures were given to her and then she began "signing."[94]  She described her task as "clerical"[95] and repeatedly expressed the belief that the affidavits were counsel's affidavits, and therefore, she relied upon counsel regarding their accuracy.[96]  In this admission, the real problem surfaces.

Default affidavits are a lender's representation as to the status of a loan.  They are routinely accepted in both state and federal courts *in lieu* of live testimony.  They are an accommodation to the lending community based on a belief by the courts that the facts they present are virtually unassailable.  The submission of evidence by affidavit allows lenders to save countless  hours and expense establishing a borrower's default without the need for testimony from a lending representative.  While they can be refuted by a borrower, too often, a debtor's offer of alternative and conflicting facts is dismissed by those who believe that a lender's word is more credible than that of a debtor.  The deference afforded the lending community has resulted in an abuse of trust.

The abuse begins with a title.  In this case, Ms. Goebel was cloaked with the position of "Assistant Secretary," in a purposeful attempt to convey an experience level and importance beyond her actual abilities.  Ms. Goebel is an earnest young woman, but with no training or experience in banking or lending.  By her own account, she has rocketed through the LPS hierarchy receiving

---

[92]  12/1/10 TT 382:5-8.

[93]  12/1/10 TT 382:9-384:21.

[94] *Id.*

[95]  12/1/10 TT 342:25-343:10.

[96] 12/1/10 TT 341:5-8, 14-19.

promotions at a pace of one (1) promotion per six (6) to eight (8) month period.[97]  Her ability to slavishly adhere to LPS' procedures has not only been rewarded, but has assured the development of her tunnel vision.  Ms. Goebel does not understand the importance of her duties, and LPS failed to provide her with the tools to question the information to which she attests.

For example, the following exchange occurred between the Court and Ms. Goebel:

Q:...if you look at paragraph 2 at the bottom there is "see attached copy of the Notice, Exhibit A, certified copy of the mortgage is Exhibit B , and copy of the assignments is Exhibit C."  Is your testimony that those documents were not attached to the affidavit when you signed it..?

A: Typically, those exhibits would not be attached.

Q:..So,...counsel would attach those after you signed..?

A: ...we relied on the attorney.  We believed the information that they were giving us and what they were going to attach, because this is their affidavit.  It would be accurate.[98]

***

Q:...Did you check any screen to see if in fact there was a note, there was a mortgage, there were assignments?

A: That would be the responsibility of the attorney.

Q:..so you didn't verify that information at all?

A: No...[99]

***

Q:...And you don't sign it [the affidavit] in the presence of the notary or the witnesses?

---

[97] 12/1/10 TT 292:9-301:9.

[98] 12/1/10 TT 340:20-341:8.

[99] 12/1/10 TT 341:10-16.

22

A: That's correct.[100]

***

Q: You weren't put under oath by a notary before you signed the Affidavit of Debt?

A: No.

Q: And you didn't really have personal knowledge of the contents [of the affidavit] because you just said the information involving the existence of the mortgage and the note and so on you relied on the Boles Law Firm to have that information correct.

A: Right.  As I stated earlier, it was the Boles Law Firm.  Option One had hired them to kind of handle this work and had asked LPS to help clerically sign these.  We relied on the Boles Law Firm.

Q: So you considered this a clerical function?

A: Part of our administrative services with LPS.

Q: But you just used the word "clerical."

A; Well, it's signing a document, more you know administrative work, clerical work, yes.[101]

***

Q: Ms Goebel...Have you ever refused to sign an affidavit for a reason other than the note payment amount was incorrect, the due date on the affidavit was incorrect, the number of installment payments that were past due was incorrect, or ...that you were not a [authorized] signatory...?

A: Not to my recollection, no.

Q:.. So if, ...you had know[n] that there were three payments that were not posted on this account...that were in the possession of either Option One or the law firm, would you have still signed the affidavit?

A: In my opinion, yes.  I was getting an affidavit from a law firm that I trusted.  They're the legal experts on the matter and Option One is in charge of their cash

---

[100] 12/1/10  TT 342:3-5.

[101] 12/1/10 TT 342:18-343:10.

posting.  I'm not the decision maker of, you know, should they proceed.  The attorney would have that knowledge.[102]

It is evident that the training provided Ms. Goebel by LPS was insufficient and negligent. LPS was the first line of communication with counsel. The evidence was clear that Option One was contacted only if LPS employees could not satisfy counsel's requests. Counsel did not communicate directly with Option One, and although Option One controlled the physical posting of payments, LPS managed the communications between Option One and its counsel regarding them.  In this case, LPS had personal knowledge of four (4)  critical facts.  First, that as of February 15, 2008, Option One had received two (2) payments from Debtors in amounts sufficient to satisfy the installments due for December and January.  Second, counsel had directed that the payments be sent to it rather than posted.  Third, Option One alerted LPS in February that the amounts forwarded were sufficient to bring the loan current.  Fourth, counsel reported to LPS that they had only received $1,846.84, a fact LPS neglected to forward to Option One.  As a result of this knowledge, LPS should have known that a payment was unaccounted for between Option One and Boles.  An inquiry to either might have brought the problem to light.  Instead, LPS ignored the facts.

Ms. Goebel presented another opportunity for LPS to get it right.  If she had reviewed the file and familiarized herself with the communications between the parties, she might have also noticed that the December payment was forwarded to Boles, but evidently not received.  She certainly would have noted the receipt of an additional payment by Boles but not posted and the inconsistency in due dates contained in the Second Motion and affidavit.  However, Ms. Goebel was trained to rotely check three (3) finite pieces of information.  She candidly admitted that even if she

---

[102] 12/1/10 TT 378:20-379:13.

24

had known of the unposted payments, she would have signed the affidavit without questioning its content because it was counsel's.[103]

Of course, the affidavit is anything but counsel's. It is the sworn statement of the loan's status by the holder of the note. It is evident that LPS blindly relied on counsel to account for the loan and all material representations. In short, the affidavit was nothing other than a farce and hardly the evidence required to support relief. The facts supporting a default are the lender's to prove, not counsel's. In this case the lender and LPS cloaked Ms. Goebel with a title that implied knowledge and gravity. LPS could have identified Ms. Goebel as a document execution clerk but it didn't. The reason is evident, LPS wanted to perpetrate the illusion that she was both Option One's employee and a person with personal and detailed knowledge of the loan. Neither was the case.

### III. Conclusion

The fraud perpetrated on the Court, Debtors, and trustee would be shocking if this Court had less experience concerning the conduct of mortgage servicers. One too many times, this Court has been witness to the shoddy practices and sloppy accountings of the mortgage service industry. With each revelation, one hopes that the bottom of the barrel has been reached and that the industry will self correct. Sadly, this does not appear to be reality. This case is one example of why their conduct comes at a high cost to the system and debtors.

The hearing on the Motion for Sanctions provides yet another piece to in the puzzle of loan administration. In *Jones v. Wells Fargo*,[104] this Court discovered that a highly automated software

---

[103] 12/1/10 TT 341:5-8, 14-19; 379:4-13.

[104] *Jones v. Wells Fargo*, 366 B.R. 584 (Bankr.E.D.La. 2007).

25

package owned by LPS and identified as MSP administered loans for servicers and note holders but was programed to apply payments contrary to the terms of the notes and mortgages. In *In re Stewart*,[105] additional information was acquired regarding postpetition administration under the same program, revealing errors in the methodology for fees and costs posted to a debtor's account. *In re Fitch*,[106] delved into the administration of escrow accounts for insurance and taxes. In this case, the process utilized for default affidavits has been examined. Although it has been four (4) years since *Jones*, serious problems persist in mortgage loan administration. But for the dogged determination of the UST's office and debtors' counsel, these issues would not come to light and countless debtors would suffer. For their efforts this Court is indebted.

For the reasons assigned above, the Motion for Sanctions is granted as to liability of LPS. The Court will conduct an evidentiary hearing on sanctions to be imposed.

New Orleans, Louisiana, April 6, 2011.

Hon. Elizabeth W. Magner
U.S. Bankruptcy Judge

---

[105] *In re Stewart*, 391 BR 327 (Bankr.E.D.La. 2008).

[106] *In re Fitch*, 390 B.R. 834 (Bankr.E.D.La. 2008).

26